# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ———————————————— | ) |  |
| THOMAS F. REILLY, Attorney General | ) |  |
| of the Commonwealth of Massachusetts, | ) | Civil Action No. 05-10450 RBC |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| UNITED STATES ENVIRONMENTAL | ) |  |
| PROTECTION AGENCY, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
| ———————————————— | ) |  |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

This is an action brought by the plaintiff, Thomas Reilly, Attorney General of the Commonwealth of Massachusetts, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, in which the plaintiff seeks records related to computerized models utilized in the promulgation of the Clean Air Mercury Rule ("CAMR"), 70 Fed. Reg. 28,606 (May 18, 2005). Specifically, on March 19, 2004, plaintiff filed a FOIA request seeking all records "relating to the Use of the Integrated Planning Model ("IPM") in connection with the impact on the electricity generating and fossil fuel industries of proposed EPA standards for the emission of mercury from power plants * * *." Complaint ¶ 15 & Exhibit B. In response to plaintiff's FOIA request, the United States Environmental Protection Agency ("EPA"), has released several responsive records to plaintiff, and has withheld others pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5).

The FOIA recognizes that the compelled disclosure of confidential advice and deliberations would have a detrimental effect on the quality of agency decision-making, and therefore exempts

from disclosure inter-and intra-agency communications that would normally be privileged in the context of civil litigation. <u>See</u> 5 U.S.C. § 552(b)(5). The documents at issue in this case are all subject to the deliberative process privilege, and some are additionally protected by the attorney-client privilege. Neither privilege has been waived. For the reasons set forth below and in the supporting agency declarations, defendant is entitled to summary judgment.

## BACKGROUND

### A.    Development of the Clean Air Mercury Rule

The CAMR permanently caps and reduces mercury emissions from coal-fired power plants through the establishment of a cap-and-trade system under Section 111 of the Clean Air Act, 42 U.S.C. § 7411. The CAMR, which was developed in part by the Clean Air Markets Division ("CAMD") of EPA, was issued on March 15, 2005 after more than a decade of discussion. <u>See</u> (http://www.epa.gov/mercury/control_emissions/decision.htm). The final version of CAMR was published in the Federal Register on May 18, 2005, <u>see</u> 70 Fed. Reg. 28606 (May 18, 2005), and took effect on July 18, 2005.

During the proposed mercury rulemaking, EPA considered different regulatory approaches. Declaration of Samuel Napolitano ("Napolitano Decl.") ¶ 5. One regulatory approach that was considered was the establishment of national emission standards based on maximum achievable control technology ("MACT") pursuant to Section 112 of the Clean Air Act, 42 U.S.C. § 7412. <u>See</u> Napolitano Decl. ¶ 5. In its evaluation of the differing proposed regulatory approaches, EPA conducted cost-benefit analyses as required by the Unfunded Mandates Reform Act, 2 U.S.C. § 1501 *et seq.* and Executive Order 12866. <u>See</u> Napolitano Decl. ¶ 5. One of these analyses used by EPA

-2-

to evaluate the cost impacts of the proposed rule was the use of the Integrated Planning Model ("IPM").  Id.

IPM is a computer program (technically, a "linear programming model") that "provides forecasts of least-cost capacity expansion, electricity dispatch, and emission control strategies for meeting energy demand and environmental, transmission, dispatch, and reliability constraints." Environmental Protection Agency, Clean Air Markets-Programs and Regulations, EPA Modeling Applications Using the Integrated Planning Model: Introduction to EPA Modeling Applications Using IPM ("EPA Modeling Applications") (available at http://www.epa.gov/airmarket/epa-ipm/index.html) (last modified June 14, 2005); see Napolitano Decl. ¶¶6-7.  EPA uses IPM to "evaluate the cost and emission impacts" of proposed regulations seeking to limit mercury emission from coal-fired power plants as well as evaluate proposed regulations seeking to limit emissions for sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), and mercury (Hg), throughout the contiguous United States.  See EPA Modeling Applications, supra; Napolitano Decl. ¶ 6.  By utilizing IPM, EPA is able to find the least-cost solution for the power sector for meeting projected electricity demand in regions across the country by taking into account environmental constraints and other economic or infrastructure constraints inherent to the power sector.  See Napolitano Decl. ¶ 6.  In doing so, IPM provides projections for electricity generation characteristics, emissions, emissions control installations, fuel use, and other power sector impacts.  Id.

EPA also uses IPM to provide analytical support for proposed rulemaking.  Id. ¶ 7.  The use of IPM in the context of policy development or proposed rulemaking typically involves examining a number of IPM runs that vary, for example, in control levels, timing of control levels, or

assumptions about the effectiveness or availability of control technology. Information from these runs is used to inform policy or rule development. Id.

In developing the CAMR, EPA conducted a number of IPM runs to evaluate both the MACT and cap-and-trade approaches. See 69 Fed. Reg. 4652 (Jan. 30, 2004); Napolitano Decl. ¶ 6. Each of the IPM runs upon which EPA relied in developing CAMR was disclosed in Docket No. OAR-2002-0056, and is available for review by the general public on EPA's website at (http://docket.epa.gov/edkpub/do/EDKStaffCollectionDetailView?objectId=0b0007d4800f14fa). EPA ultimately determined that the cap-and-trade approach would produce permanent and likely greater decreases in mercury emission compared to the MACT approach, and additionally would provide continuous incentive to develop more efficient mercury control technology. See 69 Fed. Reg. at 4706; EPA, Clean Air Mercury Rule, Basic Information: The Benefits of Cap-and-Trade Regulation Over MACT (available at http://www.epa.gov/air/mercuryrule/basic.htm) (last modified May 25, 2005).

### B.    Plaintiff's FOIA Request and Administrative Appeal

On March 19, 2004, plaintiff filed a FOIA request with EPA seeking disclosure of IPM runs conducted, but not relied upon by EPA, as well as background information related to these runs. Specifically, plaintiff's request, which was assigned tracking number HQ-RIN-01035-04-A by EPA, sought the following information:

> All records relating to the use of the Integrated Planning Model (IPM) in connection with the impact on the electricity generating and fossil fuel industries of proposed EPA standards for the emission of mercury from power plants, including but not limited to any communications about whether to undertake IPM modeling runs, and any discussions about the actual or anticipated results of such runs, and the results of any modeling runs actually performed (other than those results already disclosed

to the Working Group for the Utility MACT formed under the Clean Air Act Advisory Committee Subcommittee for the Permits/New Source Review/Toxics).

Complaint ¶ 15 & Exhibit B.

By letter dated June 10, 2004, EPA partially denied plaintiff's FOIA request. See Napolitano Decl. ¶ 11. EPA released to plaintiff copies of electronic mail correspondence between EPA and third parties, and referred plaintiff to Docket No. OAR-2002-0056, which contained the IPM runs and other documents upon which EPA relied in developing the CAMR. Id. EPA withheld all other responsive documents as exempt pursuant to the deliberative process privilege under Exemption 5 of the FOIA, 5 U.S.C. §552(b)(5). Id. Those records consist of handwritten EPA staff notes, computer files containing IPM runs for two cap-and-trade options, economic and emissions analyses of the cap-and-trade proposal in the form of documents and presentation materials, and EPA internal correspondence in the form of staff electronic mail messages. Id.

By letter dated July 15, 2004, plaintiff filed a timely administrative appeal of EPA's partial denial of the FOIA request. See Complaint ¶ 17. By letter dated December 17, 2004, EPA issued its final determination granting in part and denying in part plaintiff's appeal. See Napolitano Decl. ¶ 13; Complaint ¶ 18 & Exhibit C. In particular, EPA provided a more descriptive index of the withheld records, but upheld the determination that the withheld records were exempt from disclosure under the deliberative process privilege, 5 U.S.C. §552(b)(5). See Napolitano Decl. ¶ 13; Complaint ¶ 18 & Exhibit C. EPA also determined that the withheld records contained no reasonably segregable portions that could be released. See Napolitano Decl. ¶ 13; Complaint ¶ 18 & Exhibit C. By letter dated June 28, 2005, EPA released additional, responsive documents to the plaintiff. See Napolitano Decl. ¶ 14.

C.    **The Instant Lawsuit**

On March 10, 2005, plaintiff filed the instant lawsuit, contending that the withheld documents are not exempt from disclosure under the FOIA and seeking, *inter alia*, that this Court order that the withheld documents be made available to the plaintiff, and that plaintiff be awarded attorney's fees and costs, pursuant to 5 U.S.C. § 552(a)(4)(E).  See Complaint ¶¶ 21-27 & Prayer for Relief.  EPA filed a timely answer on April 11, 2005.

**STANDARDS**

Congress enacted FOIA "to promote honest and open government and to assure the existence of an informed citizenry to hold the governors accountable to the governed." Grand Central Partnership, Inc. v. Cuomo, 166 F.3d 473, 478 (2nd Cir. 1999) (citation and internal quotation marks omitted).  Thus, "[u]pon request, FOIA mandates disclosure of records held by a federal agency unless the documents fall within enumerated exemptions."  Dept. of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 7 (2001) (citations omitted).  In accordance with FOIA's "goal of broad disclosure, these exemptions have been consistently given a narrow compass."  Id. at 8 (citation and internal quotation marks omitted); see also Grand Central Partnership, 166 F.3d at 478.

At the same time, while narrowly construed, the exemptions provided for in the FOIA "are intended to have meaningful reach and application." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989).  Indeed, Congress recognized that public disclosure is not always in the public interest.  Rather, "FOIA represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential."  Center for Nat'l Sec. Studies v. United States Dept. of Justice, 331 F.3d 918, 925 (D.C. Cir. 2003) (citing John Doe Agency, 493 U.S. at 152).

-6-

Unlike most civil actions, in which the plaintiff bears the burden of proof, it is the government that has the burden of sustaining its actions in a FOIA case. See 5 U.S.C. § 552(a)(4)(B) ("[T]he burden is on the agency to sustain its action."). The government ordinarily seeks to satisfy this burden by filing a motion for summary judgment together with a supporting agency declaration explaining any exemptions claimed and the adequacy of the search conducted. See North Dartmouth Properties, Inc. v. U.S. Dept. of Housing & Urban Dev., 984 F. Supp. 65, 68 (D. Mass. 1997) ("FOIA cases are often decided on summary judgment."); New York Public Interest Research Group v. EPA, 249 F. Supp. 2d 327, 331 (S.D.N.Y. 2003) ("Generally, FOIA cases are resolved on motions for summary judgment, once the documents in issue are properly identified."). Moreover, "[t]o assure the broadest possible disclosure, courts often direct a government agency seeking to withhold documents to supply the opposing party with a Vaughn index, which includes a general description of each document sought by the FOIA requestor and explains the agency's justification for nondisclosure of each individual document or portion of a document." Church of Scientology Int'l v. U.S. Dept. of Justice, 30 F.3d 224, 228 (1st Cir. 1994).[1]

In this case, EPA has submitted a declaration by Samuel Napolitano, the Director of the EPA's Clean Air Markets Division, and a supporting Vaughn index. The Napolitano Declaration describes with specificity the searches conducted to locate documents response to plaintiff's FOIA requests, see Napolitano Decl. ¶ 10; sets forth with particularity, together with the supporting Vaughn index, the material withheld pursuant to Exemption 5 of FOIA, 5 U.S.C. § 552(b)(5), see Napolitano Decl. ¶¶ 16-21; EPA Vaughn Index at 1-72; EPA Vaughn Index Supplemental Page; and demonstrates that EPA has properly applied this exemption, see Napolitano Decl. ¶¶ 15-21; EPA

_____

[1] See Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).

Vaughn Index at 1-72; EPA Vaughn Index Supplemental Page. Accordingly, the Court should grant

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**ARGUMENT**

## I.     EPA CONDUCTED A REASONABLE SEARCH

The adequacy of an agency's search for documents under the FOIA "is judged by a standard

of reasonableness and depends upon the facts of each case." Maynard v. CIA, 986 F.2d 547, 559 (1st

Cir.1993) (citing Weisberg v. United States Dept. of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984));

see also Grand Central Partnership, 166 F.3d at 488 (agency's search need not be perfect, only

reasonable); Oglesby v. United States Dept. of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990) ("In order

to obtain summary judgment the agency must show that it made a good faith effort to conduct a

search for the requested records, using methods which can be reasonably expected to produce the

information requested."). As the First Circuit has explained, "[t]he crucial issue is not whether

relevant documents might exist, but whether the agency's search was 'reasonably calculated to

discover the requested documents.'" Maynard, 986 F.2d at 559 (quoting Safecard Servs., Inc. v.

S.E.C., 926 F.2d 1197, 1201 (D.C. Cir. 1991)). Thus, an agency is not required to search every

record system, but need only search those systems in which it believes responsive records are likely

to be located. See Oglesby, 920 F.2d at 68. Nor does the failure to uncover a responsive document

mean the search was inadequate; rather, "the issue to be resolved is not whether there might exist

any other documents possibly responsive to the request, but rather whether the search for those

documents was adequate." Weisberg, 745 F.2d at 1485 (internal citations omitted) (emphasis in

original).

In order to establish the adequacy of its search, the government "may rely upon affidavits provided they are relatively detailed and nonconclusory, and are submitted by responsible agency officials in good faith." Maynard, 986 F.2d at 559. Affidavits should be sufficiently detailed, but they need not "set forth with meticulous documentation the details of an epic search for the requested records." Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982). "A satisfactory agency affidavit should, at a minimum, describe in reasonable detail the scope and method by which the search was conducted." Maynard, 986 F.2d at 559 (citing Oglesby, 920 F.2d at 68; and Perry, 684 F.2d at 127).

"[I]n the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by FOIA." Perry, 684 F.2d at 127. "An agency's affidavit is 'accorded a presumption of good faith, which cannot be rebutted by "purely speculative claims about the existence and discoverability of other documents."'" Maynard, 986 F.2d at 560 (quoting Safecard Servs., 926 F.2d at 1200, in turn quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)). Consequently, if an agency demonstrates that it has conducted a reasonably thorough search, the FOIA requester can rebut the agency's affidavit "only by showing that the agency's search was not made in good faith." Id. (citing Miller v. United States Dept. of State, 779 F.2d 1378, 1383 (8th Cir. 1985)).

In this case, EPA conducted a search reasonably designed to uncover documents responsive to plaintiff's FOIA request. The documents responsive to plaintiff's FOIA request relate to the EPA's development and issuance of CAMR. Richard Vetter, an attorney with the Office of General Counsel of EPA in Research Triangle Park, North Carolina, and who worked with the staff of the CAMD on the rule, conducted the search for responsive records. See Napolitano Decl. ¶ 10. Mr.

Vetter sent an electronic mail message to staff at EPA headquarters and in Research Triangle Park who he thought were likely to have records responsive to plaintiff's FOIA request. Id. Responsive records were forwarded to Mary Jo Krolewski, an EPA program analyst familiar with the records involved in the development of the CAMR. Id. The records located included EPA staff notes, IPM runs in Docket No. OAR-2002-0056 for the proposed mercury rulemaking, computer files and spreadsheets containing IPM runs for MACT and cap-and-trade options, documents discussing economic analysis and emissions analysis of the cap-and-trade proposal, and EPA internal correspondence. Id. Ms. Krolewski reviewed the responsive records and prepared a draft response. Id.

Based on the foregoing, it is clear that the search conducted by EPA "was 'reasonably calculated to discover the requested documents.'" Maynard, 986 F.2d at 559 (quoting Safecard Servs., 926 F.2d at 1201). Accordingly, EPA has discharged its search obligation.

## II.    EPA PROPERLY INVOKED EXEMPTION 5 IN WITHHOLDING DOCUMENTS

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party * * * in litigation with the agency." 5 U.S.C. § 552(b)(5). As the Supreme Court has explained, "Exemption 5 incorporates the privileges which the Government enjoys under the relevant statutory and case law in the pretrial discovery context." Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184 (1975). Hence, "[a]gency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (e.g., attorney-client, work-product, executive privilege) are protected from disclosure under Exemption 5." Providence Journal Co. v. United States Dept. of the Army, 981 F.2d 552, 557 (1st Cir. 1992) (citing United States v. Weber Aircraft Corp., 465 U.S. 792, 799

-10-

(1984); and EPA v. Mink, 410 U.S. 73, 86 (1973)).  In this case, EPA properly withheld responsive

documents pursuant to the deliberative process and attorney-client privileges.

      A.      **Deliberative Process Privilege**

     In enacting Exemption 5, "[o]ne privilege that Congress specifically had in mind was the

'deliberative process' or ''executive' privilege, which protects the decisionmaking processes of the

executive branch in order to safeguard the quality and integrity of governmental decisions."

Hopkins, 929 F.2d at 84.  Specifically, the deliberative process privilege safeguards and promotes

agency decisionmaking processes in at least three ways:

> [I]t serves to assure that subordinates within an agency will feel free to provide the
> decisionmaker with their uninhibited opinions and recommendations without fear of
> later being subject to public ridicule or criticism; to protect against premature
> disclosure of proposed policies before they have been finally formulated or adopted;
> and to protect against confusing the issues and misleading the public by
> dissemination of documents suggesting reasons and rationales for a course of action
> which were not in fact the ultimate reasons for the agency's action.

Providence Journal Co., 981 F.2d at 557 (quoting Coastal States Gas Corp. v. Dept. of Energy, 617

F.2d 854, 866 (D.C. Cir. 1980); see also Carter v. United States Dept. of Commerce, 307 F.3d 1084,

1089 (9th Cir. 2002) ("The purpose of this privilege is to allow agencies freely to explore

possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny.")

(citation and internal quotation marks omitted); Coastal States Gas Corp., 617 F.2d at 866

(deliberative process privilege protects documents the release of which would "stifle honest and

frank communication within the agency").

     An agency record will qualify for protection under Exemption 5 if it is both "predecisional"

and "deliberative."  See Providence Journal Co., 981 F.2d at 557; Dow Jones & Co. v. Dept. of

Justice, 908 F.2d 1006, 1008-09 (D.C. Cir. 1990).  A document is "predecisional" if the agency can

"(i) pinpoint the specific agency decision to which the document correlates, (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (iii) verify that the document precedes, in temporal sequence, the decision to which it relates." Id. (internal citations and quotation omitted).  This category of material includes "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." Grand Central Partnership, 166 F.3d at 482 (citation and internal quotation marks omitted).

A "predecisional" document will qualify as "deliberative" provided it "(i) formed an essential link in a specified consultative process, (ii) 'reflect[s] the personal opinions of the writer rather than the policy of the agency,' and (iii) if released, would 'inaccurately reflect or prematurely disclose the views of the agency.'" Providence Journal Co., 981 F.2d at 558 (quoting National Wildlife Federation v. U.S. Forest Service, 861 F.2d 1114, 1118-19 (9th Cir.1988)).  This definition encompasses "documents reflecting advisory opinions, recommendations and deliberations comprising part of the process by which governmental decisions and policies are formulated." Hopkins, 929 F.2d at 84-85 (citation and internal quotation marks omitted).

Congress also "apparently did not intend 'inter-agency or intra-agency' to be rigidly exclusive terms, but rather to include [nearly any record] that is part of the deliberative process." Ryan v. Dept. of Justice, 617 F.2d 781, 790 (D.C. Cir. 1980).  Thus, for example, records generated outside an agency but created through agency initiative, such as documents provided by an agency's contractor employees, are exempt from disclosure under the deliberative process privilege.  See Hertzberg v. Veneman, 273 F. Supp. 2d 67, 76 n.2 (D.D.C. 2003) (holding that "witness statements from Forest Service contractor employees may be considered 'inter-agency or intra-agency' for the

purpose of Exemption 5 in this case.").  As the Supreme Court recognized in <u>Klamath Water Users</u>, courts adopting this view "have held that the exemption extends to communications between Government agencies and outside consultants hired by them" on the principle that "the records submitted by outside consultants played essentially the same part in an agency's process of deliberation as documents prepared by agency personnel might have done."  532 U.S. at 10.

In this case, each of the 120 documents being withheld under Exemption 5 are being withheld in whole or in part pursuant to the deliberative process privilege.  <u>See</u> Napolitano Decl. ¶ 15.  Nonw of the documents was shared outside of the federal government or one of its contractors.  <u>Id</u>. ¶¶ 16-20.  We discuss each of these documents (or categories of documents) *seriatim*.

### 1.    Document 114

Document 114 consists of handwritten staff notes of meetings of CAMD and other EPA staff that took place from January-December of 2003, which were generated by EPA staff and contain personal mental impressions.  <u>See</u> Napolitano Decl. ¶ 16; EPA <u>Vaughn</u> Index at 68.  These handwritten notes, which do not reflect official EPA policy, are predecisional and deliberative because the rulemaking was on-going when the notes were drafted, the drafters lacked decision-making authority, and the draft contains only staff impressions and comments.  <u>Id</u>. Release of these handwritten notes by CAMD and other EPA staff would have a chilling effect on EPA's decision making processes and cause public confusion about the reason for EPA's  decision.  <u>Id</u>. The notes also do not contain any reasonably segregable information.  <u>Id</u>.  EPA properly withheld this document from disclosure pursuant to Exemption 5.  <u>See</u>, <u>e.g.</u>, <u>New York Public Interest Research Group</u>, 249 F. Supp.2d at 338-39 (notes made by EPA and Office of Management and Budget officials, which reflected the suggestions, recommendations, and subjective impressions of the

authors, properly withheld under Exemption 5); <u>Strang</u> v. <u>Collyer</u>, 710 F. Supp. 9, 12 (D.D.C. 1989) (handwritten meeting notes relating to position to be taken by the N.L.R.B. in an amicus brief were properly withheld under Exemption 5 because "notes are part of the deliberative process in arriving at the final position to be taken" in the brief).

### 2.    Documents 115 and 116

Documents 115 and 116 both consist of IPM runs; specifically, Document 115 consists of IPM Run Outputs for two alternative MACT options, and Document 116 consists of IPM Run Outputs for the Hg Trading option. <u>See</u> Napolitano Decl. ¶ 17; EPA <u>Vaughn</u> Index at 68-69. The IPM runs that are being withheld, which were not relied upon by EPA in promulgating the CAMR, are pre-decisional because development of the CAMR, including IPM analysis, was on-going at the time of these runs, the runs were created before the publication of the rule in May 2005;[2] and EPA's underlying decision-making process was ongoing at the time the runs were created. <u>Id</u>. More specifically, each run of the IPM, in its choice of specific variables and use of certain projections, reveals issues that CAMD considered important in the rulemaking process, and the release of these runs therefore provide clues to the Agency's deliberations prior to rulemaking, could compromise future EPA deliberations, and could cause public confusion about the reasons behind EPA's decision-making process. <u>Id</u>. There is no segregable factual information that could be released without revealing protected pre-decisional and deliberative information at the expense of EPA's decision-making process. <u>Id</u>.

---

[2] In fact, the IPM runs were created before the issuance of the CAMR on March 15, 2005. <u>See</u> generally (http://www.epa.gov/mercury/control_emissions/decision.htm).

As set forth above, EPA uses IPM to "evaluate the cost and emission impacts" of proposed regulations seeking to limit mercury emission from coal-fired power plants as well as evaluate proposed regulations seeking to limit emissions for sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), and mercury (Hg), throughout the contiguous United States.  See EPA Modeling Applications, *supra*; Napolitano Decl. ¶ 6.  EPA properly withheld these documents from disclosure pursuant to Exemption 5.  See, e.g., Quarles v. Dept. of the Navy, 893 F.2d 390, 392-93 (D.C. Cir. 1990) (holding that cost estimates prepared to assist in selection of home ports for ships were deliberative because they derived "from a complex set of judgments" and were a part of "that elasticity that has persuaded courts to provide shelter for opinions generally"); Lead Industries, Ass'n v. OSHA, 610 F.2d at 70, 84-85 (2nd Cir. 1979) (reports containing feasibility studies, cost benefit analysis, and objective summaries of evidence requiring the author to draw inferences and to weigh the evidence are part of the deliberative process); City of West Chicago v. U.S. Nuclear Regulatory Comm'n, 547 F. Supp. 740, 749 (N.D. Ill 1982) (holding cost benefit analysis to be "wholly deliberative in nature").

Indeed, as the Ninth Circuit explained in National Wildlife Federation, in upholding the decision by the United States Forest Service to withhold, *inter alia*, cost-benefit analyses of certain proposed forest plans, "[w]hile these opinions might be characterized as opinions on facts or the consequences of facts, such a distinction, as we discussed previously, is not the touchstone for determination of the applicability of exemption 5.  As long as these opinions reveal the issues that the Forest Service considers important and provide telling clues as to the Forest Service's proposed course of action in addressing the conflicting demands on the Forest's resources, they are as much a part of the deliberative process as opinions on pure matters of law or policy."  861 F.2d at 1121.

-15-

The D.C. Circuit has likewise recognized that, "[w]hen a summary of factual material on the public record is prepared by the staff of an agency administrator, for his use in making a complex decision, such a summary is part of the deliberative process, and is exempt from disclosure under exemption 5 of FOIA." <u>Montrose Chemical Corp.</u> v. <u>Train</u>, 491 F.2d 63, 71 (D.C. Cir. 1974); <u>see</u> <u>also</u> <u>Petroleum Information Corp.</u> v. <u>Dept. of Interior</u>, 976 F.2d 1429, 1434 (D.C. Cir. 1992) ("in some instances, the disclosure of even purely factual material may so expose the deliberative process within an agency' that the material is appropriately privileged"). The documents withheld by EPA in this case fall comfortably within these the holdings of these courts.

### 3.     Documents 109, 110, and 112

Documents 109, 110, and 112 are draft memoranda prepared by CAMD staff, and were generated as part of EPA's use of the IPM to evaluate the cost impacts of the proposed CAMR. <u>See</u> Napolitano Decl. ¶ 18; EPA <u>Vaughn</u> Index at 65-67. These documents, which reflect the back-and-forth discussions and the mental impressions of EPA staff, are pre-decisional because development of the CAMR, including IPM analysis, was on-going at the time these documents were drafted, the drafters did not have decision-making authority for policy recommendations concerning the rule, the documents were created before the publication of the rule in May 2005, and EPA's underlying decision-making process was ongoing at the time the documents were created. <u>Id</u>. The documents are deliberative because they include staff-level comments and proposed language regarding rulemaking. <u>Id</u>. Release of the documents would reveal EPA's internal decision-making process concerning development of the CAMR, including variables and analyses related to use of the IPM, and could compromise future Agency deliberations; cause public confusion about the reasons behind EPA's decision-making process; and have a chilling effect on EPA staff who in the future would be

reluctant to express their opinions to the detriment of the Agency's decision-making process.  Id. There is no other reasonably segregable information in these documents.  Id. EPA properly withheld these documents under Exemption 5.  See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975) (documents that commonly are encompassed by the deliberative process privilege include "advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated"); Coastal States, 617 F.2d at 866 (deliberative process privilege protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.").

### 4.    Documents 111, 113, and 117

Documents 111,113, and 117 are drafts of multimedia briefing presentations as part of the CAMD program's use of the IPM in evaluating different IPM analyses, and were generated as part of EPA's use of the IPM in preparing the CAMR.  See Napolitano Decl. ¶19; EPA Vaughn Index at 66-68, 70.  The final versions of these documents would have been used by EPA staff in the CAMD program to brief staff from other EPA offices and EPA management on issues related to the CAMR.  Id. These documents, which reflect the mental impression of EPA staff and staff-level recommendations, are pre-decisional because development of the CAMR, including IPM analysis, was on-going at the time these documents were drafted and the EPA drafters did not have decision-making authority for policy recommendations concerning the rule, the documents were created before the publication of the rule in May 2005, and EPA's underlying decision-making process was ongoing at the time the documents were created.  Id.  The withheld information is deliberative because it includes staff-level comments and analyses regarding rulemaking.  Id.  Release of the documents would reveal EPA's internal decision-making process concerning development of the

CAMR, including variables and analyses related to use of the IPM, and could compromise future Agency deliberations, cause public confusion about the reasons behind EPA's decision-making process, and have a chilling effect on EPA staff who in the future would be reluctant to express their opinions to the detriment of the Agency's decision-making process. Id. There is no segregable factual information that could be released without revealing protected pre-decisional and deliberative information at the expense of EPA's decision-making process. Id. EPA properly withheld these documents under Exemption 5. See NLRB v. Sears, Roebuck & Co., 421 U.S. at 150; Coastal States, 617 F.2d at 866.

### 5.    Documents 1-108, 119-20

Documents 1 - 108 and 119-20 are composed of electronic mail messages produced mainly by CAMD staff, and were generated as part of EPA's use of the IPM to evaluate cost impacts of the proposed rulemaking. See Napolitano Decl. ¶ 20; EPA Vaughn Index at 1-65, 71-72; EPA Vaughn Index Supplemental Page. Non-privileged information from the electronic mail messages has been released, while substantive deliberative information has been redacted under FOIA Exemption 5. Id. The information withheld from these electronic mail messages is pre-decisional because the staff did not have decision-making authority for policy recommendations concerning the proposed rulemaking, and the e-mails were sent prior to the publication of the rule in May 2005. Id. The information withheld is deliberative because it includes staff-level comments, recommendations and analyses regarding the IPM runs and the proposed rulemaking. Id. Release of the documeEPA properly withheld this information under Exemption 5. See NLRB v. Sears, Roebuck & Co., 421 U.S. at 150; Coastal States, 617 F.2d at 866.

### B.     Attorney-Client Privilege

The attorney-client privilege "is the oldest of the privileges for confidential communications recognized by law." *Weinstein's Federal Evidence,* § 503.03 (2d Ed.).   The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients," and thereby encourage "the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The attorney-client privilege protects from disclosure documents provided by an attorney if the party asserting the privilege shows: "'(1) that he was or sought to be a client of [the attorney]; (2) that [the attorney] in connection with the [document] acted as a lawyer; (3) that the [document] relates to facts communicated for the purpose of securing a legal opinion, legal services or assistance in legal proceedings; and (4) that the privilege has not been waived.'" State of Maine v. U.S. Dept. of Interior, 298 F.3d 60, 71 (1st Cir. 2002) (quoting United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 27-28 (1st Cir.1989), in turn quoting United States v. Wilson, 798 F.2d 509, 512 (1st Cir.1986)).

In this case, Documents 1, 21, 24, 56,102,104, and 105-108 also contain information that is being withheld pursuant to the attorney-client privilege.  See Napolitano Decl. ¶ 21; EPA Vaughn Index at 1, 12-13, 14-15, 33, 59-60, 61-65; EPA Vaughn Index Supplemental Page.  Each of these documents (or portions of the documents) contain or summarize confidential legal discussions between EPA's Office of General Counsel and various other EPA employees or communications between EPA attorneys that reflect client-supplied information.  Id.  These documents therefore contain the candid opinions, analyses, and recommendations of EPA personnel regarding the legal defensibility of alternative courses of action under consideration by EPA.  Id.  Inasmuch as these documents contain confidential legal discussions between government attorneys and their client(s),

EPA properly withheld this information under Exemption 5. See In re Lindsey, 148 F.3d 1100, 1104 (D.C. Cir. 1998) (in the governmental context, the client may be the agency and the attorney may be an agency lawyer); Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 36 (D.D.C. 2000) ("legal advice from the Office of the General Counsel regarding whether it would be appropriate under the government ethics rules for the Director to accept an invitation to dinner" was protected by the attorney-client privilege); National Broadcasting Co. v. United States Small Bus. Admin., 836 F. Supp. 121, 124-25 (S.D.N.Y. 1993) (request for legal opinion from SBA's Chief Counsel for Investment and preliminary legal opinion issued by SBA's Deputy General Counsel in response to request protected by attorney-client privilege).

## CONCLUSION

For the foregoing reasons, defendant EPA respectfully requests that this Court enter summary judgment in its favor.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ Mark T. Quinlivan
MARK T. QUINLIVAN
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3606

Dated: July 29, 2005