UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | |
| THOMAS F. REILLY, Attorney General | ) | |
| of the Commonwealth of Massachusetts, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 05-10450 RBC |
| v. | ) | |
| | ) | |
| UNITED STATES ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

The Plaintiff Thomas F. Reilly, Massachusetts Attorney General, moves the Court for a

partial summary judgment ruling that Documents ## 115 and 116 are not exempt from

production under FOIA exemption 5.  The Plaintiff accordingly also requests that, in light of that

ruling, the Court order EPA to produce those documents forthwith, and further that it order EPA

to produce the remaining documents other than Document #114 for the Court's inspection *in

camera*, or submit a new affidavit setting forth the basis for continuing to claim that such

documents are exempted.  In further support of this motion, the Plaintiff refers the Court to the

Plaintiff's Memorandum, filed herewith.

1

Statement of Material Facts

1      The Plaintiff duly filed, on or about March 19, 2004, a request pursuant to FOIA

with EPA, requesting "All records relating to the use of the Integrated Planning Model (IPM) in

connection with the impact on the electricity generating and fossil fuel industries of proposed

EPA standards for the emission of mercury from power plants."  Complaint ¶ 15 & Exhibit B;

Answer "Fourth Defense" ¶ 15 (Admitted).

2      On or about December 9, 2004, EPA issued its final determination with respect to

the Plaintiff's request, in which EPA asserted that numerous documents including staff notes,

analytical documents and email were exempt from production under FOIA under exemption 5, in

that they were covered by the deliberative process privilege.  Complaint ¶ 18 & Exhibit C;

Answer "Fourth Defense" ¶ 18 (Admitting final determination and authenticating Exhibit C);

Declaration of Samuel Napolitano ¶ 13.

3      Among the documents withheld are Documents 115 and 116, consisting of the

results of computer modeling of several regulatory alternatives using the Integrated Planning

Model ("IPM").  Napolitano Decl. ¶¶ 5-7, 17.

4      Documents 115 and 116 are not deliberative process materials, based *inter alia*, on

the following evidence:

4.1    Documents 115 and 116 consist of IPM runs.  Specifically, "115 consists of IPM
       Run Outputs for two alternative MACT options and 116 consists of IPM Run
       Outputs for the Hg [*i.e.*, mercury] Trading option."  Napolitano Decl. ¶ 17.

4.2    EPA uses IPM modeling to examine impacts of proposed pollution control
       policies on the electric power sector, and thus to provide the factual/analytical

2

support for regulatory and legislative proposals. Napolitano Decl. ¶¶ 6, 7; "EPA Analyses Using IPM," excerpted in Exhibit A.[1]

4.3    From time to time, EPA updates the data and assumptions employed in IPM modeling, and in doing so consults with stakeholders and others about the accuracy of the data and reasonableness of the assumptions. *E.g.*, Exhibits A, B, C.

4.4    EPA maintains a website on which it reports updates to IPM modeling data and assumptions, and publishes modeling runs conducted in connnection with rulemakings. Exhibit A. (The modeling runs are also placed in the docket for the appropriate rulemaking.)

4.5    In the mercury rulemaking, until it abruptly abandoned the original regulatory approach in favor of a cap-and-trade approach under a different provision of the Clean Air Act, EPA consulted extensively with a stakeholder group regarding the data and assumptions employed in IPM modeling runs, and reported the results of its modeling runs to the workgroup. Exhibits D1-D5. EPA published its initial IPM runs analyzing this alternative with the Notice of Proposed Rulemaking, long before it reached a final decision with regard to the mercury rule. Exhibit A at 32-34.

4.6    In reviews of the process followed by EPA in developing the Notice of Proposed Rulemaking regarding mercury emissions by power plants, EPA's Inspector General found that the policy biases of upper level EPA officials distorted the rulemaking process and led to the suppression of evidence that would tend to undercut EPA's preferred approach, including several IPM runs relating to the technology based (MACT) regulatory approach under § 112 of the Clean Air Act. The Government Accountability Office (GAO) also found that EPA violated guidelines for performing cost-benefit analyses of significant rules by failing to

---

[1]Much of the evidence relied upon by the Plaintiff consists of webpages or documents posted on websites maintained by EPA or other U.S. Government agencies. Plaintiff believes the websites and documents are admissible on several grounds, including as admissions and official documents. The Court may also properly take judicial notice of these materials. *See Nebraska v. EPA*, 331 F.3d 995, 999 n.3 (D.C. Cir. 2003). In most cases, the attached exhibits are excerpted from webpages or documents posted on webpages. The URL addresses for the sites or documents are provided in the Plaintiff's accompanying memorandum and in the table of exhibits, attached.

adequately analyze alternative regulatory approaches and failing to make its analyses public, thereby undercutting the credibility of the approach EPA settled upon.  Exhibits E, F.

Respectfully submitted,

/S/_____
William L. Pardee, BBO #389070

Assistant Attorney General
Environmental Protection Division
Office of the Attorney General

One Ashburton Place -- Rm. 1813
Boston, MA 02108
(617) 727-2200, ext. 2419

DATED: September 15, 2005

## Exhibits

A.    "EPA Analyses Using IPM," excerpts from EPA website at  http://www.epa.gov/-airmarkets/epa-ipm/

B.    *Analyzing Electric Power Generation under the CAAA* (July 1996) (excerpts), available in EPA's Electronic Docket OAR-2001-0008, document 0007

C.    NOx SIP Call Regulatory Impact Analysis (September, 1998) (excerpts); full document available at http://www.epa.gov/-ttn/naaqs/ozone/rto/sip/-related.html

D1.    "Draft Charge and Process Document," also available at http://www.epa.gov/ttn/atw/combust/utiltox/utoxpg.html#CAAAC.

D2.    "EPA Presentation on IPM model" (April 2002), also available at http://www.epa.gov/ttn/atw/combust/utiltox/utoxpg.html#CAAAC.

D3.    "EPA Presentation on initial IPM runs" (May 2002), also available at http://www.epa.gov/ttn/atw/combust/utiltox/utoxpg.html#CAAAC.

D4.    Summary of the June 3, 2002, meeting, also available at http://www.epa.gov/ttn/atw/combust/utiltox/utoxpg.html#CAAAC.

D5.    "Suggested Additional IPM Analysis"(June 18, 2002), also available at http://www.epa.gov/ttn/atw/-combust/utiltox/utoxpg.html#CAAAC.

E.    GAO Report # GAO-05-252, "Observations on EPA's Cost-Benefit Analysis of Its Mercury Control Options" (excerpts); full report available at http://www.gao.gov/new.items/d05252.pdf.

F.    EPA Office of Inspector General, Report No. 2005-P-00003, *Additional Analyses of Mercury Emissions Needed Before EPA Finalizes Rules for Coal-Fired Electric Utilities* (February 3, 2005), also available at http://www.epa.gov/oig/reports/2005/20050203-2005-P-00003--Gcopy.pdf.



## U.S. Environmental Protection Agency

# Clean Air Markets - Programs and Regulations

Recent Additions | Contact Us | Print Version    Search:

EPA Home > Clean Air Markets > Programs and Regulations > The Latest Update of EPA Modeling Applications (v.2.1) Using The Integrated Planning Model

| Home | Business | Programs | Progress | Trading | Reports | Data and Maps | Monitoring | Issues |

**Acid Rain Program**

**NOx Trading Programs**

**Monitoring**

**US - Canada**

# EPA Modeling Applications Using The Integrated Planning Model

## Background on EPA Modeling Applications Using IPM

- Introduction to EPA Modeling Applications Using IPM
- Documentation Summary for EPA Base Case 2004 Using IPM (V.2.1.9), October 2004
- Documentation Supplement for EPA Modeling Applications Using IPM (V.2.1.6), July 2003
- Documentation of EPA Modeling Applications Using IPM (V.2.1), March 2002
- NEEDS (National Electric Energy System) Database

## EPA Analyses Using IPM

Detailed input and output files for model runs produced using IPM can be downloaded at the following links. An explanation of the elements contained in the downloaded files can be found at the first of these links.

- Clear Skies Act Analyses Using IPM V.2.1 (2002)
- Clear Skies Act Analyses Using IPM V.2.1.6 (2003)
- IPM Analysis for the Clean Air Interstate Rule (CAIR)

Exhibit A

- [IPM Analysis for the Clean Air Mercury Rule (CAMR)](#)
- [Analyses Using IPM V.2.1.9 (2004)](#)


## Introduction to EPA Modeling Applications Using IPM

EPA uses the Integrated Planning Model (IPM) to analyze the projected impact of environmental policies on the electric power sector in the 48 contiguous states and the District of Columbia. Developed by ICF Resources Incorporated and used to support public and private sector clients, IPM is a multi-regional, dynamic, deterministic linear programming model of the U.S. electric power sector. It provides forecasts of least-cost capacity expansion, electricity dispatch, and emission control strategies for meeting energy demand and environmental, transmission, dispatch, and reliability constraints. IPM can be used to evaluate the cost and emissions impacts of proposed policies to limit emissions of sulfur dioxide (SO2), nitrogen oxides (NOX) , carbon dioxide (CO2), and mercury (Hg) from the electric power sector. The IPM was a key analytical tool in developing the Clean Air Interstate Regulation (CAIR) and the President's Clear Skies Initiative.

EPA has recently completed a major update of the assumptions, inputs, and capabilities of the EPA base case and associated policy cases, which are used in EPA applications of IPM. Key update areas include:

- Emissions Controls on Existing Units
- State Multi-Pollutant Regulations
- Cost and Performance of Generating Technologies
- Sulfur Dioxide (SO2), Nitrogen Oxide (NOx), and Heat Rates
- Natural Gas Supply and Prices
- Electricity Demand Growth Assumptions


## Documentation Report (2004 Update)

To learn more about the updates, changes, and enhancements that were implemented in 2004, you can download the 2004 documentation report (in PDF format) by section:

- Documentation Summary


**Tables, Figures, and Reports\***

- Section 3: Power System Operation
- Section 4: Generating Resources
- Section 5: Emissions Control Technologies
- Section 6: Set-Up Parameters and Rules
- Section 7: Financial Assumptions
- Section 8: Fuel Assumptions


\*No figures, tables or reports are associated with Sections 1-2 of the Documentation Summary.


Assumptions that were not updated in 2004 are described in the following earlier documentation reports.

**Documentation Report (2003 Update)**

To learn more about the 2003 update, you can download the updated documentation report (in PDF format) by attachment:

- Introduction
- Summary Table of V.2.1.6 Updates
- Attachment A - Aggregation Scheme
- Attachment B - Electricity Demand Growth
- Attachment C - State Multipollutant Regulations
- Attachment D - New Source Review (NSR) Settlements
- Attachment E - Emission Rate and Removal Assumptions
- Attachment F - Emission Controls on Existing Units
- Attachment G - Planned-Committed Units
- Attachment H - Updated Assumptions for Potential Generating Units
- Attachment I - Existing Nuclear Unit Cost Assumptions
- Attachment J - Nuclear Upratings and Scheduled Retirements (MW)
- Attachment K - Mercury Emission Modification Factors
- Attachment L1 - Activated Carbon Injection (ACI) Cost Equations (Part I)

- [Attachment L2 - Activated Carbon Injection (ACI) Cost Equations (Part II)](#)
- [Attachment M - Coal Supply Updates](#)
- [Attachment N - Natural Gas Supply Updates](#)
- [Attachment O - Fuel Oil Prices](#)

**Documentation Report (V. 2.1 Update)**

To learn more about the V.2.1. update, you can download the documentation report (in pdf format) by chapter*.

- *Chapter 1:* [Introduction](#) (140 kb)
- *Chapter 2:* [Modeling Framework](#) (49 kb)
- *Chapter 3:* [Power System Operation Assumptions](#) (176 kb)
- *Chapter 4:* [Generating Resources](#) (176 kb)
- *Chapter 5:* [Emissions Control Technologies](#) (62 kb)
  - [Appendices to Chapter 5](#) (393 kb)
- *Chapter 6:* [Set-up Parameters and Rules](#) (16 kb)
- *Chapter 7:* [Financial Assumptions](#) (24 kb)
- *Chapter 8:* [Fuel Assumptions](#) (46 kb)
  - [Appendices to Chapter 8](#) (406 kb)
- *Chapter 9:* [EPA Base Case 2000 Results](#) (124 kb)

Notes: (1)With the exception of Chapters 5 and 8, the appendices for each chapter are in the same file as the chapter itself. (2)The files listed above are available in Portable Document Format (PDF). To download them you need the free Adobe Acrobat Reader. For more information, see [EPA's PDF page](#).

# National Electric Energy System (Needs) Database

The NEEDS database contains the generation unit records used to construct the "model" plants that represent existing and planned/committed units in EPA modeling applications of IPM. NEEDS includes basic geographic, operating, air emissions, and other data on these generating units. See [Section 4](#) in the Documentation Report (2004 Update) and [Chapter 4](#) of the Documentation Report (v.2.1 Update) for discussions of the data

sources underlying NEEDS.

**[NEEDS (National Electric Energy System) Database for IPM V.2.1](#)**
**[NEEDS (National Electric Energy System) Database for IPM 2003](#)**
**[NEEDS (National Electric Energy System) Database for IPM 2004](#)**

# Peer Review Activities:

## Peer Review Panel Meeting on Natural Gas Supply Assumptions, October 23-24, 2003

EPA's Clean Air Markets Division held an expert peer review panel meeting on the natural gas supply curves and associated assumptions developed by ICF Consulting, Inc. for use in EPA applications of the Integrated Planning Model (IPM). The meeting of the peer review panel was open to the public. The public was invited to submit written comments for review by EPA in conjunction with the input from the peer review panel.

The following items were made available to the peer review panel and the public:

- [Federal Register Notice](#)
- [Presentation Materials for Peer Review Panel](#)
- [Data Appendices for Peer Review Panel](#)
- [Presentation Materials from the Peer Review Meeting](#)

# Informational Session on Coal Supply Assumptions, October 29, 2003

EPA's Clean Air Markets Division held an informational session on the new coal supply curves and associated assumptions developed by ICF Consulting, Inc. for use in EPA applications of the Integrated Planning Model. EPA conducted an expert peer review of the curves and assumptions and took comments from the public in conjunction with the input from the peer review panel.

The following items were made available to the peer review panel and the public:

- Presentation Materials
- Appendices
- Cost Model

---

 Some of the documents provided by EPA are Adobe Acrobat PDF (Portable Document Format) files. For more information about PDFs, visit the About PDF page.



# U.S. Environmental Protection Agency

# Clean Air Markets - Programs and Regulations

Recent Additions | Contact Us | Print Version    Search:

EPA Home > Clean Air Markets > Programs and Regulations > The Latest Update of EPA Modeling Applications (v.2.1) Using The Integrated Planning Model > EPA, v. 2.1 Results Using IPM

| Home | Business | Programs | Progress | Trading | Reports | Data and Maps | Monitoring | Issues |

**Acid Rain Program**

**NOx Trading Programs**

**Monitoring**

**US - Canada**

# EPA, v. 2.1 Results Using IPM

- Download IPM Run Results Files
- Download Detailed Results of IPM (IPM Run Parsed Files)

**EPA, v. 2.1 Results Using IPM**

The analyses of the Clear Skies Initiative are products of the updated model. Among the factors that make IPM particularly well suited to model multi-emissions control programs are (1) its ability to capture complex interactions among the electric power, fuel, and environmental markets, (2) its detail-rich representation of emission control options encompassing a broad array of retrofit technologies along with emission reductions through fuel switching, changes in capacity mix, and electricity dispatch strategies, and (3) its capability to model a variety of environmental market mechanisms, such as emissions caps, allowances, trading, and banking. Clear Skies is implemented through an emissions cap-and-trade program. Such programs are particularly well suited for modeling using IPM, because they rely on the operation of an allowance market, the availability of a broad range of emissions reduction options, and empowerment of economic actors to achieve emission limits. In particular, cap and trade programs, like the one employed in Clear Skies, work by allocating allowances that permit the emission of limited quantities of pollution during specified periods (e.g. ozone

season or annually), permitting sources to choose whether to comply with control requirements by reducing emissions or purchasing allowances from other sources. IPM's ability to capture the dynamics of the allowance market and its provision of a wide range of emissions reduction options are particularly important for assessing the impact of multi-emissions environmental policies like Clear Skies.

## Download IPM Run Files

Clicking on the run ID in the following table initiates the downloading process. To facilitate downloading, a single zipped archive file is posted for each run. Once downloaded, the files in the zipped archive file can be extracted and decompressed using any of a number of widely available archiving/decompression software programs. Several of the files in the archive are in compressed (i.e., zipped) format and can be decompressed using the same archiving/decompression software. For a description of the types and content of the files for each run, see Roadmap to IPM Run Files for EPA Modeling Applications (v. 2.1).

**Runs Table for EPA Modeling Applications (v. 2.1) Using IPM**

| Run Name/Description | Run ID |
|---|---|
| *EPA Base Case 2000*<br>*SO2:* Title IV national annual cap and trade (9.47 million tons through 2009, 8.95 million tons 2010 onward).<br>*NOX:* SIP Call region summer cap and trade (473 thousand tons 2005 onward).<br>*State-specific* caps in Connecticut, Missouri, and Texas. | ipm2000s100d<br>(1.8 MB) |

| | |
|---|---|
| *Clear Skies Initiative*<br>*SO2:* 4.5 million ton annual cap in 2010 with national trading program and a 3.0 million ton presumptive cap in 2018.<br>*NOX:* 2.1 million ton annual cap in 2008 assigned to two Zones with trading programs, and a 1.7 million ton presumptive cap in 2018 assigned to two Zones.<br>*Hg:* 26 ton annual cap in 2010 with national trading program, and a 15 ton presumptive annual cap in 2018.<br>*State-specific* caps in Connecticut, Missouri, and Texas. | ipm2000s153d_c<br>(1.8 MB) |

# Roadmap to IPM Run Files for EPA Modeling Applications (v. 2.1)

The files posted in the Runs Table for EPA Modeling Applications (v. 2.1) Using IPM contain detailed inputs and outputs for the listed runs. EPA recommends having on hand its Documentation Report when reviewing these files.

Clicking on the run identification number which appears in the second column of the Runs Table, users can download a zipped archive file, which contains the following IPM run files:

- **DAT file:** Once decompressed, these files will have a "DAT" filename extension, e.g., ipm2000s100d.dat. They contain the key input set-up data used to define the model run, including the definitions and specifications for run years, model regions, model plants, financial parameters, available fuels, and power system transmission and operating parameters.

- **System Summary Report:** These files will have a "doc" filename extension, e.g., EPA ipm2000s100d.doc. They contain system-wide results for all run years. Topics reported include projections of generation, capacity, capacity additions and changes, capacity factors, production costs, emissions, and allowance prices. Disaggregation by model plant type categories are provided for the first five of these topics. The

model plant types are differentiated by fuel used (e.g., coal, oil/gas, nuclear, hydro), combustion technology (e.g., turbine, combined cycle gas), control technology (e.g., scrubber, post-combustion NOX control), and retrofit structure (e.g., coal plant with existing SNCR retrofit with ACI). A key to all the plant types used in reporting these results can by found in Chapter 9 of the documentation report.

- **RPE file:** Once decompressed, these files will have an "RPE" filename extension, e.g., ipm2000s100d.rpe. For each model plant, this file shows the projections of fuel consumption, emissions (rates and tonnage), capacity, costs (capital, fixed operations and maintenance, and variable operations and maintenance), and generation. The model plant results are grouped by model plant type within model regions within model run year. Aggregated results are reported (a) for each model region differentiated by plant type, (b) for each plant type differentiated by model region, (c) for model regions without consideration of plant type, and (d) for plant types without consideration of model region.

- **CAR file:** Once decompressed, these files will have an "CAR" filename extension, e.g., ipm2000s100d.car. This file contains capacity utilization projections for each model plant grouped by model plant type. Included are capacity contributed to reserve margins, capacity dispatch, and summer, winter, and annual generation, capacity factors, and availabilities. The capacity dispatch column in this file indicates the total capacity (in megawatts) that the model plant represents. The average size of a unit that the model plant represents is found in the DAT file and is the size used for cost assignment (e..g., to determine the applicable economies of scale when retrofitting existing units with emission controls).

- **TAC file:** Once decompressed, these files will have an "TAC" filename extension, e.g., ipm2000s100d.tac. The file contains annual production costs for each model plant grouped by model plant type. For each model plant, total and rate-based capital, fixed operations and maintenance (FOM), variable operation and maintenance (VOM), and fuel costs are shown. The variable costs reported for model plants in this file can

provide insights into why the utilization rates reported for some plants in the CAR file are higher than those of other model plants in the same region.

The System Summary Report can be reviewed using word processing software (e.g Microsoft Word or Corel WordPerfect). The other files can be reviewed using a good text viewer or editor. EPA uses Lister, a file viewer built into Windows Commander, a shareware file manager for Windows. EXITdisclaimer▶

Download the roadmap (PDF format, 10 KB).

---

**Download IPM Run Parsed Files**

Clicking on the name of the parsed file in the following table initiates the downloading process. The files are posted in one of two formats, a zipped archive file or an excel spreadsheet. For a description of the content of the each parsed file see the explanation of parsed files.

### Table of Parsed Run Data for EPA Modeling Applications (v. 2.1) Using IPM

| Parsed Run | File Type/Size |
|---|---|
| EPA Base Case 2000 parsed for year 2010 | 1.1 MB zipped excel file |
| EPA Base Case 2000 parsed for year 2020 | 1.1 MB zipped excel file |
| Clear Skies Initiative parsed for year 2010 | 3.4 MB excel file |
| Clear Skies Initiative parsed for year 2020 | 3.5 MB excel file |

**Parsed Results Using EPA Modeling Applications (v.2.1) of the Integrated Planning Model**

EPA Modeling Applications (v.2.1) of the Integrated Planning Model produce forecasts for model plants, i.e., clusters of real life units with similar characteristics. A parsed file is an Excel spreadsheet that provides unit-level results derived from the model plant projections obtained by the Integrated Planning Model (IPM). Parsed results are generally only produced for fossil-fuel fired units. Projections for individual plants are based on data currently available and modeling parameters which are simplifications of the real world. It is likely that future actions regarding individual plants will differ from model projections of actions; however, the aggregate impacts are expected to be appropriately characterized by the model.

The following is an explanation of the fields that appear in a parsed file.

- Year - the model run year from which the parsed results were derived (usually 2010 or 2020).

- Online YearUnique ID - The unique identifier assigned to a boiler or generator within a plant. It consists of the Plant ID (or ORIS Code), an indication of whether the unit is a boiler ("B"), generator ("G"), or committed unit ("C"), and the Unit ID. For example, for the Unique ID "113_B_1", "113" is the Plant ID, "B" indicates that this unit is a boiler, and "1" indicates that the ID of the boiler is 1.

- Plant name - The Plant's name.

- Plant Type - An indication of the type of unit - e.g., coal steam, combined cycle, IGCC (integrated gasification combined cycle), oil and gas steam, combustion turbine.

- Fuel Type - The type of fuel used in the unit for electricity generation - e.g., coal, gas, oil, other.

- State Name, State Code, County, County Code - These four fields identify the geographic location of the unit. The State Code is the FIPS State Code, and the County Code is the FIPS County Code. New units have blanks in these columns, while committed units have zeros.

- Plant ID - The unique identifier assigned to each plant in the model. Committed units have zeroes in this column, while new units have blanks. Otherwise, all Plant IDs are unique to the plant. All units within a plant will typically have the same Plant ID. The Plant ID is most often the ORIS Code.

- Unit ID - The identifier assigned to each unit/boiler in a given plant.

- Capacity - The capacity of the unit available for generation for sale to the grid. This capacity reflects the adjustments made to the unit's initial capacity in projections from IPM runs.

- Typical July Day Heat Input - The model projects heat input for the summer season. The summer season heat input is used as the basis to estimate an average heat input over the course of a day in July (billion Btu/day). Typical July Day NOx - The model projects NOx emissions for the summer season. The summer season NOx emissions is used as the basis to estimate typical NOx emissions for July (tons/day).

- Firing - For boilers, this field indicates the burner type and configuration (e.g., cyclone, FBC (fluidized bed combustion), stoker/SPR, tangential, or vertical. "Unknown" appears in instances where the burner configuration of a boiler was not known. "Other" appears for units that were not boilers.

- Bottom - For boilers, this field indicates distinguishing characteristics of the bottom of the combustion chamber (e.g., dry, wet). Blanks and "Unknown" appears in instances where the bottom characteristics of a boiler were not known. "Other" appears for units that were not boilers.

- EMF_Controls - Shows combination of scrubber, NOx post-combustion controls and particulate matter controls that already exists at the unit. Existing NOx Controls - NOx controls that already exists at the unit.

- Retrofit Code 1, Retrofit Code 2, Retrofit Control 1, Retrofit Control 2 - These columns indicate the emission control technology retrofits that the model projects will be installed on

the unit. Note, the model can retrofit units with control technologies at two different stages. Retrofit Code 1 and Retrofit Control 1 show the control technologies installed in stage 1. Retrofit Code 2 and Retrofit Control 2 show the control technologies installed in stage 2. The "Retrofit Control" columns indicate the category of controls installed. The retrofit control may include gas reburn, mercury controls, early retirement, SCR (selective catalytic reduction), SNCR (selective non-catalytic reduction), and scrubber. The "Retrofit Code" columns provide the code for the specific control technology installed. For example, LD01, LO01, LO02, ML01, ML02 are codes for various types of scrubbers. Whenever "scrubber" appears in a "Retrofit Control" column, one of these five codes will appear in the corresponding "Retrofit Code" column. Early retirement, though not a control is treated as a retrofit in the modeling and is therefore included in the column. Early retirement indicates that the model projected the unit to retire early.

- Retrofit NOx/SO2 Controls - Summarizes all of the control technologies that a unit has put on in stage 1 and stage 2. This column combines the information that appears in the Retrofit Control1 and Retrofit Control2 columns. The retrofits are cumulative to the year for which the run is parsed. For instance, if the parsed file is for 2020, it will include all retrofits projected by the model for the unit through 2020.

- Fossil unit? - Indicates whether the unit is fossil-fuel fired.

- Summer Fuel Use - Projected fuel consumed at the unit in May - September (Trillion British thermal units) during the year for which the run was parsed.

- Total Fuel Use - Projected fuel consumed at the unit during the year for which the run was parsed (Trillion British thermal units).

- Summer Subbituminous Fuel Use, Total Subbituminous Fuel Use, Summer Bituminous Fuel Use, Total Bituminous Fuel Use, Summer Lignite Fuel Use, Total Lignite Fuel Use - These six columns give the projected coal consumption, by coal rank,

during the summer months (May - September) and the year for which the run was parsed (Trillion British Thermal Units).

- Summer NOx Emission and Total NOx Emission - Projected NOx emitted from the unit during the summer months (May - September) and year round (Thousand tons) during the year for which the run was parsed.

- Total SO2 Emission - Projected annual SO2 emissions during the year for which the run was parsed (Thousand tons).

- Total CO2 Emission - Projected annual CO2 emissions during the year for which the run was parsed. (Thousand tons)

- Total Hg Emission - Projected annual mercury emissions during the year for which the run was parsed. (Tons).

Some parsed files contain two additional fields:

- Online Year - The year in which the unit came online.

- Heat Rate - The unit's projected heat rate for the year for which the run was parsed (Btus/KWh).

Download the explanation of parsed files (in pdf format, 9 kb).

Some of the documents provided by EPA are Adobe Acrobat PDF (Portable Document Format) files. For more information about PDFs, visit the About PDF page.



## U.S. Environmental Protection Agency

# Clean Air Markets - Programs and Regulations

Recent Additions | Contact Us | Print Version    Search:

EPA Home > Clean Air Markets > Programs and Regulations > EPA Modeling Applications Using The Integrated Planning Model > EPA, Results Using IPM

Home | Business | Programs | Progress | Trading | Reports | Data and Maps | Monitoring | Issues

**Acid Rain Program**

**NOx Trading Programs**

**Monitoring**

**US - Canada**

# EPA 2003 Results Using IPM

- Download IPM Run Results Files
- Download Detailed Results of IPM (IPM Run Parsed Files)

**EPA 2003 Results Using IPM**

The analyses of the Clear Skies Initiative are products of the updated model. Among the factors that make IPM particularly well suited to model multi-emissions control programs are (1) its ability to capture complex interactions among the electric power, fuel, and environmental markets, (2) its detail-rich representation of emission control options encompassing a broad array of retrofit technologies along with emission reductions through fuel switching, changes in capacity mix, and electricity dispatch strategies, and (3) its capability to model a variety of environmental market mechanisms, such as emissions caps, allowances, trading, and banking. Clear Skies is implemented through an emissions cap-and-trade program. Such programs are particularly well suited for modeling using IPM, because they rely on the operation of an allowance market, the availability of a broad range of emissions reduction options, and empowerment of economic actors to achieve emission limits. In particular, cap and trade programs, like the one employed in Clear Skies, work by allocating allowances that permit the emission of limited quantities of pollution during specified periods (e.g. ozone season or annually), permitting sources to choose whether to

comply with control requirements by reducing emissions or purchasing allowances from other sources. IPM's ability to capture the dynamics of the allowance market and its provision of a wide range of emissions reduction options are particularly important for assessing the impact of multi-emissions environmental policies like Clear Skies.

## Download IPM Run Files

Clicking on the run ID in the following table initiates the downloading process. To facilitate downloading, a single zipped archive file is posted for each run. Once downloaded, the files in the zipped archive file can be extracted and decompressed using any of a number of widely available archiving/decompression software programs. Several of the files in the archive are in compressed (i.e., zipped) format and can be decompressed using the same archiving/decompression software.

### Runs Table for EPA Modeling Applications 2003 Using IPM

| Run Name/Description | Run ID |
|---|---|
| *EPA Base Case for 2003 Analyses* <br> *SO2:* Title IV national annual cap and trade (9.47 million tons through 2009, 8.95 million tons 2010 onward). <br> *NOX:* SIP Call region summer cap and trade (473 thousand tons 2005 onward). <br> *State-specific* caps in Connecticut, Massachusetts, Missouri, New Hampshire, North Carolina, Texas, and Wisconsin. | EPA216a9c |

| | |
|---|---|
| *2003 Clear Skies Act*<br>*SO2:* 4.5 million ton annual cap in 2010 with national trading program and a 3.0 million ton presumptive cap in 2018.<br>*NOX:* 2.1 million ton annual cap in 2008 assigned to two Zones with trading programs, and a 1.7 million ton presumptive cap in 2018 assigned to two Zones.<br>*Hg:* 26 ton annual cap in 2010 with national trading program, and a 15 ton presumptive annual cap in 2018.<br>*State-specific* caps in Connecticut, Massachusetts, Missouri, New Hampshire, North Carolina, Texas, and Wisconsin. | EPA216c3 |
| 2003 Clear Skies Act Without Safety Valve | EPA216c1c |
| 2003 Clear Skies Act without Safety Valve Using Alternate Assumptions for Natural Gas Price and Electricity Growth | EPA216c11_b |
| 2003 Clear Skies Act without Safety Valve Using Alternate Assumptions for Natural Gas Price, Electricity Growth, and EMFs | EPA216c14 |

**Download 2003 IPM Run Parsed Files**

Clicking on the name of the parsed file in the following table initiates the downloading process. The files are posted in one of two formats, a zipped archive file or an excel spreadsheet. For a description of the content of the each parsed file see the explanation of parsed files.

**Table of Parsed Run Data for EPA Modeling Applications Using IPM**

| Parsed Run | File Type/Size |
|---|---|
| EPA Base Case 2003 parsed for year 2010 | 8.6 MB zipped excel file |

| EPA Base Case 2003 parsed for year 2020 | 35.7 MB zipped excel file |
| 2003 Clear Skies Act parsed for year 2010 | 8.3 MB excel file |
| 2003 Clear Skies Act parsed for year 2020 | 9.3 MB excel file |
| 2003 Clear Skies Without Safety Valve Parsed for year 2010 | 8.5 MB Zipped Excel File |
| 2003 Clear Skies Without Safety Valve Parsed for year 2020 | 14 MB Zipped Excel File |

**Explanation of Parsed Files**

EPA Modeling Applications of the Integrated Planning Model produce forecasts for model plants, i.e., clusters of real life units with similar characteristics. A parsed file is an Excel spreadsheet that provides unit-level results derived from the model plant projections obtained by the Integrated Planning Model (IPM). Parsed results are generally only produced for fossil-fuel fired units. Projections for individual plants are based on data currently available and modeling parameters which are simplifications of the real world. It is likely that future actions regarding individual plants will differ from model projections of actions; however, the aggregate impacts are expected to be appropriately characterized by the model.

The following is an explanation of the fields that appear in a parsed file.

- Year - the model run year from which the parsed results were derived (usually 2010 or 2020).

- Online YearUnique ID - The unique identifier assigned to a boiler or generator within a plant. It consists of the Plant ID (or ORIS Code), an indication of whether the unit is a boiler ("B"), generator ("G"), or committed unit ("C"), and the Unit ID. For example, for the Unique ID "113_B_1", "113" is the Plant ID, "B" indicates that this unit is a boiler, and "1" indicates that the ID of the boiler is 1.

- Plant name - The Plant's name.

- Plant Type - An indication of the type of unit - e.g., coal steam, combined cycle, IGCC (integrated gasification combined cycle), oil and gas steam, combustion turbine.

- Fuel Type - The type of fuel used in the unit for electricity generation - e.g., coal, gas, oil, other.

- State Name, State Code, County, County Code - These four fields identify the geographic location of the unit. The State Code is the FIPS State Code, and the County Code is the FIPS County Code. New units have blanks in these columns, while committed units have zeros.

- Plant ID - The unique identifier assigned to each plant in the model. Committed units have zeroes in this column, while new units have blanks. Otherwise, all Plant IDs are unique to the plant. All units within a plant will typically have the same Plant ID. The Plant ID is most often the ORIS Code.

- Unit ID - The identifier assigned to each unit/boiler in a given plant.

- Capacity - The capacity of the unit available for generation for sale to the grid. This capacity reflects the adjustments made to the unit's initial capacity in projections from IPM runs.

- Typical July Day Heat Input - The model projects heat input for the summer season. The summer season heat input is used as the basis to estimate an average heat input over the course of a day in July (billion Btu/day). Typical July Day NOx - The model projects NOx emissions for the summer season. The summer season NOx emissions is used as the basis to estimate typical NOx emissions for July (tons/day).

- Firing - For boilers, this field indicates the burner type and configuration (e.g., cyclone, FBC (fluidized bed combustion), stoker/SPR, tangential, or vertical. "Unknown" appears in instances where the burner configuration of a boiler was not

known. "Other" appears for units that were not boilers.

- Bottom - For boilers, this field indicates distinguishing characteristics of the bottom of the combustion chamber (e.g., dry, wet). Blanks and "Unknown" appears in instances where the bottom characteristics of a boiler were not known. "Other" appears for units that were not boilers.

- EMF_Controls - Shows combination of scrubber, NOx post-combustion controls and particulate matter controls that already exists at the unit. Existing NOx Controls - NOx controls that already exists at the unit.

- Retrofit Code 1, Retrofit Code 2, Retrofit Control 1, Retrofit Control 2 - These columns indicate the emission control technology retrofits that the model projects will be installed on the unit. Note, the model can retrofit units with control technologies at two different stages. Retrofit Code 1 and Retrofit Control 1 show the control technologies installed in stage 1. Retrofit Code 2 and Retrofit Control 2 show the control technologies installed in stage 2. The "Retrofit Control" columns indicate the category of controls installed. The retrofit control may include gas reburn, mercury controls, early retirement, SCR (selective catalytic reduction), SNCR (selective non-catalytic reduction), and scrubber. The "Retrofit Code" columns provide the code for the specific control technology installed. For example, LD01, LO01, LO02, ML01, ML02 are codes for various types of scrubbers. Whenever "scrubber" appears in a "Retrofit Control" column, one of these five codes will appear in the corresponding "Retrofit Code" column. Early retirement, though not a control is treated as a retrofit in the modeling and is therefore included in the column. Early retirement indicates that the model projected the unit to retire early.

- Retrofit NOx/SO2 Controls - Summarizes all of the control technologies that a unit has put on in stage 1 and stage 2. This column combines the information that appears in the Retrofit Control1 and Retrofit Control2 columns. The retrofits are cumulative to the year for which the run is parsed. For instance, if the parsed file is for 2020, it will include all retrofits

projected by the model for the unit through 2020.

- Fossil unit? - Indicates whether the unit is fossil-fuel fired.

- Summer Fuel Use - Projected fuel consumed at the unit in May - September (Trillion British thermal units) during the year for which the run was parsed.

- Total Fuel Use - Projected fuel consumed at the unit during the year for which the run was parsed (Trillion British thermal units).

- Summer Subbituminous Fuel Use, Total Subbituminous Fuel Use, Summer Bituminous Fuel Use, Total Bituminous Fuel Use, Summer Lignite Fuel Use, Total Lignite Fuel Use - These six columns give the projected coal consumption, by coal rank, during the summer months (May - September) and the year for which the run was parsed (Trillion British Thermal Units).

- Summer NOx Emission and Total NOx Emission - Projected NOx emitted from the unit during the summer months (May - September) and year round (Thousand tons) during the year for which the run was parsed.

- Total SO2 Emission - Projected annual SO2 emissions during the year for which the run was parsed (Thousand tons).

- Total CO2 Emission - Projected annual CO2 emissions during the year for which the run was parsed. (Thousand tons)

- Total Hg Emission - Projected annual mercury emissions during the year for which the run was parsed. (Tons)

Some parsed files contain two additional fields:

- Online Year - The year in which the unit came online.

- Heat Rate - The unit's projected heat rate for the year for which the run was parsed (Btus/KWh).



# U.S. Environmental Protection Agency

# Clean Air Markets - Programs and Regulations

Recent Additions | Contact Us | Print Version    Search:

EPA Home > Clean Air Markets > Programs and Regulations > EPA Modeling Applications Using The Integrated Planning Model > EPA, Results Using IPM

| Home | Business | Programs | Progress | Trading | Reports | Data and Maps | Monitoring | Issues |

**Acid Rain Program**

**NOx Trading Programs**

**Monitoring**

**US - Canada**

# IPM Analysis for the Clean Air Interstate Rule (CAIR) - Formerly known as the Interstate Air Quality Rule (IAQR)

**For an introduction to EPA modeling applications using IPM and detailed model documentation, see the EPA-IPM main page.**

## Download IPM Run Files and Parsed Files

Clicking on the run ID in the following table initiates the downloading process. To facilitate downloading, a single zipped archive file is posted for each run. Once downloaded, the files in the zipped archive file can be extracted and decompressed using any of a number of widely available archiving/decompression software programs. Several of the files in the archive are in compressed (i.e., zipped) format and can be decompressed using the same archiving/decompression software.

Clicking on the name of a parsed file in the following table initiates the downloading process. The files are posted in one or two formats, a zipped archive or an excel spreadsheet. For a description of the content of each parsed file see the Explanation of Parsed Files.

For more detail regarding the IPM runs used for the Clean Air

Interstate Rule, please see the CAIR docket. A description of the runs used for the Final CAIR can be found in the Final Rule Preamble, the Regulatory Impact Analysis (Appendix D), and the Technical Support Document named Modeling of Control Costs, Emissions, and Control Retrofits for Cost Effectiveness and Feasibility Analyses.

| January 2004 NPR | . |
|---|---|
| **IPM Run Name** | **IPM Run ID** |
| EPA Base Case for 2003 Analyses | EPA216_a9c |
| EPA Base Case 2003 parsed for year 2010 | EPA216a9c_2010_parsed |
| EPA Base Case 2003 parsed for year 2015 | EPA216a9c_2015_parsed |
| Proposed IAQR Case | EPA216_IAQR_2003 |
| Proposed IAQR Case parsed for year 2010 | EPA216_IAQR_2003_2010_parsed |
| Proposed IAQR Case parsed for year 2015 | EPA216_IAQR_2003_2015_parsed |
| Proposed IAQR SO2 Policy with Base Case NOx | EPA216_IAQR_NONOX_2003 |
| Proposed IAQR NOx Policy with Base Case SO2 | EPA216_IAQR_NOSO2_2003 |
| Proposed IAQR Using Alternative Assumptions for Natural Gas Price and Electricity Demand | EPA216_IAQR_HI_G+E_2003 |

| Proposed IAQR Using Alternative Assumptions for Natural Gas Price, Electricity Demand and SCR Costs | EPA216_IAQR_HI_G+E+SCR_2003 |
|---|---|
| Proposed IAQR Using Base Case SO2 Policy and Proposed NOx Policy in Ozone Season Only | EPA216_IAQR_SUMNOX_2003 |
| EPA Base Case for 2003 Analyses Using Alternate Assumptions for Natural Gas Price and Electricity Demand | EPA216_c5c |
| EPA Base Case for 2003 used for Zero-Out Modeling | EPA215_IAQR_ZOBC_2003 |
| EPA Base Case for 2003 used for Zero-Out Modeling parsed for year 2010 | EPA215_IAQR_ZOBC_2003_2010_parsed |
| Proposed IAQR with Trading Ratios for Title IV Allowances | EPA216_IAQR_T4_Ratios_2003 |
| **June 2004 SNPR** | . |
| **IPM Run Name** | **IPM Run ID** |
| Updated IPM modeling of the CAIR control strategy for the SNPR | EPA216_CAIR_SNPR |
| **Final CAIR** | . |
| **IPM Run Name** | **IPM Run ID** |
| EPA Base Case 2004 | Base Case 2004 |

| EPA Base Case 2004 parsed for year 2010 | IPM Base Case 2010 Parsed |
| EPA Base Case 2004 parsed for year 2015 | IPM Base Case 2015 Parsed |
| EPA Base Case 2004 parsed for year 2020 | IPM Base Case 2020 Parsed |
| IPM Run CAIR 2004 Analysis | CAIR 2004 Analysis |
| IPM Run CAIR 2004 Final | CAIR 2004 Final |
| IPM Run CAIR 2004 Final DE and NJ | CAIR 2004 Final DE and NJ |
| IPM Run BART 2004 Nationwide | BART 2004 Nationwide |
| IPM Run CAIR and BART 2004 | CAIR and BART 2004 |
| IPM Run CAIR 2004 CSP | CAIR 2004 CSP |
| IPM Run Base Case 2004 EIA | Base Case 2004 EIA |
| IPM Run CAIR 2004 EIA | CAIR 2004 EIA |
| IPM Run CAIR 2004 EIA One Phase | CAIR 2004 EIA One Phase |
| IPM Run CAIR 2004 EIA SCR Costs | CAIR 2004 EIA SCR Costs |
| IPM Run CAIR 2004 SCR Bypass NOx SIP Call | CAIR 2004 SCR Bypass NOx SIP Call |
| IPM Run CAIR 2004 No NOx | CAIR 2004 No NOx |
| IPM Run CAIR 2004 No SO2 | CAIR 2004 No SO2 |

| IPM Run CAIR 2004 No SO2 Summer NOx 1 | [CAIR 2004 No SO2 Summer NOx 1](#) |
| IPM Run CAIR 2004 No SO2 Summer NOx 2 | [CAIR 2004 No SO2 Summer NOx 2](#) |
| IPM Run BART 2004 No NOx | [BART 2004 No NOx](#) |
| IPM Run BART 2004 No SO2 | [BART 2004 No SO2](#) |
| IPM Run CAIR 2004 No Retirement Ratios | [CAIR 2004 No Retirement Ratios](#) |
| IPM Parsed File EPA CAIR parsed for year 2010 (used for air quality modeling) | [IPM Cair 2010 Parsed](#)(Excel) |
| IPM Parsed File EPA CAIR parsed for year 2015 (used for air quality modeling) | [IPM Cair 2015 Parsed](#)(Excel) |
| IPM Parsed File EPA CAIR parsed for year 2020 (used for air quality modeling) | [IPM Cair 2020 Parsed](#)(Excel) |
| IPM Parsed File EPA Final CAIR parsed for year 2010 (Final CAIR modeling) | [IPM Final Cair 2010 Parsed](#)(Excel) |
| IPM Parsed File EPA Final CAIR parsed for year 2015 (Final CAIR modeling) | [IPM Final Cair 2015 Parsed](#)(Excel) |
| IPM Parsed File EPA Final CAIR parsed for year 2020 (Final CAIR modeling) | [IPM Final Cair 2020 Parsed](#)(Excel) |

| IPM Parsed File EPA BART Nationwide parsed for year 2015 | IPM BART Nationwide 2015 Parsed (Excel) |
|---|---|
| IPM Parsed File EPA CAIR and BART parsed for year 2015 | IPM CAIR and BART 2015 Parsed (Excel) |



CAM Update | Forms | Workshops | Glossary
Site Map | About Us | Questions and Answers | Other Resources

EPA Home | Privacy and Security Notice | Contact Us



## U.S. Environmental Protection Agency

# Clean Air Markets - Programs and Regulations

Recent Additions | Contact Us | Print Version    Search:

EPA Home > Clean Air Markets > Programs and Regulations > EPA Modeling Applications Using The Integrated Planning Model > EPA, Results Using IPM

Home | Business | Programs | Progress | Trading | Reports | Data and Maps | Monitoring | Issues

**Acid Rain Program**

**NOx Trading Programs**

**Monitoring**

**US - Canada**

# IPM Analysis for the Clean Air Mercury Rule (CAMR) - formerly known as the Utility Mercury Reductions Rule

**For an introduction to EPA modeling applications using IPM and detailed model documentation, see the EPA-IPM main page.**

## Download IPM Run Files and Parsed Files

Clicking on the run ID in the following table initiates the downloading process. To facilitate downloading, a single zipped archive file is posted for each run. Once downloaded, the files in the zipped archive file can be extracted and decompressed using any of a number of widely available archiving/decompression software programs. Several of the files in the archive are in compressed (i.e., zipped) format and can be decompressed using the same archiving/decompression software.

Clicking on the name of a parsed file in the following table initiates the downloading process. The files are posted in one or two formats, a zipped archive or an excel spreadsheet. For a description of the content of each parsed file see the Explanation of Parsed Files.

For more detain regarding the IPM runs used for the Clean Air

[Mercury Rule](), please see the CAMR docket. A description of the runs used for the Final CAMR can be found in the [Final Rule Preamble]() and the [Regulatory Impact Analysis]().

| January 30, 2004 NPR | |
|---|---|
| **IPM Run Name** | **IPM Run ID** |
| EPA Base Case for 2003 MACT Analyses | [MACT basecase - 2003]() |
| EPA MACT Proposal 2003 | [MACT proposal 2003]() |
| EPA MACT Proposal 2003 Using Alternative Assumptions for Natural Gas Price and Electricity Growth | [MACT 2003 - sensitivity]() |
| EPA Basecase for 2003 MACT parsed for year 2010 | [MACT basecase - 2010 parsed results]() |
| EPA MACT Proposal 2003 parsed for year 2010 | [MACT proposal - 2010 parsed results]() |
| **Final CAMR** | |
| **IPM Run Name** | **IPM Run ID** |
| Base Case 2004 | [Base Case 2004]() |
| IPM Run CAIR 2004 Analysis | [CAIR 2004 Analysis]() |
| IPM Run CAIR 2004 Final | [CAIR 2004 Final]() |
| IPM Run CAMR 2004 Option 1 - Final CAMR Control Strategy | [CAMR Option 1]() |
| IPM Run CAMR 2004 Option 2 | [CAMR Option 2]() |
| IPM Run CAMR 2004 Option 3 | [CAMR Option 3]() |
| IPM Run CAMR Sorbent Sensitivity Option 1 | [CAMR Sorbent Sensitivity Option 1]() |
| IPM Run Base Case 2004 EIA | [Base Case 2004 EIA]() |
| IPM Run CAIR 2004 EIA | [CAIR 2004 EIA]() |
| IPM Run CAMR 2004 EIA | [CAMR 2004 EIA]() |

| EPA Base Case 2004 parsed for the year 2010 | [IPM Base Case 2010 Parsed](#) |
| EPA Base Case 2004 parsed for the year 2015 | [IPM Base Case 2015 Parsed](#) |
| EPA Base Case 2004 parsed for the year 2020 | [IPM Base Case 2020 Parsed](#) |
| IPM Parsed File EPA CAIR parsed for the year 2020 | [IPM CAIR 2020 Parsed](#) |
| IPM Parsed File EPA CAMR Option 1 parsed for the year 2010 | [IPM CAMR Option 1 2010 Parsed](#) |
| IPM Parsed File EPA CAMR Option 1 parsed for the year 2020 | [IPM CAMR Option 1 2020 Parsed](#) |
| IPM Parsed File EPA CAMR Option 2 parsed for the year 2020 | [IPM CAMR Option 2 2020 Parsed](#) |
| IPM Parsed File EPA CAMR Option 3 parsed for the year 2020 | [IPM CAMR Option 3 2020 Parsed](#) |



[CAM Update](#) | [Forms](#) | [Workshops](#) | [Glossary](#)
[Site Map](#) | [About Us](#) | [Questions and Answers](#) | [Other Resources](#)

[EPA Home](#) | [Privacy and Security Notice](#) | [Contact Us](#)

http://www.epa.gov/airmarkets/epa-ipm/utilityhgredux.html (3 of 3) [9/13/2005 11:00:09 AM]

A-96-56
II-A-07
121 pgs



OCT - 7 1997

EPA AIR DOCKET

# ANALYZING ELECTRIC POWER GENERATION UNDER THE CAAA

Office of Air and Radiation
U.S. Environmental Protection Agency

July 1996

Exhibit B

## ANALYZING ELECTRIC POWER GENERATION UNDER THE CAAA

The Clean Air Act Amendments of 1990 require the U.S. Environmental Protection Agency to consider regulations that would directly or indirectly result in the need to reduce the emissions of pollutants from the generation of electric power in the future. The Agency wants to consider how to use this statutory authority cost-effectively to meet air quality objectives.

In keeping with this goal, the Office of Air and Radiation of EPA recognized the need develop to a new approach to analyzing electric power generation. In the past, the Agency has relied on the Coal Electric Utility Model (CEUM). The following aims for a new system were set:

- Produce quick and reliable results
- Be credible and broadly accepted
- Analyze scales ranging from state-level to national-level
- Handle multiple pollutants
- Examine seasonal control strategies
- Estimate least cost compliance
- Address the influence of regulatory uncertainty in new capacity decisions
- Evaluate the implications of a more competitive environment in the power industry

## Meeting Analytic Objectives

To meet these objectives, EPA conducted three activities:

- Reviewed models that could handle this effort and selected the Integrated Planning Model (IPM) of ICF Resources as the best tool to meet the Agency's needs.
- Compiled the best available information on key macro energy and economic assumptions, electric generation technologies, air emissions under current federal and state regulatory requirements, and pollution control technologies.
- Requested comments and used recommendations made by the public on energy modeling assumptions (through the external review process that occurred in the Clean Air Power Initiative).

## Use of the IPM Model

IPM is a well-established utility planning model that has been used for a wide range of electric power generation applications by many different types of clients. This model can consider the emission reductions and costs of controlling several pollutants over time and can be set up to consider seasonal as well as annual pollution controls. It has a foresight feature that considers what the cheapest way to operate the power system is over a specified period (e.g. 2000 to 2010) subject to any specified constraints (e.g. pollutant caps, or transmission limitations) that are placed on power generation units. Proper application of the model can provide quick and reliable results at a reasonable cost. See Appendix 1 for more details on

IPM and groups that have used it.

### Assumptions

Concurrent with the selection of the model, EPA began an effort to collect the best available information on factors that will influence how and where electric power will be produced in the future. These assumptions fell into four categories:

**Macro Energy and Economic Assumptions** - These assumptions are related primarily to electricity and growth, fuel prices, power plant availability, heat rates, lifetimes, and capacity factors. See Appendix No. 2 for details.

**Electric Technology Costs and Performance** - These assumptions are related to electric technology cost and performance assumptions for new electric power plant performance and costs and existing plant operation, refurbishment and repowering performance and costs. See Appendix No. 3 for details.

**Air Emissions Levels under the Regulatory Baseline** - These assumptions cover current EPA and state requirements that will affect emission levels from various facilities. The focus has been on sulfur dioxide ($SO_2$) and nitrogen oxide ($NO_x$) controls. The Agency has also developed emission factors for unregulated mercury and carbon dioxide (carbon) emissions. See Appendix No. 4 for details.

**Pollution Control Performance and Costs** - These assumptions primarily cover the performance and unit costs of pollution control technologies for $NO_x$ and $SO_2$. EPA also has gathered information on the performance and costs of pollution control technology that could be used in the future to control mercury emissions. See Appendix No. 5 for details.

### External Review

In April 1996, EPA requested participants in the Clean Air Power Initiative to comment on the Agency's new approach to forecasting electric power generation and selected air emissions. EPA received many helpful comments and made a series of changes in its methodology and assumptions based on commentor recommendations. In conjunction with this, over the last year the Agency has received technical assistance on a wide range of technical issues from the Energy Information Administration. Non-governmental technical organizations, such as the Electric Power Research Institute and the Gas Research Institute have provided information periodically on specific technical issues.

EPA has compiled and evaluated sufficient technical information to run the IPM model and consider the implications of different types of air pollution control strategies. However, the Agency sees the collection of technical information on various aspects of the power industry as an ongoing activity that will lead to routine updating of assumptions and improvements in the forecasts and analyses done with this modeling system.

**Coverage**

The national application of IPM is able to provide EPA estimates of the future impacts of various pollution control strategies at various levels of detail. Currently, we are using it to provide results at state, NERC Region (and subregion), and national levels. See Figure 1 for a map of the NERC regional divisions that occur in the model (see Appendix 6 for key to map abbreviations). The analysis that the Agency is doing geographically covers the 48 contiguous states and the District of Columbia. All existing utility power generation units are covered in the model, as well as independent power producers and other cogeneration facilities that sell wholesale power, if they were included in the NERC data base for reliability planning. The model considers future additions by both utilities and independent power producers.

The model is able to provide estimates of air emission changes, incremental electric power system costs, changes in fuel use, and other impacts that different approaches to air pollution control in the electric power generation industry will have. It provides basic information necessary to consider the consumer price impacts, employment changes, and other types of economic impacts.

EPA's application of the model has focused heavily on understanding the operations of fossil-fueled units in the future, where the greatest level of air emissions will result. EPA's application of the model does consider the operations of nuclear and renewable energy sources, although it does not examine the air emissions produced by any of these units.

Although IPM has the capability to look annually over a long planning horizon, EPA has set it up to look at the intermediate term. The model forecasts how electric power will be generated in 2000, 2005, and 2010. The Agency has focused on developing two main forecasts of electric power generation and air emissions. The primary case that EPA uses for policy analysis is the **Base Case**. There is also a **Higher Emissions Case,** which is based on the consideration of factors that could lead to higher air pollution emissions in the future. The results for each of these cases is presented below.

**Base Case Forecasts**

EPA constructed a Base Case electric power generation forecast from 2000 to 2010 based on conclusions that it made on the best assumptions to use for factors that determine the level of power generation that will occur from various technologies. The Agency used the electric generation forecast to develop estimates of future air emissions for selected air pollutants ($NO_x$, $SO_2$, mercury and carbon).

**Electric Power Generation**

Table 1 provides the national results of EPA's Base Case for electric power generation by fuel type. Figure 2 shows the generation trends by fuel type over the forecast period. The forecast predicts that electric generation will continue to grow over the next 15 years. Most power in the United States will be supplied by coal-fired electric generation units that gradually increase their output to keep pace with demand over the forecast period. Increases in generation by coal-fired units after 2000 occurs through their increased use of existing capacity. The forecast predicts no new coal-fired units will be built after 2000.

| United States | Office of Air and Radiation | EPA-452/R-98-003 |
| Environmental Protection | Washington, DC 20460 | September 1998 |
| Agency | | |

# REGULATORY IMPACT ANALYSIS FOR THE NOx SIP CALL, FIP, AND SECTION 126 PETITIONS

## Volume 1:  Costs and Economic Impacts



Exhibit C

# REGULATORY IMPACT ANALYSIS FOR THE NOx SIP CALL, FIP, AND SECTION 126 PETITIONS

## Volume 1:  Costs and Economic Impacts

Prepared by

**Office of Air Quality Planning and Standards**
**Office of Atmospheric Programs**
**U.S. Environmental Protection Agency**

September 1998

## Table of Contents

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

LIST OF FIGURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

LIST OF TABLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

LIST OF ACRONYMS AND ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xx

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-1

Chapter 1.  INTRODUCTION AND BACKGROUND
   1.1  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
   1.2  The Clean Air Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2
       1.2.1  Ozone Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3
       1.2.2  NOx Control  and Ozone Reduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-4
       1.2.3  Title IV NOx  Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-6
       1.2.4  New Source Performance Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-7
       1.2.5  Reasonably Available Control Technology Requirements . . . . . . . . . . . . . . . . . . . . 1-8
       1.2.6  Northeast Ozone Transport Region  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-8
   1.3  Overview of the NOx SIP Call Rulemaking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-9
   1.4  Relationship Between NOx SIP Call, FIP, and Section 126 Petitions . . . . . . . . . . . . . . . . . 1-9
   1.5  Statement of Need for the NOx SIP Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-11
       1.5.1  Statutory Authority and Legislative Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . 1-11
       1.5.2  Health and Welfare Effects of NOx Emissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-11
       1.5.3  Need for Regulatory Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-12
   1.6  Requirements for this Regulatory Impact Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-13
       1.6.1  Executive Order 12866 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-13
       1.6.2  Regulatory Flexibility Act and Small Business Regulatory Enforcement Fairness
              Act of 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-13
       1.6.3  Unfunded Mandates Reform Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-14
       1.6.4  Paperwork Reduction Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-15
       1.6.5  Executive Order 12898 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-15
       1.6.6  Health Risks for Children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-15
   1.7  Structure and Organization of the Regulatory Impact Analysis . . . . . . . . . . . . . . . . . . . . . . 1-16
   1.8  References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-18

Chapter 2.  REGULATORY ALTERNATIVES
   2.1  Elements Considered in Developing Regulatory Alternatives . . . . . . . . . . . . . . . . . . . . . . . . 2-1
       2.1.1  Type of Control  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
       2.1.2  Geographic Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-2
       2.1.3  Potentially Affected Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4
       2.1.4  Stringency of Control Level  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4

2.1.5    Effective Dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2-5
2.1.6    Emissions Budget Trading System Design . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2-5
2.2    Definition of Regulatory Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2-6
2.3    References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2-8

Chapter 3.  PROFILE OF REGULATED ENTITIES
3.1    Electricity Generating Units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3-3
3.2    Industrial Boilers and Turbines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3-8
3.3    Other Stationary Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3-13
3.4    Other NO$_X$ Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3-16
3.5    Overview of Baseline Emissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3-18
3.6    References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3-18

Chapter 4.  METHODOLOGY FOR ESTIMATING EMISSIONS, COST, AND ECONOMIC
          IMPACTS FOR THE ELECTRIC POWER INDUSTRY
4.1    Analytical Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-1
4.2    Integrated Planning Model Assumptions and Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-2
       4.2.1    Macro Energy and Economic Assumptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-4
       4.2.2    Electric Energy Cost and Performance Assumptions . . . . . . . . . . . . . . . . . . . . . .    4-6
       4.2.3    Pollution Control Performance and Cost Assumptions . . . . . . . . . . . . . . . . . . . .    4-8
       4.2.4    Air Emissions Rates under the Base Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-9
4.3    Allowance Allocations and Trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-10
       4.3.1    Purpose of Allowances and Assumptions about Allocations . . . . . . . . . . . . . . . . .    4-10
       4.3.2    Trading Assumptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-11
4.4    Administrative Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-11
       4.4.1    Administrative Costs to Affected Electricity Generating Units . . . . . . . . . . . . . . .    4-11
       4.4.2    Transaction Costs of Trading Allowances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-12
       4.4.3    Administrative Costs to States and Local Governments . . . . . . . . . . . . . . . . . . . .    4-13
       4.4.4    Administrative Costs to the U.S. EPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-13
4.5    Direct Economic Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-14
       4.5.1    Costs to Electric Power Producers Relative to Revenues . . . . . . . . . . . . . . . . . . .    4-14
       4.5.2    Assessment of Potential for Passing on Cost Increases . . . . . . . . . . . . . . . . . . . .    4-14
       4.5.3    Assessment of Potential for Closures and Additions . . . . . . . . . . . . . . . . . . . . . .    4-15
4.6    Indirect Economic Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-15
4.7    Limitations of the Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-15
4.8    References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4-16

Chapter 5.  METHODOLOGY FOR ESTIMATING EMISSION REDUCTIONS, COSTS AND
          ECONOMIC IMPACTS FOR NON-ELECTRICITY GENERATING UNITS
5.1    Analytical Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-1
5.2    NOx Control Technology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-2
       5.2.1    NOx Control Technology for Industrial Boilers and Turbines . . . . . . . . . . . . . . . .    5-2
       5.2.2    NOx Control Technology for Other Stationary Sources . . . . . . . . . . . . . . . . . . . . .    5-3
5.3    Control Costs and Cost Effectiveness Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-4

5.4    Administrative Costs for Industrial Boilers and Turbines . . . . . . . . . . . . . . . . . . . . . . . . .    5-6
5.5    Economic Impacts Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-6
    5.5.1    Overview of the Economic Impact Analysis Methodology . . . . . . . . . . . . . . . . . . .    5-6
    5.5.2    Data Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-8
5.6    Small Entity Economic Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-10
5.7    References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-10


Chapter 6.  RESULTS OF COST, EMISSIONS, AND ECONOMIC IMPACT ANALYSES FOR THE
             ELECTRIC POWER INDUSTRY
6.1    Comparison of Uniform Options to the Initial Base Case . . . . . . . . . . . . . . . . . . . . . . . . .    6-1
    6.1.1    Technology Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-2
    6.1.2    Emissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-3
    6.1.3    Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-7
    6.1.4    Cost-Effectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-8
    6.1.5    Initial Base Case Compared to Final Base Case . . . . . . . . . . . . . . . . . . . . . . . . .    6-11
6.2    Regional versus Uniform Approach to Trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-11
    6.2.1    Comparison of Baseline and Uniform 0.15 Option to the Two-Region
          Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-12
    6.2.2    Comparison of Three-Region Alternative to Uniform 0.15 Alternative . . . . . . . . . . .    6-13
6.3    Other Program Designs and Sensitivity to Modeling Assumptions . . . . . . . . . . . . . . . . . . .    6-18
    6.3.1    Costs without Interstate Trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-18
    6.3.2    Banking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-19
    6.3.3    Uniform 0.35 lb/mmBtu Trading Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-20
    6.3.4    Sensitivity to IPM Assumptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-21
6.4    Direct Economic Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-25
    6.4.1    Costs Relative to Electricity Generation and Revenues . . . . . . . . . . . . . . . . . . . . .    6-26
    6.4.2    Potential Electricity Price Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-30
    6.4.3    Distribution of Cost Impacts Across Generation Types . . . . . . . . . . . . . . . . . . . . .    6-30
    6.4.4    Potential Impacts on Small Electricity Generators . . . . . . . . . . . . . . . . . . . . . . . .    6-32
    6.4.5    Potential for Closures and Additions of Capacity . . . . . . . . . . . . . . . . . . . . . . . . .    6-33
6.5    Indirect Economic Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-33
    6.5.1    Potential Employment Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-33
    6.5.2    Potential Impacts on Industrial Users of Electricity . . . . . . . . . . . . . . . . . . . . . . . .    6-35
    6.5.3    Potential Impacts on Households . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-38
6.6    Administrative Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-40
6.7    References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-41

Chapter 7.    RESULTS OF COST, EMISSIONS REDUCTIONS, AND ECONOMIC IMPACT
             ANALYSES FOR NON-ELECTRICITY GENERATING UNITS
7.1    Compliance Costs and Cost-Effectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7-1
    7.1.1    Results for Industrial Boilers and Combustion Turbines . . . . . . . . . . . . . . . . . . . . .    7-2
    7.1.2    Results for Internal Combustion Engines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7-3
    7.1.3    Results for Cement Manufacturing (Cement Kilns) . . . . . . . . . . . . . . . . . . . . . . . .    7-5

7.1.4    Results for Glass Manufacturing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-7
7.1.5    Results for Process Heaters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8
7.1.6    Results for Commercial and Institutional Incinerators . . . . . . . . . . . . . . . . . . . . . . . . 7-9
7.1.7    Summary of Results for Non-Electricity Generating Sources . . . . . . . . . . . . . . . . . . . 7-11
7.1.8    Administrative Costs for Non-Electricity Generating Units . . . . . . . . . . . . . . . . . . . 7-12
7.2    Potential Economic Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-13
7.2.1    Overview of Potentially Affected Sources, Establishments and Firms . . . . . . . . . . . 7-15
7.2.2    Results for the Preferred Alternative Combination (60%/$5,000) . . . . . . . . . . . . . . 7-17
7.2.3    Comparison By Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-22
7.3    Small Entity Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-23
7.4    References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-24

Chapter 8.  IMPACTS ON GOVERNMENT ENTITIES
8.1    State Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-1
8.1.1    Planning Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-2
8.1.2    Data Collection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-4
8.2    Administrative Costs Associated with Electricity Generating Units . . . . . . . . . . . . . . . . . . 8-6
8.3    Administrative Costs Associated with Other Stationary Sources . . . . . . . . . . . . . . . . . . . . . 8-8
8.4    Government-Owned Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9
8.5    References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

Chapter 9.  INTEGRATED COST, EMISSIONS, AND SMALL ENTITY IMPACTS SUMMARY
9.1    Emission Reductions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-1
9.2    Compliance Costs and Cost-Effectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-3
9.2.1    Cost-Effectiveness Comparisons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-6
9.3    Integrated Potential Small Entity Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-7

Appendix    STATE-BY-STATE OZONE SEASON NOx EMISSIONS FOR ELECTRICITY
GENERATING UNITS BY REGULATORY ALTERNATIVE . . . . . . . . . . . . . . . . . . . . . A-1

# Chapter 2.  REGULATORY ALTERNATIVES

This chapter explains the various regulatory alternatives considered in this analysis. Section 2.1 provides background on the elements that differentiate the options that were considered, and Section 2.2 defines the options that were analyzed and compared.

## 2.1     Elements Considered in Developing Regulatory Alternatives

EPA's NOx SIP call sets summer NOx emissions budgets for eastern States that the Agency has found significantly contribute to the nonattainment by other States of the pre-existing ozone standard (1-hour) and will contribute in the future to nonattainment by other States with the revised ozone standard (8-hour). EPA relied heavily on its estimation of the NOx reductions that the electric power industry and other stationary sources could provide cost-effectively in setting the State budgets. Other factors, such as the feasibility of implementing controls in a reasonable time frame, also influenced the Agency's final decisions. To estimate the cost-effectiveness of controls for various sources, the Agency considered several ways that controls could be implemented in the SIP call region. However, States can place controls on their sources of NOx emissions differently than the approach that EPA used in the budget setting process, if they can show that control strategy will provide the same level of NOx reduction in the SIP call region.

This section describes the elements that make up the various regulatory alternatives considered for this analysis. The regulatory alternatives described in Section 2.2 represent various combinations of these elements. Some elements of the rule remain the same for all the options considered. Other elements are considered in varying combinations, including stringency of controls, geographic scope, affected sources and design of the trading system. For all options analyzed, the timing of regulatory requirements was also considered, as this issue is critical in terms of feasibility of compliance and attainment of both the pre-existing ant the revised ozone standard.

### 2.1.1   Type of Control

EPA had to decide on the types of regulatory approaches that the Agency wanted States to consider in their efforts to lower NOx emissions from various source categories. EPA used those approaches in estimating the cost-effectiveness of ozone season NOx controls at various

levels for different types of sources.   OTAG recommended that the Agency consider controls that allow for emissions trading, rather than traditional command-and-control regulation. OTAG's analysis of trading programs had shown that there could be considerable savings from this type of approach for the electric power industry  (OTAG, 1997).

EPA also demonstrated the potential savings from a NOx emissions trading program that could result in its regulatory analysis for the proposed NOx SIP call (EPA, 1997a).  That analysis showed that in 2005 a command-and-control program for the electric power industry would cost about 30 percent more than a trading program in the NOx SIP call region.  For that reason, the Agency has focused heavily on developing regulatory approaches that States can use collectively that are based on allowance-based NOx emissions trading.   It was also clear from OTAG analysis and EPA's own work that further savings and flexibility  could be gained from allowing banking as part of a trading program.   EPA's regulatory analysis over the last year has also considered banking options for inclusion in the Model Trading Rule for States  (EPA, 1997b).

## 2.1.2   Geographic Scope

After considering OTAG's recommendations and other relevant information, EPA identified 22 States plus the District of Columbia (i.e., 23 jurisdictions) as significantly contributing to nonattainment with, or interfering with maintenance of, air quality standards in a downwind State.  The SIP call region is shown in Figure  2-1 and consists of Alabama, Connecticut, Delaware, District of Columbia, Georgia, Illinois, Indiana, Kentucky, Massachusetts, Maryland, Michigan, Missouri, North Carolina, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Virginia, West Virginia, and Wisconsin.

The final rule reflects State NOx budgets that are developed using the same region-wide stringency targets and region-wide analyses of cost-effectiveness for all 23 jurisdictions.  EPA also considered dividing the SIP call region into two or three subregions in an effort to make a distinction among the States that may contribute the most to the ozone transport problem and those where the wind patterns may be less likely to affect air quality in the other States.  The SIP call region was divided into two regions--Northeast and Southeast, or into three regions-- Northeast, Midwest, and Southeast.  Different levels of stringency are then applied in the different regions, as described below.

The two region area consists of Connecticut, Delaware, District of Columbia, Massachusetts, Maryland, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Virginia,

and West Virginia in the Northeast; and Alabama, Georgia, Illinois, Indiana, Kentucky, Michigan, Missouri, North Carolina, South Carolina, Tennessee, and Wisconsin in the Southeast.

The three region area consists of Connecticut, Delaware, District of Columbia, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, and Rhode Island in the Northeast; Illinois, Indiana, Kentucky, Michigan, Missouri, Ohio, Virginia, West Virginia, and Wisconsin in the Midwest; and Alabama, Georgia, North Carolina, South Carolina, and Tennessee in the Southeast.

### 2.1.3    Potentially-Affected Sources

EPA has developed State budgets based on the effects of additional controls (beyond those already required by the CAAA-related or reflected in existing SIPs) only for major stationary sources of NOx emissions.  These sources include: (1) electricity generating utility boilers; (2) industrial, commercial and institutional boilers; (3) combustion turbines; (4) reciprocating internal combustion engines; (4) cement manufacturing operations; and (5) other industrial processes that emit NOx.  Only existing or planned CAAA-related controls are considered in calculating budgets for other sectors (area and mobile sources) that contribute to NOx emissions.  States ultimately have discretion to determine which sources to regulate to achieve the budget level.

Analysis of costs and economic impacts in this RIA are based on a range of assumptions about which major stationary sources will actually be targeted for additional controls by the States in implementing the NOx SIP call.  The primary assumption in this analysis is that States will allocate NOx emissions reduction requirements to the largest electricity generating utility boilers; industrial, commercial and institutional boilers; combustion turbines; cement manufacturing units; and internal combustion engines.  Refer to Chapter 3 for further discussion of the assumptions regarding options for regulatory coverage.

Large electricity generating units are defined as those generating more than 25 megawatts (MW).  Large industrial boilers, combustion turbines, reciprocating internal combustion engines, and other industrial NOx sources are those capable of firing greater than 250 mmBtu/hour, or that emit greater than or equal to one ton of NOx per summer day.

### 2.1.4    Stringency of Control Level

In order to develop a cost-effective NOx reduction strategy as a basis for establishing State budgets, EPA considered various emission reduction levels for the affected sources for the summer ozone season defined as May 1 through September 30.  For the electricity generating units (EGUs), EPA considered emissions budgets based on emission limits of 0.12 lb/mmBtu, 0.15 lb/mmBtu, 0.20 lb/mmBtu, and 0.25 lb/mmBtu.[1]  For the large industrial boilers and combustion turbines, EPA considered a uniform percent emission reduction from uncontrolled projected 2007 emission levels ranging from 40 percent to 70 percent.  For the remaining large nonutility sources, EPA considered source category-specific control levels corresponding to average ozone season cost-effectiveness cut-offs ranging from $1,500/ton to $5,000/ton.

Taking into consideration the emission reductions and associated costs projected under each of the above scenarios, EPA identified cost-effective NOx reduction strategies.  Based on the reduced emissions achieved by this strategy, EPA then established State-specific budgets for ozone season

---

[1] Limits for each electricity generating unit are expressed as a specific NOx limit of pounds of NOx per mmBtu of summer heat input projected for 2007, the year which was the focus of OTAG's analysis (the year for which air quality modeling was done).

NOx emissions. Alternative budgets are calculated for the different stringency levels considered for EGUs. The details of NOx budget development can be found in the budget technical support document (EPA, 1998b).

### 2.1.5     Effective Dates

States subject to the NOx SIP call must submit revised SIPs by September 1999. The affected sources in the States must implement NOx controls by May 2003, and EPA will assess how each State's SIP has actually performed in 2007.

### 2.1.6     Emissions Budget Trading System Design

To allow for use of the most cost-effective emission reduction alternatives, an emissions budget trading program is an optional component of the NOx SIP call. Each of the States subject to the NOx SIP call are encouraged to participate in this model NOx Budget Trading Program and thereby provide a mechanism for sources to achieve cost-effective NOx reductions. The trading unit is a NOx Allowance, equal to one ton of emitted NOx. Details of the trading program are described in the Federal Register notice accompanying the final rule.

Under the NOx Budget Trading Program, each of the participating States would determine how its seasonal State trading program budget is allocated among its sources. Each source would be given a certain quantity of NOx allowances. If a source's actual NOx emissions exceed its allocated NOx allowances, the source may purchase additional allowances. Conversely, if a source's actual NOx emissions are below its allocated NOx allowances, then it may sell the additional NOx allowances. Such a program creates a competitive market for NOx allowances that encourages use of the most efficient means for reducing NOx emissions.

For purposes of this analysis, trading may occur among any of the sources within the entire SIP call region or within each of the subregions. If subregions are developed for the SIP call region, only intra-regional (within the region) trading would be allowed.

Banking would allow sources that do not use all of their NOx allowances for a given year to save them for later use. If banking is allowed, however, mechanisms such as flow controls can be put in place to limit the level of exceedance of the emissions cap. Flow controls restrict the use of the banked NOx allowances by restricting their use at certain times or within certain areas. For example, a restriction may be placed on the banked allowances that allows only a set amount to be used during a defined time period.

For this RIA, EPA analyzed a variety of trading options, and trading with banking only for the .15 trading option, where banking begins after the start of the program in 2003. Banking of "early" reductions was not modeled for the 0.15 option because earlier IPM analysis suggested that

owners of electricity generating units would want to use it to a very limited degree to lower the costs of future compliance (EPA, 1997). The following considerations were part of the 1997 analysis:

- Beginning in 2003 (and each year thereafter), the fossil fuel-fired electricity generating units over 25 MW in the SIP call region are assumed to hold NOx allowances during the summer ozone season equal to 489 thousand tons.

- Electricity generating units could trade allowances without restrictions or bank them for later use or sale to another generation unit. Trading could occur within the entire SIP call region.

- Analysis with and without flow controls.

EPA's analysis in 1997 was conducted using the 1996 version of the Integrated Planning Model (IPM). This model is described in EPA, 1996. EPA's analysis shows that on strict economic grounds, (i.e., under minimization of the total direct operating costs over the simulation period) limited banking was forecasted by the IPM based on the scenarios described above. However, EPA believes that some banking, which the IPM could not estimate, should occur when some power plants overcontrol their NOx emissions in order to bank allowances for use in years in which units experience utilization greater than forecasted. More discussion of this issue can be found in Chapter 6.

## 2.2     Definition of Regulatory Alternatives

Based on the elements described above, EPA defined specific options for this analysis. This section provides descriptions of the regulatory alternatives considered by EPA for each key NOx stationary source segment. These regulatory alternatives are summarized in Tables 2-1 (for electricity generating units), Table 2-2 (for industrial boilers and combustion turbines), and Table 2-3 (for other large stationary sources.) The NOx Budget Trading Program described in the final rule covers electricity generating units, industrial boilers, and combustion turbines. The NOx Budget Trading Program described in the final rule does not initially include other large stationary sources, however, provisions are made for inclusion of these sources should States, or the sources themselves, express a desire to participate.

Costs and economic impacts for each of these source segments are evaluated separately using different analysis techniques. The electricity generating units are evaluated using the latest version of IPM (IPM98), which optimizes nationwide delivery of electricity subject to the SIP call emissions constraint. The industrial boilers and combustion turbines are evaluated using a least-cost analysis designed to reach the specified emissions budget level at the lowest possible overall cost. Finally, all other stationary sources are evaluated at the individual source category level. The goal of the cost analyses is to determine what levels of reductions are highly cost-effective for each segment.

At the same time that EPA considered each of the alternatives in each of the tables in setting up State budgets for ozone season NOx emissions, the Agency reviewed the public comments that it

received in the Spring and Summer of 1998. The led EPA to reestimate what the NOx emissions budget for the electric power industry would be in the 0.15 Trading case, and what the budget would be for the 60%/$5,000 combination of non-electricity generating source alternatives. These alternatives are the basis for EPA's final approach to setting the budget. The NOx budget for the electric power industry was lowered from 564 thousand ozone season tons to 544 thousand ozone season tons of NOx. The NOx budget for the other large stationary sources was increased from 558 thousand to 559 thousand ozone season tons of NOx. An addendum to the RIA presents the final cost results and contains a more thorough explanation of how the emissions cap will work.

**Table 2-1**
**Regulatory Alternatives for Electricity Generating Units (EGU)**

| Name of Alternative | State Emissions Budgets Based on Ozone Season NOx Limit of: | NOx Emissions Budget (Cap) in Ozone Season (1,000 tons) | Scope of Emissions Trading |
|---|---|---|---|
| 0.25 Trading | 0.25 lb/mmBtu | 940 | Region wide |
| 0.20 Trading | 0.20 lb/mmBtu | 751 | Region wide |
| 0.15 Trading | 0.15 lb/mmBtu | 564 | Region wide |
| 0.12 Trading | 0.12 lb/mmBtu | 453 | Region wide |
| Regionality-1 | Northeast[a]: 0.15 lb/mmBtu <br> Southeast-Midwest[b]: 0.20 lb/mmBtu | 222 <br> 454 | Intra-regional only |
| Regionality-2 | Northeast[c]: 0.12 lb/mmBtu <br> Midwest[d]: 0.15 lb/mmBtu <br> Southeast[e]: 0.20 lb/mmBtu | 100 <br> 297 <br> 189 | Intra-regional only |

[a] Northeast: Connecticut, Delaware, District of Columbia, Massachusetts, Maryland, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Virginia, and West Virginia

[b] Southeast-Midwest: Alabama, Georgia, Illinois, Indiana, Kentucky, Michigan, Missouri, North Carolina, South Carolina, Tennessee, and Wisconsin

[c] Northeast: Connecticut, Delaware, District of Columbia, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, and Rhode Island

[d] Midwest: Illinois, Indiana, Kentucky, Michigan, Missouri, Ohio, Virginia, West Virginia, and Wisconsin

[e] Southeast: Alabama, Georgia North Carolina, South Carolina, and Tennessee

**Table 2-2**
**Regulatory Alternatives for Non-EGU Sources in the NOx Budget Trading Program**
**(Large Industrial Boilers and Combustion Turbines)**

| Name of Alternative | State Emissions Budgets Based on Ozone Season NOx Reduction of: | Scope of Emissions Trading |
|---|---|---|
| 40% Control | 40% from uncontrolled 2007 baseline | Region wide |
| 50% Control | 50% from uncontrolled 2007 baseline | Region wide |
| 60% Control | 60% from uncontrolled 2007 baseline | Region wide |
| 70% Control | 70% from uncontrolled 2007 baseline | Region wide |

**Table 2-3**
**Regulatory Alternatives for Non-EGU Sources NOT in the NOx Budget Trading Program[a]**

| Name of Alternative | State Emissions Budgets Based on Source Category-Specific Evaluation of the Highest Reduction Achievable for Less Than: | Scope of Emissions Trading |
|---|---|---|
| $1,500/ton | $1,500/ton | Not applicable |
| $2,000/ton | $2,000/ton | Not applicable |
| $3,000/ton | $3,000/ton | Not applicable |
| $4,000/ton | $4,000/ton | Not applicable |
| $5,000/ton | $5,000/ton | Not applicable |

[a] E.g., industrial manufacturing processes

## 2.3    References

OTAG, 1997a.  *Draft of Costs of NOx Control Strategies on Electric Power Generation Using the Integrated Planning Model*.  For incorporation into the OTAG Final Report, June 1997.

OTAG, 1997b.  *Trading and Incentives Work Group Report - Draft of OTAG Final Report*.  Chapter 7, June 1997.

U.S. Environmental Protection Agency, 1996.  *Analyzing Electric Power Generation under the CAAA*. Office of Air and Radiation, Washington, D.C., July 1996.

U.S. Environmental Protection Agency, 1997a.  *Proposed Ozone Transport Rulemaking Regulatory Analysis*.  Office of Air and Radiation, Washington, D.C., September 1997.

U.S. Environmental Protection Agency, 1997b. *Model N0x Cap and Trade Rule Workshop Working Papers*. Office of Atmospheric Programs, Washington, D.C., December 1997.

U.S. Environmental Protection Agency, 1998a. *Analyzing Electric Power Generation under the CAAA*. Office of Air and Radiation, Washington, D.C., March 1998.

U.S. Environmental Protection Agency, 1998b. *Development of Modeling Inventory and Budgets for Regional NOx SIP Call*. Office of Air Quality Planning and Standards, Research Triangle Park, September 1998.

# Chapter 4.  METHODOLOGY FOR ESTIMATING EMISSIONS, COSTS, AND ECONOMIC IMPACTS FOR THE ELECTRIC POWER INDUSTRY

This chapter presents the methodology for estimating the costs, emission reductions, and impacts of the NOx SIP call for the electric power industry.  The chapter is divided into eight sections, beginning with an analytical overview in Section 4.1.  Section 4.2 discusses the use of the Integrated Planning Model (IPM) for the analysis, including assumptions about the baseline and about technologies for power generation and emission control.  Allowance allocation and trading issues are presented in Section 4.3, and the estimation of administrative costs is discussed in Section 4.4.  These discussions are followed by Sections 4.5 and 4.6, which outline the analysis of potential direct and indirect economic impacts.  Limitations of the analysis are presented in Section 4.7, and references are presented in Section 4.8 of the chapter.

## 4.1    Analytical Overview

The basic approach to estimating the potential effects of the NOx SIP call on electricity producers is to project their actions in the absence of the rule; project their actions if they were subject to the rule; and then compare the two sets of actions.  Subtracting the total costs of generating electricity in the absence of the rule from the total costs under the rule, for example, yields the total costs of the rule itself if States and sources follow the implementation approach modeled in this report.  Similarly, subtracting estimated emissions, generation, and capacity yield the effects of the rule in these three areas.

The scope of these analyses is wide both geographically and in terms of time.  While the focus of the rule is on the 23 jurisdictions affected by the NOx SIP call, the analysis projects the actions of utilities (and non-utility generators) in all 48 contiguous States in order to capture effects that can spill out of one region into neighboring areas.  Rather than examining only a snapshot in time, the analysis covers a period starting in 2001 and running out to 2025.  Examining the industry over many years makes it possible to take many important dynamic effects into account.  For example, the effects of efficiency gains over time and the choice between capital-intensive control measures and measures that increase operating costs can be investigated by projecting utility response over a long analytical period.  In addition, the effects of allowing the banking of emission reductions can be analyzed only in a dynamic framework.

The actions of electricity generators over time are projected using the IPM, which is a detailed computer model of the electric power industry.  IPM is designed to find the most

efficient (that is, the least-cost) way to satisfy the demand for electricity under a series of limitations or constraints. The constraints under which IPM "produces" electricity can include a limit on tons of NOx emissions during the summer, and it is by setting this constraint that the effects of the NOx SIP call can be modeled. Running IPM without a limit on tons of NOx emissions produces a picture of the baseline situation in which the NOx SIP call is not in effect. Rerunning IPM after adding a constraint that limits emissions in the SIP call region to a specified number of summer tons (e.g., 564,000, under the 0.15 option) shows what the industry would do to comply with the NOx SIP call while keeping its costs as low as possible. Additional runs with different sets of constraints are conducted to assess other options, while additional runs with different assumptions make it possible to test the sensitivity of the results. More detail on how IPM operates is provided in Section 4.2 below and in *Analyzing Electric Power Generation Under the CAAA,* Office of Air and Radiation, U.S. Environmental Protection Agency, March 1998. This information and the model runs conducted for the analysis can also be found at an EPA website with the address: http://www.epa.gov/capi.

The IPM runs for the baseline and the various options constitute the heart of the analysis. Before the results can be presented, however, additional analyses must be conducted to interpret these runs. For example, in some cases it is necessary to aggregate the detailed results into totals by State and region, or to divide the cost changes by emission changes to estimate cost effectiveness. In addition, tracing the potential economic impacts of changes in costs and electricity prices beyond the electricity generating industry is outside of the scope of IPM, and must be done using standard techniques of economic impact assessment (discussed in Sections 4.5 and 4.6).

## 4.2    IPM Assumptions and Use

EPA uses IPM to evaluate the emissions and potential cost impacts expected to result from the requirements of the NOx SIP call on the electric power industry, based on EPA's illustrative implementation scenario. IPM has been used for over ten years by electric utilities, trade associations, and government agencies both in the U.S. and abroad to address a wide range of electric power market issues. The applications have included capacity planning, environmental policy and compliance planning, wholesale price forecasting, and asset valuation. EPA has used IPM extensively for environmental policy and regulatory analysis. In particular, EPA has used IPM to analyze NOx emission policy and regulations as part of the Clean Air Power Initiative (CAPI) in 1996, as an analysis tool for the Regulatory Impact Analysis of the National Ambient Air Quality Standards (NAAQS) for ozone and particulates in 1997, and as a

tool to analyze alternative trading and banking programs during the OTAG process in 1996 and 1997. IPM was also used for the regulatory analysis of the NPR.

IPM has undergone extensive review and validation over this ten-year period. In April 1996, EPA requested participants in the CAPI process to comment on the Agency's new approach to forecasting electric power generation and selected air emissions. EPA received many helpful comments and made a series of changes in its methodology and assumptions based on commenters' recommendations. Most recently, IPM and EPA's modeling assumptions were reviewed as part of the OTAG process. Again, changes were made to the methodology and assumptions based on commenters' recommendations.

The version of IPM used by EPA (IPM98) represents the U.S. electric power market in 21 regions, as depicted in Figure 4-1. These regions correspond in most cases to the regions and sub-regions used by the North American Electric Reliability Council (NERC). IPM models the electricity demand, generation, transmission, and distribution within each region as well as the transmission grid that connects the regions.

The model includes existing utility power plants as well as independent power producers and cogeneration facilities that sell firm capacity into the wholesale market. Data on the existing boiler and generator population, which consists of close to 8,000 records, are maintained in EPA's National Electric Energy Data System (NEEDS). In order to make the modeling more time and cost efficient, the individual boiler and generator data are aggregated into "model" plants. EPA's application of the model has focused heavily on understanding the future operations of coal-fired units, which will have the greatest air emissions among the fossil-fired units. The operation of other types of non-fossil fuel-fired generation capacity, including nuclear and renewables, are also simulated but at a higher degree of aggregation.

**Figure 4-1**
**Integrated Planning Model Regions in the Configuration Used by EPA**



Working with these existing model plants and representations of alternative new power plant options, IPM determines the least-cost means for supplying electricity demand while limiting air emissions to remain below specified policy limits.  Multiple air emissions policies can be modeled simultaneously.  For example, IPM is used in this study to simulate compliance with existing CAAA Title IV $SO_2$ emission requirements as well as actions that EPA has considered for controlling the ozone season NOx emissions in the States covered by the NOx SIP call.  While determining the least-cost solution, IPM also determines the optimal compliance strategy for each model plant.  A wide range of compliance options are evaluated, including the following:

- Fuel Switching – For example, switching from high sulfur coal to low sulfur coal.

- Repowering – For example, repowering an existing coal plant to a gas combined-cycle plant.

- Pollution Control Retrofit – For example, installing selective catalytic reduction (SCR), selective non-catalytic reduction (SNCR), or gas reburn (to reduce NOx emissions), or flue gas desulfurization (to control $SO_2$ emissions).

- Economic Retirement – For example, retiring an oil or gas steam plant.

- Dispatch Adjustments – For example, running high-NOx cyclone units less often, and low NOx combined-cycle plants more often.

IPM provides estimates of air emission changes, incremental electric power generation costs, changes in fuel use, and other potential impacts for each air pollution policy analyzed.

The model is not limited in scope to facilities owned by electric utilities, but also includes independent power producers (IPP) that provide electricity to the power grid on a firm-contract basis, as well as IPP facilities larger than 25 megawatts that provide power on a non-firm basis.

IPM simultaneously models over an extended time period, and reports results for selected years. In addition to reporting for 2003, which is the year that the regulatory approach would begin, these analyses also provide results for 2001, 2005, 2007, and 2010.

In using IPM to analyze NOx emission policy over the past two years, EPA has developed a set of data and assumptions that reflect the best available information on the electricity market and operating factors. These data and assumptions can be grouped into the following four categories:

- **Macro Energy and Economic Assumptions** – These assumptions are related primarily to electricity demand projections, fuel prices, power plant availability, heat rates, lifetimes, and capacity factors. Also included in this category are discount rate and year dollar assumptions.

- **Electric Technology Cost and Performance** – These assumptions are related to electric technology cost and performance for existing and new plants, as well as for existing plant refurbishment and repowering.

- **Pollution Control Performance and Costs** – These assumptions primarily cover the performance and unit costs of pollution control technologies for NOx and $SO_2$.

- **Air Emissions Rates under the Base Case** – These assumptions cover current EPA and State requirements that will affect emission levels from various facilities. The focus has been on $SO_2$ and NOx controls.

Each of these sets of data and assumptions are briefly discussed below. More detail can be found in EPA's March 1998 report entitled *Analyzing Electric Power Generation under the CAAA*.

### 4.2.1 Macro Energy and Economic Assumptions

In developing the analysis for the NOx SIP call, EPA makes assumptions about major macro energy and economic factors, as shown in Table 4-1. See Appendix No. 2 of EPA's March 1998 report *Analyzing Electric Power Generation under the CAAA* for details on most of the macro energy and economic factors.

In this study, IPM's cost outputs are converted from real 1997 dollars to real 1990 dollars to be consistent with the cost analyses prepared for the proposed NOx SIP call and the Agency's recently published Regulatory Impact Analysis of the National Ambient Air Quality Standards for ozone and particulates. The factor used for this purpose is 0.83, which corresponds to the gross domestic product implicit price deflator index published by the Bureau of Economic Analysis.

**Table 4-1**
**Key Baseline Assumptions for Electricity Generation**

| Factor | Assumption |
|---|---|
| Discount Rate (percent per year) | 6 |
| Conversion Factor from 1997 to 1990 Dollars | 0.83 |
| Electricity Demand Growth Rate (percent per year)[a] | 1997-2000 = 1.6<br>2001-2010 = 1.8<br>> 2010     = 1.3 |
| Reductions due to Climate Change Action Plan (Billion kwh) for sensitivity analysis in section 6.3.4 | 2001 = 100<br>2003 = 164<br>2005 = 228<br>2007 = 293<br>2010 = 389<br>>2019 = 608 |
| Power Plant Lifetimes | Fossil Steam    = 65 years if ≥ 50 MW<br>                    = 45 years if < 50 MW<br>Nuclear         = 40 year license length<br>Turbines        = 30 years |
| U.S. Nuclear Capacity (gigawatts) | 2001 = 93<br>2003 = 90<br>2005 = 87<br>2007 = 86<br>2010 = 81<br>2020 = 50 |
| Nuclear Capacity Factors (percent) | 2001 = 80<br>2003 = 80<br>2005 = 80<br>2007 = 82<br>2010 = 81<br>2020 = 83 |

**Table 4 -1 (continued)**
**Key Baseline Assumptions for Electricity Generation**

| Factor | Assumption |
|---|---|
| World Oil Prices (1997$ per BBL) | 2001 = 19.20<br>2003 = 19.90<br>2005 = 20.50<br>2007 = 20.80<br>2010 = 21.20<br>2020 = 22.40 |
| Wellhead Natural Gas Price (1997$ per mmBtu)[b] | 2001 = 1.90<br>2003 = 1.95<br>2005 = 2.00<br>2007 = 2.00<br>2010 = 2.00 |
| Coal Steam Power Plant Availability (percent) | 1995 = 82<br>2000 = 83.5<br>2005/10/20 = 85 |
| Existing Power Plant Heat Rates | No change over time |
| Coal Mining Productivity Increases<br>(percent change per year) | 1995-1999 = 3.1<br>2000-2004 = 2.8<br>2005-2009 = 2.4<br>2010-2014 = 2.1<br>2015-2025 = 2.1 |
| Average Delivered Coal Prices[b]<br>(percent change per year 2001-2010) | -2.0 |

[a]    Does not include any adjustment for potential improvements related to the Climate Change Action Plan.

[b]    Based on recent ICF analyses using updated coal mining productivity and supply for coal, and technology and supply assumptions for gas. Note that the natural gas prices are <u>not</u> an assumption in the model, but are a forecast of the model.

### 4.2.2    Electric Energy Cost and Performance Assumptions

In order to simulate the electric power market under baseline conditions and for each of the regulatory options, assumptions are made on the cost and performance of new power plants as well as for repowering existing power plants. These characterizations of new power plant cost and performance are used in IPM to determine the least cost means for meeting projected future electricity requirements subject to the baseline emission restrictions and the NOx emission limits specified for each regulatory option.

Power plant cost and performance assumptions are developed for the following new conventional and unconventional power plant types:

- New Conventional Power Plants

- Conventional Pulverized Coal;
- Advanced Coal (Integrated Gasification Combined Cycle - IGCC);
- Combined Cycle;
- Combustion Turbine; and
- Nuclear

- New Renewable/Nontraditional Options

  - Biomass IGCC;
  - Solar Photovoltaics;
  - Solar Thermal;
  - Geothermal; and
  - Wind

Cost and performance projections are developed for 2001, 2003, 2005, 2007, and 2010 in order to capture changes in technology over time. In general, the year 2001 estimates reflect generation technology that is close to or identical to existing technology, and the later year estimates reflect advancements in costs and performance. The Agency relies heavily on work that the Energy Information Administration did in support of the most recent *Annual Energy Outlooks* (AEO97 and AEO98). EIA had its approach peer-reviewed during its development.

In addition to the AEO, key data sources used to develop these assumptions are as follows:

EPRI, *TAG Technical Assessment Guide, Electricity Supply - 1993*, EPRI
TR-102276-V1R7, June 1993;

SERI, *The Potential of Renewable Energy: An Interlaboratory White Paper*,
SERI/TP-260-3674, March 1990; and

TVA, *Integrated Resource Plan Environmental Impact Statement*, Volume Two,
Technical Documents, July 1995.

In addition to these assumptions on new power plants, EPA also develops assumptions on the cost and performance of repowering existing power plants. The following three types of repowering options are considered:

- Repowering Coal Steam to Integrated Gasification Combined-Cycle;

- Repowering Coal Steam to Gas Combined-Cycle; and

- Repowering Oil/Gas Steam to Gas Combined-cycle.

The key sources of data for this section are the repowering studies conducted by Bechtel Corporation, the TVA Integrated Resource Plan EIS, and the EIA life extension report.

For more details on the assumptions made about the cost and performance of new power plants and repowering of existing power plants, see Appendix No. 3 of EPA's March 1998 report *Analyzing Electric Power Generation under the CAAA*.

### 4.2.3    Pollution Control Performance and Cost Assumptions

EPA develops pollution control cost and performance estimates for the following options:

• Coal-Fired Steam Electric Generating Units

- Combustion Controls;
- Selective Catalytic Reduction;
- Selective Non-Catalytic Reduction; and
- Natural Gas Reburn.

• Oil and Gas-Fired Steam Generating Units

- Selective Catalytic Reduction; and
- Selective Non-Catalytic Reduction.

EPA also develops cost and performance estimates for combining SCR or SNCR with coal plant scrubbers.  With these options, the IPM can determine if in some instances, it is optimal to place a scrubber <u>and</u> SCR or SNCR to reduce $SO_2$ emissions and NOx emissions from a given plant simultaneously.  In determining the least cost means for complying with a NOx regulatory policy, the model can choose from among these pollution control options and change the dispatch of model plants.  For example, the model in some cases can reduce the utilization of high NOx emitting units and increase the utilization of low NOx emitting units.

In addition to including the pollution control cost and performance estimates described above, IPM also takes into account the cost and performance of combustion controls installed beyond those resulting from implementation of Title IV and Title I (Reasonable Available Control Technologies - RACT) requirements.  Note that the Title IV NOx program permits an owner/operator to comply with the requirements by averaging the NOx emissions from some units within the owner/operator system with emissions from other units also within the same system.  This emissions averaging permits an owner/operator to install controls on units that are cost-effective to control and average emissions from these units with emissions from units that are less cost-effective to control.  EPA accounts for the cost of combustion controls beyond those needed for Title IV compliance in the following manner:  (1) EPA identifies the units that either are (Phase I units) or are likely to (Phase II units) average their emissions with other controlled units, and (2) EPA reasons that these uncontrolled units, for the purposes of this proposed rulemaking, will install the least expensive controls, that is, combustion controls, where requirements beyond Title IV are imposed on them.  These units can further reduce their emissions by installing SCR, SNCR, or gas reburn, as described above.  Additionally, using continuous emissions monitoring (CEM) data, EPA found that

some sources with a common owner or operator, that could average their emissions under Title IV, consistently emitted well below (20 percent or more) their Title IV mandated levels. For the purposes of analyses in this report, such sources are assumed to emit at their actual CEM-measured levels, not their applicable Title IV Standard.

These performance and pollution control cost assumptions for NOx are based on the following sources:

U.S. Environmental Protection Agency, *Regulatory Impact Analysis of NOx Regulations*, October 1996

Bechtel Power Corporation, *Cost Estimates for NOx Control Technologies Final Report,* February 1996

Bechtel Power Corporation, *Draft Technical Study on the Use of Gas Reburn to Control NOx at Coal-fired Electric Generating Units*, June 1996

Acurex Environmental Corporation, *Phase II NOx Controls for NESCAUM and MARAMA Region*, 1995.

For more details on the assumptions made about pollution control cost and performance see Appendix No. 5 of EPA's March 1998 report, *Analyzing Electric Power Generation under the CAAA*.

## 4.2.4    Air Emissions Rates under the Base Case

Assumptions about the other environmental rules that will be in effect with or without the NOx SIP call constitute a vital aspect of the baseline because even existing environmental initiatives will lead to NOx reductions in the future. If the reductions that are projected to take place under these initiatives are not accounted for, the effects of the NOx SIP call in capping NOx emissions will be overestimated.

Three sets of regulations affecting NOx emissions in the baseline are taken into account in this analysis. First, EPA factors in regulations under Title I of the Clean Air Act, including RACT requirements for existing sources, EPA's New Source Performance Standards, and controls based on Best Available Control Technology (BACT) and Lowest Achievable Emissions Rates (LAER) that would be in effect for new sources. The analysis also accounts for the NOx reductions from utility units under Phases I and II of Title IV's Acid Rain Program, which set rate limitations for most coal-fired generators greater than 25 MW of capacity.

Finally, the control program agreed upon by the Ozone Transport Commission for the Ozone Transport Region is assumed to go forward in the baseline. The OTC's Memorandum of Understanding envisions three progressively more stringent control requirements for sources in the

OTR: Phase I, Phase II, and Phase III. Though EPA anticipates that all three of these phases will eventually be implemented in the baseline, cases including Phase I alone (i.e., RACT controls in place in the OTR) are examined in some of the baseline analyses. This baseline, which is referred to as the *Initial Base Case*, is the primary basis for comparison in this RIA. Comparisons of the options to a *Final Base Case*, which assumes that Phase II and Phase III of the OTC's MOU will also go into effect, are also made in the RIA. Because Phases II and III are estimated to cut NOx from electric generators, any comparison of an option to the Initial Base Case will appear to be more effective (and more costly) than a comparison of that option to the Final Base Case. In considering the effects of the OTC's MOU, this analysis covers only the NOx controls in the SIP call region. In considering the effects of the OTC's MOU, this analysis covers only the NOx controls in the SIP call region. Thus NOx controls resulting from the OTC MOU in Maine, Vermont, and New Hampshire are not included.

## 4.3    Allowance Allocations and Trading

For the purposes of this analysis, the NOx SIP call is assumed to be implemented through an emissions trading program. The trading program works by allocating the limited rights to emit NOx in limited quantities during the summer, and allowing sources to choose the extent to which they will reduce emissions or purchase these limited rights or "allowances." For many aspects of the analysis, the initial distribution of the allowances is not important; the only relevant fact regarding the allowances is their total volume (segmented by region for the regional options), which determines the number of tons of NOx reductions required. The reasons for this separation of the allowance allocations from the rest of the analysis, and the circumstances under which the allocation does become important, are described Section 4.3.1. Assumptions about the trading of allowances are presented in Section 4.3.2.

### 4.3.1    Purpose of Allowances and Assumptions about Allocations

IPM works by finding the least-cost method for producing electric power for the industry as a whole, assuming the entire industry in the area of the NOx SIP call is subject to an overall cap on ozone season NOx emissions. The model places pollution controls or makes dispatch changes to electricity generating units that lead to the achievement of emission reductions at the lowest cost. As a result, some firms' power plants are projected to be tightly controlled, at significant cost, while other firms' plants have no controls beyond those assumed in the baseline.

Realistically, this pattern would not be seen unless some system existed to give incentives to the firms with the most cost-effective control possibilities to bear the greatest part of the control burden. The NOx SIP call envisions that these incentives will take the form of compensation for allowances, which must be purchased by the firms that elect to under-control their plants' emissions. Firms are assumed to either buy or sell allowances depending on their own costs of control in comparison to the market price of allowances. As the price reacts to changes in demands and

supplies of allowances, the market will help ensure that the costs of incremental reductions of NOx are the same for all participants.

Projecting how the NOx emissions cap will be divided initially among firms through awards of allowances is not important for estimating the total costs of the NOx SIP call or the control methods that will be used if it can be assumed that the allowance market will be efficient. If the market is efficient, the only effect of allocating more allowances to a given firm will be that a firm will be able to sell more allowances after controlling emissions to an efficient degree. Experience with the $SO_2$ allowance market under Title IV demonstrated that these markets can function efficiently, with significant trading volumes and minimal transaction costs (U.S. EPA, Forthcoming-Fall 1998).

The initial distribution of the allowances is, however, very important in assessing potential impacts and trading patterns. If, for example, allowances are distributed in proportion to baseline NOx emissions, owners of coal plants would be able to sell many more allowances than if allowances are distributed in proportion to baseline generation.

For this analysis, it is assumed that States will divide allowances only among affected sources, in proportion to their 1995 or 1996 fuel input, allowing both for growth in capacity and growth in electricity output to 2007. These assumptions are somewhat simplified versions of the allowance distribution system recommended by EPA for State consideration, which provides for shifts in allowance distributions over time in response to changing capacity use, unit closures, and new builds. These

# Chapter 6.  RESULTS OF COST, EMISSIONS, AND ECONOMIC IMPACT ANALYSES FOR THE ELECTRIC POWER INDUSTRY

This chapter summarizes the potential cost, NOx emission reductions, and economic impacts associated with the NOx SIP call for electricity generating sources. The results of various regulatory alternatives are presented and compared with each other and with one of two baselines. Section 6.1 introduces the annual cost and emission measures and compares four uniform regulatory alternatives (based on NOx emission rates of 0.25, 0.20, 0.15, and 0.12 lbs/mmBtu) to the Initial Base Case (as well as the Final Base Case). Section 6.2 compares the results under the 0.15 uniform (that is, NOx-SIP-call-region-wide) alternative to alternatives that restrict trading to two or three sub-regions, with emission rates that vary by sub-region. Section 6.3 presents the results of an analysis of alternative program designs and sensitivity analyses, in which the results for the 0.15 alternative are shown under various alternative assumptions regarding electricity demand, equipment life, control measure effectiveness, and the discount rate. Potential direct and indirect economic impacts of the rule are discussed in Sections 6.4 and 6.5 of this chapter, respectively. Finally, Section 6.6 presents administrative costs, and Section 6.7 contains references for the chapter.

The comparisons between alternatives, comparisons of major program alternatives, and the sensitivity analyses are made in reference to the 0.15 lb/mmBtu alternative because that alternative is the basis for the final NOx SIP call emissions budgets. For most of the comparisons, results are presented only for the year 2007. Limiting the presentation to a single year simplifies the exposition, and the similarity in costs and emission reductions from year to year ensures that little is lost by the simplification. The year 2007 is selected in part because many areas of the affected region are obligated to reach compliance with the one-hour ozone standard in that year. In addition, modeling predicts that annual compliance costs reach their peak near 2007, so presenting only that year avoids understating the costs of the rule.

## 6.1     Comparison of Uniform Alternatives to the Initial Base Case

EPA considered four geographically uniform alternatives in developing the NOx SIP call, each one based on a different allowable emissions rate. For example, the 0.15 alternative is based on limiting summer NOx emissions to 0.15 lb/mmBtu of fuel heat input during the summer season after allowing for growth in electricity demand to 2007. This alternative imposes a seasonal cap of 564 thousand tons of NOx. The 0.15 alternative provides the point of comparison for sensitivity and other analyses in this chapter. The Integrated Planning Model was used to generate predictions of the technology selection, costs, and emissions for electricity generating units under the various alternatives.

Trading is assumed to be allowed both within and among the 23 jurisdictions in the SIP call region. EPA examines the cost and emission reduction impacts of each of the uniform regulatory alternatives incremental to the Initial Base Case level. The Initial Base Case assumes compliance with RACT, BACT, and NSPS requirements, as well as Phase I of the Ozone Transport Commission (OTC) Memorandum of Understanding (MOU); as such it includes all currently applicable Federal or State NOx control measures. The Final Base Case assumes the controls included in the Initial Base Case, as well as Phase II and Phase III of the OTC MOU. In the Final Base Case, many units have already implemented SNCR and SCR controls to meet the more stringent requirements of the Final Base Case. This section presents the results of the cost and emissions reductions analyses and translates those results into measures of cost-effectiveness for the uniform regulatory alternatives. Section 6.1.5 of this chapter contains a comparison of the costs of the 0.15 trading alternative in the Initial and Final Base Cases.

### 6.1.1    Technology Selection

Tables 6-1 and 6-2 present emission control responses for coal and oil/gas fired boilers in the SIP call region under each of the uniform alternatives.  If States choose to follow the implementation scenario that EPA has modeled, Table 6-3 shows additions to natural gas combined cycle capacity that will occur as part of compliance.  Industry will increase its use of natural gas over coal to generate power as part of its approach to compliance.  Some coal, oil, or gas-fired boilers will be retrofit with SCR, SNCR, or gas reburn.  Others will have no incremental control technology added beyond the types of controls required under Title IV, BACT and OTC Phase I/RACT in the Initial Base Case.  In addition, some boiler capacity will could close in response to the way States implement the NOx SIP call.  Not shown in the table are combustion turbines and combined cycle units, which are not expected to be retrofit with additional controls in response to the NOx SIP call.  IPM analysis does show, however, that about 2,000 to 4,000 MW of combined cycle capacity would be added, depending on the alternative.  The IPM runs project that almost all of the control technology retrofits needed to reduce emissions to the cap under the uniform alternatives would come from the coal-fired boilers, which tend to be both larger and higher in baseline emissions than other types.  As alternatives become more stringent, Title IV controls (i.e., combustion controls such as low NOx burners) are augmented with SNCR and then with SCR (which is capable of greater NOx reduction).  The same general pattern is seen for the oil/gas- fired boilers, though the percentages of them that are retrofit with SNCR or SCR are smaller than for the coal boilers.

**Table 6-1**
**Estimated Emission Control Responses for Coal-Fired Steam Units**
**to the NOx SIP Call in 2007**
**(MW Capacity for the SIP Call Region)**

| Emission Control Response | 0.25 Trading | 0.20 Trading | 0.15 Trading | 0.12 Trading |
|---|---|---|---|---|
| Close Unit | 18 | 16 | 113 | 183 |
| Comply with BACT | 4,158 | 4,158 | 4,158 | 4,158 |
| Title IV NOx Controls Only [a] | 97,895 | 40,242 | 4,545 | 4,879 |
| Add SNCR | 93,003 | 133,240 | 129,690 | 83,172 |
| Add SCR | 7,208 | 23,384 | 63,267 | 109,761 |
| Add Gas Reburn | - | 1,242 | 509 | 129 |

Source: ICF analysis.
[a] This row shows the MW capacity adding *only* Title IV NOx controls.  Therefore, the numbers tend to decrease with increases in option stringency.

**Table 6-2**
**Estimated Emission Control Responses for Oil/Gas-Fired Steam Units**
**to the NOx SIP Call in 2007**
**(MW Capacity for the SIP Call Region)**

| Emission Control Response | 0.25 Trading | 0.20 Trading | 0.15 Trading | 0.12 Trading |
|---|---|---|---|---|
| Close Unit | 182 | 181 | 201 | 151 |
| No Further Controls Beyond OTC Phase I/RACT | 33,564 | 33,253 | 29,890 | 23,624 |
| Add SNCR | 447 | 759 | 4,102 | 7,008 |
| Add SCR | - | - | - | 3,410 |

Source: ICF analysis.

**Table 6-3**
**Estimated Emission Control Responses to the NOx SIP Call**
**in 2007 – Added Natural Gas Combined-Cycle**
**(MW Capacity for the SIP Call region)**

| Emission Control Response | 0.25 Trading | 0.20 Trading | 0.15 Trading | 0.12 Trading |
|---|---|---|---|---|
| Added Capacity of Combined Cycle[a] | 1,895 | 1,798 | 2,200 | 4,156 |

Source: ICF analysis.
[a] Above level in the Initial Base Case, which is 47,308 MW.

### 6.1.2    Emissions

The control technologies presented in Tables 6-1 and 6-2, which result from the implementation scenario modeled by EPA, will reduce NOx emissions by hundreds of thousands of tons in the SIP call region.    Although the NOx SIP call focuses on ozone season NOx emissions, reductions of NOx emissions under the uniform alternatives will occur year-round because some of the control strategies (e.g., combustion controls) function continuously.    For the 0.15 alternative in 2007, the annual reductions amount to 1,183 thousand tons over the Initial Base Case, with 245 thousand of those tons (21 percent) from outside the ozone season.    Table 6-4 shows the incremental ozone season tons of NOx emitted under each of the uniform alternatives compared to the Initial Base Case.    The rule requires sources to be in compliance starting in May 2003.    From that point on, the emissions for electricity generating units are assumed to be capped under the scenarios modeled by EPA, resulting in 564 thousand tons of NOx per ozone season under the 0.15 alternative.    Initial Base Case emissions continue to increase after this point due to forecasted growth in electric power generation, while the cap remains constant.    As a result, the incremental NOx emission reductions grow yearly after 2003.    Figure 6-1 shows State-by-State emissions results for each of the

uniform trading alternatives, compared to the emissions under the Initial Base Case[2].  Figure 6-2
shows the emissions for the Initial Base Case, the State budget levels, and the IPM analysis results for
the 0.15 trading alternative[3].  The incremental reduction in ozone season tons under the 0.15
alternative amounts to about 62 percent of baseline ozone season NOx emissions in the period
between 2003 and 2010 — slightly less in the early years and slightly more in the later years.  By
contrast, the reductions in annual tons are less than 35 percent of baseline annual tons, because
emission reductions in the winter months are only about 12 percent of baseline emissions.  This
disparity stems from the fact that the most widely used control strategies — SNCR and SCR — can be
shut off at the end of each ozone season to limit operating costs.  Most importantly, as Figure 6-2
shows, a uniform trading program can lead to reductions throughout the NOx SIP call domain that
are comparable to what would occur under a command-and-control approach where States set
emission rates for EGUs aimed at hitting each State's NOx budget level.

**Table 6-4**
**Estimated Ozone Season NOx Emissions and Reductions**
**under the Uniform Trading Alternatives and the Initial Base Case**
**(1,000 tons)**

| Case/Alternative | 2003 | 2005 | 2007 | 2010 |
|------------------|------|------|------|------|
| Initial Base Case | 1,462 | 1,497 | 1,502 | 1,511 |
| 0.25 Trading (Reduction) | 940 (523) | 940 (557) | 940 (563) | 940 (572) |
| 0.20 Trading (Reduction) | 751 (711) | 751 (746) | 751 (751) | 751 (760) |
| 0.15 Trading (Reduction) | 564 (899) | 564 (933) | 564 (938) | 564 (948) |
| 0.12 Trading (Reduction) | 453 (1,009) | 453 (1,043) | 453 (1,049) | 453 (1,058) |

Source: ICF analysis.
Numbers do not sum due to rounding.

[2] The data used to develop Figure 6-1 is included in Appendix B, Table B-1.

[3] The data used to develop Figure 6-2 is included in Appendix B, Table B-2.

**Figure 6-1**
**Ozone Season NOx Emissions in 2007 from the Electric Power Industry for States in the SIP Call Region:**
**Uniform Trading Alternatives Compared to the Initial Base Case**



**Figure 6-2**

**Ozone Season NOx Emissions in 2007 from the Electric Power Industry for States in the SIP Call Region:**

**Uniform 0.15 Trading Alternative Compared to the Initial Base Case and the State Budget Component under the 0.15 lb/mmBtu Limit**



### 6.1.3    Costs

EPA calculated the annual cost of the uniform alternatives incremental to the Initial Base Case level.[4]  Table 6-5 presents EPA's estimates of the total annual costs that the electric power industry could incur in the years 2003, 2005, 2007, and 2010.  For each of the uniform alternatives, the incremental cost rises until 2007, but begins to fall in subsequent years.  Because of growth in demand for electricity, the fixed cap of 564,000 tons per ozone season becomes progressively tighter over time; as fuel input grows, the fixed allocation of allowances leads to a tighter and tighter effective limit.  This effective tightening tends to drive the costs of meeting the emissions cap higher over time.  Countering this tendency, on the other hand, is a reduction over time in the costs of new generation and control technologies, and the possibility of retrofitting existing plants to function as combined-cycle units.  By 2010, these improvements begin to dominate, and incremental costs begin to decline.

**Table 6-5**
**Incremental Annual Costs for Uniform Alternatives Relative to the Initial Base Case**
**(Compliance Costs above Initial Base Case, million 1990$)[a]**

| Alternative | 2003 | 2005 | 2007 | 2010 |
|---|---|---|---|---|
| 0.25 Trading | $589 | $628 | $643 | $632 |
| 0.20 Trading | $894 | $935 | $948 | $932 |
| 0.15 Trading | $1,308 | $1,354 | $1,378 | $1,341 |
| 0.12 Trading | $1,766 | $1,816 | $1,846 | $1,757 |

Source: ICF analysis.
[a] Compliance costs do not include administrative, monitoring, or transaction costs, which are minor in comparison to the total cost of the rule. Units covered by Title IV will have monitoring devices in the baseline, which will reduce the incremental monitoring costs.  See Section 6.6.

#### *Trading*

Some regulated sources have years of experience with inter-firm and intra-firm emissions trading.  In the mid-1980s, EPA published the Emissions Trading Policy Statement (51 FR 43831), which allowed sources to obtain emission credits for use as emission offsets and in bubbles.  In 1990, the Clean Air Act Amendments (CAAA) expanded the potential pool of sources that would need to obtain offsets.  The 1990 CAAA was also the advent of the acid rain $SO_2$ allowance market, under which the electric power industry learned to use emissions trading as a compliance strategy.  In addition, a variety of market-based programs have been implemented at the State and local levels. Most recently, the Ozone Transport Commission adopted a Memorandum of Understanding committing the signatory States to the development and proposal of a regional NOx emissions cap-

---

[4]All cost data and cost-effectiveness calculations are presented in 1990 dollars.

and-trade program, similar to the one proposed under the NOx SIP call. Under these emissions trading programs, especially the allowance markets, the affected sources became familiar with emissions trading markets and the procedure for buying and selling allowances.

Sources are assumed to participate in the NOx allowance market to utilize the most cost-effective compliance option and because of experience gained with other trading programs. The potentially affected sources are expected to trade allowances within their own company and/or with other companies. For example, based on the IPM results for the 0.15 alternative, 641 units are projected to obtain about 78,000 allowances from the 506 units projected to provide excess allowances. Only 23 percent of the units (333 units) are expected to use only the allowances allocated to them. Table 6-6 shows the number of expected trades for individual units, including inter- and intra-firm transactions, under the 0.25, 0.15, and 0.12 uniform alternatives. It is notable that a substantial number of trades could occur under each of the alternatives examined, with many units able to generate excess allowances for the use of other units. The number of allowances traded between and within companies under each of the uniform alternatives varies somewhat: under the 0.12 alternative, approximately 73,000 allowances may be traded, while under the 0.25 alternative, approximately 118,000 allowances may be traded. Under the 0.15 alternative, about 37,000 of the 78,000 traded allowances (about half) are projected to be inter-firm trades. Though EPA has estimated the volumes of inter-firm allowance trades only for the 0.15 alternative, the number of allowances traded among individual firms may vary from alternative to alternative.

### 6.1.4    Cost-Effectiveness

The average cost-effectiveness of the regulatory alternatives is calculated from the Initial Base Case level. Cost-effectiveness is calculated as the total annual costs of the alternative divided by ozone season emission reductions. Table 6-7 shows the emissions change and the annual costs and cost-effectiveness that the EPA estimates for the potentially affected part of the electric power industry in the years 2003, 2005, 2007, and 2010. As shown in the table, the average costs per ozone season ton of NOx removed under the 0.15 alternative for each of the four years differ slightly, but for each year is less than $1,500 per ton of NOx removed. The highest cost per ton removed is seen in 2007. The effects of the growth in electricity demand and the application of the fixed cap of ozone season tons of NOx on cost, described in the preceding section, explains the pattern in cost-effectiveness over time. Comparing the change in total costs to the change in emissions, it can be seen that the cost per ozone season ton removed increases. Thus, costs are rising faster than emission reductions, as more costly measures are pressed into service on smaller and less-intensively used units.

The increasing per-ton cost can be seen more clearly by presenting the changes in costs and tons for each alternative *relative to the next-most-stringent alternative,* instead of relative to the base case. This approach, which shows the incremental per-ton costs of just the *additional* tons of reductions as the alternatives grow more stringent, is presented in Table 6-8.

**Table 6-6**
**Number of Fossil Fuel-Fired Units in IPM Runs**
**Expected to Buy, Sell, or Do Nothing in the NOx SIP Call Trading Program[a]**
**(0.25, 0.15, and 0.12 Uniform Alternatives)**

| Fuel Type | Buy Allowances | Sell Allowances | Do Nothing |
|---|---|---|---|
| **0.25 Trading** | | | |
| Coal | 517 | 265 | 0 |
| Oil/Gas | 9 | 123 | 10 |
| Combined Cycle/ Combustion Turbine | 15 | 207 | 335 |
| Integrated Gasification/ Combined Cycle | 0 | 1 | 0 |
| Total | 541 | 596 | 345 |
| **0.15 Trading** | | | |
| Coal | 507 | 275 | 0 |
| Oil/Gas | 39 | 91 | 10 |
| Combined Cycle/ Combustion Turbine | 95 | 139 | 323 |
| Integrated Gasification/ Combined Cycle | 0 | 1 | 0 |
| Total | 641 | 506 | 333 |
| **0.12 Trading** | | | |
| Coal | 462 | 320 | 0 |
| Oil/Gas | 38 | 92 | 10 |
| Combined Cycle/ Combustion Turbine | 112 | 130 | 315 |
| Integrated Gasification/ Combined Cycle | 0 | 1 | 0 |
| Total | 612 | 543 | 325 |

[a] Allowance transfers within companies are included among the purchases and sales, though money would not necessarily change hands in these internal transactions.

**Table 6-7**
**Summary of Estimated Emission Reductions, Cost, and Cost-Effectiveness**
**for the Uniform Alternatives of the NOx SIP Call:  Selected Years**

| Year/Alternative | Reductions in Ozone Season NOx Emissions (1,000 tons) | Annual Cost above Initial Base Case (million 1990$) | Cost per Ozone Season Ton of NOx Removed (1990$/ton) |
|---|---|---|---|
| **2003** | | | |
| 0.25 Trading | 523 | $589 | $1,127 |
| 0.20 Trading | 711 | $894 | $1,258 |
| 0.15 Trading | 899 | $1,308 | $1,455 |
| 0.12 Trading | 1,009 | $1,766 | $1,750 |
| **2005** | | | |
| 0.25 Trading | 557 | $628 | $1,128 |
| 0.20 Trading | 746 | $935 | $1,254 |
| 0.15 Trading | 933 | $1,354 | $1,451 |
| 0.12 Trading | 1,043 | $1,816 | $1,741 |
| **2007** | | | |
| 0.25 Trading | 563 | $643 | $1,143 |
| 0.20 Trading | 751 | $948 | $1,263 |
| 0.15 Trading | 938 | $1,378 | $1,468 |
| 0.12 Trading | 1,049 | $1,846 | $1,760 |
| **2010** | | | |
| 0.25 Trading | 572 | $632 | $1,106 |
| 0.20 Trading | 760 | $932 | $1,226 |
| 0.15 Trading | 948 | $1,341 | $1,415 |
| 0.12 Trading | 1,058 | $1,757 | $1,660 |

Source: ICF analysis.

Because of rounding, the cost-effectiveness values do not equal the ratio of the costs to the NOx reductions shown in the table.

**Table 6-8**
**Comparison of Estimated 2007 Incremental Ozone Season NOx Emission Reduction, Cost,
and Cost-Effectiveness for Different Regulatory Alternatives**

| Alternative | Reduction Incremental to Next-Most-Stringent Alternative (1,000 ozone season tons) | Cost, Incremental to Next-Most-Stringent Alternative (million 1990$) | Incremental Cost-Effectiveness, Relative to Next-Most-Stringent Alternative (1990$/ozone season ton) |
|---|---|---|---|
| 0.25 Trading[a] | 563 | $643 | $1,143 |
| 0.20 Trading | 188 | $305 | $1,618 |
| 0.15 Trading | 187 | $430 | $2,294 |
| 0.12 Trading | 111 | $468 | $4,240 |

Source: ICF analysis.
Because of rounding, the cost-effectiveness values do not equal the ratio of the incremental costs to the NOx reductions shown in the table.
[a] Compared to the Initial Base Case.

### 6.1.5    Initial Base Case Compared to Final Base Case

The Initial Base Case assumes compliance with RACT, BACT, and NSPS requirements, as well as Phase I of the Ozone Transport Commission (OTC) Memorandum of Understanding (MOU). As such, it is best suited for estimating the cost of further controls above the requirements already in place. The Final Base Case assumes the controls included in the Initial Base Case, as well as Phase II and Phase III of the OTC MOU. In the Final Base Case, many units have already implemented SNCR and SCR controls to meet the more stringent requirements of the Final Base Case and will not need to spend as much to meet the NOx SIP call requirements. For this reason, the cost of the NOx SIP call is lower when compared to the Final Base Case than to the Initial Base Case. For example, the incremental annual cost of the 0.15 alternative is $1,250 million when compared to the Final Base Case, but $1,378 million compared to the Initial Base Case.

### 6.2    Regional versus Uniform Approach to Trading

The uniform alternatives presented in the preceding section set State-by-State caps that are all based on the same nominal emission rate, and envision unrestricted trading of emission allowances among all SIP call States. EPA also examined alternatives that attempt to target the emission reductions to the sources that might have the greatest impact on severe non-attainment areas downwind. These regional trading alternatives set tighter caps for States closer to the Northeast, and less stringent caps for the Midwest and Southeast. Because a trading system that allowed unrestricted trade of allowances from region to region would undermine the stratified caps set up by these regional alternatives, interstate trading is limited to States within the same regions.

The remainder of this section compares the cost and emissions results under the 0.15 trading alternative with the two-region (Regionality 1) and three region (Regionality 2) alternatives

in turn. The comparisons place less emphasis on cost per ton of NOx removed, and more emphasis on showing the differences between alternatives in terms of emissions by region and the effects of trading. Because the intent of the regional alternatives is to cost-effectively reduce ozone levels in severe nonattainment areas, the cost per ton of NOx removed is of secondary importance compared to the distribution of emission reductions

### 6.2.1    Comparison of Baseline and Uniform 0.15 Alternative to the Two-Region Alternative (Regionality 1)

The summary of the effects of the two-region alternative (Regionality 1) relative to the 0.15 trading alternative are shown in Table 6-9. The two-region alternative restricts trading to within two regions, split approximately along Northern and Southern boundaries.[5] Because the two-region alternative reduces the stringency of the cap (to a nominal 0.20 lb/mmBtu) in the Region 1 while leaving it constant (at a nominal 0.15 lb/mmBtu) in Region 2, it results in smaller emission reductions in Region 2 compared to the 0.15 trading alternative. Figure 6-3 shows the State-by-State emission results for the two-region alternative compared to the Initial Base Case.[6]

The two-region alternative would be less costly than the 0.15 trading alternative, which is to be expected given its lower stringency. The cost of the 0.15 trading alternative compared to the baseline is $1,378 million, while the cost of the two-region alternative is $1,118 million. Thus, the incremental 111.7 thousand tons of ozone season NOx emissions eliminated in 2007 under the uniform 0.15 trading alternative relative to the two-region alternative would cost an additional $260 million.

---

5 The two-region area consists of Connecticut, Delaware, District of Columbia, Massachusetts, Maryland, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Virginia, and West Virginia in Region 1 (Northeast and Mid-Atlantic States); and Alabama, Georgia, Illinois, Indiana, Kentucky, Michigan, Missouri, North Carolina, South Carolina, Tennessee, and Wisconsin in Region 2 (Southeast and Midwest States).

6 The State Budgets for the two-region alternative used in Figure 6-3 are calculated using the variable emission rates for each SIP call region. The data used to develop Figure 6-3 is included in Appendix B, Table B-3.

**Table 6-9**
**Comparison of Ozone Season NOx Emission Reductions:**
**Uniform 0.15 Trading Alternative, and the Two-Region Alternative (Regionality 1)**
**(1,000 tons)**

| Incremental Measure (from Baseline) | Reductions Relative to Initial Baseline: 0.15 Trading | Reductions Relative to Initial Baseline: Two-Region Alternative | Incremental Effect of Two-Region Alternative | Reductions under Two-Region Alternative as a Percentage of 0.15 Trading |
|---|---|---|---|---|
| Total Tons Reduced | 938 | 826 | -112 | 88% |
| Tons reduced, Region 1 (0.15 lb/mmBtu) | 351 | 340 | -11 | 97% |
| Tons Reduced, Region 2 (0.20 lb/mmBtu) | 587 | 486 | -101 | 83% |

Source: ICF analysis.

### 6.2.2    Comparison of Three-Region Alternative (Regionality 2) to Uniform 0.15 Alternative

The three-region alternative sets a cap based on 0.12 lb/mmBtu in Region 1, 0.15 lb/mmBtu in Region 2, and 0.20 lb/mmBtu in the Region 3.[7]  The emission results under the three-region alternative are similar to those of the 0.15 alternative.  States in the Northeast tend to reduce NOx emissions beyond the 0.15 lb/mmBtu levels as part of their compliance strategy.  Under the 0.15 alternative, these States will receive credits that they can sell to electricity generating units in the Southeast and Midwest.  Under the three-region alternative, the electricity generating units in the Northeast are held to a tighter standard than under the 0.15 alternative, and will not receive as many credits as under the 0.15 alternative.

Tables 6-10 and 6-11 display the same information about emissions between alternatives, but in different forms:  Table 6-10 shows total reductions, while Table 6-11 shows differences.  Both of the first two columns of Table 6-10 refer to the 0.15 alternative.  The first column shows the total NOx reductions (in thousands of tons per year) assigned to each of three regions, based on the caps given to States within Region 1 (the Northeast), Region 2 (the Midwest), and Region 3 (the Southeast).  These figures represent the emission reductions by region that would be provided by the 0.15 alternative in the year 2007 *if there is no interstate trading*, that is, if States are held to their

---

[7]The three-region area consists of  Connecticut, Delaware, District of Columbia, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, and Rhode Island in Region 1(Northeast States); Illinois, Indiana, Kentucky, Michigan, Missouri, Ohio, Virginia, West Virginia, and Wisconsin in Region 2 (Midwest and Adjacent OTR States); and  Alabama, Georgia, North Carolina, South Carolina, and Tennessee in Region 3 (Southeast States).

emissions budgets. The second column shows the projected emissions reductions under the 0.15 alternative, given the interstate trading projected by IPM for 2007. The fact that the total reduction, 938 thousand tons, is the same in both columns reflects the fact that trading redistributes emission reductions but does not change the total.

The third column of Table 6-10 shows the tons of reductions by region under the three-region case; these figures represent the emissions under the different caps specified by EPA. No interregional trading is allowed under this alternative. Across the rows of Table 6-10, we see that overall reductions are lower under the regional alternative, but reductions in the Northeast and Midwest are higher than under the 0.15 alternative. The Southeast, with a cap based on a limit of 0.20 lb/mmBtu, has emissions of over 37 thousand tons higher than the 0.15 alternative. Figure 6-4 shows the State-by-State emission results for the three-region alternative compared to the Initial Base Case and the expected results if the State Budgets were set with the limit of 0.15 lb/mmBtu.[8]

The effects of trading and differences between alternatives are also shown in Table 6-11. The first column shows the difference between emission reductions under the 0.15 trading alternative and the reductions that would be required given the State-by-State budgets if trading is not allowed. This column shows that the pattern of trading under the 0.15 trading alternative would tend to reduce emissions in the Northeast by an additional 14 thousand tons compared to the State budgets, while allowing the other two regions to reduce their emissions less than required to meet the State budgets.

The second column of Table 6-11 compares the results of the three-region alternative to 0.15 alternative without trading. The three-region alternative does not reduce total emissions by as much; emissions would be higher by 22 thousand tons in 2007 under the three-region alternative than under the 0.15 alternative, largely as a result of higher emissions in the Southeast. The three-region alternative does reduce emissions *in the Northeast* by almost 25 thousand tons more than under the 0.15 alternative before trading, while providing for smaller reductions in the Midwest and especially the Southeast.

As shown in the third column of Table 6-10, the effects of the three-region alternative are smaller if the changes due to interregional trading in the 0.15 alternative are considered. The three-region alternative provides about 11 thousand additional tons of reductions in the Northeast compared to the 0.15 alternative after trading, and about five thousand extra tons of reductions in the Midwest. The annual cost of the three-region alternative compared to the Initial Base Case is $1,349 million. The savings for this alternative compared to the 0.15 alternative would be on the order of $29 million.

---

8The data used to develop Figure 6-4 is included in Appendix B, Table B-3.

**Table 6-10**
**Comparison of 2007 Ozone Season NOx Emission Reductions:**
**0.15 State Budgets, Uniform 0.15 Trading, and the Three-Region Alternative (Regionality 2)**
**(1,000 tons)**

| Incremental Measure (from Initial Base Case) | Reductions under 0.15 State Budgets[a] | Reductions under Uniform 0.15 Trading | Reductions under Three-Region Alternative |
|---|---|---|---|
| Total Tons Reduced | 938 | 938 | 916 |
| Tons reduced, Region 1 (0.12 lb/mmBtu) | 117 | 131 | 142 |
| Tons reduced, Region 2 (0.15 lb/mmBtu) | 607 | 603 | 607 |
| Tons reduced, Region 3 (0.20 lb/mmBtu) | 214 | 204 | 167 |

Source: ICF analysis.
[a] The State Budget levels were set with a 0.15 lb/mmBtu rate and a ozone season cap of 564,000 tons. This column shows Initial Base Case Emissions - State Budgets for each region. Total emission reductions under the State Budgets are equal to the emission reductions under the 0.15 alternative.

**Table 6-11**
**Comparison of the Differences Between 2007 Ozone Season NOx Emissions for**
**0.15 State Budgets, Three-Region Alternative (Regionality 2), and Uniform 0.15 Trading**
**(1,000 tons)**

| Incremental Measure (from Baseline) | Reductions under 0.15 Trading Relative to State Budgets[a] | Reductions under Three-Region Alternative Relative to State Budgets[a] | Reductions under Three-Region Alternative Relative to 0.15 Trading |
|---|---|---|---|
| Total Tons Reduced | 0.0 | -22.0 | -22.0 |
| Tons reduced, Region 1 (0.12 lb/mmBtu) | 13.8 | 24.7 | 10.9 |
| Tons reduced, Region 2 (0.15 lb/mmBtu) | -4.4 | 0 | 4.5 |
| Tons reduced, Region 3 (0.20 lb/mmBtu) | -9.3 | -46.7 | -37.4 |

Source: ICF analysis.
[a] The State budgets are listed in the SNPR for the 0.15 alternative and in Appendix B, Table B-1.

**Figure 6-3**

**Comparison of 2007 Ozone Season NOx Emissions in the Initial Base Case with the State Component of the NOx Budget Under the Two-Region Alternative and the Emissions Results from the Two-Region Alternative**



**Figure 6-4**
**Comparison of 2007 Ozone Season NOx Emissions in the Initial Base Case with the State Component**
**of the NOx Budget for the Three-Region Alternative and the Emissions Results from the Three-Region Alternative**



**6.3        Other Program Designs and Sensitivity to Modeling Assumptions**

This section compares the major program alternatives considered by EPA in the development of the NOx SIP call.  Section 6.3.1 contains a discussion of costs in the absence of interstate trading,  Section 6.3.2 contains the results of the banking/no banking analysis, Section 6.3.3 presents an analysis of a 0.35 lbs/mmBtu alternative, and Section 6.3.4 presents IPM results for the 0.15 trading alternative under varying assumptions on technology, discount rate, and electricity demand.

**6.3.1      Costs without Interstate Trading**

Another program option is to set State budgets based on a uniform emission rate and to restrict trading between sources within State boundaries.  Table 6-12 presents the results of the analysis restricting trading and shows the difference in outcomes under this "no interstate trading" case for the 0.15 lb/mmBtu alternative.  The cost increase for a program with 23 regions (where each of the jurisdictions covered by the NOx SIP call would be its own region and allowing trading only within each State or jurisdiction) compared to the 0.15 alternative is approximately two percent.  The cost difference is due to the fact that there are some differences in control costs within State boundaries, and effective trading can therefore occur within State boundaries.  This estimate of the difference in cost between the 0.15 trading alternative and the alternative that does not allow interstate trading is dependent on the assumption that all States will set up trading programs for electricity generating units within their boundaries.  If States adopt rate-based approaches, the cost could be expected to be  higher, though this possibility was not explicitly modeled for this report.[9]  The distribution of emissions under the no interstate trading case, which is equal to the State budgets, is shown in Table 6-10.

---

9The effects of a program that did not allow trading within States was addressed in EPA September 1997.

**Table 6-12**
**Emission Reductions, Cost, and Cost-Effectiveness with and without Interstate Trading in 2007**
**for the SIP Call Region**

| Incremental Measure (from Base Case) | Region[a] | 0.15 Alternative with Interstate Trading | 0.15 Alternative without Interstate Trading | Effects of Preventing Interstate Trading |
|---|---|---|---|---|
| NOx Reductions (1,000 ozone season tons) | Region 1 | 131 | 117 | - 14 |
| | Region 2 | 603 | 607 | 4 |
| | Region 3 | 204 | 214 | 9 |
| | Region Total | 938 | 938 | 0 |
| Cost (million 1990$) | Region Total | $1,378 | $1,407 | $29 |
| Average Cost per Ton (1990$) | Region Total | $1,468 | $1,499 | - |

Source: ICF analysis.
[a] Regions 1, 2, and 3 are defined in Section 6.2.2.

## 6.3.2    Banking

Under an allowance based emissions trading program with banking, sources can create reductions beyond required levels in one season, thus freeing up some allowances for use in a later season. Each banked allowance represents one ton less emissions in the current season. Banking is a cross-cutting option, because it can be used with any of the uniform or regional alternatives. Banking encourages early reductions, provides flexibility, and reduces cost for regulated sources. It also dispels the "use it or lose it" conception concerning the use of allowances, and accommodates changes in generation activity that may occur in response to interruptions of power supply from sources that do not emit NOx. On the other hand, banking can create uncertainty about actual emissions in a given season.

EPA considered several banking alternatives, including options with (1) no banking; (2) banking of emission reductions after the start of the program; (3) banking of "early" reductions (i.e., those that come before the beginning of the program); (4) and banking from an earlier phase of the program to a later phase.

Banking of "early" reductions was only modeled for the 0.15 alternative because earlier IPM analysis suggested that owners of electricity generating units would want to use it to a very limited degree to lower the costs of future compliance, although not all the important advantages of banking were incorpated into that analysis (EPA, 1997a). A two-phase banking program was also not modeled. Table 6-13 presents IPM results for the 0.15 alternative with and without banking, where banking begins after the start of the program in 2003.

Banking is most valuable for programs in which costs per ton removed rise over time, which is most likely to occur if the effective stringency of the regulations rises over time. In the case of the NOx SIP call, the effective stringency rises only slightly over time as a result of a fixed emissions cap interacting with a growing demand for electricity. Over time, however, anticipated improvements in technology (including combined-cycle retrofits) will counteract the effects of growth, so that the cost per ton removed is expected to fall eventually.

Given the fact that costs per ton removed are expected to rise only slightly at first and then fall, it is not surprising that little banking was predicted by IPM in the 0.15 alternative with banking beginning in 2003. Both costs and the geographic distribution of emission reductions would be almost the same with or without a banking program.

**Table 6-13**
**Effects of Banking on Estimated Ozone Season NOx Emission Reductions, Incremental Cost,**
**and Cost-Effectiveness for the 0.15 Trading Alternative**

| | | 2003 | 2005 | 2007 | 2010 |
|---|---|---|---|---|---|
| Reductions of Ozone season NO$_X$ Emissions (1,000 tons) | Without Banking | 899 | 933 | 938 | 948 |
| | With Banking Beginning in 2003 | 902 | 931 | 935 | 948 |
| Costs, Incremental to Initial Base Case (million 1990$) | Without Banking | $1,308 | $1,354 | $1,378 | $1,341 |
| | With Banking Beginning in 2003 | $1,326 | $1,348 | $1,358 | $1,338 |
| Average Cost/Ton of Ozone season NOx Removed (1990$) | Without Banking | $1,455 | $1,451 | $1,468 | $1,415 |
| | With Banking Beginning in 2003 | $1,469 | $1,448 | $1,453 | $1,412 |

Source: ICF analysis.

This analysis does not consider a banking plan in which emission reductions prior to 2003 could be used to ease the transition to the NOx SIP call, and help ensure that allowances were available for planning purposes early in the compliance period. Under that type of banking program, more tons would be banked and the savings and other advantages (especially in terms of reduced uncertainty) would be greater. Annual emissions starting in 2003, however, would be higher and less predictable than in programs that did not allow early emissions to be banked.

### 6.3.3    Uniform 0.35 lb/mmBtu Trading Alternative

EPA analyzed the emissions and cost-effectiveness results of imposing a 0.35 lb/mmBtu standard for NOx, assuming no implementation of the OTC MOU Phases II and III (i.e., the Initial Base Case). Under this scenario, no electricity generating units use post-combustion controls; rather, they add only Title IV controls. The ozone season emissions reductions compared to the Initial Base Case in 2007 are an additional 187 thousand tons. By comparison, the 0.15 trading alternative provides ozone season NOx emission reductions of 938 thousand tons. The lower reductions in NOx emissions correspond to lower total and average costs. Table 6-14 illustrates these results.

**Table 6-14**
**Comparison of Estimated 2007 Ozone Season NOx Emission Reductions, Incremental Cost, and Cost-Effectiveness Between Uniform 0.35 Trading Alternative and 0.15 Trading Alternative**

|  | 0.35 Trading | 0.15 Trading | Incremental Effect |
|---|---|---|---|
| NOx Reduction (1,000 ozone season tons) | 187 | 938 | 751 |
| Annual Cost (million 1990$) | $217 | $1,378 | $1,161 |
| Average Cost-Effectiveness (1990$/ozone season ton) | $1,165 | $1,468 | $303 |

Source: ICF analysis.
Numbers may not sum due to rounding.

### 6.3.4    Sensitivity to IPM Assumptions

Sensitivity analyses on several key assumptions in the IPM analysis are presented in this section. These analyses, which respond to many of the comments received on the proposed NOx SIP call, include the effects of a higher discount rate, lower SNCR effectiveness, shorter equipment life, and higher growth rates of demand were developed to assess the robustness of the results outlined above. The sensitivity analyses are all evaluated relative to the uniform 0.15 trading alternative.

#### *Effects of Higher Discount Rate*

This sensitivity analysis assumes that the after-tax cost of capital is eight percent per annum rather than the six percent rate that is assumed in the rest of the IPM modeling. Table 6-15 presents cost and emission reduction differences between the two scenarios. As shown, the incremental cost of the 0.15 trading alternative rises by about two percent when a higher discount rate is assumed. Emission reductions are higher under the higher discount rate assumption, because the higher discount rate leads operators to delay installing new, lower-emitting units. The delay in introducing new units leads to higher baseline emissions, and the need for greater reductions to reach the NOx SIP call cap.

**Table 6-15**
**Effects of Alternative Discount Rate Assumptions on the Emission Reductions and Cost in 2007**
**for the Uniform 0.15 Trading Alternative**

| | Expected Discount Rate (6%) | Higher Discount Rate (8%) | Incremental Effect |
|---|---|---|---|
| NOx Reduction (1,000 ozone season tons) | 938 | 940 | 2 |
| Incremental Annual Cost (million 1990$) | $1,378 | $1,414 | $36 |
| Average Cost-Effectiveness (1990$/ozone season ton) | $1,468 | $1,504 | $36 |

Source: ICF analysis.

### Effects of Lower SNCR Effectiveness

This scenario assumes that, on coal-fired boilers emitting below 0.50 lb/mmBtu, SNCR will reduce NOx by 30 percent rather than 40 percent assumed in the rest of the analyses. Table 6-16 presents technology choices under the expected effectiveness scenario and the lower assumed effectiveness scenario, as well as the incremental change. Table 6-17 presents cost differences between the two scenarios. As shown, the incremental cost of the 0.15 trading alternative rises (by about 11 percent) when lower SNCR effectiveness is assumed. Shifts in the application of technology also take place with lower SNCR effectiveness. Table 6-17 shows that less capacity is retrofitted with SNCR when a lower effectiveness is assumed, and more capacity is retrofitted with SCR. EPA examined whether this potential increase in the installation of SCR would be feasible by 2003 and found that it would be feasible (EPA, 1998a). Also shown in Table 6-16 is a small increase in capacity of gas combined cycle units. Costs increase in part because of the reduced cost-effectiveness of the SNCR units, and the consequent need to substitute more expensive control measures.

**Table 6-16**
**Emission Control Choices by 2007 under Lower SNCR Effectiveness: 0.15 Trading**

| MW of Capacity | Expected SNCR Effectiveness (40% reduction from coal-fired units with baseline NOx below 0.5 lb/mmBtu) | Lower SNCR Effectiveness (30% reduction from coal-fired units with baseline NOx below 0.5 lb/mmBtu) | Incremental Effect of Lower SNCR Effectiveness | |
|---|---|---|---|---|
| | | | Total MW | Percentage Change |
| SNCR | 133,792 | 84,761 | -49,031 | -36 % |
| SCRª | 63,267 | 93,638 | 30,371 | 47 % |
| Gas CC | 20,443 | 20,997 | 554 | 2.7 % |

Source: ICF analysis.

ª In part because the increased need to install SCR is offset by reductions in SNCR installation, EPA's analysis of the feasibility of installing control technologies found that the necessary retrofits under this scenario could be accomplished. See "Feasibility of Installing NOx Control Technologies by May 2003," U.S. EPA, July 1998.

**Table 6-17**
**Ozone Season NOx Emission Reductions, Incremental Cost, and Cost-Effectiveness in 2007**
**Under Lower SNCR Effectiveness: 0.15 Trading**

| | Expected SNCR Effectiveness (40% reduction from units with baseline NOx below 0.5 lb/mmBtu) | Lower SNCR Effectiveness (30% reduction from units with baseline NOx below 0.5 lb/mmBtu) | Incremental Effect of Lower SNCR Effectiveness |
|---|---|---|---|
| NOx Reduction (1,000 ozone season tons) | 938 | 938 | 0 |
| Annual Cost (million 1990$) | $1,378 | $1,526 | $148 |
| Average Cost-Effectiveness (1990$/ozone season ton) | $1,468 | $1,626 | $158 |

Source: ICF analysis.

### Effects of Shorter Equipment Life

This scenario assumes that all equipment life is 15 years rather than 20 years as assumed in the other analyses. The changes in the technologies used to comply with the NOx SIP call under this scenario are similar to those seen for the higher discount rate scenario: capital-intensive technologies are used less, with greater emphasis on dispatching changes. Table 6-18 presents cost differences between the two scenarios. As shown, the incremental cost of the 0.15 trading alternative would rise by six percent if equipment life were shorter than assumed by EPA.

**Table 6-18**
**Ozone Season NOx Emission Reductions, Incremental Cost, and Cost-Effectiveness in 2007**
**Assuming Shorter Equipment Life: 0.15 Trading**

|  | Expected Life (20 years) | Lower Assumed Life (15 years) | Incremental Effect |
|---|---|---|---|
| NOx Reduction (1,000 ozone season tons) | 938 | 941 | 3 |
| Annual Cost (million 1990$) | $1,378 | $1,461 | $83 |
| Average Cost-Effectiveness (1990$/ozone season ton) | $1,468 | $1,552 | $84 |

Source: ICF analysis.

Numbers may not sum due to rounding.

### Effects of Alternative Demand Scenarios

Tables 6-19 and 6-20 present the effects on projected cost and cost-effectiveness of changing electricity demand forecasts, using the 0.15 trading alternative as a basis for comparison. The first alternative scenario, shown in Table 6-19, assumes the full increase in demand projected by NERC; unlike EPA's baseline assumptions, this alternative does not allow for reductions related to the Climate Change Action Plan (CCAP)[10]. The second alternative scenario, shown in Table 6-20, assumes that retail competition (in addition to the already assumed wholesale competition) occurs throughout the country. Three main quantitative effects of retail competition were modeled: electricity price reductions, which will induce increases in electricity demand; initiation of time-of-day pricing; and increased retirement of nuclear generation units due to their inability to be competitive.

Both of these alternative demand scenarios lead, in the Initial Base Case, to more electricity production from fossil-fueled units. Greater projected fossil-fueled production leads, in turn, to higher emissions in the Initial Base Case, and the need for greater reductions to meet a given emissions cap. The total cost and the cost-effectiveness are therefore higher under the alternative demand scenarios.

---

10The CCAP reductions are listed in Chapter 4, Table 4-1.

**Table 6-19**
**Effects of Assuming Full NERC Demand/No CCAP Reduction on the Effects of**
**the NOx SIP Call in 2007:  0.15 Trading**

|  | NOx Reduction (1,000 ozone season tons) | Annual Cost (million 1990$) | Cost-Effectiveness (1990$/ton) |
|---|---|---|---|
| Projected Demand | 938 | $1,378 | $1,468 |
| Full NERC Demand/ No CCAP Reduction | 996 | $1,502 | $1,508 |
| Increase Due to Alternative Assumption | 58 | $124 | $40 |

Source: ICF analysis.
Numbers may not sum due to rounding.

**Table 6-20**
**Effects of Assuming Retail Competition--More Demand/Less Nuclear Power on the Effects**
**of the NOx SIP Call in 2007: 0.15 Trading**

|  | NOx Reduction (1,000 ozone season tons) | Annual Cost (million 1990$) | Cost-Effectiveness (1990$/ton) |
|---|---|---|---|
| Projected Demand | 938 | $1,378 | $1,468 |
| Retail Competition -- More Demand, Less Nuclear Power | 996 | $1,491 | $1,498 |
| Increase Due to Alternative Assumption | 58 | $113 | $30 |

Source: ICF analysis.
Numbers may not sum due to rounding.

**6.4      Direct Economic Impacts**

This section presents the results of the cost analyses from the perspective of potential economic impacts.  Direct impacts, which are presented in this section, are those borne by the entities that potentially incur costs because they are required to reduce emissions.  Indirect impacts, on the other hand, fall on entities that are affected through their interactions with the directly affected entities.  They are presented in Section 6.5.

This section moves from the broadest level of impacts down to more specific assessments. Costs of the rules relative to all electricity generation are presented first, followed by consideration of the potential distribution of costs across types of generators.  Finally, potential impacts on small owners of electricity generating units are summarized.

**6.4.1    Costs Relative to Electricity Generation and Revenues**

Table 6-21 shows the potential impact of the compliance costs of the rule at the broadest level by comparing them to the total amount of electricity generated annually.  Annualized costs for the year 2007 are shown in the third row of the exhibit for four uniform alternatives.  These costs are then compared to electricity generation to show costs in terms of mills (i.e., tenths of cents) per kilowatt-hour.  Also shown in the table is the fact that generation in the SIP call region is lower under each of the alternatives than in the base case.  Because power production will be growing over time with or without the NOx SIP call, producers in the SIP call region will still generate more power in 2007 than in the current year — the effect of the NOx SIP call will be to lower the rate of generation growth in the SIP call region and shift some of it to nearby States where power is less expensive to produce[11].  Furthermore, because some utilities will own capacity both inside and outside of the SIP call region, some of the shifts in generation will represent a shift within corporations, rather than a shift in output from one group of firms to another.

**Table 6-21**
**Generation Changes and Costs Compared to Generation in 2007**
**for Uniform Alternatives of Differing Stringency**

|  | Initial Base Case | 0.25 Trading | 0.20 Trading | 0.15 Trading | 0.12 Trading |
|---|---|---|---|---|---|
| Total Generation in SIP Call Region (millions MWhrs) | 2,075 | 2,026 | 2,026[a] | 2,018 | 1,995 |
| Percent of National Power Generation | 56% | 55% | 55% | 55% | 54% |
| Costs Relative to Initial Baseline (billion 1990$) | - | 0.64 | 0.95 | 1.38 | 1.85 |
| Cost per Unit (mills/kWh, 1990$) | - | 0.31 | 0.47 | 0.68 | 0.93 |

Source: ICF analysis and U.S. Energy Information Administration *Annual Energy Outlook 1998,* December 1997.
[a] Generation is lower under the 0.20 alternative than the 0.25 alternative; the difference is not apparent because of rounding.

These potential costs can be put into perspective by comparing them to the typical revenues received by electricity suppliers.  Table 6-22 shows, for the same alternatives presented in the preceding exhibit, the incremental per-kilowatt cost of generation in comparison to an estimate of per-kilowatt-hour revenues received by utilities and other suppliers in the SIP call region.   Revenues, in turn, closely approximate the total costs of supplying electricity to the end-use customer

---

11EPA did not analyze the potential change in electric demand (it is held constant), rather, EPA analyzed the change in the mix of suppliers that may result from implementation of the SIP call.

(including amortization of equipment and a return on invested capital).[12]  Table 6-22 shows that the potential costs of the rule are less than two percent of the revenues of electricity suppliers for all of the alternatives, and climb above one percent only for the 0.15 and 0.12 alternatives.  Under traditional cost-of-service regulation, this potential cost increase could be expected to constitute the price increase as well.

**Table 6-22**
**NOx SIP Call Compliance Costs by Alternative**
**Compared to Revenues from Electricity in 2007**
**(1990$)**

| | 0.25 Trading | 0.20 Trading | 0.15 Trading | 0.12 Trading |
|---|---|---|---|---|
| Average Per-unit Revenues, 23 Jurisdictions, Base Case (mills/kWh)[a] | 60.00 | 60.00 | 60.00 | 60.00 |
| Cost per Unit, all Generation in SIP Call Region (mills/kWh) | 0.31 | 0.47 | 0.68 | 0.93 |
| Cost as a Percentage of Revenues | 0.52% | 0.78% | 1.13% | 1.55% |

Source: Average revenues per kWh calculated by ICF using EIA Form 861 for 1996; other figures calculated by ICF.
[a]The table shows the costs of the NOx SIP call in 2007 in comparison to current revenues from electricity.  Per-unit revenues can be expected to change over time (as a result of increased competition in the industry), so the percentage impact of the rule will differ from the impact shown in the table.

### Effects of Cost Changes on Electricity Producers

Whether potential costs of the magnitude shown in Tables 6-21 and 6-22 have a significant impact on electricity producers depends in part on whether the costs will be accompanied by offsetting price changes.  In the past, because the electric power industry was tightly regulated, it was reasonable to assume that their commissions would have approved (perhaps after a lag) rate increases sufficient to cover the costs related to emission control programs.  Alternatively, part of the rule-related increases in operating costs may have been reflected in fuel adjustment clauses. The lack of competition helped to limit the reduction in demand resulting from a rate increase.  Utilities could thereby expect to continue receiving an adequate return on invested capital, and concerns about economic impacts were limited to the lag between cost and rate increases, and the impacts of the rate increases on electricity demand.

---

[12]Table 6-22 shows the costs of the NOx SIP call in 2007 in comparison to 1996 revenues from electricity.  Per-unit revenues can be expected to change over time (as a result of increased competition in the industry), so the percentage impact of the rule will differ from the impact shown in the table.

More recently, the restructuring of the industry and the prospect of competition among utilities and non-utility producers has added uncertainty to the task of projecting economic impacts on utilities. Competition at the wholesale level may complicate the process of passing on unusually high costs, while greater uncertainty over the speed of retail deregulation increases the difficulty of projecting the price impact on customers. This section discusses some potential effects of the restructuring process on the recovery of the costs of the rule by electricity generators.

The potential effects of the NOx SIP call on the electric power industry will depend in part on the timing of the rule relative to the progress of the restructuring process. The NOx SIP call is scheduled to go into effect by mid-2003. Competition at the wholesale level is already underway and will be fully implemented prior to 2003. Competition at the retail level is expected to spread widely by 2002, and to be largely complete by 2003 to 2005 (in the States where it occurs). Thus, for most of the period in which the NOx SIP call will impose costs, the assumptions of freely competitive markets should apply. The following discussion of effects on utilities, therefore, begins from a free-market perspective. Following that discussion, the effects of possible limits on competition early in the period are discussed.

### Effects of Cost Increases Under Competition

In a world in which electricity prices are set by competitive market forces at both the wholesale and the retail level, theory predicts that the interaction of buyers and sellers will ensure that prices reflect the marginal costs of generation (that is, the incremental costs of producing another unit of output).[13] The need to limit NOx even as electricity output increases means that marginal costs of generation will rise: producing more electricity under the NOx SIP call might require using more reagent for SNCRs as capacity factors increase, or it might require the use of higher-cost fuels than are used under the Initial Base Case. Assuming that the demand for electricity is relatively inelastic (which is a reasonable conservative assumption for the short run), the price of electricity is predicted to rise by up to the amount that marginal costs rise.[14]

---

13The total price of electricity to consumers includes, in addition to the costs of energy, additional costs for transmission, distribution, and (where appropriate) charges for peak capacity. Capacity charges were found not to be affected significantly under the 0.15 alternative, and transmission and distribution charges are assumed not to change in response to the NOx SIP call. Thus, this analysis and discussion focuses on the marginal costs of producing energy, which are expected to rise as a result of the NOx SIP call.

14A price increase could result in a more significant reduction in the quantity of electricity demanded in the long run than in the short run. A reduction in electricity demand would lower the total costs of the NOx SIP call, and limit the size of the price increase, while reducing the revenues received by electricity producers. These possible impacts have not been analyzed for this report.

Because suppliers in a competitive market are not required to produce at a loss, this increase in prices can be expected to be high enough to at least cover the *variable* costs actually incurred by every producer. Any kilowatt-hours that would have cost more to generate than the revenues they would bring in would not be produced. The fact that price will be high enough to cover variable costs, however, does not by itself mean that there would be no impacts on generators. Some generating units might have unusually high variable costs for any given level of output; such units will not be used during time periods in which the market price of electricity is too low given their variable costs. Overall, generators in the SIP call region are predicted to cut output during the ozone season by several percent, largely from power plants that would use control strategies with high marginal costs (e.g., combinations of SNCR and allowance purchases). The owners of these units would lose the net revenues they would have earned on those kilowatt-hours of output that they did not produce, if their State chose to implement the NOx SIP call as modeled by EPA.

A more significant issue is that the adjustment of prices in response to changes in marginal costs does not guarantee that all increases in fixed costs will be covered. Fixed costs (such as the capital costs of installing emission control systems) do not affect the free market equilibrium unless they are large enough to result in the retirement of plants as a way to avoid incurring unrecoverable costs. Short of early retirement, which IPM does not project for any significant amount of capacity, there is no necessary connection between fixed costs and price changes.

Some or all of the fixed costs of the rule can be recouped if the price increases exceed the average change in variable costs. A relatively large increase in marginal costs could occur, for example, if generating units that are available for generating incremental power tend to be those with high variable costs of control (e.g., those with SNCR and a need to purchase allowances for every additional mmBtu of fuel used). Because the change in the price of electricity will be determined by the increase in marginal costs for these marginal units, the price increase could be higher than the average increase in variable costs.

This pattern appears to fit the case of the 0.15 alternative. Among coal-fired boilers, those units projected to retrofit with SNCR tend not to be used to the maximum extent possible (in part because their costs of operation are high). By contrast, the coal-fired boilers retrofit with SCR, which have lower increases in marginal cost, tend to be run almost continuously, and cannot contribute to further increases in output. Thus, increases in electricity output tend to come from the under-utilized units retrofit with SNCR, and the marginal costs of electricity tend to reflect their high variable costs of control. Based on model results, it appears that marginal-cost-based prices would rise by more than enough to cover *in aggregate* both the fixed and variable costs of the rule.

There is, however, no guarantee or even expectation that the increased revenues will accrue in exact proportion to increased costs. Rather, owners of units for which emissions are unusually low in the baseline (or for which costs of control are low) will tend to gain when prices rise as a result of the rule. Conversely, owners of high-emitting units that are costly to control will not necessarily recover all of their increased costs. The additional costs might then be borne by the owners of those units.

Because of the restructuring process that is accompanying the shift from regulated to free market conditions, the identities of the owners of the units is somewhat uncertain. The traditional, vertically integrated utility provides all of the functions of generation, transmission, distribution, and marketing services. Under competition, some of these functions are likely to be split off: utilities might sell off their generation capacity and/or turn over their marketing functions to other entities, possibly keeping their transmission and distribution functions. The owners of the power plants, who will presumably be responsible for reducing emissions and for holding sufficient allowances, might well be entities other than the utilities that currently own them.

Whether this change in ownership also means that any particularly high costs under the NOx SIP call will fall on the new owners is less clear. To the extent that unrecoverable costs of compliance can be clearly predicted before the sale of the power plant, these potential costs will most likely be considered fully in the negotiations over the selling price. That is, unusually high-emitting plants will tend to have lower market values than clean ones. Only the costs that cannot be foreseen (resulting, perhaps, from unforeseen increases in allowance prices) will fall on the new owners. A significant portion of the costs of the rule might then be borne by the current owners of those generation assets that will cost the most to control. Because most utilities own a range of different types of generation capacity, with varying baseline NOx rates, some of the variability in costs can be expected to be canceled out: high costs for high-emitting generation will be balanced in many cases by plants with low or zero emissions.

### Effects of Cost Increases during the Transition to Competition

As mentioned above, there may be cases in which electricity is sold at regulated retail prices for a period after the implementation of the NOx SIP call. The effects of the regulations will ultimately depend on the decisions made by the utility regulators, and cannot therefore be predicted with assurance. Understanding the reason for the continued regulation of retail electricity prices might narrow the uncertainty over their possible effects.

One of the main reasons that some retail price regulation will persist is to deal with the problem of "stranded costs" — fixed costs that were incurred under a regulated environment, for generation assets that would not be able to cover their full costs in a free market. Regulatory responses to the problem of stranded costs vary by SIP call region and situation. In some cases, the issue of stranded cost recovery has been separated from the issue of free market rates by including on utility bills a separate, non-by-passable charge to cover stranded costs. The rest of the bill would be determined by the market, and could presumably take the effects of the NOx SIP call into account.

In other cases, utility regulators have agreed to fix retail prices for the electricity sold by utilities that own these assets for a set period, rather than allowing the generating prices that customers will ultimately see to float down to free-market levels. If the utility is able to reduce its costs (of generation, or of purchasing power from other suppliers), while continuing to sell at a fixed rate, it will be able to cover some portion of its stranded costs. In some cases, the utilities agree to provide a discount from previous regulated rates, so that consumers can realize some of the advantages of the free market even during the transition. If the terms of the agreed-upon rate freeze

(including the size of the initial discount) do not take into account the additional costs associated with the NOx SIP call, the utility might be in the position of absorbing the costs of the rule for the length of the price freeze. State utility regulators may need to be cognizant of the potential effects of the NOx SIP call on the need for stranded cost recovery.

**6.4.2    Potential Electricity Price Changes**

As discussed above, a reasonable basis for projecting price changes in response to cost increases is the increase in marginal costs of electricity production. Marginal cost changes (that is, cost changes that vary with firm or industry output) are key because they immediately affect the market equilibrium: if demand can be assumed to be relatively inelastic, microeconomic theory strongly suggests that almost all of a marginal cost increase will be quickly translated into increased prices. Because electricity demand has been relatively inelastic, in the short run, the change in marginal costs resulting from the rules is a reasonable upper-bound estimate of the change in electricity prices in the short run.

If all States implemented the NOx SIP call as illustratively modeled by EPA, annual average marginal costs of electricity production could rise by 1.0 mill/kWh in 2007, or about 1.6 percent of average revenues per kWh. Overall, the marginal cost changes in 2007 fall in the middle of the changes over the period from 2003 to 2010.

Prices could rise by these same amounts as an upper bound estimate; to the extent that electricity demand is not completely inelastic, prices would not rise as much. If prices were to go up on the order of the changes in marginal costs, total revenues to the electric power industry, in the absence of a change in generation, would rise by about $1.9 billion in 2007, and the *net* revenues to the industry after the increase in costs would be on the order of half of a billion dollars. Estimating economic impacts is made somewhat more complex by the fact that generation is projected to be lower in some years under the NOx SIP call than in the base case, by 2.8 percent in 2007 for the 0.15 alternative, for example. This decline would require utilities within the SIP call region to purchase more power from outside the SIP call region (or import it from generating capacity they own outside the SIP call region), though this increased cost would be largely balanced out by savings of the costs of generation.

**6.4.3    Distribution of Cost Impacts Across Generation Types**

Impacts on electricity producers will also depend heavily on the characteristics of their power plants. Utilities with an unusually high percentage of capacity and generation from units that start out with low emission rates, or are relative inexpensive to control, will generally have lower costs per kilowatt-hour of electricity produced. These utilities might include those that have already been regulated under other regulations, and therefore have low baseline emissions. Other utilities may have a preponderance of small coal-fired boilers with high baseline emissions rates. These utilities

may have to install controls to reduce baseline emissions rates, and then may still have to purchase allowances in order to comply.

Though costs per kilowatt hour can be different for every affected unit, it can be instructive to show costs for typical units in the most important generator categories. Table 6-23 presents IPM results for four types of units: combustion turbines; gas combined cycle; oil/gas-fired boilers; and coal-fired boilers. Within each type, results are shown for small and large examples, where sizes are selected as the lower and upper quartiles of the size distribution, respectively. The population is further subdivided into examples with low initial NOx rates (at the lower quartile of rates) and high initial NOx rates (at the upper quartile). Finally, for the boilers, examples for cases with SCR and SNCR are displayed.

Costs, displayed in mills per kilowatt hours, are calculated by adding the cost of the control technology (if any) to the number of allowances that could be sold, times an estimate of the value of the allowances. For the purposes of exposition, allowance prices are assumed to be $3,000 per ton, on the basis of the marginal cost of NOx reductions in the 0.15 trading alternative over the analytical period. The number of allowances that could be sold is calculated by comparing controlled emission rates to an estimate of the allowances that would be allocated to the unit under the 0.15 alternative, and multiplying by an estimate of the fuel input to the unit over the ozone season. The total net cost of compliance, considering both control measure costs and allowance costs or revenues, is then divided by estimated annual generation to yield an average cost per kWh.

As seen in the table, typical combustion turbines and combined-cycle plants realize savings rather than costs from the rule (not counting administrative or monitoring costs). Because their emission rates are typically low even in the baseline (due in some cases to previously installed control devices), they are not assumed to be retrofitted with additional emission control devices.

Oil and gas-fired boilers with low initial rates can experience savings analogous to those for combustion turbines and combined cycle units. Oil and gas boilers with high rates can have net costs, with or without the addition of control technology. If electricity prices rise appreciably (in step with changes in marginal costs, for example) as a result of the NOx SIP call, some owners of oil and gas-fired boilers would be better off because their control costs would be lower than the industry-wide increase in marginal costs.

Coal-fired boilers, which provide the majority of fossil generation, can have costs in the range of one mill per kilowatt hour. This cost is comparable to, though somewhat higher than, the average costs for all generation under the 0.15 alternative. That cost increase, of 0.68 mills/kWh, is shown in Table 6-21. As shown in Table 6-23, costs can be expected to be higher for smaller units (1.0 - 1.6 mills/kWh) than for large units (0.4 - 1.0 mills/kWh). Costs will also tend to be higher for those units with higher baseline rates (including some Group 2 boilers, which were not required to reach low rates under Title IV).

Analysis of the IPM results also shows changes in capacity factors for some of the typical units in response to the NOx SIP call. Units that employ SNCR are most likely to reduce their

capacity factors, and those with low controlled rates (either coal with SCR or gas turbine/CC) are likely to increase their capacity factors. As discussed above, this pattern leaves the marginal units more likely to have high marginal costs of generation, because the units with available capacity face additional costs of purchasing reagent and allowances when they increase generation. The units that reduce their capacity factors will lose the revenues that would have accompanied their lost output; on the other hand, they also save their variable costs of operation for those kilowatt hours.

**Table 6-23**
**Potential Net Cost (After Allowance Purchases/Sales) by Unit Type under 0.15 Trading Alternative in 2007**
**(mills/kWh, 1990$)**

| | Small Units | | Large Units | | | |
|---|---|---|---|---|---|---|
| Unit Type | Low Initial NOx Rate | High Initial NOx Rate | Low Initial NOx Rate | | High Initial NOx Rate | |
| Combustion Turbine | (Unaffected) | (Unaffected) | -1.3 | | -0.4 | |
| Gas Combined Cycle | -1.3 | -0.3 | -2.0 | | -0.3 | |
| Oil/Gas Fired Boiler | 0.0 | 0.8 | -0.5 | -0.4 (SNCR) | 0.5 | 0.1 (SNCR) |
| Coal Fired Boiler | 1.0 (SNCR) | 1.6 (SNCR) | 0.9 (SCR) | 0.4 (SNCR) | 1.0 (SCR) | 0.5 (SNCR) |

Source: ICF analysis.

## 6.4.4    Potential Impacts on Small Electricity Generators

To investigate the possibility that small utilities and other small affected entities could be adversely affected by the NOx SIP call, EPA has conducted a screening analysis of small entity impacts. That analysis reveals that a relatively small number of small utilities are potentially affected in this analysis, in part because coverage is limited to units greater than 25 MW, and in part because small utilities are more common in the western states that are outside the 23 jurisdictions named in the SIP call. Of almost 900 utilities nationwide that generate electricity, over 700 are considered small by SBA's definition (of less than 4 billion kWh per year). Fewer than 250 of these small utilities are found in the SIP call region, however, and of these only about 190 own fossil-fuel fired units. Excluding those utilities that have no units greater than 25 MW leaves 41 small potentially affected utilities.

Though many of these small utilities will be affected to a minor degree only, about half may experience cost increases that are greater that one percent of their electricity-based revenues under EPA's illustrative implementation scenario. The small utilities that may be more seriously affected tend to be those relying more heavily on coal-fired boilers, especially cyclones (which tend to have high uncontrolled emissions and are not subject to tight controls under Title IV), and those with units

whose baseline NOx emission rates are unusually high.  While these utilities constitute almost half of *affected* small utilities, they are less then ten percent of the small utilities that may be affected in the absence of the size cut-off established by EPA to limit impacts on small sources.

In a search for small non-utility generators, EPA identified approximately 100 affected units that generate electricity but are not owned by a utility.  The owners of almost all of these units are identified using a data base of non-utility generators.  Data collected on the revenues, SIC codes, and total generation of the owners or their parent companies are used to divide the owners into small and large entities.  Those for whom data on size are unavailable are assumed to be small in order to estimate a conservative "worst case" scenario.  In all, 73 small non-utility entities with units greater than 25 MW are analyzed.

Estimated costs of compliance are calculated under the conservative assumption that all small non-utility units comply through the purchase of allowances.  This approach would tend to overstate compliance costs because it does not consider cases in which emission reductions can be achieved at costs below the marginal cost of reductions in the SIP call region.  In the 0.15 trading alternative, 12 entities judged to be small are projected to face costs in excess of one percent of revenues under EPA's illustrative implementation scenario.  These 12 entities constitute about 16 percent of the 73 small non-utilities analyzed.

Adding 20 small utilities to 12 small non-utility entities yields a total of 32 small entities in the trading program with projected costs in excess of one percent of revenues.  These 32 entities constitute about 27 percent of all small affected entities, though it would be an even smaller percentage if a 25 MW cut-off was not used.

### 6.4.5    Potential for Closures and Additions of Capacity

A potentially important measure of the economic impacts of a rule is the number of potential closures predicted to result from the rule.  Closures occur when the costs of compliance are so high as to make the net present value of future operation negative, leading to the abandonment of a productive asset as the least-costly alternative.  New installations of capacity induced by the rule constitute another important measure.

The results of the IPM analysis show that some capacity could be shut down or retired early as a result of the NOx SIP call, if the States implemented the SIP call as EPA modeled it.  At most, 183 MW of coal-fired capacity and 151 MW of oil/gas-fired capacity, out of a total of over 230,000 MW, are projected to close.  Thus, all but 0.7 percent of capacity would continue to operate under the NOx SIP call.  These potential closures will be more than offset (in terms of capacity) by an increase in combined-cycle units of between 1,798 and 4,156 MW (depending on the alternative).

**6.5**     **Indirect Economic Impacts**

In addition to impacts on the entities that are potentially directly affected by the rules, there will be some impacts on sectors of the economy that interact with the electricity generating industry. This section briefly examines the potential effects on fuel suppliers, industrial users of electricity, and households.

**6.5.1**     **Potential Employment Impacts**

Emission control devices will have to be installed as a result of the NOx SIP call. Thus, the rule will generate an initial demand for workers to install emission control technology and a continuous demand for workers to operate and maintain the technology. Tables 6-24 and 6-25 present the potential impact on employment in the control technology sector for the 0.15 trading alternative.

**Table 6-24**
**Potential Impact on Employment in the Control Technology Sector: 0.15 Trading**
**(Construction and Installation)**

| Labor Required for Construction and Installation 2000 - 2003 | | | | Increased Annual Labor Demand, assuming construction and installation take three years (FTEs) |
|---|---|---|---|---|
| Combustion Controls (worker-years) | SCR (worker-years) | SNCR (worker-years) | Total (worker-years) | |
| 6,511 | 21,535 | 14,312 | 42,358 | 14,119 |

Source: ICF analysis.

**Table 6-25**
**Potential Impact of 0.15 Trading Alternative on Labor Requirements in the Control Technology Sector**
**(O&M)**
**in 2007**
**(Full-Time Equivalent)**

| SCR | SNCR | Total |
|---|---|---|
| 316 | 669 | 985 |

Source: ICF analysis.
No additional O&M assumed to be required for combustion controls.

The NOx SIP call may also affect demand for labor in the coal and natural gas sectors. Coal produced is likely to decrease while natural gas production is likely to increase. The resulting decrease in the demand for coal workers (which amounts to less than one percent of total coal mining employment) and increase in the demand for natural gas workers are presented in Tables 6-26

and 6-27.  EPA did not estimate the potential additional indirect impact on labor demand for coal transportation workers, but it is expected to be smaller the than potential changes in production workers.

# ELECTRIC UTILITY STEAM GENERATING UNITS MACT RULEMAKING WORKING GROUP

## Charge and Process

June 2001
Revision 3

**Clean Air Act Advisory Committee**
**Permits, New Source Reviews, and Toxics Subcommittee**
**Federal Advisory Committee**

Exhibit D1

TABLE OF CONTENTS

Page

1.0     OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.0     REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3.0     SCOPE OF ELECTRIC UTILITY STEAM GENERATING UNIT MACT
        RULEMAKING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4.0     WORKING GROUP PROCESS AND CHARGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5.0     PROPOSED REGULATORY DEVELOPMENT ACTIVITIES AND SCHEDULE . . . . . . 4



## ELECTRIC UTILITY STEAM GENERATING UNIT MACT RULEMAKING

### 1.0    OVERVIEW

This document is a work plan for public involvement in the development of national emission standards for hazardous air pollutants (NESHAP) under section 112 of the Clean Air Act, as amended (CAA), for oil- and coal-fired electric utility steam generating units.  The approach to rulemaking includes forming a working group under the Permits, New Source Reviews, and Toxics Subcommittee of the Clean Air Act Advisory Committee (CAAAC), which is chartered under the Federal Advisory Committee Act (FACA).  The working group would be formed initially for a 1-year period with periodic reviews of the useful duration being conducted.

### 2.0    REGULATORY BACKGROUND

Section 112(n)(1)(A) of the CAA required that, after considering the results of the study mandated by the same section, the Administrator determine whether regulation of HAP emissions from electric utility steam generating units was appropriate and necessary.  The results of the study were documented in the Utility Air Toxics Final Report to Congress (RTC), which was finalized in February 1998 and released to Congress and the public.  In the RTC, the U.S. Environmental Protection Agency (EPA) stated that, for the utility industry, mercury from coal-fired electric utility steam generating units was the HAP of greatest concern for public health.  However, nickel emissions from oil-fired units and other HAP emissions from coal-fired units are also of concern.

To further inform the regulatory finding, the EPA issued an information collection request (ICR) under the authority of section 114 of the CAA to all coal-fired electric utility steam generating units requesting coal data from such units for calendar year 1999.  Certain units were also required to conduct stack tests to evaluate their mercury emissions.  In addition, the EPA solicited data from the

public through a February 29, 2000 Federal Register notice. A public meeting was held on June 13, 2000 in Chicago, Illinois, where the public was invited to provide EPA with their views on what the regulatory finding should be.

The EPA also undertook an evaluation of the mercury control performance of various emission control technologies that are either currently in use on coal-fired units for pollutants other than mercury or that could be applied to such units for mercury control. The evaluation was conducted along with other parties, including the Department of Energy (DOE).

In addition, at the direction of Congress, the EPA funded the National Academy of Sciences (NAS) to perform an independent evaluation of the available data related to the health impacts of methylmercury and provide recommendations for EPA's reference dose (RfD--the amount of a chemical which, when ingested daily over a lifetime, is anticipated to be without adverse health effects to humans, including sensitive subpopulations). The NAS conducted an 18-month study of the available data on the health effects of methylmercury and provided EPA a report of its findings in July 2000.

On December 14, 2000 (65 FR 79825; December 20, 2000), the EPA announced that regulation of HAP emissions from oil- and coal-fired electric utility steam generating units was necessary and appropriate. Under an existing settlement agreement, such regulations must be proposed by December 15, 2003 and promulgated by December 15, 2004. At the June 2000 public meeting noted above, the EPA indicated a desire to keep the regulatory process open and to include all stakeholders involved. After discussion with the various stakeholder groups, it has been decided that the most effective means of ensuring that inclusion would be to form a working group under the existing Permits, New Source Reviews, and Toxics Subcommittee.

## 3.0     SCOPE OF THE RULEMAKING

The electric utility steam generating unit MACT rulemaking includes the oil- and coal-fired subset of fossil fuel-fired electric utility steam generating units defined under section 112(a)(8) of the CAA as follows:

The term "electric utility steam generating unit" means any fossil fuel fired combustion unit of more than 25 megawatts that serves a generator that produces electricity for sale. A unit that cogenerates steam and electricity and supplies more than one-third of its potential electric output capacity and more than 25 megawatts electrical output to any utility power distribution system for sale shall be considered an electric utility steam generating unit.

These units are scheduled for regulation under section 112 (NESHAP) after being added to list of source categories for such regulation in the Federal Register notice cited above.

The pollutants to be considered for regulation as part of the electric utility steam generating unit MACT rulemaking include all those listed under section 112(b). During development of the regulations, information on the magnitude of emissions, risks, and other factors will be considered in order to focus the regulatory effort on the most significant pollutants and environmental issues.

## 4.0     WORKING GROUP PROCESS AND CHARGE

As noted above, the working group is to be formed under the Permits, New Source Reviews, and Toxics Subcommittee of the CAAAC. Information regarding the structure, charter, and responsibilities of the CAAAC may be found at <http://www.epa.gov/oar/caaac/index.html>. A proposed composition of the working group is presented in Table 1. It is envisioned that the core members of the working group will come from existing members of the CAAAC and the Subcommittee. Additional members will be invited to join the working group to ensure stakeholder balance. Members may invite others as needed to provide specific technical input. The working group will be co-chaired by EPA and a member of one of the stakeholder groups.

The working group will conduct analyses of the information, identify regulatory alternatives, assess the impacts of the regulatory alternatives, and make preliminary regulatory recommendations for the source category. Products of the working group will be reported to the CAAAC through the Permits, New Source Reviews, and Toxics Subcommittee. The working group will strive for consensus, defined as a position that members can accept or support, even though the position may not be their first choice. The EPA will retain its full and independent authority and responsibility for making all regulatory decisions. The EPA will make regulatory decisions, whether or not consensus is reached.

A consensus-based recommendation to EPA will, however, be given great weight and consideration in these decisions.

### *Starting Point*

The basis for undertaking this effort is the EPA's finding that regulation, under section 112 of the CAA, of HAP emissions from oil- and coal-fired electric utility steam generating units is necessary and appropriate. Thus, revisiting of the rationale for, and background of, the finding is not a topic of discussion for the working group.

TABLE 1.  PROPOSED COMPOSITION OF WORKING GROUP

| Stakeholder Groups | Number of Members |
| --- | --- |
| Environmental, public health, pollution prevention, and environmental justice groups | 6 |
| State/local/tribal regulatory agencies | 5 |
| Affected sources, fuel producers and suppliers, labor groups | 8 |

### *Charge to the Working Group*

The overall goal of the working group is to provide input to the EPA regarding Federal air emissions regulations for these units that will maximize environmental and public health benefits in a flexible framework at a reasonable cost of compliance, within the constraints of the CAA. The working group effort is designed to achieve this goal by:

(1)    Obtaining active participation from stakeholders, including environmental groups, regulated industries, and State/local/tribal regulatory agencies in all phases of regulatory development, and encouraging public input throughout the process;

(2)    Determining the most effective ways to address the environmental issues associated with the HAP pollutants; and

(3)    Considering strategies to simplify the regulations and allow flexibility in the methods of compliance while maintaining full environmental benefits.

The working group will be formed for an initial period of one year.  The effectiveness of the group will be periodically reviewed to determine if extending the period is warranted.  Meetings of the working group may be supplemented with individual meetings with stakeholders and/or the public on an ad hoc basis as requested and as necessary.

## 5.0    PROPOSED REGULATORY DEVELOPMENT ACTIVITIES AND SCHEDULE

A more specific schedule for the electric utility steam generating unit MACT rulemaking is shown in Table 2.  The rulemaking requires a clear commitment on the part of the stakeholders and EPA to meet the deadline of promulgation in December 2004.  To meet this deadline, EPA will take whatever actions it can to move the regulatory development process forward.

The proposed schedule outlined in Table 2 is subject to change or modification.  As the need arises, the schedule may be adjusted to facilitate the collection and analysis of information and the development of recommendations.  The schedule will be reviewed, and revised as necessary, on a regular basis.



TABLE 2.  PROPOSED REGULATORY DEVELOPMENT SCHEDULE

| General Activities | Date | Group Responsible |
|---|---|---|
| Working Group established; overall schedule and general activities | 08/01 | CAAAC; EPA |
| Brief CAAAC on results of data analyses | 11/01 | Working Group; CAAAC |
| Preliminary floor determinations; preliminary regulatory alternatives | 12/01 | Working Group |
| Brief CAAAC on preliminary floor and regulatory alternatives | 12/01 | Working Group; CAAAC |
| Revise MACT floor calculation and recommendations | 03/02 | Working Group; CAAAC |
| Analyze impacts of regulatory alternatives (e.g. HAP emission reductions, capital and annualized costs for each alternative) | 12/01 - 06/02 | Working Group |
| Brief CAAAC on cost/emissions analyses/recommendations | 06/02 | Working Group; CAAAC |
| Regulatory alternatives/cross-category trade-offs identified | 06/02 | Working Group; CAAAC |
| Overall economic impacts and benefits analysis | 06/02 - 08/02 | EPA |
| Present results of economics and benefits analyses to CAAAC | 08/02 | EPA |
| Brief CAAAC on regulatory alternative selection options | 09/02 | Working Group; CAAAC |
| CAAAC presents regulatory recommendations to EPA | 02/03 | CAAAC; Working Group |
| Decision on regulatory alternative(s) | 03/03 | EPA Management |
| Draft proposal package | 04/03 - 06/03 | EPA |
| Management review of EPA package | 06/03 - 08/03 | EPA Management |
| OMB review of EPA package | 08/03 - 11/03 | OMB |
| Signature and proposal | 12/03 | EPA Management |
| Public comment period | 12/03 - 02/04 | Public |
| Summarize public comments | 01/04 - 02/04 | EPA |
| Decision on changes to the regulations | 02/04 | EPA Management |
| Draft package (preamble, regulation, background document) | 02/04 - 07/04 | EPA |
| EPA Management review | 07/04 | EPA Management |
| OMB Review of EPA promulgation package | 07/04 - 10/04 | OMB |
| Signature and Promulgation | 12/04 | EPA |

a    The schedule does not show all meetings of the CAAAC or the Working Group.  It is expected that the Working Group will meet periodically throughout the project.

**CLEAN AIR ACT ADVISORY COMMITTEE**
**PERMITS/NEW SOURCE REVIEW/AIR TOXICS SUBCOMMITTEE**
**UTILITY MACT WORKING GROUP**

**April 3, 2002**

**U.S. Environmental Protection Agency**
**109 T.W. Alexander Drive, Room C111**
**Research Triangle Park, North Carolina**

**AGENDA**

| | |
|---|---|
| 9:30 a.m. -  9:45 a.m. | Introductions and opening remarks by Sally Shaver and John Paul, Co-chairs |
| 9:45 a.m. - 10:00 a.m. | Cinergy/Latham & Watkins presentation on subcategorization paper (distributed following March meeting) - Mike Geers |
| 10:00 a.m. - 10:30 a.m. | Working Group discussion of subcategorization paper |
| 10:30 a.m. - 10:45 a.m. | EPA presentation on Integrated Planning Model (IPM) |
| 10:45 a.m. - 11:00 a.m. | EPA presentation on proposed scenarios for modeling analyses |
| 11:15 a.m. - 11:30 a.m. | UARG presentation on scenarios for modeling analyses - Lee Zeugin |
| 11:30 a.m. - 12:00 p.m. | Working Group discussion of modeling input |
| 12:00 p.m. -  1:00 p.m. | Lunch |
| 1:00 p.m. -  1:30 p.m. | Working Group review of Ranking Mini Group paper and suggestions (presented at March 4 meeting) |
| 1:30 p.m. -  1:45 p.m. | UARG presentation on CEM variability analyses - Lee Zeugin |
| 1:45 p.m. -  2:15 p.m. | EPA presentation on negative removal values |
| 2:15 p.m. -  3:00 p.m. | Working Group discussion of negative removal values and statistical paper |

Exhibit D2

| | |
|---|---|
| 3:00 p.m. -  3:15 p.m. | Working Group discussion of Non-mercury HAP Mini Group suggestion of surrogate measures for non-mercury HAP |
| 3:15 p.m. -  3:30 p.m. | Review of action items and discussion of next steps |
| 3:30 p.m. | Adjourn |

# Analysis of Alternative Subcategorization Options

Utility MACT Working Group

May 13, 2002

Exhibit D3

**Note:**

Levels of control presented do not represent any Workgroup or Agency conclusions on appropriate levels of control.  Levels of control presented are hypothetical levels for purposes of analyzing subcategorization options.

# MACT Cases Analyzed - Case I & II

- **Case I - No Subcategorization**
  - High:
    - 90% removal or 0.43 lbs/TBtu for all units
  - Med:
    - 80% removal or 0.79 lbs/TBtu for all units
  - Low:
    - 70% removal or 2.53 lbs/TBtu for all units

- **Case II - Categorization by Fuel Type**
  - High:
    - 90% removal or 0.43 lbs/TBtu for Bituminous fuels
    - 85% removal or 0.66 lbs/TBtu for Subituminous fuels
    - 55% removal or 3.98 lbs/TBtu for Lignite fuels
  - Med:
    - 80% removal or 0.81 lbs/TBtu for Bituminous fuels
    - 65% removal or 1.90 lbs/TBtu for Subituminous fuels
    - 45% removal or 6.90 lbs/TBtu for Lignite fuels
  - Low:
    - 70% removal or 2.07 lbs/TBtu for Bituminous fuels
    - 30% removal or 4.32 lbs/TBtu for Subituminous fuels
    - 35% removal or 10.8 lbs/TBtu for Lignite fuels

# MACT Cases Analyzed - Cases III & IV

- **Case III - Categorization by Fuel Type**
  - Med:
    - 80% removal or 0.79 lbs/TBtu for Bituminous & Subituminous fuels
    - 45% removal or 6.90 lbs/TBtu for Lignite fuels
- **Case IV - Categorization by Boiler Type**
  - Med:
    - 95% or 0.09 lbs/TBtu for FBC units
    - 80% removal or 0.79 lbs/TBtu for all other units

# Modeling Assumptions

- Activated Carbon Injection
  - 80% removal
  - Capital costs between $1/kW to $55/kW
- Removal Efficiencies
  - SCR +FGD = 95% removal all coals
  - SNCR + FGD = 90% removal for all coals
- For more information:
  - http://www.epa.gov/airmarkets/epa-ipm

# National Emissions



# Regional Emissions



**Central Hg Emissions (tons)**

**Midwest Hg Emissions (tons)**

**West Hg Emissions (tons)**

**Northeast Hg Emissions (tons)**

**Texas Hg Emissions (tons)**

**South Hg Emissions (tons)**

# Generation Mix





# Installed Technology



# Coal Impacts



## Coal Produced for Power Generation Sector

**West**

**Interior**

**Appalachia**

- ■ 1999 Coal
- ■ Case I - Med
- ■ Case II - Med
- ■ Case III - Med
- ■ Case IV - Med

**Scale: Appalachia 1999 = 285 million tons**

# Coal Impacts



**Coal Produced for Power Generation Sector**

**Scale: Appalachia 1999 = 285 million tons**

# Coal Impacts



# Total Costs and Emissions



# Other Emissions Impacts

- No significant change in $SO_2$ and $CO_2$ emissions in all cases

- About 20% reduction in NOx emissions in all cases

**Clean Air Act Advisory Committee**
**Permits/New Source Review/Air Toxics Subcommittee**
**Utility MACT Working Group**
**Summary of Working Group Meeting 06/03/02**

The eighth meeting of the working group established under the Clean Air Act Advisory Committee's (CAAAC) Permits/New Source Review/Air Toxics Subcommittee was held on June 3, 2002 at the Hall of the States building in Washington, D.C. John Paul opened the meeting by indicating that the full CAAAC would like to hear from the Working Group at its next meeting (likely to be late September or early October 2002).

Felice Stadler provided introductory comments on a memo prepared by Michael Shore (unable to attend this meeting) on the issue of oil-fired units. Initial feedback on the memo was requested from the Working Group; the feedback will be incorporated into a more detailed presentation at the July 9 meeting.

These comments were followed by Working Group discussion. The following points or questions were made during the open discussion:

- five (or more) data points are needed to set the floor;
- the available data are not adequate to establish a short-term standard (but may be suitable for a longer-term averaging period);
- predominately gas-fired units (<10-30% oil use) should be exempt from any standard for oil-fired units;
- the standard needs to be based on an annual average;
- the variable nickel content of oil needs to be recognized;
- the health problem resulting from nickel emissions is still an open question;
- a MACT standard must be set for all HAP, regardless of the individual health problems;
- the court decision on National Lime does not require EPA to establish standards for each HAP emitted; and
- can pilot-scale data be used to establish a MACT floor and/or set a MACT emission limit.

The EPRI will try to provide a list of oil-fired utility units with ESP controls (the data may be as of 1990). The STAPPA/ALAPCO will then try to obtain any particulate matter data that are available for these plants.

1

Exhibit D4

Ann Weeks and Bill O'Sullivan provided introductory comments on a memo prepared by Martha Keating (also unable to attend this meeting) on the issue of non-mercury HAP. Again, feedback on the memo was requested from the Working Group which will be incorporated into further discussion at the July 9 meeting.

These comments were followed by Working Group discussion. The following points or questions were made during the open discussion:

·        grouping all metals under a surrogate would be inappropriate for setting the floor. The metals could be grouped by volatility (e.g., low, medium) as was done under the hazardous waste rules but EPA would have to address how the metals behave (i.e., do they behave the same?). A unit could also change fuel, burn differently, etc. to meet a metal limit.
·        the question of using four vs. five data points remains;
·        the issue of how non-detect values are handled must be addressed;
·        are the 34 plants representative of the universe of boilers as a whole;
·        where was the inlet testing done;
·        what was the particulate emission rate;
·        what controls were in-place during the testing;
·        "representativeness" does not have to be proved, just the top performing 12 percent;
·        the differences between coal types must be accounted for;
·        subcategorization by fuel type is inappropriate;
·        the differences in HAP metal emissions resulting from different firing modes must be addressed;
·        additional data are required, particularly for the acid gas HAP;
·        need an identification of units with wet or dry acid gas controls;
·        can the TRI data be used in any manner (general opinion was that it could not);
·        the health effects should be focused on rather than the mere presence; and
·        a decision on how the HAP would be grouped needs to be made before data adequacy and surrogates can be determined.

Bill O'Sullivan then presented a potential grouping scenario with associated surrogates as follows:

particulate HAP (including radionuclides) -   PM NSPS
acid gas HAP -                             $SO_2$ NSPS
organic HAP -                                          CO limit (use the toughest RACT limits
                                                      which are on the order of 10 - 100 ppm)

2

John Paul presented a generic approach summarizing the use of surrogates whereby a group of like HAP would be regulated based on a limit for either one of the HAP or of a surrogate that would ensure an adequate level of control for all the HAP in the group. The approach was generally accepted by the Working Group but some reservation was expressed on how the "adequate" level would be determined. It was requested of all the stakeholder groups that they come back at the July 9 meeting with opinions/proposals on the approach along with how they would carry out the approach (i.e., what groups, what HAP in each group, what surrogates for each group) – in effect, come up with a "position statement."

There followed a discussion following up on the workshop held on May 30 on the IPM. A brief summary of the meeting was presented along with a summary of a paper provided by Mike Geers and Claudia O'Brien. The EPA also presented summary responses to some of the questions that had arisen at the last meeting related to the IPM. This was followed by general Working Group discussion. The following points were made during the open discussion:

· does the IPM assume that the control equipment is available when needed and at normal cost (i.e., is enough construction capacity available) [yes];
· it cannot be assumed that everything will go smooth, everything will be installed on all plants by December 15, 2007;
· the IPM should allow for constraints on the availability of activated carbon, control equipment, etc.;
· why are years beyond the MACT implementation date included [because decisions made for regulatory programs coming into place in those years would impact MACT decisions as well as residual risk for the MACT];
· what is the impact of activated carbon use on dispatch decisions;
· discussions should be continued on the IPM variables, etc. but at the same time, the process should be kept moving forward without waiting for resolution of the issues;
· can EPA do sensitivity analyses to see if changing the IPM assumptions even makes a difference in the output;
· which "changes" are more important and should be explored first (some are easier to implement, should that be decided, than others);
· the loss of ash sales due to activated carbon use should be incorporated into the IPM;
· more fabric filter cases (polishing) need to be incorporated in the IPM;
· a lower mercury control value for ESP use should also be incorporated in the IPM; and
· ranges of assumed values should be used rather than specific values (which would be more difficult to agree upon).

3

The EPA will explore what changes could be made in what time frame and with what level of effort and report back to the Working Group in a couple of weeks. A teleconference may then be set up prior to the next meeting to discuss what may be done. Working Group members should provide to EPA any further comments on the IPM model within two weeks.

All presentations will be placed on the utility MACT website (http://www.epa.gov/ttn/atw/combust/utiltox/utoxpg.html).

Review of action items and discussion of next steps

The next meeting will be July 9, 2002 at the STAPPA/ALAPCO facilities in Washington, D.C., and will be from 9:30 a.m. to 4:00 p.m. Some concern was raised about the August 5 and September 9 dates (in Research Triangle Park); alternative dates and sites will be explored but no commitment was made to change the meeting dates or locations. It was noted that the September date immediately precedes the Air Quality III conference in D.C. (September 10 - 12). The following topics/action items were suggested for the July meeting:

· The "oil-fired unit" mini-group will provide follow-up to the discussion held at this meeting, including information on data availability, variability of nickel in oil, and the number of ESP-controlled units. Others on the Working Group will provide information on these topics as they have it available.

· The "non-mercury HAP" mini-group will provide feed-back on suggested HAP groupings, surrogates, and the approach to getting to a standard.

· The stakeholder groups will start bringing things to the table regarding specific recommendations on issues they feel EPA must address in a MACT standard (e.g., subcategories, floors, averaging period, format of the standard).

· EPA will provide input on what issues it feels it wants feedback on from the Working Group.

· EPA will provide, within 2 - 3 weeks, information on changes to the IPM and details on a conference call. Working Group members will also provide any additional comments on the IPM to the EPA during this time frame.

· Working Group members and EPA will consider the elements to be reported out to the full CAAAC.

The idea would be to look to presentations at the August and September meetings that provide the various stakeholder positions on the range of issues each feel important (i.e., specific recommendations) followed by Working Group discussion of the presentations. This would lead to a Working Group presentation (or series of presentations) at the next full CAAAC meeting. The more that can be accomplished at the July meeting, the more time will be available for discussion at the August and September meetings.

**CLEAN AIR ACT ADVISORY COMMITTEE**
**PERMITS/NEW SOURCE REVIEW/AIR TOXICS SUBCOMMITTEE**
**UTILITY MACT WORKING GROUP**

**June 3, 2002**

**STAPPA/ALAPCO Headquarters**
**The Hall of States Building, Room 383-385**
**444 North Capitol Street, N.W.**
**Washington, D.C. 20001**

**AGENDA**

| | |
|---|---|
| 10:00 a.m. - 10:15 a.m. | Introductions and opening remarks by Bob Wayland and John Paul, Co-chairs |
| 10:15 a.m. - 10:45 a.m. | Presentation by Oil Mini Group followed by Working Group discussion - Felice Stadler |
| 10:45 a.m. - 11:45 a.m. | Presentation by Non-mercury HAP Mini Group followed by Working Group discussion - Bill O'Sullivan |
| 11:45 a.m. - 12:30 p.m. | Lunch |
| 12:30 p.m. - 1:30 p.m. | Presentation by Coal Mini Group on SCR research followed by Working Group discussion - Lee Zeugin |
| 1:30 p.m. - 1:45 p.m. | Report on May 30 IPM assumptions meeting - Larry Monroe |
| 1:45 p.m. - 2:00 p.m. | EPA presentation on additional initial IPM run data breakouts |
| 2:00 p.m. - 3:15 p.m. | Working Group discussion of IPM data breakouts |
| 3:15 p.m. - 3:30 p.m. | Review of action items and discussion of next steps |

3:30 p.m.                   Adjourn

**Clean Air Act Advisory Committee**
**Permits/New Source Review/Air Toxics Subcommittee**
**Utility MACT Working Group**
**Suggested Additional IPM Analysis 06/18/02**

At the Clean Air Act Advisory Committee (CAAAC) Utility MACT Working Group meeting held on June 3, 2002, Larry Monroe (Southern Company) summarized a list of suggested changes to the EPA Base Case 2000 mercury modeling assumptions that were discussed at a May 30 workshop. These suggested changes included revised assumptions related to mercury control and regrouping of model run years. EPA agreed to consider these changes and also to provide the timeframes needed to implement any changes. EPA has not made any decisions on implementing the changes, but has provided below the timeframe needed to implement these changes and other analyses to address the concerns raised by the suggested changes should the decision be made to make the change. The timeframes provided below only include the time required to develop the capability to address the issues raised; they do not include the time required to rerun all the MACT scenarios. We have also indicated those changes we might propose to do.

The following are the changes suggested by Working Group members:
- Update activated carbon injection (ACI) cost and performance for cold-side ESP (no spray cooling, limited performance)
- Offer more menu choices (removal rates) for ACI
- Update SCR-FGD co-control
- Update base co-control emission modification factors (EMFs)
  - S    Separate EMFs of lignite-fired power plants from subbituminous power plants
  - S    Use latest ICR evaluations
- Drop SNCR effects on mercury
- Model run year timing

1) Update ACI cost and performance for cold-side ESP (no spray cooling, limited performance).

Updating the ACI costs to remove SC or add FF could be done in six weeks from the date of data availability. EPA is still in the process of examining the effectiveness of spray cooling in combination with ACI and the performance achieved by cold-side ESP/ACI combinations and does not propose to make this change at this time.

2) Offer more menu choices (removal rates) for ACI.

In the EPA Base Case 2000 only ACI with 80% removal rate is provided as a retrofit option. Providing additional menu choices such as ACI with 70% and 90% removals simultaneously within the model is expected to make the model too large to run. We suggest that we approach this issue by implementing the following:

Exhibit D5

Reduce existing model size – EPA Base Case 2000 provides SNCR technology options to every coal plant. We have noticed that SNCR technology is not a major control technology of choice in most of our analyses. Thus, this option could be dropped from the menu of compliance choices for coal plants larger than 100 MW. For similar reasons, we also suggest that gas reburning technology options not be provided to coal power plants.

An additional option to reduce model size is to reduce the number of run years from five to four. These model size reduction options could allow EPA to endogenously model ACI with two removal rates. EPA is proposing to a 60% removal and 90% removal for ACI. With the 90% removal option, we could include the addition of a pulse-jet fabric filter for units with hot-side or cold-side ESPs.

The above methodology would greatly improve the mercury modeling capability and reduce the possibilities of over compliance of mercury removal and address member's concerns regarding this issue. We estimate that it will take three months from the date when the data will be finalized to implement this approach. If there are still instances of over compliance of mercury removal, the extent of over compliance can be estimated offline based on model outputs.

2) Update SCR-FGD co-control; Update base co-control (separate lignite from subbituminous and use latest ICR evaluations); and drop SNCR effects on mercury.

Changes to mercury co-controls provided by existing or added NOx, $SO_2$, and PM controls can be implemented in a reasonable period of time. These will result in changes to EMFs and, hence, will influence the retrofit choices that need to be provided to a model plant. Retrofit choices might need to be added in IPM where none existed before (e.g., SCR+FGD may need an ACI choice). These options can be implemented within 4-6 weeks if the cost and performance of ACI does not change.

EPA is proposing to make the change to institute separate EMFs for lignite and subbituminous units and update the EMFs using the latest ICR evaluations. EPA is also proposing to update its SCR+FGD for other coals and its SNCR+FGD assumptions with the alternative emission modification factors (based on EIA mercury removal assumptions) provided in Appendix 5 of EPA's IPM documentation. EPA is not proposing to change its assumptions for SCR+FGD co-control for bituminous coals until ongoing testing at units with these configurations has been completed.

3) Model run year timing.

Model run years can be changed in a short period of time. It should be noted that because all the years mapped together take on the same dispatch characteristics (the average across the grouped years), it is usually advisable to place the output year in the middle of the years that are mapped together.

EPA is unclear whether this change to model runs will address the member's concerns. EPA believes that the members are concerned that annualizing total costs over a 30-year period is unrealistic. Limiting the run years does not address this issue; rather changing the book-life of a retrofit used in the model addresses the issue and this is not being considered for change at this time.

**United States Government Accountability Office**

# GAO

Report to Congressional Requesters

**February 2005**

# CLEAN AIR ACT

# Observations on EPA's Cost-Benefit Analysis of Its Mercury Control Options



**GAO**

Accountability ★ Integrity ★ Reliability

Exhibit E

**February 2005**

# GAO
**Accountability · Integrity · Reliability**

# Highlights

Highlights of GAO-05-252, a report to congressional requesters

## CLEAN AIR ACT

# Observations on EPA's Cost-Benefit Analysis of Its Mercury Control Options

## Why GAO Did This Study

Mercury is a toxic element that can cause neurological disorders in children. In January 2004, the Environmental Protection Agency (EPA) proposed two options for limiting mercury from power plants, and plans to finalize a rule in March 2005. The first would require each plant to meet emissions standards reflecting the application of control technology (the technology-based option), while the second would enable plants to either reduce emissions or buy excess credits from other plants (the cap-and-trade option). EPA received over 680,000 written comments on the proposal. EPA is directed by statute and executive order to analyze the costs and benefits of proposed rules, and the agency summarized its analysis underlying the two options in the proposal. In this context, GAO was asked to assess the usefulness of EPA's economic analysis for decision making. In doing so, GAO neither independently estimated the options' costs and benefits nor evaluated the process for developing the options or their consistency with the Clean Air Act, as amended.

## What GAO Recommends

GAO recommends that, prior to finalizing a rule, EPA take steps to address shortcomings in its cost-benefit analysis to increase the usefulness of the analysis for decision making. In commenting on the report, EPA said that it plans to largely address GAO's recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-05-252.

To view the full product, including the scope and methodology, click on the link above. For more information, contact John Stephenson at (202) 512-3841 or stephensonj@gao.gov.

## What GAO Found

GAO identified four major shortcomings in the economic analysis underlying EPA's proposed mercury control options that limit its usefulness for informing decision makers about the economic trade-offs of the different policy options. First, while Office of Management and Budget (OMB) guidance directs agencies to identify a policy that produces the greatest net benefits, EPA's analysis is of limited use in doing so because the agency did not consistently analyze the options or provide an estimate of the total costs and benefits of each option. For example, as seen in the table, EPA analyzed the effects of the technology-based option by itself, but analyzed the effects of the cap-and-trade option alongside those of another proposed rule affecting power plants, the Clean Air Interstate Rule (the interstate rule), without separately identifying the effects of the cap-and-trade option. As a result, EPA's estimates are not comparable and are of limited use for assessing economic trade-offs. EPA officials said they analyzed the cap-and-trade option alongside the interstate rule because the agency views the two proposed rules as complementary. Nonetheless, to provide comparable estimates, EPA would have to analyze each option alone and in combination with the interstate rule.

**Estimated Annual Economic Impacts of EPA's Proposed Mercury Policy Options in 2010 (1999 dollars, in billions)**

| Policy option | Annual costs | Annual benefits | Annual net benefits |
|---|---|---|---|
| Technology-based option | 2 | 15 or more | 13 or more |
| Cap-and-trade option | Not estimated | Not estimated | Not estimated |
| Technology-based option and the interstate rule | Not estimated | Not estimated | Not estimated |
| Cap-and-trade option and the interstate rule | 3 to 5 or more | 58 to 73 or more | 55 to 68 or more |

Source: EPA.

Second, EPA did not document some of its analysis or provide information on how changes in the proposed level of mercury control would affect the cost-and-benefit estimates for the technology-based option, as it did for the cap-and-trade option. Third, EPA did not estimate the value of the health benefits directly related to decreased mercury emissions and instead estimated only some secondary benefits, such as decreased exposure to harmful fine particles. However, EPA has asked for comments on a methodology to estimate the benefits directly related to mercury. Fourth, EPA did not analyze some of the key uncertainties underlying its cost-benefit estimates.

# Contents

## Letter                                                                 1

Results in Brief                                                          3
Background                                                                5
EPA's Economic Analysis Is of Limited Use for Informing Decision
    Makers about the Economic Trade-offs of Different Policy
    Options                                                              8
Conclusions                                                             15
Recommendations for Executive Action                                    16
Agency Comments                                                         16

## Appendixes

Appendix I:     Objectives, Scope, and Methodology                      20

Appendix II:    Comments from the Environmental Protection Agency       21

Appendix III:   GAO Contacts and Staff Acknowledgments                  23
                GAO Contacts                                            23
                Staff Acknowledgments                                   23

## Table

Table 1:   Estimated Annual Economic Impacts of EPA's Proposed
           Mercury Policy Options in 2010                                9

---

**Abbreviations**

| | |
|---|---|
| CAA | Clean Air Act |
| EPA | Environmental Protection Agency |
| FDA | Food and Drug Administration |
| IPM | Integrated Planning Model |
| MACT | Maximum Achievable Control Technology |
| OMB | Office of Management and Budget |
| UMRA | Unfunded Mandates Reform Act |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, D.C. 20548**

February 28, 2005

Congressional Requesters

Mercury is a toxic element that poses human health threats, especially to fetuses and children. For example, children of women exposed to mercury during pregnancy—typically from contaminated fish—may face increased risk of neurological disorders, including delays in learning ability. According to the Centers for Disease Control, 6 percent of women of childbearing age have mercury blood levels that exceed safe levels. Mercury enters the environment through natural and human activities, such as volcanic eruptions and fuel combustion. In January 2004, the Environmental Protection Agency (EPA) issued a proposed rule under the Clean Air Act to regulate mercury emissions from the nation's largest unregulated industrial source: coal-fired power plants. The proposed rule laid out two policy options, one of which EPA plans to choose and finalize in a March 2005 rule. The first, the "technology-based" option, would require coal-fired power plants to meet specific mercury emissions standards reflecting the application of control technology.[1] The second option would set a national cap on mercury emissions and allow power plants flexibility either to achieve reductions or to purchase credits from plants that achieved excess reductions (the "cap-and-trade" option).[2] The proposed rule has become a contentious environmental policy issue, with EPA receiving over 680,000 written public comments on the proposal.

Much of the debate over the proposed rule centers on the relative merits of the two policy options, such as the potential costs to industry and the expected human health benefits. Federal agencies are required by statute and executive order to analyze the impacts of economically significant rules—those that would affect the economy by $100 million or more each

---

[1]Under this option, also referred to as the Maximum Achievable Control Technology (MACT) approach, the emissions standards would vary depending on coal type.

[2]Both proposed options would apply to coal-fired electricity generating units greater than 25 megawatts in size that produce electricity for sale. We refer to these units as coal-fired power plants.

year—unless otherwise prohibited by law.[3] Further, the Office of Management and Budget (OMB) has developed guidance and best practices under Executive Order 12866 that, among other things, direct agencies to explore alternative regulatory approaches, taking into consideration different levels of stringency, and identify the policy that would maximize net benefits (total benefits minus total costs), unless another approach is required by statute.[4] OMB guidance states that identifying the policy option with the greatest net benefits is useful information for decision makers and the public, even when maximizing net benefits is not the only or overriding policy objective. In addition, OMB guidance directs agencies to conduct their economic analyses in accordance with the principles of full disclosure and transparency. Furthermore, in cases such as the final mercury rule, where expected economic impacts would exceed $1 billion annually, OMB guidance directs agencies to identify and quantitatively analyze key uncertainties in their economic analysis.[5] EPA analyzed the economic effects of its proposed mercury rule and found that a rule based on either option would impose billions of dollars in emissions control costs but would also generate human health benefits of even greater value. EPA summarized the results of its economic analysis in the January 2004 proposed rule and plans to conduct additional analysis to support a final rule.

---

[3]The Unfunded Mandates Reform Act of 1995, Pub. L. No. 104-4, 109 Stat. 48 (1995) (codified at 2 U.S.C. § 32) (UMRA) and Executive Order 12866 require agencies to conduct economic analyses of economically significant rules. Further, UMRA requires agencies to choose the least costly, most cost-effective, or least burdensome option unless inconsistent with law or the agency head explains why this option was not adopted, and the executive order directs agencies to select the policy that maximizes net benefits to society unless a statute requires otherwise.

[4]OMB, *Economic Analysis of Federal Regulations under Executive Order 12866* (Washington, D.C., January 1996).

[5]For rules with annual benefits or costs exceeding $1 billion, OMB directs agencies to conduct a formal probabilistic assessment of key uncertainties underlying its cost-and-benefit estimates. OMB Circular No. A-4, Regulatory Analysis (Sept. 14, 2003). This guidance did not apply to the proposed rule but does apply to the final rule.

EPA's economic analysis of its mercury control options is complicated by another proposed rule, the Clean Air Interstate Rule (the interstate rule), which would reduce emissions of sulfur dioxide and nitrogen oxides.[6] This rule would share some of the costs and benefits of regulating mercury because the technologies that power plants would likely install to comply with the rule could also reduce mercury emissions. EPA had planned to finalize the interstate rule by the end of 2004, but announced in December 2004 that it would delay a final decision on the rule until March 2005. Also in December 2004, EPA issued a public notice providing new data and information relevant to EPA's economic analysis of the proposed mercury rule and solicited additional public comment on this information for consideration by the agency prior to finalizing the rule.

In this context, you asked us to assess the usefulness of the economic analysis underlying EPA's proposed mercury rule for decision making. To respond to this objective, we, among other things, reviewed EPA's analysis of the proposed rule's economic effects using OMB guidance and standard economic principles, and discussed the analysis with senior officials within EPA's Office of Air and Radiation, which is responsible for developing the proposed rule and analyzing its economic effects. In doing this work, we did not independently estimate the costs or benefits of either control option, evaluate the process for developing either option, or assess the options' consistency with the Clean Air Act, as amended. (See app. I for a more detailed description of the scope and methodology of our review.) You also asked us to provide information on the availability and cost of mercury control technologies, and we surveyed mercury technology vendors, power companies, and federal and other researchers on these issues. Subsequent to this report, which we plan to issue before the agency promulgates a final rule, we will provide information on mercury control technologies in a separate product. We performed our work between May 2004 and February 2005 in accordance with generally accepted government auditing standards.

## Results in Brief

We identified four major shortcomings in the economic analysis underlying EPA's proposed mercury rule that limit its usefulness for informing decision

---

[6]EPA currently regulates power plant emissions of sulfur dioxide and nitrogen oxides through its acid rain program. Both pollutants contribute to acid rain and the formation of fine particles that have been linked to aggravated asthma, chronic bronchitis, and premature death.

makers and the public about the economic trade-offs of the two policy options. First, because EPA used inconsistent approaches in analyzing the two proposed policy options, the analysis did not provide sufficient information to compare which two options and determine which would provide the greatest net benefits. For example, EPA analyzed the costs and benefits of the technology-based option by itself but analyzed the cap-and-trade option in combination with the proposed interstate rule—combining the costs and benefits of the two rules without separately identifying those associated with the cap-and-trade option. EPA officials said they analyzed the effects of the cap-and-trade option alongside the interstate rule because the agency views the two proposed policies as complementary. Nonetheless, EPA's December 2004 decision to postpone the interstate rule highlights the need for consistent analysis of the two mercury policy options on their own merits, independent of the proposed interstate rule. In addition, the comparability of EPA's analysis is further limited because the agency did not provide consistent information on the total costs and benefits of the two options over the entire implementation period.

Second, EPA did not document some of its analysis or adhere to the principles of full disclosure and transparency as directed by OMB, and it did not provide decision makers or the public with consistent information on how changes in the proposed level of control would affect its estimates of net economic benefits for each option. Third, because of time, resource, and technical constraints, EPA did not quantify the human health benefits specifically related to reductions in mercury emissions, such as reduced incidence of neurological disorders. Instead, EPA estimated only some of the health benefits that would occur as a secondary benefit of regulating mercury—that is, decreased exposure to fine particles that cause respiratory and heart ailments. The two options in the proposed rule differed significantly in their targeted mercury reduction levels and time frames, and we believe that monetary estimates of the health benefits of mercury reductions would assist decision makers in comparing the net benefits of each option. Along these lines, EPA recently solicited public comment on a proposed methodology for estimating mercury-specific benefits in the final rule. Fourth, EPA did not analyze some of the key uncertainties underlying its cost-and-benefit estimates, although the agency plans to conduct a more formal assessment of these uncertainties, as directed by OMB guidance, prior to issuing a final rule. In light of these limitations, we are recommending that the EPA Administrator improve the agency's economic analysis prior to issuing a final rule by providing some additional analysis and ensuring that the analysis supporting the final rule

is documented and available to decision makers and the public. In commenting on a draft of this report, EPA's Assistant Administrator for Air and Radiation said that, prior to issuing a final mercury regulation by March 15, 2005, EPA will conduct additional analysis that will largely address the findings and recommendations identified in our report. EPA's letter is included as appendix II.

# Background

Mercury enters the environment through natural and man-made sources, including volcanoes, chemical manufacturing, and coal combustion, and poses ecological threats when it enters water bodies, where small aquatic organisms convert it into its highly toxic form—methylmercury. This form of mercury may then migrate up the food chain as predator species consume the smaller organisms. Through a process known as bio-accumulation, predator species may develop high mercury concentrations in their tissue as they take in more mercury than they can metabolize or excrete.

Fish contaminated with methylmercury may pose health threats to those that rely on fish as part of their diet. According to EPA, mercury harms fetuses and can cause neurological disorders in children, including poor performance on behavioral tests, such as those measuring attention, motor and language skills, and visual-spatial abilities (such as drawing). In addition, populations that consume larger amounts of fish than the general population—including subsistence fishers, as well as certain Native Americans and Southeast Asian Americans—may face higher risk of exposure to contaminated fish, according to EPA. The Food and Drug Administration (FDA) and EPA recommend that expectant mothers, young children, and those nursing children avoid eating swordfish, king mackerel, shark, and tilefish and limit consumption of other potentially contaminated fish, such as tuna. These agencies also recommend checking local advisories for recreationally caught freshwater and saltwater fish. According to EPA, 45 states issued mercury advisories in 2003 (the most recent data available).

Because mercury released to the atmosphere can circulate for long periods of time and be transported thousands of miles before it gets deposited, it is difficult to link mercury accumulation in the food chain with sources of mercury emissions. EPA estimates that about half of the mercury deposited in the United States is emitted by sources within this country. In 1999, the most recent year for which data were available, EPA estimated that man-made sources within the United States emitted about 115 tons of

mercury. Of these emissions, the agency estimates that about 48 tons, 42 percent of the total, came from coal-fired power plants. While power plants are not required to limit their mercury emissions, EPA estimates that the plants currently capture about 27 tons of mercury each year, primarily through the use of controls for other pollutants, such as those used to control nitrogen oxides, particles, and sulfur dioxide. EPA estimates that power plants would otherwise emit about 75 tons of mercury per year.

The Clean Air Act (CAA) Amendments of 1990 required EPA to study the environmental and health effects of hazardous air pollutants from coal-fired power plants and determine whether it was "appropriate and necessary" to regulate these pollutants. In 2000, EPA determined that mercury was a hazardous air pollutant and that it was appropriate and necessary to regulate mercury using the technology-based option. Under this section of the act, the emissions limit had to be at least as strict as the average emissions of the facilities with the best-controlled emissions.[7] Because power plants did not already use controls specifically intended to control mercury, EPA analyzed the effectiveness of controls for other pollutants that capture mercury as a side benefit.[8]

This effort culminated in EPA's January 2004 proposal for a technology-based option that would reduce mercury emissions from a current level of 48 tons per year to a projected 34 tons per year (a 29 percent reduction) by 2008. At the same time, however, EPA proposed an alternate policy option that would limit mercury emissions in two phases: to 15 tons in 2018 (a 69 percent reduction from current levels), preceded by an as-yet-unspecified interim cap starting in 2010. The alternate policy option, which would rely on a cap-and-trade system similar to that currently used to control emissions that cause acid rain, differs from the technology-based option in that it would not require each facility to meet emission standards based on control technology.[9] Instead, EPA would set a

---

[7]Specifically, the act required EPA to establish limits based on the mercury removal achieved by the top 12 percent of facilities (in terms of their mercury removal).

[8]EPA's Office of Research and Development discusses mercury control technologies in a January 2004 white paper entitled "Control of Mercury Emissions from Coal-Fired Electric Utility Boilers." We will provide information on the availability, cost, performance, and use of mercury control technologies in a subsequent report.

[9]According to EPA, if it selects this policy option, it will first have to formally reverse its 2000 decision that it was appropriate and necessary to regulate mercury with a technology-based standard.

nationwide "cap" for mercury emissions from coal-fired power plants and then distribute tradable emissions allowances that represent a certain amount of the total cap. At the end of each year, each power plant would have to hold sufficient allowances for the mercury it emitted that year. Plants that reduced their emissions below the levels represented by their allowances could sell their extra allowances to other plants.

In addition to its proposed mercury rule, EPA has proposed another rule for power plants, the Clean Air Interstate Rule, which is intended to reduce emissions of nitrogen oxides and sulfur dioxide beginning in 2010. EPA expects that this proposed rule would result in the installation of pollution controls that capture mercury as a side benefit, and thereby decrease mercury emissions to 34 tons per year by 2010, the same level of reduction as the technology-based option. Under the cap-and-trade option, EPA has indicated that it may establish a mercury cap for 2010 equal to the control level expected through the interstate rule. EPA postponed its decision on finalizing the interstate rule until March 2005 while the agency awaits congressional action on pending legislation, known as the Clear Skies Act, that would establish emissions caps and an allowance system similar to those in the interstate rule and the cap-and-trade mercury control option.[10] EPA has stated a preference for achieving reductions of mercury, nitrogen oxides, and sulfur dioxide simultaneously through legislation rather than regulations.

Responsibility for analyzing the economic impacts—including costs to industry and expected public health effects—of air pollution control policies rests with EPA's Office of Air and Radiation. EPA provided documentation of its economic analysis for the proposed mercury rule in three primary documents, some of which refer readers to additional documentation on the agency's Web site or in the public rule-making docket.[11] According to EPA, the agency did not have time to assemble its economic assessment of the proposed rule in a single document prior to issuing the proposed rule. To assist in estimating costs that air quality regulations will impose on the power industry, EPA uses the Integrated

---

[10]The Clear Skies Act was initially introduced in both houses of Congress in 2003 (H.R. 999 and S. 485) and would limit emissions of mercury, nitrogen oxides, and sulfur dioxide simultaneously. The proposed legislation was reintroduced in the Senate in 2005 (S.131).

[11]See (1) 69 Fed. Reg. 4652 (Jan. 30, 2004); (2) U.S. EPA, Benefit Analysis for the Section 112 Utility Rule, January 2004; and (3) U.S. EPA, Economic and Energy Impact Analysis for the Proposed Utility MACT Rulemaking.

Planning Model (IPM), which estimates how power plants would respond to various environmental policies. The assumptions underlying this model, such as those regarding fuel costs, the costs of pollution controls, and future electricity demand, can affect the modeling results, according to EPA officials responsible for the modeling.

# EPA's Economic Analysis Is of Limited Use for Informing Decision Makers about the Economic Trade-offs of Different Policy Options

We identified four major shortcomings in the economic analysis underlying EPA's proposed mercury rule that limit its usefulness for informing decision makers and the public about the economic trade-offs of the two options. First, EPA did not consistently analyze each of its two mercury policy options or provide estimates of the total costs and benefits of the two options, making it difficult to ascertain which policy option would provide the greatest net benefits. Second, EPA did not document some of its analysis or provide consistent information on the anticipated economic effects of different mercury control levels under the two options. Third, the agency did not estimate the economic benefits directly related to decreased mercury emissions. Finally, the agency did not analyze some of the key uncertainties underlying its cost-and-benefit estimates.

## EPA Did Not Consistently Analyze Each Policy Option or Provide a Complete Accounting of Costs and Benefits

EPA's estimates of the costs and benefits of its two proposed policy options are not comparable because the agency used inconsistent approaches in analyzing the two options. As shown in table 1, EPA analyzed the technology-based option alone, while it analyzed the cap-and-trade option in combination with the interstate rule. In analyzing the technology-based option by itself, EPA estimated the rule would cost about $2 billion annually, and achieve benefits of $15 billion or more annually, yielding net benefits (benefits minus costs) of $13 billion or more annually. In contrast, EPA analyzed the effects of the cap-and-trade option in combination with the proposed interstate rule by combining the costs and benefits of the two proposed rules without separately identifying and documenting those associated with the cap-and-trade option alone. This analysis found that the two proposed rules together would impose costs of $3 billion to $5 billion or more annually, while generating annual benefits of $58 billion to $73 billion or more and annual net benefits of $55 billion to $68 billion or more.

**Table 1: Estimated Annual Economic Impacts of EPA's Proposed Mercury Policy Options in 2010**

1999 dollars, in billions

| Policy option | Annual costs | Annual benefits[a] | Annual net benefits |
|---|---|---|---|
| Technology-based option | 2 | 15 or more | 13 or more |
| Cap-and-trade option | Not estimated | Not estimated | Not estimated |
| Technology-based option and the interstate rule | Not estimated | Not estimated | Not estimated |
| Cap-and-trade option and the interstate rule | 3 to 5 or more[b] | 58 to 73 or more[b] | 55 to 68 or more[b] |

Source: EPA.

[a]As discussed further below, EPA's monetary benefits estimates do not include the human health benefits specifically related to reductions in mercury emissions. Instead, EPA monetized some of the health benefits that would occur as a secondary benefit of regulating mercury.

[b]According to EPA, the lower of the range reflects a scenario involving no additional reductions beyond those achieved by the interstate rule, while the upper end of the range reflects mercury caps similar to those in the Clear Skies legislation. EPA estimated that the interstate rule alone would generate annual benefits of $58 billion or more while imposing annual costs of about $3 billion.

Because the estimates for the two options are not comparable, however, it is not clear which option would provide the greatest net benefits. This is particularly important in light of EPA's decision to delay finalization of the interstate rule.[12] EPA officials responsible for the rule acknowledged the lack of comparability with its analysis of the two proposed options. These officials said the agency analyzed the cap-and-trade option alongside the interstate rule because it viewed these two proposed policies as complementary. They also said it would have been useful to analyze the technology-based option alongside the interstate rule, but the agency did not do so because of time constraints. Nonetheless, it is important for EPA to consistently analyze each policy option and provide decision makers with comparable estimates of net economic benefits.

---

[12]In December 2004, EPA announced that it would finalize the interstate rule in March 2005, unless Congress makes substantial progress on Clear Skies legislation. Rules may also be delayed or blocked in court. For example, a coalition of environmental groups and state attorneys general challenged a 2003 EPA New Source Review rule, and the U.S. Court of Appeals for the District of Columbia Circuit issued a stay on the rule's implementation. *State of New York v. United States Environmental Protection Agency*, Docket No. 03-1380.

The comparability of EPA's analysis is further limited because the agency did not provide consistent information on the total costs and benefits of the two options over their entire implementation periods. Specifically, EPA provided cost-and-benefit estimates for 2010, rather than estimates of the total costs and benefits over the entire implementation period.[13] This is important because the economic impact of the policy options could vary from year to year and because the two options have different implementation timelines. For example, under the proposed cap-and-trade option, a second level of mercury reductions would take effect in 2018, which would likely generate additional costs and benefits at that time. Thus, the estimates EPA provided for 2010 did not fully account for the expected costs and benefits over the implementation period for this option. In contrast, EPA officials said that its estimate of the technology-based option in 2010 reflects the full implementation cost because its analysis assumes that power plants would achieve compliance with the technology-based option by that date. However, without estimates of the total value of benefits and costs of each option over the entire implementation period, it is difficult to ascertain which option would generate the greatest net benefits.

## EPA Did Not Document Some of Its Analysis Supporting the Policy Options or Provide Consistent Information on the Economic Impacts of Different Control Levels

The economic analysis underlying the proposed mercury rule does not consistently reflect OMB's guidance to agencies in terms of adhering to the principles of full disclosure and transparency when analyzing the economic effects of regulations. Specifically, we identified two primary cases where EPA's analysis does not adhere to these principles, further limiting the usefulness of the agency's analysis in decision making and diminishing the transparency of the analysis to the public.

First, while EPA provides substantial information on its analysis of the technology-based option in the documents supporting its economic analysis of the proposed rule, the agency does not do so for the cap-and-trade option. For the technology-based option, EPA provides documents that describe its findings. In contrast, the agency provides only a summary of its findings for the cap-and-trade option in the rule's preamble and refers to its findings as "rough estimates" that are based on consideration of available analysis of the interstate rule, the

---

[13]OMB guidance states that agencies should discount costs and benefits that accrue in different time periods to present values. To compute present value, the agencies need to discount the estimated costs and benefits using interest rates recommended by OMB.

technology-based option, and the proposed Clear Skies legislation. EPA does not describe specifically how the agency used this analysis of other proposed rules and legislation to estimate the costs and benefits of the cap-and-trade option, and it does not identify the key analytical assumptions underlying its cost-and-benefit estimates. This lack of documentation and transparency leaves decision makers and the public with limited information on EPA's analysis of the cap-and-trade option.

Second, EPA officials responsible for the economic analysis told us that they analyzed two variations of the proposed technology-based option with more stringent mercury limits than the option included in the proposal, but the agency did not include this analysis in the documents supporting its economic analysis or in the public rule-making docket. This is inconsistent with EPA's analysis of the cap-and-trade option, in which it provided a range of costs and benefits associated with different levels of stringency. This omission is also at odds with OMB guidance directing agencies to conduct their economic analysis in accordance with the principles of full disclosure and transparency.[14]

With respect to the analysis of the technology-based scenarios that the agency did not make publicly available, EPA officials said the additional modeling showed that the more stringent scenarios were not as cost-effective as the proposed technology-based option. However, EPA did not estimate the benefits of these two scenarios, thereby precluding a comparison of the net economic benefits under the proposed mercury policy options. As a result, it is unclear whether the reduction levels and implementation timelines under either proposed option represent the regulatory scenario that would provide the greatest net benefits.

In January 2005, EPA officials responsible for the mercury rule said the agency does not have an obligation to analyze and document every control scenario. We recognize that OMB guidance gives agencies latitude in determining the number of regulatory alternatives to consider and that agencies must balance the thoroughness of their analysis with the practical limits of their ability to carry out analysis. Nonetheless, providing information on the costs and benefits of even a limited range of control scenarios under both proposed options would help decision makers and the public in assessing how different levels of stringency would affect

---

[14]OMB, *Economic Analysis of Federal Regulations under Executive Order 12866* (Washington, D.C., January 1996).

overall estimates of costs and benefits. In December 2004, EPA solicited public comment on additional economic analyses the agency received from commenters on the January 2004 proposed rule, including some that relied on models, assumptions, and levels of stringency that were different from the scenarios EPA analyzed.

## EPA Did Not Estimate the Human Health Benefits of Mercury Reductions

Although EPA's analysis states that a mercury regulation would generate a variety of benefits, the agency did not estimate in monetary terms all of the benefits expected from reducing mercury emissions. Most notably, EPA did not quantify the human health benefits of decreased exposure to mercury, such as reduced incidence of developmental delays, learning disabilities, and neurological disorders. Instead, EPA estimated only some of the health benefits it anticipates would occur from decreased exposure to fine particles and discussed other impacts qualitatively.[15] Because the two options in the proposed rule differed significantly in both the amount of mercury emission reductions and the time frames in which these reductions would occur, the lack of estimates of the mercury-specific benefits of each policy option represents a significant limitation of EPA's economic analysis. That is, to the extent that each proposed option would yield measurable mercury-specific health benefits, EPA's analysis may underestimate the total expected benefits of both options. Moreover, because the options may yield different mercury-related health benefits, the lack of estimates of these benefits makes it difficult to weigh the relative merits of the two proposed options.

According to EPA, its analysis did not estimate key mercury-related health benefits because of technical, time, and resource limitations. Specifically, agency officials responsible for the analysis said the agency did not have a method for determining the extent to which mercury reductions from power plants would translate into decreased incidence of mercury-related health problems. According to EPA, estimating these benefits involves a number of complex chemical, physical, and biological processes, as well as a wide variety of human behaviors, such as fish consumption practices.

Although EPA did not estimate the expected human health and other benefits of decreased exposure to mercury emissions in the analysis supporting the proposed rule, the agency did list the various human health

---

[15]According to EPA, health effects associated with fine particles include exacerbated asthma, bronchitis, heart attacks, premature mortality, and respiratory diseases.

and other benefits it expects would stem from a mercury rule. Importantly, in December 2004, the agency announced that it was revising its benefit estimates and solicited public comment on a proposed method for estimating mercury-specific benefits. According to EPA, this method would focus on (1) quantifying projected emissions from coal-fired power plants relative to other sources, (2) modeling the dispersion and deposition of mercury, (3) modeling the link between changes in mercury deposition and changes in the methylmercury concentrations in fish, (4) assessing the methylmercury exposure from consuming fish, and (5) assessing how reductions in methylmercury exposure affect human health. According to EPA officials responsible for analyzing the proposed rule's effects, the agency will consider public comments on this approach and revise its analysis before finalizing a rule. In January 2005, EPA officials responsible for the analysis agreed that providing monetary estimates of mercury-specific benefits would enhance their analysis, and said that the agency might have sufficient information to estimate some, but not all, of the expected human health benefits of reducing mercury emissions.

## EPA Did Not Assess Key Analytical Uncertainties That Could Affect Its Cost-and-Benefit Estimates

OMB guidance under Executive Order 12866 stipulates that agencies should analyze and present information on uncertainties with their cost-and-benefit estimates. According to EPA officials responsible for the economic analysis, the agency's cost model is generally sensitive to assumptions about future electricity demand and fuel prices, as well as the availability, cost, and performance of pollution controls. Because these assumptions involve long-term projections, they also involve a substantial amount of uncertainty. EPA conducted a limited uncertainty analysis of natural gas prices and electricity demand growth on the cost estimates by examining the impact of alternative projections and concluded that its cost estimates were not particularly sensitive to changes in these variables. However, EPA did not assess how the distribution of estimated benefits and costs would differ given changes in its assumptions about the availability, cost, and performance of mercury control technologies, even though the agency believes that these assumptions could affect its economic modeling.

Furthermore, EPA's December 2004 notice for additional public comment on the mercury proposal highlighted the uncertainty surrounding the ability of its computer model to estimate mercury control costs, primarily because of the power industry's limited experience with implementing mercury controls.[16] This notice solicited public comment on, among other things, the assumptions in its economic modeling related to the cost, availability, and performance of mercury control technologies. According to senior EPA officials responsible for analyzing the mercury proposal, changes in these assumptions could have a sizable impact on the agency's cost-and-benefit estimates. This acknowledgment of key uncertainties in its economic modeling highlights the need to determine how they could affect the overall cost-and-benefit estimates for each proposed option.

In addition, EPA did not analyze the key uncertainties surrounding its benefit estimates. For example, EPA used economic data from its earlier assessment of the proposed Clear Skies legislation to approximate the impact of emissions reductions that would be expected under the mercury rule. According to EPA, the agency used this approach—referred to as a "benefits-transfer approach"—because time and resource constraints prevented it from performing new research to measure the value of health impacts under a mercury rule. OMB's September 2003 guidance, which applies to economically significant final rules issued after January 1, 2005, states that although such an approach can provide a quick and low-cost means of obtaining monetary values, the method may be characterized by uncertainty and potential biases of unknown magnitude and should be treated as a last-resort option.[17] Furthermore, EPA's economic analysis states that the benefits analysis has many sources of uncertainty, including those associated with emissions data, air quality modeling, and the effect of emissions on human health. The agency did not, however, formally assess the impact of these uncertainties.

---

[16]69 Fed. Reg. 69864 (Dec. 1, 2004)

[17]OMB Circular No. A-4, Regulatory Analysis (Sept. 17, 2003).

In January 2005, EPA officials responsible for the proposed mercury rule acknowledged this limited analysis of key uncertainties and said that the agency plans to conduct a more formal assessment of these uncertainties prior to issuing a final rule, as directed by OMB's September 2003 guidance.[18] This guidance directs agencies to assess the sources of uncertainty in their regulatory analyses and the way in which cost-and-benefit estimates may be affected under plausible assumptions. Furthermore, in cases where the annual economic effects total $1 billion or more, the guidance states that agencies should provide a formal quantitative assessment of the key uncertainties about costs and benefits.

## Conclusions

Because EPA estimates that regulating mercury emissions would have significant economic impacts totaling billions of dollars per year, it is important for the agency to have a credible basis for selecting a policy that will maximize the return on this investment. However, EPA's initial economic analysis of the two policies it is considering has a number of shortcomings. Specifically, because EPA did not analyze and document the economic effects of each policy option by itself—as well as in combination with the interstate rule—over their varying full implementation periods, the results cannot be meaningfully compared. In addition, EPA did not document the analysis supporting the cap-and-trade option or provide consistent information on the economic impacts of different mercury control levels for the two options, limiting the transparency and usefulness of the analysis. Further, without monetary estimates of the human health benefits of mercury emissions reductions—a primary purpose of a mercury regulation—over the full implementation period of each option or, at a minimum, a qualitative comparison of these benefits, EPA's analysis does not provide decision makers with a strong basis for comparing the net benefits under each option. Finally, because EPA did not analyze some of the key analytical uncertainties that could affect its estimates of net benefits, the agency could enhance its economic analysis by further evaluating these uncertainties and how they could affect its overall findings. Unless EPA conducts and documents further economic analysis, decision makers and the public may lack assurance that the agency has evaluated the economic trade-offs of each option and taken the appropriate

---

[18]A formal quantitative analysis under the Circular involves an assessment of the probability distributions underlying the estimated benefits and costs, conducted using tools such as simulation models or expert opinion.

steps to identify which mercury control option would provide the greatest net benefits.

# Recommendations for Executive Action

To improve the usefulness of the agency's economic analysis for informing decision makers and the public, and to help ensure consistency with OMB guidance for economic analysis, we recommend that, as the agency revises its economic analysis prior to selecting a mercury control option, the EPA Administrator take the following four actions:

- Analyze and fully document the economic effects of each policy option by itself, as well as in combination with the interstate rule, over their full implementation periods.

- Ensure that the agency documents its analysis supporting the final rule and consistently analyzes the effect that different levels of mercury control would have on cost-and-benefit estimates under each policy option.

- Include monetary estimates, where possible, of the human health benefits of reductions in mercury emissions from power plants or, at a minimum, provide qualitative information on how these benefits are likely to compare under the two options over a consistent time frame, reflecting full implementation of both options.

- Further analyze uncertainties surrounding estimates of costs and benefits, as directed by OMB guidance, and evaluate how these uncertainties could affect overall estimates of the rule's impacts.

# Agency Comments

We provided EPA with a draft of this report for review and comment. In commenting on the draft report, the Assistant Administrator for Air and Radiation said that, prior to issuing a final mercury regulation by March 15, 2005, EPA will conduct additional analysis that will largely address the findings and recommendations identified in our report. EPA's letter is included as appendix II.

As agreed with your offices, unless you publicly announce the contents of this letter earlier, we plan no further distribution until 7 days from the report date. At that time, we will send copies of the report to the EPA

Administrator and other interested parties. We will also make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you have any questions about this report, please contact me at (202) 512-3841 or stephensonj@gao.gov. Key contributors to this report are listed in appendix III.

John B. Stephenson
Director, Natural Resources and Environment



OFFICE OF INSPECTOR GENERAL

Catalyst for Improving the Environment

**Evaluation Report**

# Additional Analyses of Mercury Emissions Needed Before EPA Finalizes Rules for Coal-Fired Electric Utilities

**Report No. 2005-P-00003**

**February 3, 2005**



Exhibit F

**Report Contributors:**                    Rick Beusse
                                            Carolyn Blair
                                            Hilda Canes
                                            Sarah Fabirkiewicz
                                            James Hatfield
                                            Erica Hauck
                                            James Huber


**Abbreviations**

| | |
|---|---|
| CAA | Clean Air Act |
| CAIR | Clean Air Interstate Rule |
| CHPAC | Children's Health Protection Advisory Committee |
| EPA | Environmental Protection Agency |
| FACA | Federal Advisory Committee Act |
| OIG | Office of Inspector General |
| ICR | Information Collection Request |
| IGCC | Integrated Gasification Combined Cycle |
| IPM | Integrated Planning Model |
| OMB | Office of Management and Budget |
| MACT | Maximum Achievable Control Technology |
| NTEC | National Tribal Environmental Council |
| $NO_x$ | Nitrogen Oxide |
| OCHP | Office of Children's Health Protection |
| $SO_2$ | Sulfur Dioxide |

**Cover photo:**     Virginia Electric Power Company's coal-fired plant at Mt. Storm, West Virginia.
                     Source:  http://www.oag.state.ny.us/press/2000/nov/nov16a_00_pictures.html



**U.S. Environmental Protection Agency**
**Office of Inspector General**

2005-P-00003
February 3, 2005

# At a Glance

*Catalyst for Improving the Environment*

## Why We Did This Review

Members of the Senate Environment and Public Works Committee requested that we review EPA's development of its proposed rule for controlling mercury emissions from coal-fired electric utilities.

## Background

Coal-fired electric utilities represent the largest source of airborne mercury emissions in the United States. Once airborne, mercury can be deposited into water, where it bio-accumulates in fish and animals at the top of the food chain. Human consumption of fish is the primary method of exposure to mercury, which has been shown to cause neurological and fetal developmental problems.

On January 30, 2004, EPA proposed rules for regulating mercury emissions from coal-fired steam generating electric utility units. EPA proposed two options for controlling mercury emissions, one a control technology standard with emission limits and the other a performance based cap-and-trade approach.

**For further information, contact our Office of Congressional and Public Liaison at (202) 566-2391.**

**To view the full report, click on the following link:**
**www.epa.gov/oig/reports/2005/20050203-2005-P-00003.pdf**

### *Additional Analyses of Mercury Emissions Needed Before EPA Finalizes Rules for Coal-Fired Electric Utilities*

### What We Found

Evidence indicates that EPA senior management instructed EPA staff to develop a Maximum Achievable Control Technology (MACT) standard for mercury that would result in national emissions of 34 tons annually, instead of basing the standard on an unbiased determination of what the top performing units were achieving in practice. The 34-tons-per-year target was based on the amount of mercury reductions expected to be achieved from implementation of nitrogen oxide (NOx) and sulfur dioxide ($SO_2$) controls under a separately proposed, but related, air rule. According to EPA officials, 34 tons represents the most realistic and achievable standard for utilities. However, because the results of the MACT standard were prescribed and prior estimates were lower than what was proposed, the standard likely understates the average amount of mercury emissions reductions achieved by the top performing 12 percent of utilities, the minimum level for a MACT standard required by the Clean Air Act. Further, this MACT standard, as proposed, does not provide a reasonable basis for determining whether the MACT or cap-and-trade approach provides the better cost benefit.

The Agency's cap-and-trade proposal can be strengthened to better ensure that anticipated emission reductions would be achieved. For example, utilities would not need to install mercury-specific controls to achieve the interim cap, but could meet the cap by implementing NOx and $SO_2$ controls associated with another proposed trading program. Also, the proposal does not adequately address the potential for hot spots. Further, provisions for units emitting small amounts of mercury could be improved.

We also found that EPA's rule development process did not comply with certain Agency and Executive Order requirements, including not fully analyzing the cost-benefit of regulatory alternatives and not fully assessing the rule's impact on children's health.

### What We Recommend

We recommend that EPA re-analyze mercury emissions data collected for the top performing 12 percent of units to develop a MACT floor. The Agency should also conduct a revised cost-benefit analysis for the updated MACT that takes into account the impact of mercury co-benefits achieved through the proposed Clean Air Interstate Rule. The results of the cost-benefit review should be compared to the cost-benefit of the proposed cap-and-trade option to determine the most cost beneficial option for controlling mercury emissions. We also recommend that EPA strengthen its cap-and-trade proposal by more fully addressing the potential for hot spots; revising the safety valve proposal so that it is used only as intended during periods of unanticipated market volatility; and revising the proposed exemption for small emitters. Further, we recommend that the Agency conduct more in-depth analyses of the regulatory alternatives and children's health impacts as required by Executive Orders. The Agency's response to the draft report did not specifically address our recommendations, but raised concerns about certain aspects of the report.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

THE  INSPECTOR GENERAL

February 3, 2005

<u>**MEMORANDUM**</u>

SUBJECT:      Evaluation Report:  Additional Analyses of Mercury Emissions Needed
              Before EPA Finalizes Rules for Coal-Fired Electric Utilities
              Report No. 2005-P-00003

TO:           Jeffrey R. Holmstead
              Assistant Administrator for Air and Radiation

This memorandum transmits the results of an Office of Inspector General (OIG) evaluation regarding the Environmental Protection Agency's (EPA) development of the proposed rule for regulating mercury emissions from coal-fired steam generating electric utility units.  This report contains findings that should help EPA in its efforts to develop the final rule.   Also, the report contains corrective actions the Office of Inspector General (OIG) recommends.  This report represents the opinion of the OIG and the findings contained in this report do not necessarily represent the final EPA position. Final determinations on matters in this report will be made by EPA managers in accordance with established procedures.

**Action Required**

In accordance with EPA Directive 2750, as the action official, you are required to provide this Office with a written response within 90 days of the final report date.  The response should address all recommendations.  For the corrective actions planned but not completed by the response date, please describe the actions that are ongoing and provide a timetable for completion.  Where you disagree with a recommendation, please provide alternative actions for addressing the findings reported.

We appreciate the efforts of  EPA officials and staff in working with us to develop this report.  If you or your staff have any questions regarding this report, please contact me at (202) 566-0847 or Kwai Chan, Assistant Inspector General for Program Evaluation, at (202) 566-0827.

Nikki L. Tinsley

Attachment


cc:     Steve Johnson, Acting Administrator
        William Farland, Acting Deputy Assistant Administrator for Science, ORD
        Ann Klee, General Counsel
        Pete Cosier, Audit Followup Coordinator, OAR
        Kwai Chan, Assistant Inspector General for Program Evaluation, OIG
        Mark Bialek, Counsel, OIG

# *Table of Contents*

**At a Glance**

## Chapters

| 1 | **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1** |
|---|---|---|
| | Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| | Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| | Scope and Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 |
| | Results in Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 |

| 2 | **Mercury MACT Development Compromised** . . . . . . . . . . . . . . . . . . . . . . . . . . | **11** |
|---|---|---|
| | Requirements for MACT Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 |
| | EPA's Process for Addressing Variability in Computation | |
| |     of Mercury MACT Floor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |
| | EPA Staff Instructed to Develop MACT Floor That Would Result in | |
| |     National Emissions of 34 Tons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 |
| | Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| | Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| | Agency Comments and OIG Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |

| 3 | **Cap-and-Trade Option Can Be Strengthened** . . . . . . . . . . . . . . . . . . . . . . . . . | **18** |
|---|---|---|
| | EPA's Proposed Cap-and-Trade Approach . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 |
| | Proposed Cap-and-Trade Program Needs to Further Address | |
| |     Certain Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 |
| | Proposed Emissions Trading Rule Should Also Address Tribal Concerns . . . | 24 |
| | Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 |
| | Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 |
| | Agency Comments and OIG Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |

| 4 | **Rule Development Process Not Consistent with** | |
|---|---|---|
| | **Expected and Past Practices** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **27** |
| | Description of Rulemaking Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| | Some FACA Members Considered Job Unfinished . . . . . . . . . . . . . . . . . . . . | 28 |
| | Intra-Agency Review Limited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| | Requirements for Cost-Benefit Analyses Not Fully Implemented . . . . . . . . . | 32 |
| | Required Children's Health Analysis Not Completed . . . . . . . . . . . . . . . . . . | 33 |
| | Scope Limitations: Inter-Agency Review . . . . . . . . . . . . . . . . . . . . . . . . . . . | 34 |
| | Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35 |
| | Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35 |
| | Agency Comments and OIG Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35 |

# Appendices

**A**    **Timeline of Events Related to Development of Mercury Rule** . . . . . . . . . .  **37**

**B**    **OIG's Request for Documents Related to Development of Utility MACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **39**

**C**    **Different MACT Floor Proposals** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **43**

**D**    **EPA's Rule Development Process** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **44**

**E**    **Agency Comments to the Draft Report and OIG Evaluation** . . . . . . . . . . .  **46**

**F**    **Distribution** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **54**

# Chapter 1
## Introduction

## Purpose

The Office of Inspector General (OIG) initiated this review based on a request from members of the Senate Environment and Public Works Committee.  In their written request, the Senators expressed concerns with the process used to develop the Environmental Protection Agency's (EPA's) January 2004 proposed rule for regulating mercury emissions from coal-fired steam generating electric utility units.  The proposed rule included two different options for regulating mercury emissions.  One approach was a Maximum Achievable Control Technology (MACT) standard that would establish emission limits applicable to all coal-fired utility units.  The other approach was a mercury cap-and-trade approach that would establish a national cap on mercury emissions and allow individual utilities to trade emissions allowances in a market-based system.  The objectives of our evaluation were to determine:

- Do the data and analyses in the docket demonstrate that the proposed MACT option reflects the maximum achievable reductions from coal-fired steam generating electric utility units?

- Is the mercury cap-and-trade option, as proposed, sufficient to ensure public health protection?

- What process did EPA follow in developing the proposed rule, and was this process consistent with applicable statutes, regulations, policy, guidance, and past Agency practice?

## Background

Mercury is released globally into the environment through natural processes, such as volcanoes, and also from human activity.  Man-made releases of mercury are primarily due to the burning of mercury-containing fuels and wastes, and through industrial manufacturing processes.  Man-made mercury emissions from the United States are estimated to account for roughly 3 percent of total global mercury emissions.  Mercury from lead smelters, municipal waste combustors, hospital waste incinerators, manufacturing operations, and other sources are largely already regulated by EPA.  In the United States, the largest source of airborne mercury emissions is the coal-burning electric utilities industry, representing an estimated 40 percent of total U.S. man-made airborne mercury

emissions.  EPA has estimated that one-third of all U.S. emissions of mercury are deposited within the contiguous United States, while the remaining two-thirds enter the global cycle.  The January 2004 proposal is the first attempt to regulate mercury emissions from these utilities at the Federal level.

Airborne concentrations of mercury are generally considered to be small and not a serious health concern while still in the air.  However, once mercury enters fresh-water and salt-water bodies, either directly or through air deposition, it can bioaccumulate in fish and other animal tissues in its more toxic form, methylmercury.  As mercury bioaccumulates in the food chain, its concentration becomes increasingly higher in animals at the top of the food chain (such as larger predatory fish) that consume smaller contaminated organisms.  Because of the bioaccumulation of methylmercury, the primary route of human exposure to mercury is through the consumption of fish, both salt water and fresh water.  Excessive human exposure to mercury has been associated with severe detrimental neurological and developmental health effects.  Depending on the dose, human health effects from exposure to mercury can include subtle losses of sensory and cognitive ability, tremors, inability to walk, and death.  The developing fetus may be particularly sensitive to the detrimental effects of methylmercury; thus, exposure to mercury by women of child-bearing age is of particular concern.

From a global perspective, mercury accumulation in salt-water fish is a public health concern.  EPA and the Food and Drug Administration have cautioned that young children, as well as women who might become pregnant, are pregnant, or are nursing should limit their consumption of certain salt-water predatory fish.  Mercury bioaccumulation in U.S. water bodies is also a public health concern, and 45 States issued fish advisories for mercury in 2003.  Many of these fish advisories caution that women and young children should limit their consumption of certain types of fish.

### EPA Reference Dose for Methylmercury

Based on studies showing adverse health effects from exposure to methylmercury, EPA set a reference dose for methylmercury that was designed to protect the most sensitive subgroup (i.e., developing fetuses).  An EPA reference dose reflects the estimate of daily exposure to the human population, including sensitive subgroups, that is not likely to cause harmful effects during a lifetime.  The current EPA reference dose for methylmercury –  which was included in EPA's 1997 Mercury Study Report to Congress –  is 0.1 micrograms per kilogram of body weight per day.

2

Subsequent to EPA's 1997 Mercury Study Report to Congress, Congress directed[1] EPA to request the National Academy of Sciences to perform an independent study on the toxicological effects of methylmercury and to prepare recommendations on the establishment of a scientifically appropriate exposure reference dose. The National Academy of Sciences completed its review in 2000, and concluded that the EPA reference dose of 0.1 micrograms per kilogram was a scientifically justifiable level for the protection of health.

The most recent results from Centers for Disease Control and Prevention's ongoing National Health and Nutrition Examination Survey show that mercury blood levels of most children and women of childbearing age were below levels of concern corresponding to the EPA reference dose. However, 5.66 percent of childbearing-aged woman had blood mercury levels at or above the reference dose. The survey also questions participants about their fish consumption. For the 1999-2000 survey period, tuna and shrimp were the two most frequently cited types of fish/shellfish consumed. These results, and other studies, suggest that seafood (as opposed to fresh-water fish) is the predominant source of mercury exposure in the United States. However, some subpopulations in the United States consume more fish, including fresh-water fish, than the general population. These groups may be at increased risk from mercury exposure. For example, studies have shown elevated blood levels of mercury in some Native American tribes that consumed fresh-water fish.

### Statutory Requirements for Controlling Mercury Emissions from Utility Plants

The Clean Air Act (CAA) requires EPA to regulate emissions of 188 air toxics (also known as hazardous air pollutants), including mercury. EPA was to identify and establish emission standards for major source categories emitting these pollutants. Specifically, section 112(d) of the CAA requires EPA to establish emission limits for major source categories emitting air toxics, commonly referred to as MACT standards. The MACT standard is to require the maximum degree of reductions achievable for the source category, taking into consideration cost and any non-air quality health and environmental impacts.

A key requirement of section 112(d) is that emission standards for existing sources in a category or subcategory shall not be less stringent than the average emission limitation achieved by the best performing 12 percent of the existing sources for which the Administrator has data. The emission limitation achieved by the best performing 12 percent of sources is referred to as the "MACT floor."

---

[1] H.R. Rep. No. 769, 105th Cong., 2d Sess. at 281-282 (1998). This is the Conference Report to accompany H.R. 4194, October 5, 1998.

3

The CAA also established specific requirements with respect to air toxics emissions from utilities. Section 112(n)(1)(A) requires EPA to perform a study of the hazards to public health that are reasonably anticipated to occur as a result of air toxics emissions from electric utility steam generating units. This study was to develop and describe alternative control strategies for emissions that may warrant regulation under section 112. Further, with respect to regulating emissions from utility plants, section 112(n)(1)(A) states:

> *The Administrator shall regulate electric utility steam generating units under this section, if the Administrator finds such regulation is appropriate and necessary after considering the results of the study required by this subparagraph.*

EPA published its Final Report[2] with respect to utilities in February 1998, but deferred making a determination as to whether regulation of these units was appropriate and necessary. However, the Final Report concluded that:

- Mercury from coal-fired utilities was the air pollutant of greatest potential concern to public health from utilities;
- Coal-fired utilities are estimated to emit about one-third (51 tons based on 1994 emissions) of U.S. anthropogenic (man-made) mercury emissions per year;
- Ingestion of contaminated fish is the most important route of exposure to mercury; and
- Modeling in conjunction with the available scientific data provides evidence for a plausible link between emissions of mercury from utilities and the methylmercury found in soil, water, air, and fish.

In its Final Report, EPA listed a number of research needs related to mercury emissions. These included obtaining additional data on mercury emissions, such as the amount emitted from various types of units; the proportion of divalent versus elemental mercury;[3] and how factors such as the control device, fuel type, and plant configuration affect emissions and speciation.

---

[2] Study of Hazardous Air Pollutant Emissions from Electric Utility Steam Generating Units - - Final Report to Congress, EPA-453/R-98-004a, February 1998.

[3] Airborne divalent mercury is adsorbed onto particles or bound to other compounds and is deposited sooner and mainly in the vicinity of the emissions sources (local to regional distances), while elemental mercury (vapor) remains airborne longer and is transported on a hemispherical/global scale.

4

### *Information Collection Request*

Based on the research needs outlined in the Final Report, the then-EPA Administrator concluded that obtaining additional information from owner/operators of coal-fired electric utility steam generating units was needed to determine whether regulation of electric utility steam generating units was appropriate and necessary. Accordingly, EPA used its authority under CAA section 114 to collect data from all domestic coal-fired electric utility steam generating units. The resulting information collection request (ICR) consisted of three phases of data collection:

- **Phase I** collected general information on every coal-fired electric generating utility unit and was completed in January 1999.

- **Phase II** consisted of obtaining information on the amount of coal received on a per shipment basis for the 1999 calendar year for every facility. In addition, the mercury and chlorine content of the coal was reported for every sixth shipment.

- **Phase III** consisted of emissions testing at 80 units,[4] which were selected to represent a cross-section of boiler and control device types. For each of the 80 units selected, testing for mercury was conducted at the inlet and outlet of the last pollution control device on the unit. Each unit was to conduct three separate test runs and to also sample and analyze the coal used during each of the three separate runs.

### *December 2000 Findings and Determination*

In a December 20, 2000, Federal Register Notice, EPA published its finding that regulation of mercury emissions from coal-fired utility plants was appropriate and necessary. The notice described four primary sources of information for the finding:

- EPA's February 1998 "Study of Hazardous Air Pollutant Emissions from Electric Utility Steam Generating Units -- Final Report to Congress."
- An ICR to all coal-fired electric utility steam generating units requesting coal data for 1999 and a request to certain units for stack test results to evaluate air toxics emissions.
- An evaluation of the mercury control performance of various emission control technologies currently in use to control other pollutants or that could be applied to such units to control mercury emissions.

---

[4] Emission tests were actually conducted at 79 different units with 2 tests conducted at 1 unit for a total of 80 tests.

- An evaluation of available health data related to mercury conducted by the National Academy of Sciences.

The Notice concluded that, ". . . during the regulatory development process, effective controls for mercury and other HAPs (hazardous air pollutants) can be shown to be feasible." The Notice recognized the considerable interest in using economic incentive programs, such as emission trading, to achieve emission reductions. However, in its December 2000 notice, EPA cited concerns about the potential local impact of emissions trading and noted that any trading program must be constructed in a way that assured communities nearest a source were adequately protected. The Notice stated:

> *Thus, in developing a standard for utilities, the EPA should consider the legal potential for, and the economic effects of, incorporating a trading regime under section 112 in a manner that protects the local populations.*

After issuance of these findings and its determination that regulation of utilities was appropriate and necessary, EPA began to develop a MACT standard for mercury emissions from coal-fired electric utility units. Additionally, a workgroup was established in August 2001 under the Clean Air Act Advisory Committee to provide EPA with input regarding Federal MACT regulations for coal-fired electric utility steam generating units. Appendix A provides a timeline of events associated with the development of the MACT rule.

### Clear Skies Proposal

Concurrent with EPA's initial efforts to develop a MACT for utility units, legislation was proposed in Congress[5] to establish a multi-pollutant approach for addressing mercury, sulfur dioxide ($SO_2$), and nitrogen oxide (NOx) emissions from utilities. This legislation, referred to as Clear Skies, proposed a cap-and-trade approach to controlling emissions of these three pollutants. With respect to mercury, the initial Clear Skies legislation called for an interim cap on total U.S. mercury emissions of 26 tons per year by 2010. Based on modeling done in support of the Clear Skies Proposal, EPA estimated that some facilities would install mercury-specific technology by 2010 in order to meet the 26-ton cap. Clear Skies proposed a final cap of 15 tons on mercury emissions by 2018, and EPA analysis projected that additional sources would choose to install mercury-specific controls to meet the cap.

When Clear Skies legislation stalled in Congress, EPA decided to propose a cap-and-trade approach for controlling mercury emissions as an alternative to a

---

[5] Clear Skies was proposed in both the U.S. House of Representatives and Senate in July 2002, and reintroduced as the Clear Skies Act of 2003 on February 27, 2003.

6

MACT standard.  EPA proposed these regulatory alternatives in the January 30, 2004, Federal Register Notice.  In addition to the proposed mercury rule alternatives, EPA on January 30, 2004, also proposed new air rules for reducing $SO_2$ and NOx emissions.  This proposed rule, now known as the Clean Air Interstate Rule (CAIR), would establish a cap-and-trade program for 29 States in the Eastern United States and the District of Columbia whose $SO_2$ and NOx emissions significantly contribute to fine particle and ozone pollution problems in other downwind States.  Together, the CAIR and mercury proposals would create a multi-pollutant approach to controlling emissions from utilities similar to what was originally proposed in the Clear Skies legislation.

### Proposed Mercury Rule

As a result of a prior court settlement[6], EPA had agreed to issue proposed power plant mercury emission standards by December 15, 2003.  In the January 30, 2004, Federal Register Notice, EPA  proposed its rule for regulating mercury emissions from coal-fired steam generating electric utility units.  This proposal includes two different approaches for controlling mercury emissions from utilities: a MACT standard or a mercury cap-and-trade program.

**EPA's Proposed MACT Standard Approach:**  EPA proposed separate emission limits to be achieved by 2008 for five subcategories: three subcategories for different coal types (bituminous, sub-bituminous, and lignite); one for coal refuse or waste; and one for a specific type of combustion process known as Integrated Gasification Combined Cycle (IGCC).[7]  Table 1-1 shows the specific per unit emissions limits for existing units in the proposed rule.

**Table 1-1: Proposed MACT Emission Limits**

| Subcategory | Emission limit  (lbs/TBtu)* |
|---|---|
| Bituminous | 2.0 |
| Sub-bituminous | 5.8 |
| Lignite | 9.2 |
| Coal-Refuse | 0.38 |
| IGCC | 19.0 |

* = pounds per Trillion British thermal units.

These emission limits were based on what EPA determined to be the MACT floor.  EPA proposed that the MACT standard be based on the MACT floor as

---

[6] Under a settlement agreement reached in 1998 with the Natural Resources Defense Council, EPA agreed to issue a proposed rule for regulating mercury from power plants by December 15, 2003, and a final rule by December 2004.  (*Natural Resources Defense Council v. EPA,* D.C. Cir., No. 92-1415, 4/15/98).  Natural Resources Defense Council later agreed to extend the deadline for the final rule to March 15, 2005.

[7] The IGCC process converts coal into gas and uses the coal gas as fuel for generating electricity.

opposed to a beyond-the-floor[8] level because it concluded that technologies for reducing mercury emissions were not commercially available and, thus, beyond-the-floor emission standards were not achievable. EPA estimated that total national mercury emissions would be reduced from 48 to 34 tons per year if the proposed MACT rule was implemented.

**EPA's Proposed Cap-and-Trade Approach.** In lieu of adopting a MACT standard to regulate mercury emissions from utilities, EPA presented an alternative proposal that would regulate mercury emissions from utility units under a national cap-and-trade program implemented under section 111 of the CAA.[9] The cap-and-trade proposal included an unspecified interim cap on mercury emissions in 2010 and a final cap of 15 tons by 2018. Though EPA did not specify an interim cap level, the Agency proposed that it be based on the maximum amount of mercury reductions that could be achieved through implementing the controls necessary to reduce $SO_2$ and $NO_x$ emissions, i.e., the mercury co-benefit of these controls through implementation of CAIR. The preamble to the rule states that EPA modeling indicated an expected co-benefit level, which is the result of implementing the CAIR rule, resulting in mercury emissions of 34 tons per year. EPA also took comment on administering the cap-and-trade approach under CAA section 112 instead of section 111.[10] The primary difference between these two approaches is that a section 112 cap-and-trade program would be administered centrally by EPA while the section 111 program would be administered individually by States.

## Scope and Methodology

We conducted our field work from May 2004 through December 2004, and did so in accordance with *Government Auditing Standards*, issued by the Comptroller General of the United States. We performed field work in EPA's Office of Air and Radiation locations in Washington, DC, and Research Triangle Park, North Carolina. We interviewed staff from EPA offices and outside organizations to gain an understanding of the rule as developed, other options considered, and the rule development process. We interviewed officials from EPA's Office of Air and Radiation; Office of Research and Development; Office of Enforcement and Compliance Assurance; and Office of Policy, Economics, and Innovation. We also contacted environmental and utility industry representatives, and State, local, and tribal organizations interested in the development of this proposed rule, to

---

[8] A MACT standard more stringent than the floor is referred to as "beyond-the-floor."

[9] Concurrent with this approach, EPA proposed to revise its December 2000 finding that regulating utilities under section 112 was necessary and appropriate.

[10] This approach would not require EPA to revise its December 2000 finding, but would require EPA to "de-list" utilities as a source category requiring a MACT standard.

obtain their views. We reviewed data and analyses developed in support of the rule, and public comments included in the rulemaking docket. We also reviewed related information provided by both EPA and non-EPA officials contacted.

The Government Accountability Office is conducting a review of technology-related issues for the proposed mercury rule, which is an important consideration in determining whether the MACT standard can be set at a level that is more stringent than the floor. The Government Accountability Office report was not available in December 2004 for consideration in the OIG report.

### *Limitations*

Our evaluation was conducted and completed before the Agency had completed the rulemaking process. Accordingly, our observations and characterizations about the process reflect the status of the rulemaking process at the time we completed our review. Issuance of the final rule is planned for March 15, 2005, and the final rule may consider additional information or analyses not available at the time we completed our review. For example, EPA released a notice of data availability for the proposed Clean Air Mercury Rule on December 1, 2004. The notice requests additional public comment on issues addressed in this report, and solicits further comment on new data and information to help EPA evaluate which regulatory approach will best reduce mercury emissions from power plants. We did not specifically consider the notice because it was released after we had completed our review and analyses. However, the notice includes information available previously in the public comment docket for this rule, and it is possible we had considered some of that information during our review.

The OIG was not provided with several important documents it requested from the Agency; therefore, that information was not available for consideration in this report. Our memorandum detailing the requested information, as well as specifics on what information was provided by the Agency, are provided in Appendix B. Consideration of the inter-agency review process was limited to information from EPA staff and information available in the docket only. We were not able to discuss the inter-agency review process with Office of Management and Budget (OMB) staff who were responsible for coordinating the inter-agency review process. The OIG did not independently analyze the databases or computer modeling programs that EPA used in developing the proposed rule. With respect to the development of the MACT standard, the OIG did not attempt to independently calculate the MACT floor.

## Results in Brief

Evidence indicates that EPA senior management instructed EPA staff to develop a MACT standard for mercury that would result in national emissions of 34 tons annually, instead of basing the standard on what the top performing units were achieving in practice. Also, we determined that EPA's mercury cap-and-trade proposal – a nationwide emissions trading program for an air toxic – can be strengthened to better ensure that human health is protected and anticipated emission reductions achieved, should this approach to reducing mercury emissions be adopted. Further, although EPA rulemaking procedures are not consistently applied, Agency staff told us that they would have expected greater adherence to the guidance for mercury rule development due to the significance of this particular regulatory action, but this did not happen.

We recommend that EPA re-analyze mercury emissions data collected, and conduct a revised cost-benefit analysis for the updated MACT that takes into account the impact of mercury co-benefits achieved through the proposed CAIR. We also recommend that the Agency strengthen its cap-and-trade proposal. Further, we recommend that the Agency conduct an integrated analysis with respect to whether emissions reductions under either of these proposals are the most child-protective, timely, and cost-effective.

The Agency disagreed with certain aspects of our draft report, and offered suggested changes or revisions. The Agency's response did not specifically address our recommendations. We made changes to the final report based on the Agency's comments, as appropriate. See Appendix E for the full text of the Agency's official comments to our draft report and our response to these comments.

# Chapter 2
## Mercury MACT Development Compromised

Evidence indicates that EPA senior management instructed EPA staff to develop a MACT standard for mercury that would result in national emissions of 34 tons annually, instead of basing the standard on an unbiased calculation of what the top performing units were achieving in practice.  The CAA requires that a MACT standard should, at a minimum, be based on the emissions levels achieved by the top performing 12 percent of units, not a targeted national emissions result.  The 34-tons-per-year target was based on the co-benefits expected to be achieved from implementation of NOx and $SO_2$ controls under the proposed CAIR.  EPA noted that this target was based on extensive analysis and, in EPA's judgment, represented the lowest level of mercury emissions that it could reasonably expect the utility industry to achieve.

Because the results of the MACT standard were prescribed and prior estimates were lower than what was proposed, we believe it likely that the standard understates the average amount of mercury emissions reductions achieved by the top performing 12 percent of power units.  Some Agency officials told us that, in their opinion, the true MACT floor would result in lower mercury emissions than the 34 tons estimated from current MACT floor limits.  Therefore, if this proposed MACT standard was adopted, it would not achieve the maximum emission reductions achievable and the associated health benefits.  Further, this MACT standard, as proposed, does not provide a reasonable basis for comparison in determining which of EPA's two proposed regulatory alternatives (i.e., the MACT standard or the mercury cap-and-trade program) provides the better cost-benefit.

## Requirements for MACT Standards

In accordance with the CAA, EPA is to establish MACT standards that require the maximum emissions reductions the Agency believes are achievable for a major source category.  At a minimum, the MACT standard cannot be less stringent than the average emission reductions achieved by the top performing 12 percent of units in a category (e.g., all coal-burning utilities) or subcategory (e.g., utilities burning bituminous coal) for which the Administrator has data.  EPA has wide latitude in the types of emissions data used to determine the MACT floor, including the discretion to select a reasonable method to estimate emissions achieved, and to address variability to account for the most adverse operating conditions reasonably foreseeable.  If EPA decides to set a limit beyond the floor, it must consider the cost of achieving those reductions, any resulting non-air quality and environmental impacts, and energy requirements.

In accordance with a court settlement, EPA had agreed to publish its final mercury rule by December 15, 2004. This date was re-negotiated with the court petitioner and the final rule deadline was extended to March 15, 2005.

## EPA's Process for Addressing Variability in Computation of Mercury MACT Floor

As provided under CAA section 112(d), EPA first determined whether a MACT standard should be developed for all coal-fired units or sub-categories. EPA analyzed the ICR data and identified the top performing units from all units for which emissions data were collected. Evaluation of the ICR data for the top performing units focused on coal type, plant processes, and control technology. EPA could not identify a common attribute that contributed to mercury emission reductions for all of the top performing units that would allow development of a single MACT emissions limit for all units. Additionally, it was determined that no units had installed mercury-specific control technology, although controls installed to reduce emissions of other pollutants also helped reduce mercury emissions. When no single common factor was identified, EPA evaluated the data further and determined that sub-categorization by coal type, which is also a driving factor in plant design, was warranted to establish the MACT. One additional sub-category was established for a particular plant type – Integrated Gasification Combined Cycle – because the plant burns gas from coal rather than any particular type of coal.

For each sub-category, EPA identified the top performing units based on emission tests collected during the ICR. However, EPA determined that these emission tests alone did not sufficiently estimate the effect of fuel variability over time on the emissions of the best performing units. To account for this variability, EPA used coal composition data (i.e., mercury and chlorine content) for coal shipments collected during the ICR to estimate emissions throughout the year for the top performing units in each subcategory. This increased the number of emission points available from which to calculate the MACT limits. [11]

The emission points for each of the top performing units were ranked and then EPA selected one of the highest emissions points (i.e., the 97.5 percentile) for each unit. According to EPA, this emission point reflects the best performance under the worst foreseeable operating conditions for the unit. EPA took the average of these selected emission points for each sub-category and adjusted this

---

[11] Prior court cases have upheld EPA's right to consider variability in developing MACT floors. For a discussion of the appropriateness of EPA's efforts to account for variability, see *Cement Kiln Recycling Coalition v. Envt'l Protection Agency*, 255 F.3d 855 (D.C.Cir. 2001), *examining, Sierra Club v. Envt'l Protection Agency,* 167 F.3d 658 (D.C.Cir.1999) and *National Lime Ass'n v. Envt'l Protection Agency*, 233 F.3d 625, 629 (D.C.Cir.2000) ("National Lime II").

average to further account for variability (i.e., the 97.5 percent upper confidence level of the average). This adjusted average was established as the MACT floor and the proposed standard for each subcategory.

Unlike many previous MACT standards, the proposed utility MACT standard would not require the installation of a specific control technology since no mercury-specific control technology had been installed in utilities. EPA determined that emerging mercury-specific technologies were not yet commercially available for the utility industry. The Government Accountability Office is conducting a study to assess the current state of mercury control technology.

## EPA Staff Instructed to Develop MACT Floor That Would Result in National Emissions of 34 Tons

Evidence indicates that EPA staff were instructed to develop a MACT standard that would result in national emissions of 34 tons per year. Some staff told us that they heard these specific directions and others told us that they heard in different meetings during rule development that the application of the MACT floor to utilities should equal 34 tons per year (a 29-percent reduction from the present 48-tons emitted nationwide). These statements were further corroborated by internal EPA e-mails, which specifically identified 34 tons per year as the number desired despite the fact that prior modeling results did not result in 34 tons. E-mails between EPA staff discussed various MACT emission limits by subcategory and modeling scenarios that could be used to get closer to the 34 tons target. For example, a November 2003 e-mail stated that:

> If the 14+K of subbit ACI is using the 90% option and we restrict this to 60%, perhaps we can get in the 34 tpy range. I don't think that restriction would be considered inappropriate for a 2007 MACT analysis.

EPA documents and an analysis of the process used to compute the MACT floor support EPA staff's statements that the MACT floor computations were developed to produce the desired national emissions of 34 tons per year. Documentation that we reviewed indicated that EPA conducted at least three Integrated Planning Model (IPM)[12] runs in order to reach the pre-determined target for national mercury emissions of 34 tons. The initial IPM run to try to reach the 34-tons target yielded a national emission of 29 tons (i.e., the IPM model indicated that mercury could be reduced from 48 tons to 29 tons). After changing the proposed MACT emission limits, a second IPM model yielded a

---

[12] EPA uses ICF Resources Incorporated's Integrated Planning Model for air emission modeling. The model projects what decisions utilities would make for meeting air emission regulations based on economic considerations.

national emission of 27 tons. While we were provided summary information about these two IPM model runs, they were not included in the EPA rulemaking docket.

An Agency source indicated that these results were not acceptable to senior management because they were not close enough to the 34-tons target. A third run performed, based on the proposed emission limits, showed 31 tons. EPA cited the 31-tons model results in the proposed rule, but explained in the preamble that 34 tons is the more probable emissions level because the model used to estimate emissions was underestimating the amount of mercury emissions that would occur. EPA noted that the IPM model may have understated mercury emissions by 2.3 tons for units burning bituminous coal.[13] Table 2-1 depicts the emission limits used in the three IPM runs and the resulting total national emissions:

**Table 2-1: Results of Proposed MACT Scenarios to Reach 34 Tons**

| Coal type | Run #1 | Run #2 | Run #3 (Proposal) |
|---|---|---|---|
| Bituminous | 0.57 * | 1.4 * | 1.9679 * |
| Sub-bituminous | 6.46 * | 5.06 * | 5.8 * |
| Lignite | 18.45 * | 19.48 * | 9.2 * |
| Total National Mercury Emissions (tons-per-year) | 29-30 ** | 27.2-27.9** | 30-31** |

\*　Proposed per unit mercury emission standard expressed in pounds per trillion British thermal units (lb/TBtu).

\*\*　Estimated tons of national mercury emission resulting from modeling the application of the unit emission standard to all utility units.

The emission limits shown in Run #3 above, ultimately proposed as the MACT standard, were based on a multi-variability analysis submitted by WEST Associates (a western utility consortium).[14] However, EPA adjusted this approach, increasing the MACT floor emission limits for two of the three subcategories beyond those derived by WEST Associates. For example, WEST Associates used an upper confidence level of 95 percent of the mean of the best performing units to account for variability. EPA adjusted the confidence level to

---

[13] The IPM model only allows Activated Carbon Injection technology, a mercury specific control technology, to reduce mercury emissions at 60% and 90% levels. The inability of the model to address the full range of reductions between these two levels means that the model may have understated mercury emissions by as much as 2.3 tons for bituminous-fired units.

[14] The analysis was submitted during the last Federal Advisory Committee Act meeting, convened in March 2003.

14

97.5 percent, which resulted in an increase in the emission limit for two of the three sub-categories. According to EPA's variability analysis, this adjustment was made to account for EPA's interpretation of the number of units that should be included in the MACT floor analysis.[15] These adjustments increased the MACT floor closer to a national emission level of 34 tons per year.

### Relationship of the 34-Ton Estimate to Cap-and-Trade Proposals

The 34-tons-per-year target is important because it is based on mercury emission modeling results used in two separately proposed cap-and-trade programs for utilities – CAIR and the mercury cap-and-trade program – proposed as alternatives to the mercury MACT. EPA has stated its intent to implement its multi-pollutant (mercury, $SO_2$, and NOx) cap-and-trade programs, originally included in stalled Clear Skies legislation, through the proposed CAIR and mercury regulations.

EPA has also proposed that the mercury reductions gained from implementing CAIR should serve as the interim cap on mercury emissions in the mercury cap-and-trade program. According to the preamble to the mercury rule, the reason for basing the interim cap on the co-benefits from CAIR is that the Agency does not believe mercury control technology that has been demonstrated for all coal types is commercially available. In addition, Agency officials stated that the 34-tons-per-year target was based on the co-benefits expected to be achieved from implementation of NOx and $SO_2$ controls under the proposed CAIR. They noted that this target was based on extensive analysis and, in EPA's judgment, represents the lowest level of mercury emissions that they could reasonably expect this industry to achieve by 2010.

### Additional Estimates of Mercury Emissions

Interviews with sources both inside and outside the Agency suggest that if unbiased analyses of data were conducted, a range of possible MACT floor levels would most likely result. One EPA official stated that the true range of possible MACT floors was probably as low as 8 to 10 tons per year up to the mid-20s, but that either end of that range would be a stretch. Further, the source stated that the real range is about 15 tons per year to the low 20s for this MACT, and that anything above or below those numbers was a stretch. This includes the 34 tons proposed by the Agency. These statements about the possible range of MACT floors are supported by results of different MACT floor limits and/or varying model assumptions used by some organizations providing comments to the

---

[15] For example, West Associates used 5 units for each sub-category, while EPA used 4 units for the bituminous and sub-bituminous sub-categories and 5 units for lignite sub-category.

proposed rule. For example, the Clean Air Task Force evaluated the ICR data to develop MACT floor limits that were different than those developed by EPA. Applying these limits to the same IPM model used by EPA resulted in national mercury emissions of 12 tons[16] (i.e., a 75-percent reduction from 48 tons). Modeling by the Electric Power Research Institute and Edison Electric Institute used the MACT floor limits proposed in the rule and showed an estimated 32 tons of mercury emissions nationwide (i.e., a 33-percent reduction from 48 tons). Examples of varying modeling efforts and results can be found in Appendix C.

## Conclusions

EPA's current estimate of the amount of mercury emissions occurring after implementing $SO_2$ and NOx controls, called for in EPA's CAIR, is 34 tons. Given (1) that EPA is attempting to implement the Clear Skies multi-pollutant approach through regulation; (2) the numerous modeling runs conducted to determine national emission resulting from different MACT emission limits; (3) the adjustments made in the accounting for variability; (4) the statements of EPA officials involved in the rulemaking process; and (5) EPA e-mails reviewed, we believe EPA's approach for developing the MACT floor was compromised. Further, it is unlikely that an unbiased calculation of the MACT floor would produce emission limits that would result in estimated national mercury emissions of 34 tons per year (i.e., EPA's current estimate of the co-benefit of $SO_2$ and NOx proposed regulations).

## Recommendations

We recommend that the Assistant Administrator for Air and Radiation:

2-1    Conduct an unbiased analysis of the mercury emissions data to establish a MACT floor in accordance with the requirements of CAA section 112(d).

2-2    Re-negotiate with the court petitioner for an extension of the final rulemaking deadline sufficient to solicit and accept public comments on the unbiased analysis of mercury emissions data in an open, public, and transparent manner.

## Agency Comments and OIG Evaluation

The Agency commented that the draft report incorrectly characterized the calculation of the MACT standard, and that the Agency had calculated the MACT

---

[16] The Clean Air Task Force considered the effect of implementing the proposed CAIR rule on the mercury MACT. EPA did not consider the impact of implementing CAIR in its MACT modeling efforts. More information on this issue is found in Chapter 4 of this report.

floor in accordance with the requirements of CAA section 112(d).  The Agency also maintained that its extensive work, including development of the proposed Clear Skies legislation, showed that, in the absence of immediately available mercury control technology, the mercury reductions as co-benefits of $SO_2$ and NOx controls represent the lowest level of mercury emissions that the Agency reasonably expects could be achieved.  We believe our report accurately characterized the MACT development process.  Our observations were based on review of supporting documentation related to MACT development, and interviews with Agency staff and stakeholders involved in the process, including State and local, environmental, and industry groups.  Although the MACT floor was ostensibly based on data from the top performing 12 percent of units, this data was analyzed with a final target already in mind, i.e., 34 tons.  While the Agency has conducted analysis to determine the co-benefit of $SO_2$ and NOx controls, we do not believe this meets the requirements of CAA section 112(d) in developing the MACT standard.  The Agency's complete response to the draft report and our evaluation of its response are in Appendix E.

# Chapter 3
## Cap-and-Trade Option Can Be Strengthened

EPA's mercury cap-and-trade proposal – a nationwide emissions trading program for an air toxic – can be strengthened to better ensure that human health is protected and that anticipated emission reductions are achieved, should this approach to reducing mercury emissions be adopted.  The cap-and-trade proposal could be strengthened by:

- Adequately addressing the potential for hot spots.
- Establishing an interim cap that would provide greater incentive for utilities to install mercury-specific control technology by 2010.
- Setting a reasonable safety valve provision.
- Clarifying conditions pertaining to exemptions for small emitting facilities.

These changes could help ensure that the proposed mercury cap-and-trade program obtains the desired emissions reductions in a timely manner.

## EPA's Proposed Cap-and-Trade Approach

A cap-and-trade program could provide several benefits in terms of controlling emissions.  Trading programs generally provide regulated units with more flexibility to meet overall emissions reductions than do conventional command-and-control approaches because a unit may apply whichever control method it finds to be most appropriate and cost-effective to meet emission limits.  This flexibility serves to minimize overall control costs in the market.  Furthermore, cap-and-trade programs can provide greater environmental certainty by establishing fixed national emissions caps that cannot be exceeded.  However, a cap-and-trade program's environmental benefits will depend on the adequacy of the cap.

Under EPA's proposed mercury emissions trading program, units that cannot cost-effectively reduce emissions through controls may buy allowances from units that were able to reduce emissions beyond their established allowance limits and are willing to sell their extra allowances.  Each unit is required to possess one emissions allowance per each ounce of mercury it emits. Units would be allowed to buy and sell credits among one another in a national emissions market.  EPA's proposed cap-and-trade alternative proposes that the interim mercury emissions cap for 2010 be based on the amount of mercury reductions achieved solely as a co-benefit through implementation of $SO_2$ and NOx controls under the proposed CAIR.  As noted in Chapter 2, EPA's latest estimate of the mercury benefit from implementing CAIR is 34 tons per year.  The cap-and-trade proposal sets a final cap of 15 tons per year in 2018.

18

# Proposed Cap-and Trade Program Needs to Further Address Certain Issues

The proposed cap-and-trade rule for mercury meets the three basic guiding principles of trading programs as defined by EPA: a cap on emissions, accountability, and simplicity of design and implementation.  However, we identified four issues with EPA's mercury cap-and-trade proposal that need to be further addressed.  Details follow on each issue.

### Interim Cap Could Be Tightened to Force Earlier Development of Mercury-Specific Control Technology

Although EPA has not yet set a specific interim cap for 2010, the preamble to the proposed rule states that the interim cap will be based solely on the mercury emissions reductions achieved as co-benefits of regulating $SO_2$ and NOx under CAIR, estimated by EPA to be 34 tons.  Thus, it would not be necessary for units to install mercury-specific controls in order to meet the 2010 interim cap, and this would limit the effectiveness of the regulation to force new technological advances in mercury control.  If the interim cap under this proposal is set at 34 tons, utilities could delay consideration of  installing new mercury-specific technology until meeting the more stringent cap in 2018 is imminent.  However, according to EPA officials, if the banking provision of the cap-and-trade program operates as intended, some facilities would have the incentive to implement mercury-specific controls before 2018, which would reduce emissions beyond the interim cap level before the final cap becomes effective.  EPA officials also pointed out that experience under other cap-and-trade programs has shown that the largest emitters are typically the first to reduce emissions and will generally achieve the greatest level of reductions.  According to the preamble, the reason for basing the interim cap solely on the co-benefits from CAIR is that EPA does not believe mercury control technology that has been demonstrated for all coal types is commercially available.

Further, the proposed rule does not address what would happen under the cap-and-trade approach if CAIR is not implemented.  Given that the 2010 cap is based solely on the co-benefits from CAIR, it is unclear what would occur under the proposed rule if CAIR is not implemented.

An EPA official stated that although some EPA staff indicated they would like to see analyses on different cap levels for comparison purposes, no such formal analyses were conducted.  EPA conducted one IPM run based on an interim cap of 34 tons and a final cap of 15 tons (in conjunction with CAIR), but no runs were conducted using alternative caps for comparison.  Clear Skies analyses were made available in the proposed mercury rule docket, and according to an EPA official the mercury cap-and-trade IPM run is comparable to the Clear Skies IPM runs.  According to this EPA official, one such run of Clear Skies had a different interim

19

cap (26 tons) and this run, while not exactly matching the modeling conducted for the proposed mercury cap-and-trade program, provides an idea about the costs of an alternative mercury cap.

### Potential for Hot Spots Not Fully Analyzed

EPA did not fully analyze the potential for hot spots (i.e., areas of elevated pollutant concentrations) to occur under its proposed cap-and-trade option. The potential for hot spot formation under the proposed cap-and-trade rule has generated a great deal of concern and debate among various stakeholders. Modeling and projecting the likelihood of hot spots under the proposed rule is made difficult by the relatively high degree of uncertainty involved with mercury transport and deposition patterns (i.e., when the airborne mercury is deposited onto the ground or into water bodies), particularly local or near-field deposition.

Further complicating efforts to use computer models to determine where mercury deposition will occur is the fact that three different chemical forms of mercury are emitted by utility units and each has varying deposition patterns. For example, oxidized and particulate mercury are more likely to deposit locally or regionally, while elemental mercury travels and is more global in nature. Although air emission-related hot spots are generally thought of in terms of high ambient air concentrations near a source, this is not the only consideration with mercury. The main health risk associated with mercury is not its ambient concentrations, but rather its deposition into water bodies and resulting bioaccumulation in fish. However, the connection between air emissions and levels of mercury ultimately found in fish tissue is not yet fully understood.

EPA's Clean Air Markets Division conducted a Proximity Analysis to determine "where, in relation to water bodies, emissions would occur" under the mercury emissions trading provision of the Clean Air Interstate Rule. However, as noted in the analysis, the issue of hot spots was not fully analyzed:

> *This examination of projected mercury emissions has significant limitations and does not constitute an analysis of "hotspots." Such an analysis of hotspots would, in part, necessitate detailed assessments of the atmospheric fate, transport, and deposition of mercury from power generating sources, and assessments of the potential population exposure to mercury contaminated fish in water bodies due to generating and other sources.*

Although EPA did not conduct the detailed assessment of hot spots described above, EPA stated in the preamble to the proposed rule that it does not expect hot spots to occur for several reasons, as follows:

- Modeling suggests that the largest emitters, which are more likely to produce local deposition, will be the first to implement control technology under a cap-and-trade approach and will reduce emissions by the largest amount.

- CAIR would result in implementation of control technologies for $SO_2$ and NOx that also provide the co-benefit of reducing emissions of the types of mercury (oxidized and particulate) that are likely to deposit locally.

- The Acid Rain program has not resulted in the formation of hot spots.

- States have "the ability to address local health-based concerns separate from the mercury cap-and-trade program requirements," and under the proposed State-administered program would "retain the power . . . to adopt stricter regulations to address local hot spots or other problems."

- The proposed final cap would be a 70-percent reduction in mercury emissions from current uncontrolled levels (from 48 to 15 tons).

However, potential problems arise with EPA's reasoning. For example, the Acid Rain program controls for $SO_2$ emissions, which are primarily deposited regionally and globally, not locally, while mercury can deposit locally as well as regionally and globally. Trading programs are generally thought to be most effective for pollutants that do not deposit locally. Further, the Acid Rain program co-exists with the National Ambient Air Quality Standards program, which has established a minimum level of air quality for $SO_2$, while no such minimum standards exist as a back-stop in the mercury cap-and-trade proposal. In addition, the Acid Rain program contains a provision stipulating that, in the case of delayed implementation due to litigation, a more conventional command-and-control approach would take effect, but the proposed cap-and-trade rule for mercury lacks a similar provision.

While the preamble to the proposed rule notes that individual States have the authority under section 111 to adopt stricter regulations than those set by EPA, it does not address whether States would have this same authority under a section 112 cap-and-trade program. Further, approximately one-third of States have laws limiting "the ability of their regulatory agencies to adopt regulations that are more stringent than any federal environmental regulation." Thus, these States may not be able to adequately address hot spots, should they arise.

EPA has recognized that additional information is needed to better understand and address potential hot spots. For example, in the preamble to the proposed rule, EPA states its intent to reassess the hot spot issue by taking a ". . . hard look at the Hg emissions inventory after full implementation of the first phase cap. . . ," and also requested comments on how it might address hot spots in a cap-and-trade program. In addition, EPA suggested the use of trading ratios between regions as

a way to address potential regional deposition differences. The Agency also requested site-specific data on areas where commenters believe hot spots would continue to exist if a cap-and-trade program were implemented.

Due to time constraints, the OIG did not fully evaluate potential environmental justice implications resulting from a cap-and-trade program, nor did we fully assess the extent of the Agency's analysis of these issues.

### Safety Valve Provision May Not Encourage Reductions

The proposed safety valve price may be set too low to achieve the intended effect of reducing mercury emissions through the installation of control technology and the open-market trading of emission allowances. The safety valve provision in the proposed cap-and-trade mercury rule provides a price cap on the cost of emissions reductions, and was included in the proposed rule due to uncertainties associated with future costs and the availability of mercury control technologies. Under the safety valve provisions of the proposed rule, if the price of allowances reaches a certain level, units will be permitted to borrow allowances from the future for a fixed price. To help ensure that the overall cap on emissions is met over the long-term, units can borrow only from their own bank of future allowances. The provision is intended to "minimize unanticipated market volatility" and ensure that "the cost of control does not exceed a certain level." Thus, in effect, units may emit more in the current period, but would be forced to emit less in the future because they are using future allowances. However, we identified two concerns with the proposed safety valve provisions.

*Safety Valve Price.* For a safety valve provision to be used appropriately (that is, only when market volatility makes it necessary), the price should be set so that it is higher than the market price of allowances or the actual cost of abatement (emission reduction). If this price is too low, it may be cheaper for the unit operator to purchase future emissions allowance at the safety valve price rather than installing emission controls. Under the proposed rule, the safety valve price is set at $35,000 per pound, or $2,187.50 per ounce, adjusted annually for inflation. This figure was decided upon during development of the Clear Skies Initiative, but new analyses have estimated that the actual cost of abatement will be substantially higher than $35,000 per pound.

Although EPA stated in one of the rule's supporting documents that, "based on current technological capabilities, the cost of mercury removal is expected to reach the safety valve price ($35,000/lb) by 2010," it further stated that "technological improvements could decrease the cost of mercury control over time and cause prices to remain below safety valve levels." Staff within EPA indicated that the current safety valve price of $35,000 was too low based on new analyses. For example, 2003 and 2004 Department of Energy estimates show the "baseline costs" of mercury removal to be $50,000 - $75,000 per pound, with cost

22

reductions expected over time.  However, senior EPA officials told us that they did not believe the safety valve price would be reached because they expect the cost of activated carbon injection, a mercury-specific control technology, to decrease over time.  According to these officials, the IPM does not account for this variable and may be misleading since it shows the cost of activated carbon injection remaining constant over time.

***Safety Valve Borrowing.***  The proposed rule stated that units may purchase safety valve allowances from "following years," and the supplemental notice stated they may be purchased from allowances available for allocation in the next control period.  The supplemental notice also provided an example of how a State could incorporate the safety valve provision into its cap-and-trade program.  However, the proposed safety valve provision does not place a limit on the number of allowances a unit can borrow under this provision.  As the Clean Air Task Force writes in its comments, a unit could, theoretically, continue borrowing indefinitely from future years by buying safety valve allowances in lieu of installing controls or buying allowances on the open market.  Such an approach would make economic sense as long as the proposed safety valve price was set lower than the baseline cost of controls.  In the proposed rule, EPA acknowledges that its "proposed approach may create implementation problems associated with the need to 'reconcile' at some point in time the allowances borrowed from future compliance periods," and requests comment on the issue.

### Small Emitters Exemption Needs To Be Clarified

EPA has proposed that utility units emitting less than 25 pounds of mercury per year be exempt from the cap-and-trade program, but has not completely addressed how their exemption and the national emission cap will be impacted if their emissions increase.  EPA included this exemption because of concerns that new mercury-specific control technologies expected to be developed may not practicably apply to these units.  Based on EPA data developed for units operational in 1999, 396 of the 1,120 units operational in 1999 were estimated to have emitted less than 25 pounds of mercury per year each.  These 396 units made up 35.4 percent of the total operating units, but contributed only 3,742 of the 95,975 pounds of estimated mercury emissions, or 3.9 percent in 1999.  According to the proposed rule's preamble, EPA states there is reason to believe that the 15-tons Phase II cap can be achieved in a cost effective manner, even if the lowest emitting 396 units are excluded from coverage under this cap.  EPA is soliciting comment on this proposal.

One commenter noted that both capacity utilization and emission rate increases could occur in small emitting sources after they have been exempted from cap-and-trade requirements.  EPA does not address this issue in the proposed rule.  Another commenter stated that EPA had done no analysis of the small emitter exemption with respect to either costs or impacts.  According to this commenter, a

vast majority of the units emitting less than 25 pounds of mercury are part of a multi-boiler facility, and it is entirely likely that at some facilities all of the boilers are tied into common duct work for pollution control. Consequently, these units should be considered as one unit emitting over 25 pounds and not eligible for the exemption.

While we did not fully assess the impact of this, we believe the commenters have raised valid concerns. Further, we noted that the relative significance of these small emitters increases as the cap-and-trade program progresses. For example, in 2018, these emitters, based on their 1999 emissions, would represent 12.5 percent of the total 15 tons in emissions allowed under the final cap. If EPA moves forward with its cap-and-trade proposal, the Agency can better ensure that anticipated emission reductions are achieved if it clearly addresses the circumstances under which small emitters would have to participate in the cap-and-trade program.

## Proposed Emissions Trading Rule Should Also Address Tribal Concerns

Although Executive Order 13175 requires EPA to develop an "accountable process to ensure meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications,"[17] tribal concerns were not addressed during development of the proposed cap-and-trade rule. In the preamble, EPA states that the proposed rule may have tribal implications because two coal-fired utility units are located in Indian Country. Representatives from the National Tribal Environmental Council (NTEC) informed us that neither they nor their approximately 180 member tribes had any involvement in the development of the proposed mercury rule. This was confirmed by an EPA official at a March 2004 public meeting on the proposed mercury rule.

Among NTEC's greatest concerns over the proposed mercury rule are:

- the absence of tribal involvement and/or consultation in the development of the proposal;
- a failure to adequately monitor mercury deposition on tribal lands, which means that the impact of mercury is unknown; and
- lack of consideration for American Indians and Alaska Natives' dependence upon fish and the terrestrial animals that feed on those local fish.

The average tribal member and child eats much more fish than the typical consumer and the representatives explained that tribes (especially children and the expanding youth population) are faced with increased adverse health effects

---

[17] Consultation and Coordination with Indian Tribal Governments (65 FR 67249, November 6, 2000).

caused by such exposure.

NTEC does not support the cap-and-trade program and noted that, if the program is implemented, there is no mechanism currently in place for the tribes to enter into cap-and-trade allowance sales. In fact, allowances are only available to the States. NTEC cited the U.S. Government's trust responsibility, which includes looking after the health and survival of tribes. This responsibility is met in part by conducting tribal consultation on a government-to-government basis.

EPA officials noted that other organizations, including States, were not consulted during the development of the cap-and-trade proposal. Although States were not consulted, we noted that States were allotted mercury allowances while the Tribes were not.

## Conclusions

The cap-and-trade proposal can be strengthened to better ensure that the anticipated emission reductions are achieved, should this approach be adopted by EPA. First, the interim cap suggested under the current proposal is set at a level that could be met without installing mercury-specific control technology, thus potentially delaying installation of mercury-specific controls until 2018. Also, the cap-and-trade option has not adequately addressed the potential for hot spots. In addition, EPA needs to ensure that it establishes a safety valve provision that will have the intended effect of encouraging unit operators to install controls or buy emission credits. Further, EPA needs to ensure adequate tribal involvement for the proposed mercury rule to ensure that tribes are not negatively impacted by a cap-and-trade rule.

## Recommendations

We recommend that the Assistant Administrator for Air and Radiation:

3-1    Re-assess the basis for the interim and final caps. This analysis should consider the results of the re-assessed MACT floor (see Recommendation 2-1).

3-2    Further assess the risk of hot spots and, if CAA section 112 residual risk requirements are not implemented, then section 111 cap-and-trade regulations should specifically identify how EPA will meet its intention to reassess the hot spots issue.

3-3    Strengthen the safety valve provision so that the safety valve price is set at a level whereby it is only used for its intended purpose of minimizing unanticipated market volatility. Alternatively, EPA may stipulate other

controls over borrowing from future allowances, such as imposing a greater than 1:1 allowance trading ratio; and allowances borrowed from the future will be reconciled to ensure that facilities cannot borrow indefinitely into the future.

3-4    Reassess the necessity of a small emitter exemption, and if a decision is made to exempt, explain in sufficient detail the reasoning for such a provision and establish how small emitters will be handled within the cap-and-trade program should they exceed emissions of 25 pounds a year.

3-5    Address tribal issues by: developing a mercury emissions consultation strategy with tribes, with the assistance of tribal representatives, that will ensure the Agency fulfills its trust responsibility and conducts proper government-to-government consultation with tribes; and establishing a mechanism for coal-fired utilities located on tribal lands to participate in the cap-and-trade approach.

## Agency Comments and OIG Evaluation

The Agency's comments expressed a concern that the report does not "comprehensively and accurately describe" how the proposed cap-and-trade approach would work. The Agency also expressed concern that we did not highlight the knowledge EPA has gained from modeling and past experience with cap-and-trade programs. We believe our draft report portrayed an accurate representation of how the proposed mercury cap-and-trade program would work. One of the objectives of our review was to evaluate whether the proposed cap and trade rule was sufficiently protective of public health. As a result, we highlighted certain concerns with the rule as proposed. We made revisions, where appropriate, based on technical comments made by Agency staff and officials. However, there are several important differences between the Acid Rain program, to which the Agency often refers when discussing past cap-and-trade experience, and the proposed mercury cap-and-trade program. The Agency's complete response to the draft report and our evaluation of its response are in Appendix E.

# Chapter 4
## Rule Development Process Not Consistent with Expected and Past Practices

Although EPA rulemaking procedures are not always applied consistently, many Agency staff told us that they would have expected greater adherence to the guidance for mercury rule development due to the significance of this particular regulatory action, but this did not happen. When the Clear Skies legislation stalled, EPA decided to address the Clear Skies program in a regulatory manner instead. This led to EPA including a mercury cap-and-trade option, similar to Clear Skies, in its proposed mercury rule. As focus on the cap-and-trade approach increased, EPA began to de-emphasize the mercury MACT development process. This included:

• Cancelling the next scheduled Federal Advisory Committee Act (FACA) meeting and ending communication with FACA members.
• Abridging the normal intra-agency review process, particularly at the staff level.
• Failing to fully address the cost-benefit of MACT alternatives and not analyzing the potential impact of implementing CAIR on the proposed MACT option.
• Not fully analyzing the impact of the proposed mercury cap-and-trade program on children's health.

## Description of Rulemaking Process

*EPA's Action Development Process: Guidance for EPA staff on Developing Quality Actions* outlines steps EPA staff and management are to follow when developing Agency actions, such as rules, policy statements, and statutorily mandated reports to Congress. The guidance suggests that EPA staff follow a prescribed set of steps beginning with tiering the action based on several of its characteristics. Once tiered, a standard process exists for developing the proposed action. As a Tier One action, the proposed mercury utility rule was considered a top action that would ". . . demand the ongoing involvement of the Administrator's office and extensive cross-Agency involvement on the part of the AAs/RAs (Assistant Administrators and Regional Administrators)."

The Action Development Process guidance contains five key elements, which are summarized below. These include steps for:

• planning sound scientific and economic analysis;

27

- developing and selecting regulatory options based on relevant scientific, economic, and policy analyses;
- involving affected Headquarters and Regional managers early and continuing involvement until the final action is completed;
- ensuring active and appropriate cross-Agency participation; and
- encouraging appropriate and meaningful consultation with stakeholders through substantive consultative procedures.

Appendix D describes the rule development process in detail.

## Some FACA Members Considered Job Unfinished

Within EPA, the creation of an advisory committee is not required for MACT rule developments, but such groups have been formed to advise the Agency in past MACT rulemakings and can provide a means of substantive consultation with stakeholders. An EPA official noted that for contentious rulemakings where a great deal of stakeholder involvement and public comment is anticipated, such as the mercury rule, it is not uncommon for an advisory committee to be formed. FACA allows for the creation of committees, boards, commissions, councils, and similar groups to furnish expert advice, ideas, and diverse opinions to officers and agencies in the executive branch of the Federal Government. The Act notes that the function of committees is advisory only, and decisions on how the advice will be used is determined by the official, agency, or officer involved.

The FACA working group for this rulemaking, known as the Utility MACT working group, was formed within the Permits/New Source Review Air Toxics Subcommittee of the larger Clean Air Act Advisory Committee. Working group members consisted of representatives from State and local agencies; environmental organizations; industry; control equipment vendors; and coal interests, producers, and unions. Both co-chairs of the group indicated that they believed the working group had balanced stakeholder representation.[18] The working group was formed for an initial period of 1 year and met approximately once per month starting August 2001.

The working group was charged with providing input for the development of a MACT standard for utilities. In a presentation given to the group by the EPA co-chair, the group was instructed that they were not to reconsider the Agency's prior finding that regulation of coal-fired electric steam generating units under section 112 of the CAA was necessary and appropriate, nor were they to consider a cap-and-trade option. Although a cap-and-trade option was introduced in Congress in July 2002 in the Clear Skies legislation, this option was not considered by the working group.

---

[18] Although the working group did not include tribal representation, EPA solicited their participation.

In October 2002, the working group issued its final report, *Recommendations for the Utility Air Toxics MACT: Final Working Group Report,* in which it identified issues that "EPA must consider and resolve in its drafting of the utility MACT." Some of the issues identified included:

- sub-categories;
- floor levels;
- beyond-the-floor levels of mercury;
- compliance method (monitoring); and
- compliance time.

The working group decided early that consensus among its various stakeholder groups was unlikely, and did not attempt to reach agreement on specific recommendations it could make to the Agency. Instead, the report presented the opinions of all the stakeholders on the issues.

Though the working group issued the final report in October 2002, it held another meeting on March 4, 2003, just after Clear Skies legislation was re-proposed in February. Certain members of the working group had requested that EPA conduct additional analyses using the IPM to further explore the cost-benefit of different MACT proposals as presented by the working group members. Members of the working group did not have direct access to the IPM, as EPA contracts for its use through a third party, and thus requested that EPA have the additional analyses run and then provide the group with the results. According to several members of the working group we contacted, it was expected that the working group would receive the results of the additionally requested IPM runs at the March 4 meeting, but were instead told the runs were not yet complete. Another meeting was scheduled for April 15, 2003, to provide the results of the IPM runs, but members were notified by EPA of its cancellation via e-mail on April 1.

In July 2003, Administrator Whitman responded to Congressman Waxman's request for the status of IPM runs for the working group. The Administrator stated that it was the Agency's intention to convene an additional FACA meeting when the IPM analyses were complete. However, in March 2004, the Assistant Administrator for Air and Radiation said the Agency would not provide the additional MACT IPM analyses and would instead focus resources on developing a cap-and-trade alternative, the administration's preferred regulatory approach.

The working group has not met since its last meeting in March 2003 and has not been officially contacted by the Agency since its planned April 15, 2003, meeting was cancelled. A formal notice of termination has not been issued to the working group and, according to some members, they were not given an explanation as to why the working group ended. EPA has stated on its web site that it began proceeding with a cap-and-trade regulatory approach in the absence of Congressional action on Clear Skies legislation. The FACA working group's

29

deliberations were stopped after Clear Skies was re-proposed and before EPA began developing its proposed cap-and-trade regulation. While some working group members indicated satisfaction with the work completed by the group, others considered the job unfinished due to the lack of opportunity to consider the additionally requested runs.

According to senior EPA officials, the working group's original charter was for only one year. One of the officials acknowledged that EPA had initially intended to conduct the runs requested by the working group but later decided that it would not be beneficial. These officials further indicated that since the working group had not reached consensus, the Agency did not believe the working group should have been extended.

## Intra-Agency Review Limited

According to staff involved, the intra-agency work group review process followed in this rulemaking varied significantly from past Agency practice and applicable guidance for Tier One rules in that the group only met two times and was not given an opportunity to provide meaningful feedback on the proposed rule. According to the Agency's regulatory development guidance, a work group is to meet frequently enough to ensure that all significant issues and options are discussed and agreed upon. Then, the significant issues and several options to resolve each issue are to be provided to senior management. Senior management then selects those options they believe will best achieve the goals of the action for a Final Agency Review.

The work group's first meeting was held on February 27, 2003, and the second and final meeting took place on August 7, 2004. In preparation for the first meeting, the work group chair e-mailed to the work group members a copy of the Utility MACT FACA working group's final report, along with a draft analytical blueprint for the rulemaking. According to EPA's Action Development Plan, an analytical blueprint is "a document that spells out a work group's plans for data collection and analyses that will support development of a specific action," and is intended to be developed as "a collaborative effort." The draft blueprint stated, "the intent of the rule is to require that oil-and-coal-fired units achieve a MACT-level of control," and it listed the "minimum analytical needs" for the rulemaking:

- A regulatory impact analysis, assessing the economic impact on industry of levels beyond the MACT floor.
- Assessment of multi-pathway concerns.
- A regulatory flexibility analysis addressing small business concerns.
- Assessment of environmental justice concerns.
- Children's health concerns.
- Unfunded mandate assessment, evaluating the impact of the rulemaking on State/local/tribal governments, some of which own or operate coal-fired units.

- ICR issues.

Although the above issues were identified for study in the draft analytical blueprint, some were never fully addressed, such as the children's health study and an assessment of environmental justice concerns. The draft blueprint also stated that:

> ". . . the EPA believes that emissions trading is prohibited under Section 112 of the CAA. However, industry, and to a more limited extent, some other stakeholders would like to explore emissions trading as an option (perhaps in beyond-the-floor analyses) for this rulemaking."

Members of the work group, including the Office of Research and Development and the Office of Policy, Economics, and Innovation, submitted comments to the draft analytical blueprint via e-mail to the work group chair. But work group participants we interviewed stated that they received no feedback or modified drafts of any work products based on their comments and input.

In preparation for the second intra-agency workgroup meeting, members were asked to review and comment on four sections (approximately 42 pages) of an early version of the draft (July 3, 2003) preamble. However, intra-agency workgroup members received no modified work products that incorporated their feedback. Additionally, no Final Agency Review meeting was held for the proposed mercury rule whereby core intra-agency review participants had the opportunity to concur or nonconcur with the proposed rule before it was sent to OMB for review and final action.

Several EPA staff who were involved in the abbreviated intra-agency work group review process told the OIG that it was made clear to them by their managers, and in the case of one work group representative, by the work group chair, that decisions about this rule were being made at a "higher level." For example, in an e-mail discussing intra-agency comments, a member of the work group was told:

> The decision was made at a much higher level than mine to "bypass" the normal EPA Work Group procedure prior to the proposal and we have been told that all the Office directors were contacted about both the process change and rulemaking.

Similarly, these officials told us that it became clear to members that their feedback would not likely be considered. One Agency source said that, in general, there was not a meaningful opportunity for EPA offices to comment on this rule. Some Agency officials said they considered the intra-agency review process to have been conducted, but at a higher staff level and with less input than usual from lower staff levels. However, at least one office usually involved in the intra-agency review process – the Office of Enforcement and Compliance

31

Assurance – was neither given the opportunity to review nor submit comments regarding the proposed rule before it was sent to OMB, according to former and current Office of Enforcement and Compliance Assurance officials contacted.

According to senior EPA officials it is not unusual during the development of high-profile rules, particularly those under a tight deadline, for EPA to not strictly follow the Agency's prescribed rulemaking process.

## Requirements for Cost-Benefit Analyses Not Fully Implemented

Although EPA conducted certain required analyses, other analyses were not completed. For rulemakings with an annual economic impact of $100 million or more, Executive Order 12866[19] requires that Federal agencies, in deciding whether or how to regulate, assess all costs and benefits of available regulatory alternatives and provide the reasoning for selecting the proposed regulatory action over such alternatives. This Executive Order also directs that Federal agencies base their decisions on the best reasonably obtainable scientific, technical, and economic information concerning the need for, and consequences of, the intended regulation.

EPA staff told OIG that senior management instructed them not to undertake certain scientific and technical analyses that they thought necessary. For example, staff were instructed during meetings not to conduct IPM runs (which could have been helpful in considering alternatives) until they were told the national mercury emissions per year desired for the MACT. As discussed in Chapter 2, EPA conducted analyses of various MACT floor levels, but presented only a 34-tons-per-year option to the public. In addition, the Agency did not fully analyze a beyond-the-floor MACT alternative.

EPA's cost-benefit analysis of the MACT proposal did not take into account mercury emissions reductions that would be gained as co-benefits resulting from NOx and $SO_2$ controls installed under the proposed CAIR. However, the Agency's cost-benefit analysis of the cap-and-trade option did consider CAIR co-benefits. This prevents a balanced comparison of the two options. EPA staff told us that a MACT-plus-CAIR alternative was not analyzed because, when the MACT floor was completed, CAIR had not yet been proposed. However, EPA issued a December 2004 Notice of Data Availability for the proposed rule, which included an analysis submitted by the Clean Air Task Force that estimates the impact (in terms of emission reductions) of CAIR in conjunction with the proposed MACT standard. The notice did not include a similar analysis by EPA.

The Agency did not monetize the health benefits of mercury reductions, though

---

[19] Regulatory Planning and Review, 58 FR 51735, October 4, 1993.

Office of Air and Radiation staff have said the final rule will include quantitative, non-monetized endpoints as well as a qualitative discussion. EPA staff told us that they have ongoing efforts to develop a benefits analysis, but that it is slow moving and has not been completed. Since March 2004, when the Administrator stated the Agency would take a closer look at the issue, there has been a process to try and do a full benefits analysis, but the process is moving slowly. While a benefits analysis should be based on scientific literature, staff told us that there had been pressure to base the analysis on public comment through the Notice of Data Availability. The notice presents a methodology for determining the benefit of mercury reductions and requests comment on this methodology.

## Required Children's Health Analysis Not Comprehensive

EPA did not adequately evaluate the environmental health effects of the proposed rule on children. Executive Order 13045[20] requires such an evaluation because "[a] growing body of scientific knowledge demonstrates that children may suffer disproportionately from environmental health risks and safety risks." In prior MACT rulemakings EPA had determined that Executive Order 13045 and, therefore, a children's health evaluation, is not applicable because MACTs are technology standards and apply consistently to covered sources. However, since the proposed rule includes a cap-and-trade option, which is a performance standard that could result in an uneven distribution of emissions, it is covered under Executive Order 13045 and, therefore, an analysis of the rule's impact on children's health is required.

Although the proposed rule states that EPA evaluated health and safety effects pertaining to children, our review of the proposal and docket did not show that EPA performed such analyses in accordance with Executive Order 13045. We requested such analyses from EPA, but were not provided with any specific studies of the rule's impact on children's health. Interviews with officials from EPA's Office of Children's Health Protection indicated they were not involved during the rule development. However, Office of Children's Health Protection staff said their lack of involvement in such functions is not unusual due to limited staffing.[21] Members of the Children's Health Protection Advisory Committee (CHPAC) told us that the proposed rule does not adequately take into account children's vulnerabilities. The CHPAC outlined their concerns in a January 26, 2004 letter to the Administrator, in which they made several recommendations, including that the Agency "[e]valuate the possibility that hot spots could result"

---

[20] Protection of Children From Environmental Health Risks and Safety Risks, 62 FR 19885, April 23, 1997.

[21] A May 2004 OIG report found that there was no overall, coordinated strategy integrating children's environmental health efforts into the Agency as a whole (*The Effectiveness of the Office of Children's Health Protection Cannot Yet Be Determined Quantitatively*; OIG Report No. 2004-P-00016; May 17, 2004).

from the cap-and-trade program as proposed.[22]  In a subsequent June 8, 2004 letter to the Administrator, CHPAC additionally recommended that EPA "[e]valuate the relative health benefits of reducing mercury exposure for children and women of child-bearing age under the MACT and cap-and-trade regulatory options."

EPA senior officials noted that prior studies on the health impact of mercury addressed the impact of methylmercury exposure on children and, therefore, the rule itself addresses children's health.  We recognize that current reference dose levels for mercury exposure are based on the impact to children's health.  However, we were not provided any analyses assessing the extent to which the proposed rule may result in uneven distribution of mercury deposition that could increase some children's exposure to mercury.  Office of Research and Development officials noted that regardless of the extent of any additional analysis, they do not know what the impact of reducing sources emissions by a certain percentage would have on deposition or in what timeframe.  However, they noted that reductions in emissions will reduce atmospheric mercury, which in turn will result in less deposition, lower mercury levels in fish, and ultimately reductions in human exposure to mercury.  EPA officials stated that this type of extensive analysis had not been done for the proposed rule, but they hoped to have a more detailed assessment for the final rule.  They further explained that the Notice of Data Availability issued in December 2004 proposed a process for quantifying the proposed rule's impact on mercury deposition and the resulting bioaccumulation in the environment.

## Scope Limitation: Inter-Agency Review

Due to time constraints[23] and the fact that OMB controls this process and not EPA, the OIG did not evaluate the inter-agency review process and EPA's response to the edits resulting from that process.  The inter-agency review process occurs under the direction of OMB after a proposed rule is submitted to the Office of Information and Regulatory Affairs in OMB for review, as stipulated in Executive Order 12866.  The process is typically informal and, according to one EPA official, details on the meetings between OMB and other agencies, as well as comments submitted to OMB during the review, often are not included in the formal docket.

It is difficult to determine every agency involved in the editing process, which agency made specific edits to the proposal, or the timing of these edits based on inter-agency review documents contained in the docket.  We identified comments from at least four agencies or offices other than EPA and OMB: the Department

---

[22] Chapter 3 of this report recommends that EPA further assess the risk of hot spots.

[23] Our field work in some areas was limited in order to provide the results of our review to EPA management in time for them to consider our recommendations in developing the final rule.

of Energy; the Department of the Interior; the Small Business Administration; and the Council on Environmental Quality.

## Conclusions

The rulemaking process did not meet the expectations of some EPA staff and FACA work group members, and did not fully address certain Executive Order requirements to conduct cost-benefit and children's health analyses. These deviations from prior practice and Executive Order requirements appeared to have occurred, in part, because of the Agency's decision to include a proposed cap-and-trade option in the proposed rule, as well as a need to meet the deadlines for the proposed MACT rule reached in prior court settlements.

## Recommendations

We recommend that the Assistant Administrator for Air and Radiation:

4-1    Ensure that the Office adheres to the Action Development Process during EPA's future rulemaking actions to include obtaining input from all relevant Agency Offices.

4-2    Conduct more in-depth cost-benefit analyses of the proposed mercury options to determine the preferred approach.

4-3    Conduct a more in-depth analysis of the impact of the proposed options on children's health.

## Agency Comments and OIG Evaluation

The Agency stated that the draft report failed to recognize the nature of the regulatory development process and incorrectly stated that EPA did not adequately evaluate the proposed rule's impact on children's health. Further, the Agency stated that the draft report improperly characterized the process by suggesting that it had not been sufficiently inclusive. We believe the draft report accurately described the rulemaking process, and continue to believe that the Agency should have more comprehensively evaluated the proposed cap-and-trade rule's impact on children's health. A cap-and-trade program, while reducing overall emissions, can result in geographically uneven distributions of emissions. The proposed rule did not include an analysis of where or how likely such varying mercury emissions and resulting depositions could occur, and what impact this may have on children's health. The OIG does not agree that the Agency review process was inclusive. As we noted in our draft report, according to staff involved, the intra-agency work group review process followed in this rulemaking varied significantly from past Agency practice and applicable guidance for Tier

One rules.  Given this rule's far-reaching national implications for human health, the environment, and the economy, the OIG believes it was important for the Agency to have been more inclusive of available Agency expertise and external stakeholder input to develop this rule.  The Agency's complete response to the draft report and our evaluation of its response are in Appendix E.

# Timeline of Events Related to Development of Mercury Rule

| Date | Event |
|---|---|
| November 15, 1990 | President signs CAA Amendments of 1990. Section 112 requires EPA studies of mercury and Hazardous Air Pollutant emissions from utilities. |
| December 1997 | EPA issues "Mercury Study Report to Congress." Emissions trading discussed as a control option. |
| February 1998 | EPA issues "Study of Hazardous Air Pollutant Emissions from Electric Utility Steam Generating Units." Defers decision on whether regulation of utilities is necessary and appropriate under CAA section 112. |
| July 11, 2000 | National Academy of Sciences releases report, "Toxicological Effects of Methylmercury," which concludes that EPA's reference dose for methylmercury is a scientifically defensible level. Estimates that 60,000 newborns a year could experience neurological damage due to mercury. |
| December 2000 | EPA Issues Federal Register Notice making final determination that regulation of mercury from utilities under CAA section 112 is "appropriate and necessary." Discusses cap-and-trade as an option but states that such an approach must protect local populations close to a source. |
| August 1, 2001 | First meeting of Utility MACT working group. Charge to the Group is to develop a MACT standard. Explicitly directed not to consider trading. |
| July 2002 | Clear Skies Act of 2002 introduced in the Senate and House of Representatives. Proposed a multi-pollutant approach to controlling $SO_2$, NOx, and mercury emissions from power plants. |
| August 28, 2002 | EPA contractor memo outlines options for developing proposed MACT floor. |
| October 2002 | Utility MACT working group issues final report. Consensus not reached. Additional IPM runs recommended based on MACT emission limit proposals from stakeholder groups. |
| February 27, 2003 | Initial meeting of intra-agency work group (one of two total meetings). Analytical blueprint prepared for group addresses traditional MACT, not cap-and-trade, and identifies minimum analyses needed. |
| February 27, 2003 | Clear Skies re-introduced in House and Senate as Clear Skies Act of 2003. |
| March 4, 2003 | WEST Associates issues white paper proposing multi-variability method for determining MACT floor; presented at last meeting of Utility MACT working group. Paper presented to FACA at its last meeting. Method eventually adopted by EPA but with some changes. |
| March 4, 2003 | Last meeting of Utility MACT working group. April meeting canceled by EPA; group had planned to discuss results of recommended IPM runs. |
| March 14, 2003 | Briefing provided to Administrator Whitman. Presentation states EPA will continue to develop a section 112 MACT standard unless Congress removes the requirement. |

37

| Date | Event |
|---|---|
| April 1, 2003 | EPA cancelled last FACA working group meeting. E-mail indicates runs not yet available, and meeting would be rescheduled at a later date. |
| August 7, 2003 | Second (and final) intra-agency work group meeting held, reviewing draft preambles.  Several MACT emission limits proposed, none of which match those in published proposed rule. |
| November 4-5, 2003 | E-mails between EPA officials discuss efforts to establish MACT floor resulting in mercury emissions of 34 tons per year, based on IPM runs using various proposed MACT emission limits. |
| November 26, 2003 | EPA memo to file explaining MACT floor (based on WEST Associates method). |
| December 15, 2003 | "Regulatory Flexibility Act Analysis" entered in Docket. |
| December 2003 | EPA contractor issued memorandum discussing beyond-the-floor analysis. |
| December 15, 2003 | Proposed mercury rule signed. |
| January 2004 | EPA Report on Benefit Analysis entered in Docket. |
| January 28, 2004 | "Energy and Economic Impact Analysis" entered in Docket. |
| January 30, 2004 | Proposed mercury rule published in the Federal Register. |
| March 16, 2004 | Supplemental Notice issued to the original proposed rule providing procedures for implementing cap-and-trade proposal. |

Appendix B

# OIG's Request for Documents Related to Development of Utility MACT



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
OFFICE OF INSPECTOR GENERAL
OFFICE OF PROGRAM EVALUATION
1301 CONSTITUTION AVENUE, N.W.(2460T)
EPA WEST BUILDING
WASHINGTON, DC 20004

November 15, 2004

MEMORANDUM

Subject:    Document Request for Assignment Number 2004-1021 - Development of the
             Proposed MACT for Utility Units

To:          Jeffrey Holmstead,
             Assistant Administrator for Air and Radiation

From:        Kwai Chan, /s/
             Assistant Inspector General for Program Evaluation

This memorandum is a formal request to you and your staff cc'ed below for several documents
that we need in order to complete our work on the subject evaluation.  The majority of these
documents have already been requested and are listed again herein.  In addition, we are
requesting specific information (see item 7 below) not previously requested that is needed for us
to fully and comprehensively address our evaluation objectives.  We request that you provide us
with the following information by November 26, 2004, in order that this information can be
fully considered in our review:

1. Any and all statistical analysis and related internal correspondence for the two
   MACT IPM runs conducted in November 2003, including electronic records, that
   are not included in the docket.

2. Any and all written OGC analysis concerning use of Section 111 vs. Section 112,
   both for the December 2000 findings and determination and the January 2004
   proposed rule, including electronic records.

3. Any and all documentation showing final intra-agency concurrence (or equivalent)

39

for issuing the proposed rule, including electronic records.

4. Any and all written comments resulting from the intra-agency review process, including electronic records.

5. The analysis related to children's health that was specifically referred to in the proposed rule's preamble on page 4715 of the Federal Register Notice.

6. The Agency analysis determining the origination of Latham and Watkins language that was included in the proposed rule's preamble, and

7. Any and all internal and external Agency correspondence or other written communications related to the development of the MACT floor that were developed, transmitted, and/or received during the period October 15, 2003 through December 15, 2003, including e-mails meeting the definition of Federal Records.

We appreciate your prompt response to this request.  Please contact Jim Hatfield, Assignment Manager, at 919-541-1030, or Carolyn Blair, Project Manager, at 919-541-7702, to coordinate the submittal of information related to this request.  If any of the above information does not exist please indicate that fact in your response.

cc: Robert Brenner, Deputy Assistant Administrator for Air and Radiation
    Bill Wehrum, Office of the AA for OAR
    Jason Burnett, Office of the AA for OAR
    Stephen Page, Director, OAQPS
    Sally Shaver, Director, Emissions Standards Division, OAQPS
    Bob Wayland, Combustion Group Leader, ESD, OAQPS
    William Maxwell, Principal Rulemaking Contact, Proposed MACT for Utility Units, ESD,
    Nikki Tinsley, Inspector General
    Eileen McMahon, Assistant Inspector General for Congressional and Public Liaison
    Mark Bialek, Counsel, OIG

## *Status of Agency's Response to OIG's Request for Documents Related to Development of Utility MACT*

| Item Requested | Status |
|---|---|
| 1. Any and all statistical analysis and related internal correspondence for the two MACT IPM runs conducted in November 2003, including electronic records, that are not included in the docket. | 1. We received limited information after the draft report was provided to the Agency for comment. Specifically, we were provided copies of Agency e-mails that discussed how the information used in these MACT IPM runs was developed. |
| 2. Any and all written OGC analysis concerning use of Section 111 vs. Section 112, both for the December 2000 findings and determination and the January 2004 proposed rule, including electronic records. | 2. Since this was a legal issue before the courts, we determined that we would not address this, so the information was not needed. |
| 3. Any and all documentation showing final intra-agency concurrence (or equivalent) for issuing the proposed rule, including electronic records. | 3. No documentation provided. |
| 4. Any and all written comments resulting from the intra-agency review process, including electronic records. | 4. No documentation provided. |
| 5. The analysis related to children's health that was specifically referred to in the proposed rule's preamble on page 4715 of the Federal Register Notice. | 5. Additional information in general was provided after the draft report was issued, but no analysis on children's health specific to this rule was included. |
| 6. The Agency analysis determining the origination of Latham and Watkins language that was included in the proposed rule's preamble, and | 6. The Agency pointed out the information in the docket related to this issue, but did not provide specific Agency analysis. Since this issue was related to inter-agency review process, which is controlled by OMB, we did not fully address this issue (See Scope Limitation in Chapter 4 of this report.) |

| 7. Any and all internal and external Agency correspondence or other written communications related to the development of the MACT floor that were developed, transmitted, and/or received during the period October 15, 2003 through December 15, 2003, including e-mails meeting the definition of Federal Records. | 7. No documentation or response received other than the limited information in the e-mails provided for Request 1 above. |

Appendix C

# *Different MACT Floor Proposals*

| Source | Emission Limits (Input base - lbs/Tbtu) | | | | | | | | | | | | | Total Estimated Emissions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Process Sub-Categories | | | | | | | | Coal Type Sub-Categories | | | | | |
| | FBC | FBC (sub-Bit. + Bit) | FBC - Lignite | Other | Bit. - Hot | Bit. - Wet | Bit. - Saturated | IGCC | Sub-Bit. + Bit. | Bit. | Sub-Bit. | Lignite | Coal Refuse | |
| EPA Proposed Rule | NA | NA | NA | NA | NA | NA | NA | 19.0 | NA | 2.000 | 5.800 | 9.200 | 0.4 | 34 [1] |
| FACA- Environmental | 0.190 | NA | NA | 0.210 [2] | NA | NA | NA | NA | NA | NA | NA | NA | NA | 1.9 [3] |
| FACA - Industry | 2.000 | NA | NA | NA | 3.700 | 3.200 | 2.200 | NA | NA | NA | 4.200 | 6,500 | NA | 25-30 [3] 36 [6] |
| FACA - State & Local - Option 1 | NA | NA | NA | NA | NA | NA | NA | NA | 0.600 | NA | NA | NA | NA | 6.7 [3] |
| FACA - State & Local - Option 2 | NA | NA | NA | NA | NA | NA | NA | NA | 0.400 | NA | NA | NA | NA | 6.3 [3] |
| FACA - Clean Energy Group | NA | 0.320 | 12.0 | NA | NA | NA | NA | NA | 1.223 | NA | NA | 9.091 | NA | 13.1 [3] |
| Clean Air Task Force [4] | NA | NA | NA | NA | NA | NA | NA | 4.9 | NA | 0.420 | 1.500 | 4.500 | 0.1 | 12 [5] |

**Abbreviations**

Bit.:       Bituminous
FACA:    Federal Advisory Committee Act
FBC:      Fluidized Bed Combustion
lb/Tbtu: pounds per Trillion British thermal units
IGCC:    Integrated Gasification Combined Cycle
MACT:   Maximum Achievable Control Technology
NA:        Not Applicable

**Notes:**

1   Estimate based on Integrated Planning Model results.
2   Applied to all units except FBC
3   Based on estimates developed by Northeast States for Coordinated Air Use Management.
4   Clean Air Task Force preferred a MACT with no sub-categorization but re-computed a MACT floor based on EPA's proposed subcategories.
5   Based on Integrated Planning Model run and includes co-benefit reductions from Clean Air Interstate Rule.
6   Based on calculations performed by the industry group.

# *EPA's Rule Development Process*

EPA actions are assigned to one of three tiers based on the nature of the anticipated issues and the level of cross-Agency interactions needed to ensure a quality action.  The proposed rule is a Tier one rule and meets the following criteria.

---

**Tier 1 Criteria: Administrator's Priority Actions**
This tier will include top actions that demand the ongoing involvement of the Administrator's office and extensive cross-Agency involvement on the part of the Assistant/Regional Administrators.

**Factors to consider in making a judgment about placing an action in Tier 1 are:**

• major cross Agency or cross-media policy implications or precedents

• potential for major or precedent-setting implementation issues

• potential for major cross-Agency, cross-media, or inter-agency controversy

• potential for major economic impact on other levels of government or the regulated community

• highly controversial in terms of external interest

• ongoing, formal involvement of the Agency's highest level of management (Administrator, Deputy Administrator) is necessary or desired

• presents a significant opportunity for the Agency to advance the Administrator's priorities

**Action should be placed in Tier 1 if...**

• science issue(s) are precedent setting and controversial

• economically significant per Executive Order 12866 (i.e., > $100 million), unless the program office can justify placement in Tier 2

• economics issue(s) are precedent setting and controversial

---

The program office develops the proposed rule, which may take months to years depending on the complexity of the rule, priorities, and court/statutory deadlines.  Rule development follows five major stages, as outlined in the Agency's Action Development Plan.  The first stage is determining the proper tier for the action based on the criteria outlined above.  The following table describes the five stages of an Action Development Plan.

## Five Major Stages of an Action Development Plan

**Stage 1. Tiering the Action**

• Understand tiering

• Place action in the appropriate tier

• Obtain tiering approval

**Stage 2. Developing the Proposed Rule or Draft Action**

• Charter the workgroup

• Get the workgroup underway

• Prepare the preliminary analytic blueprint and get early guidance from senior management

• Prepare the detailed analytic blueprint

• Senior management approval of analytic blueprint

• Complete data gathering, consultation, peer review, analyses, and options development

• Select Options

• Develop the proposed action by preparing preamble, rule, and supporting documents

• Conduct Final Agency Review to ensure senior management approval

• Office of Policy, Economics, and Innovation review for rules deemed as "significant" under Executive Order 12866

**Stage 3. Requesting OMB Review for Proposed and Final Actions (if necessary)**

• Determine if OMB review is necessary. Only those regulatory actions designated "significant" under Executive Order 12866, "Regulatory Planning and Review" are subject to review by OMB (e.g., actions having an annual effect on the economy of $100 million)

• Prepare regulatory action for submission to OMB

• Address OMB's comments

• Docket the OMB review process

**Stage 4. Requesting the Administrator's Signature and Publishing an Action**

• Request the Administrator's signature

• Publish the action in the Federal Register and open docket(s)

**Stage 5. Developing the Final Action and Ensuring Congressional Review**

• Receive public comments

• Consider and address public comments

• Determine next steps

• Submit actions to Congress under the Congressional Review Act or the Courtesy Copy Policy

Appendix E

# *Agency Comments to the Draft Report and OIG Evaluation*

**MEMORANDUM**

| | |
|---|---|
| SUBJECT: | Comments on the December 17, 2004 Draft Evaluation Report Entitled, Additional Analyses of Mercury Emissions Needed Before EPA Finalizes Rules for Coal-Fired Electric Utilities |
| FROM: | Jeffrey R. Holmstead<br>Assistant Administrator for Air and Radiation<br>U.S. Environmental Protection Agency |
| | William H. Farland, PhD<br>Acting Deputy Assistant Administrator for Science<br>Office of Research and Development<br>U.S. Environmental Protection Agency |
| TO: | Nikki Tinsley<br>Inspector General<br>U.S. Environmental Protection Agency |
| DATE: | January 24, 2005 |

Thank you for giving us the opportunity to review the draft report referenced above and to open dialogue with OIG staff. We have substantial concerns with the referenced draft including several inaccuracies and flaws that we feel must be addressed before the report is finalized. This memorandum briefly summarizes our major concerns.

Agency scientists and experts know a great deal about mercury: what are the sources, both domestically and internationally; where does mercury in this country come from; what is the chemistry that converts mercury deposited on the land and in the water into mercury that becomes available to the food chain; what are the routes of exposure in this country to mercury; what are the potential impacts of controls on that exposure; and what is the status of the various technologies now being studied.

While some questions remain in our understanding of many of these linkages, this will not prevent the Agency from regulating mercury from power plants, and it will do so as effectively as possible, informed by the full body of knowledge it now possesses. The Agency also recognizes that mercury emissions from facilities as complex as coal-fired power plants should not be considered in isolation of the other efforts to reduce air pollution; hence the Administration's strategy to further control $SO_2$ and NOx while instituting new, specific regulations for mercury. The Agency believes that such a

46

a strategy can deliver significant overall health benefits to a broad segment of the American public.

EPA strongly urges the IG to take the broad base of information we know about mercury, as well as the outstanding unanswered questions, into consideration when developing the final report.

**1. The draft report criticizes the rulemaking process as being incomplete even before a final rule is issued.** This critique rings hollow given the iterative nature of rulemaking. The rulemaking process consists of a proposed rule, a public comment period and often additional information before final decisions are made. The IG characterized the process as incomplete before the process had finished. For example, a number of the issues regarding benefit-cost analysis raised in the draft report are issues that the Agency is working on as evidenced by its Notice of Data Availability on November 30, 2004.

> *OIG Response: Our review was initiated at the request of seven U.S. Senators, who asked that we complete this review in sufficient time to allow the Agency to address any issues raised in our report. We have added information to the Scope and Methodology section in Chapter 1 of the Final Report explaining that our review was completed while the Agency was still in the process of finalizing the rule. Accordingly, our report reflects findings and observations about the status of the process at the time we completed our review. We look forward to seeing the results of the Agency's additional cost-benefit analyses, as recommended in our report.*

**2. The draft report inaccurately suggests that US power plant mercury emissions represent a large part of the human exposure problem.** Most exposure to mercury comes from eating fish from the world's oceans and the mercury in these fish comes from a variety of sources released over many years, including natural emissions like volcanoes, and anthropogenic emissions from many countries, representing emissions from a variety of sectors, in addition to emissions from US power plants. It is because US power plants are part of the larger problem that EPA has proposed, for the first time ever, to require reductions from this sector.

Given the global nature of mercury exposure and the uncertainty in the time to realize benefits from current emission reductions, the action to reduce mercury emissions from power plants must be seen in the larger context of all the activities EPA and others in the international community are implementing to reduce exposure to mercury.

> *OIG Response:* Our draft report did not suggest that mercury emissions from U.S. power plants represent a large part of the human exposure problem. Power plants are one of many sources of mercury emissions. The primary objective of our review was to assess EPA's development of the proposed rule for regulating mercury emissions from coal-fired electric utility units, and we included information in our draft report on mercury emissions and mercury health effects for background purposes. Nonetheless, we have included additional information in Chapter 1 of the Final Report to put total U.S. mercury and U.S. power plant emissions in the context of global mercury emissions. We understand that primary route of human exposure to mercury is through the consumption of fish and that the Centers for Disease Control and Prevention surveys indicate that seafood is the predominant type of fish consumed by women of child-bearing age and children. However, certain subgroups, such as Native Americans, eat more fresh-water fish and may be more susceptible to mercury exposure than others. We added this information to the background section of our final report.

**3. The draft report does not comprehensively and accurately describe how the proposed cap-and-trade system would work, leading the reader with misimpression about what our experience and modeling has taught us.** The draft report fails to recognize that a cap-and-trade system requires emissions reductions on a concrete timeline of declining caps, thus leading to continual reduction of emissions and promotion of new technologies. It also fails to acknowledge that, under this system, the largest emitters typically will be the first to reduce their mercury emissions and will generally achieve the greatest level of reductions.

The draft report criticizes the cap-and-trade proposal for not requiring the installation of mercury-specific controls until 2018, but this is inaccurate and reflects a misunderstanding about how cap-and-trade works. The report should recognize the fact that it is reductions in mercury emissions that will lead to improvements in public health and these reductions will occur much earlier than 2018. Moreover, neither the Maximum Achievable Control Technology (MACT) approach nor the cap-and-trade approach would require any particular technology for controlling mercury. Either approach would require power plants to meet certain standards for mercury control, and then let individual plants find the best way to meet those standards.

> *OIG Response:* One of the objectives of our review was to evaluate whether the proposed mercury cap-and-trade rule was sufficiently protective of public health. As a result, we highlighted certain concerns with the rule as proposed. As such, we limited our focus of the mercury cap-and-trade proposal to concerns about the interim cap level, the potential for hot spots formation, the safety valve provision, the exemption of small emitters, and tribal impacts.

*Our draft report portrayed an accurate representation of how the mercury cap-and-trade program works.  While the proposed mercury cap-and-trade rule should ultimately result in emissions reductions, we do not agree that the proposal provides a "concrete timeline of declining caps."  For example, the proposed rule provides an interim cap that is based on co-benefits from existing technologies and can be achieved without the implementation of mercury-specific controls.  Since the interim cap for mercury emissions can be achieved without mercury-specific controls, the proposed rule may not adequately promote the use of new technologies.   Also, the only other mercury cap is the 2018 final cap, and EPA modeling indicates it may not be met in 2018 due to the banking provisions of the proposed mercury trading program.  Finally, our draft report noted that neither the proposed cap-and-trade nor the MACT option require the use of any specific technology.*

*While EPA has experience with cap-and-trade programs such as the Acid Rain program, there are differences in the transport and fate of SO2 and mercury emissions which need to be addressed in a cap-and-trade approach to controlling mercury emissions.  For example, $SO_2$ emissions are primarily deposited regionally and globally, while mercury can deposit locally.   Additional differences between these two cap-and-trade programs were highlighted in Chapter 3 of the draft report.*

**4.  The draft report incorrectly characterizes the calculation of the MACT standard.**  The draft report did not independently calculate the MACT floor, but instead simply relied on assertions made by critics of the proposal as the basis for their critique. The proposed MACT floor was calculated in accordance with the requirements of CAA Section 112(d) by basing the standard on what the top performing 12 percent of units were achieving in practice, taking into account subcategorization and variability.

Contrary to the claims in the draft report, the Agency did investigate beyond-the-floor MACT alternatives and did propose a beyond-the-floor standard where technology was found to be available (i.e., Integrated Gasification Combined Cycle (IGCC) subcategory).

**OIG Response:**  The OIG did not inaccurately characterize the calculation of the MACT floor.  Our analysis was based on discussion with a number of EPA stakeholders and EPA officials, and review of supporting documentation.  We found evidence that although the MACT floor was ostensibly based on data from the top performing 12 percent of units, this data was analyzed with a final target already in mind, i.e., 34 tons.   As stated in the Agency's Comment 5 to our draft report, this "floor" of 34 tons was obtained during the Clear Skies legislative process.  Accordingly, we do not consider this floor to be based on an unbiased analysis of what the top performing 12 percent of units were achieving.

With respect to IGCC units, our review focused primarily on the development of the standards for existing units.  Of the over 400 coal-fired power plants in operation in the U.S., two are IGCC plants.  Although EPA did not propose a beyond-the-floor standard for existing IGCC units, EPA proposed an emission limit for new IGCC units that was below the calculated floor for IGCC units and was based on EPA's determination that mercury reduction of 90 percent could be obtained for this subcategory through the use of carbon bed technology.

**5.  The draft report suggests that the proposed rule was flawed because other regulatory alternatives that would achieve emissions levels lower than about 34 tons per year were not developed or proposed.**  In particular, the draft report makes much of the fact that the MACT proposal was developed with the goal of achieving a nationwide emissions level from affected power plants of about 34 tons per year.  The report fails to consider the fact that EPA had developed extensive information about mercury emissions and control techniques in the power sector during the MACT regulatory development process and during the development of the Clear Skies initiative.  That work caused us to conclude that mercury reductions could, in fact, be achieved in the power sector over the 3-4 year MACT compliance period specified by the statute.  However, these reductions would not come for the most part from mercury-specific controls (such as activated carbon injection).  Extensive work conducted by the Office of Air and Radiation and the Office of Research and Development indicated that mercury-specific controls will not become readily available for commercial application to this industry until 2010 or later  - well beyond the MACT compliance period.  Consequently, the proposed rule is predicated on the assumption that virtually all mercury reductions during the MACT compliance period would have to be accomplished as a co-benefit of installing air pollution controls designed to remove $SO_2$ or NOx.  As part of the Clear Skies effort, EPA had extensively studied the capacity of the power sector to install $SO_2$ and NOx controls during the period up to 2010.  That work showed that 34 tons per year was the lowest level of mercury emissions that we could reasonably expect the power sector to achieve through the aggressive application of $SO_2$ and NOx controls up to 2010.  Further, as a part of the FACA process established for this rulemaking, industry submitted what they thought would be possible under a true co-benefit approach (i.e., no mercury-specific controls).  Their estimate was that 36 tons per year of mercury would be emitted under a MACT approach.  The EPA proposal is grounded in careful analysis as to what levels of mercury control reasonably can be expected over the MACT compliance period.

*OIG Response: Our draft report concluded that the MACT development process was compromised for several reasons. This included the fact that several MACT floor proposals were lower than the EPA's proposed MACT rule, including several proposals developed by EPA in trying to achieve a floor that would result in annual emissions of 34 tons. This included two EPA IPM runs that showed national emissions of 29 tons and 27 tons, that were not included in the rulemaking docket or available for public comment. While the Agency has conducted analysis to determine the co-benefit of $SO_2$ and NOx controls, we do not believe this meets the requirements of CAA section 112(d) in developing the MACT standard. For example, the co-benefit is based on an average performance of all units, not just the best performers. We continue to believe the Agency should conduct additional analyses before finalizing the rule. As noted in the draft report, the Government Accountability Office is conducting a review of technology-related issues for the proposed mercury rule.*

**6. The draft report fails to recognize the nature of the regulatory development process and incorrectly states that EPA "did not adequately evaluate the environmental health effects of the proposed rule on children."** We have made it clear from the start of the rulemaking process that the health effects of greatest concern are possible developmental effects in fetuses and young children exposed to unsafe levels of methylmercury. Unlike most other rules that EPA develops, this rulemaking is singularly directed at developing an appropriate regulatory approach for addressing the potential impacts on children. Evidence of this can be seen in EPA's first guiding principle in the development of a final mercury rule which states that the rule will concentrate on the need to protect children and pregnant women from the health impacts of mercury.

Consistent with this principle, EPA Office of Air and Radiation participated in an ongoing dialogue with the Children's Health Protection Advisory Committee (CHPAC) and responded to CHPAC's recommendations on mercury exposure in children. Further, EPA and others have conducted extensive work on the health effects of mercury for the developing fetus and young children, including a National Academy of Sciences review completed in 2000. The Inspector General's draft report misses this key point.

*OIG Response: We do not believe we failed to recognize the nature of the rulemaking process.   Further, the Agency should have more comprehensively evaluated the proposed cap-and-trade rule's impact on children's health.  A cap-and-trade program, while reducing overall emissions, can result in geographically uneven distributions of emissions. The proposed rule did not include an analysis of where or how likely such varying mercury emissions and resulting depositions could occur, and what impact this may have on children's health.*

*Children's Health Protection Advisory Committee members did not characterize their interaction with the Agency as an ongoing dialogue.  Committee members  told us that the Agency's response to their  concerns with the proposed rule did not satisfactorily address their recommendations.*

**7.  The draft report improperly characterizes the process by suggesting that it has not been sufficiently inclusive.**  EPA has held dozens of high-level inter-office and external meetings on this rule.  This inclusive process was needed both because the rule has far-reaching national implications for human health, the environment, and the economy and also because a well-informed decision on an issue this complicated requires hearing diverse perspectives. While there is always room to improve communications within and with those outside of EPA, there is little basis to fault the Agency in this case.

*OIG Response:   The OIG does not agree that the Agency review process was inclusive. As we noted in our draft report, according to staff involved, the intra-agency work group review process followed in this rulemaking varied significantly from past Agency practice and applicable guidance for Tier One rules.  Specifically, the work group process followed in this rulemaking was unusual in its short duration, infrequent meetings, late start with respect to the final rule deadline, and overall lack of communication and feedback between the work group and Agency decision makers.  Further, work group members were not given the opportunity to review and comment on an entire draft proposal before it was published in the Federal Register.  For example, staff from the Office of Enforcement and Compliance Assurance were never given a draft of the proposed rule to review or comment on, thus this office could not assess the adequacy of the proposed rule's monitoring, record keeping, or reporting provisions as it typically does for Tier One MACTs.  With respect to meeting with external stakeholders, tribal representatives told us that they were not consulted during the development of the proposed cap-and-trade option. Given this rule's far-reaching national implications for human health, the environment, and the economy, the OIG believes it was important for the Agency to have been more inclusive of available Agency expertise and external stakeholder input in developing this proposed rule.*

Again, thank you for the opportunity to review the draft report. We would be happy to work with you and your staff to ensure that you promptly receive all the information and analysis you need to finalize the report. The final report should include an improved discussion of (1) the global nature of mercury exposure and the uncertainty in the time to realize benefits from current emission reductions; (2) how a proposed cap-and-trade system would require emissions reductions on a concrete timeline; (3) the approaches to calculation of the MACT floor; (4) the substantial effort EPA devoted to evaluating the risk of mercury exposure on children; and (5) the inclusiveness of EPA's process towards reaching a final rule.

> **OIG Response:** *The Agency's comments have been included in the final report as appropriate. We appreciate the efforts of both the Office of Air and Radiation and the Office of Research and Development in working with us to clarify certain technical issues and in providing prompt input so that we could issue our report in a timely manner.*

# *Distribution*

Acting Administrator (1101A)

Assistant Administrator for Air and Radiation (6101A)

Deputy Assistant Administrator for Air and Radiation (6101A)

Acting Deputy Assistant Administrator for Science, Office of Research and Development (A101R)

Acting Deputy Assistant Administrator for Management, Office of Research and Development (A101R)

General Counsel, Office of General Counsel (4010A)

Agency Followup Official (the CFO) (2710A)

Agency Followup Coordinator (2724A)

Audit Followup Coordinator, Office of Air and Radiation (6102A)

Audit Followup Coordinator, Office of Research and Development (A102R)

Associate Administrator for Congressional and Intergovernmental Relations (1301A)

Associate Administrator for Public Affairs (1101A)

Director, Office of Air Quality Planning and Standards (C404-04)

Deputy Director, Office of Air Quality Planning and Standards (C404-04)

Audit Liaison, Office of Air Quality Planning and Standards (C404-2)

Inspector General (2410)