UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THOMAS F. REILLY, Attorney General of the Commonwealth of Massachusetts, | ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 05-10450 RBC |
| v. | ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM IN SUPPORT OF PARTIAL SUMMARY JUDGMENT
FOR THE PLAINTIFF AND IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

**Introduction**

This is an action to compel EPA to comply with the Freedom of Information Act

(FOIA), 5 U.S.C. § 552 *et seq.*  The Plaintiff is Massachusetts Attorney General Tom Reilly.  In

March, 2004, Attorney General Reilly requested certain records of EPA, relating to analytical

modeling performed in connection with a rulemaking to establish mercury emission limits for

electricity generating plants.  EPA produced some records, many of them heavily redacted, but

claimed exemption for numerous documents under FOIA exemption 5 (deliberative process).

The heart of the request concerns computer modeling runs relating to one of the

regulatory alternatives originally proposed by EPA, but which EPA abandoned midway through

the rulemaking.  Although EPA published a number of modeling runs analyzing the alternatives, it

1

suppressed several modeling runs related to the abandoned alternative, and now claims that these

runs, unlike others published in the course of the rulemaking, are exempt from production under

FOIA as deliberative process.

EPA acknowledges that it bears the burden of proof with respect to the claimed

exemption. EPA Mem. at 7. Yet, EPA's summary judgment motion offers only a generic

defense of its claim. In short, parroting the First Circuit's decision in *Providence Journal Co. v.*

*United States Dept. of the Army*, 981 F.2d 552, 557 (1st Cir. 1992), EPA asserts that the withheld

modeling runs are exempt from production because "[r]elease of runs not relied on by the Agency

would provide clues to the Agency's deliberations prior to rulemaking . . . [and] could

compromise future Agency deliberations and cause confusion about the reasons behind EPA's

decision-making process." Declaration of Samuel Napolitano (Napolitano Decl.) ¶ 17.

EPA does not respond to allegations in the Complaint that its suppression of these

modeling runs is contrary to federal law, Executive Order, and best practices guidelines for agency

rulemaking, as well as the agency's own past practices and prior conduct in this very rulemaking.

Complaint ¶¶ 8, 9. Still less does it attempt a defense against the criticisms of its own Inspector

General and the Government Accountability Office, both finding that EPA's failure to conduct

additional modeling of the abandoned alternative, and its suppression of modeling results, depart

from past practice as well as administration policy. Complaint ¶¶ 19, 20. More important,

EPA's formulaic response simply fails to demonstrate that the IPM modeling runs are indeed

deliberative process materials rather than the same sort of factual information that EPA has used

for almost ten years as a principal support for its regulatory program for the electric power

industry. FOIA does not permit agencies to suppress facts it would rather not consider, or have the public consider.

In sum, EPA has fallen well short of carrying its burden. Indeed, EPA is so far short of making a case for exempting these materials that the Plaintiff specifically requests a finding that "the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding," pursuant to 5 U.S.C. § 552(a)(4)(F), in addition to an order directing the agency to produce the withheld records.

### Statement of Facts

*The Integrated Planning Model*

The Integrated Planning Model (IPM) is a proprietary computerized model of the electric power industry, used by EPA for a variety of purposes in developing emission control strategies.[1] Because IPM provides a coherent and consistent (though not necessarily accurate) dynamic model of the electric industry, EPA has come to rely upon IPM modeling results in developing "market based" (cap-and-trade) regulatory programs to reduce emissions of nitrogen oxides, sulfur dioxide and mercury. For example, EPA used IPM in developing a 1998 rule

---

[1]In EPA's somewhat opaque words,

> IPM is a multi-regional, dynamic, deterministic linear programming model of the U.S. electric power sector. It provides forecasts of least-cost capacity expansion, electricity dispatch, and emission control strategies for meeting energy demand and environmental, transmission, dispatch, and reliability constraints. IPM can be used to evaluate the cost and emissions impacts of proposed policies to limit emissions of sulfur dioxide (SO2), nitrogen oxides (NOX) , carbon dioxide (CO2), and mercury (Hg) from the electric power sector.

"Introduction to EPA Modeling Applications Using IPM," at http://www.epa.gov/airmarkets/-epa-ipm/. *See Nebraska v. EPA*, 331 F.3d 995, 999 n.3 (D.C. Cir. 2003) (Court will take judicial notice of EPA website).

known as the NOx SIP Call Rule to test control strategies, estimate costs, generate state by state

growth factors, and generate data for air quality analytical models.  *See Appalachian Power Co. v.*

*E.P.A.*, 249 F.3d 1032, 1052 (D.C. Cir. 2001); NOx SIP Call Final Rule, 63 Fed. Reg. 57356,

57365, 57401 (October 27, 1998); "Final Response to Comments Document for the Ozone

Transport Rulemaking (NOx SIP Call)," Sept. 30, 1998, "NOx SIP call Air Quality Technical

Support Document (TSD)," Nov. 16, 1998,  both available at http://www.epa.gov/-

ttn/naaqs/ozone/rto/sip/related.html.   EPA also relied on IPM in developing control strategies

and cost-benefit analysis in the Clean Air Interstate Rule (CAIR), 70 Fed. Reg. 25162, 25176,

25196-25227, 25305-25314 (May 12, 2005), and the Clean Air Mercury Rule (CAMR), 70 Fed.

Reg. 28606 (May 18, 2005).  *See* "EPA Analyses Using IPM," http://www.epa.gov/-

airmarkets/epa-ipm/ (excerpted as Exhibit A).

EPA selected the IPM from a number of alternatives on the market in or around 1995 for

its flexibility and acceptance in the industry.  From the start EPA solicited technical assistance

and public comment with regard to the model, data, and assumptions to be used.  In a 1996

paper, EPA reported that:

> EPA has compiled and evaluated sufficient technical information to run the
> IPM model and consider the implications of different types of air pollution
> control strategies.  *However, the Agency sees the collection of technical information
> on various aspects of the power industry as an ongoing activity that will lead to
> routine updating of assumptions and improvements in the forecasts and analyses
> done with this modeling system.*

EPA, *Analyzing Electric Power Generation under the CAAA* 3 (July 1996) (emphasis added),

available in EPA's Electronic Docket OAR-2001-0008, document 0007 (excerpted as Exhibit B).

*See also id.* at 1 (selection criteria for model included: that it "Be credible and broadly

accepted").[2]  Thus, from the start EPA recognized that the usefulness of the IPM in supporting

EPA's programs heavily depended on public examination of the model itself as well as the data

and assumptions used in modeling runs.

And indeed EPA has continued to update the assumptions and data used in IPM in a

public process designed to maintain broad acceptance.  In the NOx SIP Call Regulatory Impact

Analysis (September, 1998) (the NOx SIP Call RIA) at 4-2, available at http://www.epa.gov/-

ttn/naaqs/ozone/rto/sip/-related.html, EPA noted that IPM had "undergone extensive review and

validation" during the ten years it had been in use by industry and more recently by EPA, and

that IPM's and EPA's modeling assumptions had been thoroughly reviewed in the two years

leading up to the final rule.  In the NOx SIP Call RIA itself, EPA took considerable pains to

explain the assumptions used in modeling a base case and state by state budgets, including

alternative emission limitations, and to lay out the results of its IPM runs.  NOx SIP Call RIA at

2-7 to 2-9, 4-1 to 4-2, 4-4 to 4-12, 6-1 to 6-35 (excerpted as Exhibit C).

---

[2]EPA provided additional background in the NOx SIP Call Final Rule, 63 Fed. Reg.
57356, 57408-409 (October 27, 1998) (responding to comments regarding use of IPM rather than
other data to project state specific growth rates).  In the NOx SIP Call Regulatory Impact
Analysis (RIA), EPA says the following:

> EPA has used IPM extensively for environmental policy and regulatory analysis.
> In particular, EPA has used IPM to analyze NOx emission policy and regulations
> as part of the Clean Air Power Initiative (CAPI) in 1996, as an analysis tool for
> the Regulatory Impact Analysis of the National Ambient Air Quality Standards
> (NAAQS) for ozone and particulates in 1997, and as a tool to analyze alternative
> trading and banking programs during the OTAG process in 1996 and 1997 [which
> led to the NOx SIP Call].

NOx SIP Call Regulatory Impact Analysis (September, 1998) at 4-2 (Exhibit C), available at
http://www.epa.gov/ttn/naaqs/ozone/rto/sip/related.html,

Subsequent to the NOx SIP Call, EPA regularized the process for updating and publicizing the data and assumptions used in the IPM. EPA publishes all such information, as well as input and output files for model runs produced using IPM on its website "Clean Air Markets -- Programs and Regulations" at http://www.epa.gov/airmarkets/epa-ipm/#intro (Exhibit A). Thus, EPA has published the IPM runs for the proposed Clear Skies Act,[3] for the Clean Air Interstate Rule,[4] and for the Clean Air Mercury Rule.[5]

EPA's traditional commitment to transparency with regard to the IPM, modeling assumptions and data is also required by the Clean Air Act and the Administrative Procedure Act. While EPA's reliance upon IPM in preference to other types of data is permissible, *see Appalachian Power Co. v. E.P.A.*, 249 F.3d at 1052-53, the agency must demonstrate in its rulemakings that the IPM is analytically sound, and that modeling assumptions, data selection and methodologies are rational. As stated in *Appalachian Power*,

> the EPA has "undoubted power to use predictive models" but only so long as it "explain[s] the assumptions and methodology used in preparing the model" and "provide[s] a complete analytic defense" should the model be challenged. [Small Refiner Lead Phase-Down Task Force v. EPA], 705 F.2d [506] at 535 [(D.C.Cir. 1983)] (citations and internal quotation marks omitted). . . . "With its delicate balance of thorough record scrutiny and deference to agency expertise, judicial review can occur only when agencies explain their decisions with precision, for 'it will not do for a court to be compelled to guess at the theory underlying the

---

[3] http://www.epa.gov/airmarkets/epa-ipm/results.html (2 runs); http://www.epa.gov/-airmarkets/epa-ipm/results2003.html (5 runs) (Exhibit A).

[4] http://www.epa.gov/airmarkets/epa-ipm/iaqr.html (numerous runs). Numerous additional runs were generated for this program under updated assumptions. *See* http://www.epa.gov/airmarkets/epa-ipm/iaqr.html#cair (Exhibit A).

[5] http://www.epa.gov/airmarkets/epa-ipm/utilityhgredux.html (23 runs) (Exhibit A).

agency's action . . .'" American Lung Ass'n v. EPA, 134 F.3d 388, 392
(D.C.Cir.1998) (quoting SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1947)).

249 F.3d at 1054-55.  *See* Clean Air Act § 307(d), 43 U.S.C. § 307(d) (rulemaking docket must

contain all factual data on which rule is based, the methodology used to obtain it, and all

comments, data and information submitted by any person with regard to the proposed rule).

Thus, in the *Appalachian Power* case the Court remanded the matter to EPA for further

explanation why the agency used State-specific growth factors generated using IPM when in

some States actual growth over a few years had already outstripped growth forecast by IPM

over a ten-year period, explaining that "[t]he EPA is well aware of its obligation to 'examine the

relevant data and articulate a satisfactory explanation for its action,' yet it failed to discharge this

obligation here."  *Id.* at 1054.  *See also id.* at 1059.[6]

*The Mercury Rulemaking and the Withheld IPM Runs*

In December, 2000, EPA concluded that mercury emissions from coal burning power

plants should be regulated under CAA § 112, 42 U.S.C. § 7412. *Regulatory Finding on the*

*Emissions of Hazardous Air Pollutants From Electric Utility Steam Generating Units*, 65 Fed.

Reg. 79825 (December 20, 2000).  The following Spring, EPA met with interested parties

---

[6]In a separate challenge in the same case, North Carolina complained of EPA's failure to
consider computer modeling that had been performed by a consultant.  While the Court rejected
the challenge (the modeling was submitted to EPA after the rule to which it related had already
been promulgated), it stressed EPA's duty to consider all data relevant to a rulemaking:

> There is no doubt that the EPA is required to examine the relevant data and
> articulate a sufficiently reasoned explanation for its action. . . .  This Court is
> obligated to "overturn a rulemaking as arbitrary and capricious where the EPA has
> failed to respond to specific challenges that are sufficiently central to its decision."

*Id.* at 1059 (citations omitted).

("stakeholders") to discuss how to proceed in determining appropriate mercury emissions limits

under § 112 (Maximum Achievable Control Technology -- MACT).  In August, EPA convened a

subcommittee of a standing Clean Air Act Advisory Committee (the Working Group) "to

provide input to the EPA regarding Federal air emissions regulations for these units that will

maximize environmental and public health benefits in a flexible framework at a reasonable cost of

compliance, within the constraints of the CAA."  "Draft Charge and Process Document" at 4

(Exhibit D1), available at http://www.epa.gov/ttn/atw/combust/utiltox/utoxpg.html#CAAAC.[7]

EPA proposed a detailed schedule designed to yield a final rule by December, 2004.  Among

other things, the schedule charged the Working Group to develop preliminary control levels,

regulatory alternatives, and cost and benefit analyses for presentation to EPA by February, 2003.

EPA would then select which regulatory alternative or combination to propose, and would

prepare and publish a notice of proposed rulemaking by December, 2003. Ex. D1 at 6.

EPA introduced IPM modeling proposals to the Working Group at the April 3, 2002,

meeting, and described the results of a first round of modeling runs at the May 13, 2002 meeting.

*See* Agenda for April 3, 2002, Meeting; "EPA Presentation on IPM model" (April 2002) (Exhibit

D2); Summary of May 13, 2002, Meeting; "EPA Presentation on initial IPM runs" (May 2002)

(Exhibit D3), all available at http://www.epa.gov/ttn/atw/combust/utiltox/utoxpg.html#CAAAC.

The modeling assumptions, control scenarios and data used in these modeling runs, and proposals

for additional runs, were extensively discussed at a dedicated May 30 workshop and meetings of

June 3 and June 9.  The Summary of the June 3, 2002, meeting reflects a detailed discussion of

---

[7]This website tracked the development of the December 2000 finding and post-finding
activities through the Working Group's last meeting on March 4, 2003.

the modeling runs and the need to adjust certain of the assumptions and constraints employed,

and an interest in additional runs to determine, for example, the extent to which different

assumptions would affect the ability of industry to meet selected emission limits cost-

effectively.  The Summary indicates that EPA agreed to consider these suggestions, and to post

the results of additional runs on the Working Group website.  Summary at 2-3, available at

http://www.epa.gov/ttn/atw/-combust/utiltox/utoxpg.html#CAAAC. (Exhibit D4).  EPA

subsequently reported to the Working Group on how long it would take to make the data and

other changes required in order to perform the additional IPM runs.  *See* "Suggested Additional

IPM Analysis" at 1 (June 18, 2002) (Exhibit D5), available at http://www.epa.gov/ttn/atw/-

combust/utiltox/utoxpg.html#CAAAC.

The Working Group published its final recommendations in October, 2002, and met once

more in March, 2003.  Both the recommendations and the Summary of the March 2003 meeting

suggest that the Working Group expected to continue its role in developing the mercury rule.

EPA instead disbanded the Working Group, and in its January 2004 Notice of Proposed

Rulemaking (NPR), 69 Fed Reg. 4652 (January 30, 2004), revealed that it had developed an

alternative "market-based" cap and trade approach under CAA § 111.  69 Fed. Reg. at 4652.

Although the docket at this time contained only the original IPM runs for the MACT alternative,

EPA apparently had already decided against this alternative, for no additional analysis of the

MACT alternative was placed in the docket after the NPR, and all subsequent published IPM

modeling analyzed the new § 111 approach.  *See* Ex. A, at 32-34.

Nevertheless, EPA has conceded in response to Attorney General Reilly's FOIA request

that the agency did perform at least two additional IPM runs for the MACT alternative, as well

as IPM runs analyzing a cap and trade scenario.  Although the Napolitano Declaration and Vaughn Index provide little detail about these runs, it seems clear that they analyze the § 112 regulatory alternatives (including facility by facility MACT and a cap and trade approach based on MACT).  Vaughn Index items 74, 86.[8]  The Vaughn Index provides no dates for the runs, but the descriptions of other documents suggest that ICF Consulting, the proprietor of the IPM model, was requested to perform "a new MACT run and a new Hg Trading run" in November, 2003, and was queried concerning the results of one of the runs in December.  Vaughn Index items 74-77, 85, 86.

EPA states that it "ultimately determined that the cap-and-trade approach [under § 111] would produce permanent and likely greater decreases in mercury emission compared to the MACT approach and additionally would provide continuous incentive to develop more efficient mercury control technology."  EPA Mem. at 4.

*Critiques of the Mercury Rulemaking and Suppression*
*of IPM Modeling by EPA's Inspector General*
*and the Government Accountability Office*

Executive Order 12866, 58 Fed. Reg. 51735 (October 4, 1993), requires agencies such as EPA to perform "[a]n assessment, including the underlying analysis, of costs and benefits of potentially effective and reasonably feasible alternatives" to proposed significant regulatory actions, whether those alternatives are identified by the agencies or the public; and to provide "an explanation why the planned regulatory action is preferable to the identified potential

---

[8]See as well the discussion of these runs in the critiques issued by EPA's Inspector General and the Governmental Accountability Office, both summarized *infra*.

10

alternatives." E.O. 12866, § 6(a)(3)(C). The Office of Management and Budget (OMB) "Best

Practices Guidances" under E.O. 12866 states among other things that:

> Analysis of the risks, benefits, and costs associated with regulation must be
> guided by the principles of full disclosure and transparency. Data, models,
> inferences, and assumptions should be identified and evaluated explicitly, together
> with adequate justifications of choices made, and assessments of the effects of
> these choices on the analysis. The existence of plausible alternative models or
> assumptions, and their implications, should be identified. In the absence of
> adequate valid data, properly identified assumptions are necessary for conducting
> an assessment.

OMB, Economic Analysis of Federal Regulations Under Executive Order 12866, Introduction

(January 11, 1996), available at http://www.whitehouse.gov/omb/inforeg/riaguide.html.

On or about March 7, 2005, the Government Accountability Office (GAO) published a

report on EPA's cost-benefit analysis in the mercury NPRM. GAO, Report # GAO-05-252,

"Observations on EPA's Cost-Benefit Analysis of Its Mercury Control Options" (Exhibit E),

available at http://www.gao.gov/new.items/d05252.pdf. The GAO found "four major

shortcomings" in EPA's analysis, including a failure to "consistently analyze options or provide

an estimate of the total costs and benefits of each option," and a failure by EPA to "document

some of its analysis or provide information on how changes in the proposed level of mercury

control would affect the cost-and-benefit estimates for the technology-based option [i.e.,

MACT], as it did for the cap-and-trade option." GAO Report, Summary. With regard to the

second stated failure, GAO found:

> EPA officials responsible for the economic analysis told us that they analyzed
> two variations of the proposed technology-based option with more stringent
> mercury limits than the option included in the proposal, but the agency did not
> include this analysis in the documents supporting its economic analysis or in the
> public rule-making docket. This is inconsistent with EPA's analysis of the cap-

and-trade option, in which it provided a range of costs and benefits associated
with different levels of stringency. This omission is also at odds with OMB
guidance directing agencies to conduct their economic analysis in accordance with
the principles of full disclosure and transparency.

GAO Report at 11. It seems evident that the alternatives analyses *not* included in the NPRM

are the same IPM modeling runs that EPA has declined to produce in response to Attorney

General Reilly's FOIA request.

EPA's Inspector General also investigated the mercury rulemaking. On February 3, 2005,

she reported, among other things, that the rulemaking had been compromised by EPA senior

management's bias in favor of the cap and trade alternative, and that EPA selected the IPM runs

that favored that approach, and suppressed IPM runs that favored the MACT option. EPA

Office of Inspector General, Report No. 2005-P-00003, Additional Analyses of Mercury

Emissions Needed Before EPA Finalizes Rules for Coal-Fired Electric Utilities Chapt. 2

(February 3, 2005) (Exhibit F), available at

http://www.epa.gov/oig/reports/2005/20050203-2005-P-00003--Gcopy.pdf. The report states:

> Documentation we reviewed indicated that EPA conducted at least three
> Integrated Planning Model (IPM) runs in order to reach the pre-determined target
> for national mercury emissions of 34 tons. The initial IPM run to try to reach the
> 34-tons target yielded a national emission of 29 tons (i.e., the IPM model
> indicated that mercury could be reduced from 48 tons to 29 tons). After changing
> the proposed MACT emission limits, a second IPM model yielded a national
> emission of 27 tons. While we were provided summary information about these
> two IPM model runs, they were not included in the EPA rulemaking docket.

OIG Report at 13. Assuming that EPA has identified all of the suppressed IPM modeling runs

in the Vaughn Index, it again seems clear that the two runs referenced in the Inspector General's

report are among those which EPA has declined to produce.

**Argument**

I.    **EPA HAS FAILED TO DEMONSTRATE THAT THE IPM MODELING RUNS ARE EXEMPT UNDER FOIA EXEMPTION 5.**

FOIA's "basic purpose is 'to ensure an informed citizenry, vital to the functioning of a democratic society,' . . . or, stated more specifically, '"to open agency action to the light of public scrutiny,"' *Church of Scientology Internat'l v. U.S. Dept. of Justice,* 30 F.3d 224, 228 (1st Cir. 1994) (citations omitted). "The policy underlying FOIA is thus one of broad disclosure. . . . The government bears the burden of demonstrating the applicability of a claimed exemption . . . ." *Id.*

FOIA provides limited exceptions to this general rule. However, "'[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act,' *Department of Air Force v. Rose,* 425 U.S. 352, 361(1976); '[c]onsistent with the Act's goal of broad disclosure, these exemptions have been consistently given a narrow compass. . . .'" *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). "[A]ny '[d]oubts are customarily to be resolved in favor of openness.'" *Providence Journal Co. v. U.S. Dept. of the Army*, 981 F.2d 552, 557 (1st Cir. 1992).

EPA relies upon exemption 5, which provides that "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" are exempt from the Act's requirements. 5 U.S.C. § 552(b)(5). To qualify for protection under this exemption, a document must "must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it," for example, materials covered by the attorney work product, attorney client, and deliberative process privileges. *Department of the Interior v. Klamath WUPA*, 532 U.S. at 8.

EPA asserts that the withheld documents fall under the deliberative process privilege. This privilege protects deliberative and policy-making processes and, while recognizing that factual materials may sometimes reflect and disclose such processes, Congress did not intend generally to exempt factual materials. *EPA v. Mink*, 410 U.S. 73, 89 (1973).

As stated in *Providence Journal Co. v. U.S. Dept. of the Army*, "A predecisional document will qualify as 'deliberative' provided it (i) formed an essential link in a specified consultative process, (ii) 'reflect[s] the personal opinions of the writer rather than the policy of the agency,' and (iii) if released, would 'inaccurately reflect or prematurely disclose the views of the agency.'" 981 F.2d at 559.

The Napolitano Declaration divides the withheld documents into three categories: handwritten staff notes of meetings while development of the CAMR was underway; two IPM runs for alternative MACT approaches, and two runs for cap-and-trade approaches; and various emails and other documents concerning the development of the additional IPM runs or summarizing and/or analyzing the results thereof. Mr. Napolitano asserts the exemption with respect to all withheld documents in similar conclusory terms. For example, he states that the IPM runs are pre-decisional; that they reveal issues that the agency considered important in the rulemaking process; that their release "would provide clues to the Agency's deliberations"; and that their release "could compromise future Agency deliberations and cause public confusion about the reasons behind EPA's decision-making process." Napolitano Decl. ¶ 17. *See Ethyl Corp. v. U.S. E.P.A.*, 25 F.3d 1241, 1248 -1250 (4th Cir. 1994) (similar conclusory affidavit required remand for more detailed justification or *in camera* review of documents).

Mr. Napolitano's declaration falls well short of carrying EPA's burden of justifying an exemption for these documents under the deliberative process privilege. Indeed, the evidence cited in the Statement of the Case ineluctably points to the conclusion that the IPM runs are factual in nature and not deliberative, and moreover that EPA itself considered full candor regarding the model as well as the data and assumptions used in the model to be essential to its usefulness as an alternative to empirical evidence in its rulemakings.

For example, although Mr. Napolitano avers that IPM runs are predecisional and deliberative materials, the release of which could compromise future rulemakings, he does not attempt to reconcile that assertion with the facts:

- EPA maintains a standing website on which it publishes full details and updates about the data and assumptions used to generate an IPM "Base Case," *i.e.*, a forecast based among other things on assumptions about future usage, fuel costs, and emission controls, and that it regularly seeks input on these assumptions from experts and stakeholders. Mr. Napolitano does not reconcile EPA's policy of transparency regarding the model and the data and assumptions employed therein with his avowed concern that disclosure of particular model runs "could compromise future Agency deliberations and cause public confusion about the reasons behind EPA's decision-making process."

- EPA publishes IPM runs conducted in connection with its rulemakings on its standing website, and it does so in connection with both notices of proposed rules and notices of final rules. In the mercury rulemaking, for example, EPA published the results of some IPM runs for the MACT alternative together with the NPRM, long before EPA reached a decision in favor of the § 111 cap-and-trade alternative and against the § 112 MACT alternative. EPA's use of IPM modeling runs as support for its rules implies that EPA regards the IPM runs as essentially factual in nature. At any rate, Mr. Napolitano does not explain how the publication of these runs both before and concurrently with publication of the final rule is consistent with the alleged character of the IPM runs as predecisional and deliberative rather than primarily factual data supporting and elucidating the agency's action.

15

- At the outset of the mercury rulemaking, EPA convened the Working Group, with which it reviewed in detail all of the variable assumptions that it planned to use in conducting IPM runs, both to test regulatory approaches and to determine sensitivity of the forecast to assumptions concerning cost of controls, fuel costs, and other variables. The Working Group was indeed charged with developing analyses of the alternatives under consideration, and reporting with recommendations to EPA. Mr. Napolitano does not square EPA's own conduct in the mercury rulemaking with his concern that disclosure of the suppressed runs would "reveal[ ] issues that CAMD considered important in the rulemaking process [and] . . . provide clues to the Agency's deliberations prior to rulemaking."

- Although Mr. Napolitano states that the suppressed IPM runs were not relied upon by EPA in reaching its final decision, EPA claims to have "determined that the cap-and-trade approach would produce permanent and likely greater decreases in mercury emission compared to the MACT approach . . . ." EPA Mem. at 4. Since the IPM runs provided the principal factual basis for findings regarding costs and benefits of regulatory alternatives, it is difficult to square this "finding" with Mr. Napolitano's assertion that the agency did not consider or use the suppressed IPM runs.

EPA's customary treatment of IPM modeling runs is consistent with the President's Executive Order 12866, 58 Fed. Reg. 51735 (October 4, 1993), which requires agencies to analyze the costs and benefits of significant proposed actions and "reasonably feasible alternatives," and to explain "why the planned regulatory action is preferable to the identified potential alternatives." E.O. 12866, § 6(a)(3)(C). This directive applies to the data, models, inferences, and assumptions used in the analysis, and "plausible alternative models or assumptions, and their implications, should be identified." OMB, Economic Analysis of Federal Regulations Under Executive Order 12866, Introduction (January 11, 1996). The reports of EPA's own Inspector General and of the GAO underscore how much EPA's handling of the IPM runs in issue has deviated from established procedure.

EPA relies upon cases treating specific pre-decisional documents involving cost or cost-benefit analyses of proposed agency actions as exempt deliberative materials. EPA Mem. at 15-16, *citing Quarles v. Dept. of the Navy*, 893 F.2d 390, 392-93 (D.C. Cir. 1990); *Lead Industries Ass'n v. OSHA*, 610 F.2d 70, 84-85 (2d Cir. 1979); *City of West Chicago v. U.S. Nuclear Regulatory Comm'n*, 547 F. Supp. 740, 749 (N.D. Ill. 1982). These cases do not assist EPA. For one thing, they deal with documents quite dissimilar to the IPM runs. In *Quarles*, a reporter sought a cost analysis backing up the Navy's estimate of the cost of establishing bases in various locations on the Gulf coast. So far as appears, the document in question represented the author's judgment or educated guess on cost questions. In *Lead Industries*, the document was a draft prepared by a consultant analyzing evidence in the rulemaking record concerning the cost and effectiveness of alternative emissions limitations on lead in gasoline. And in *City of West Chicago*, the document again consisted of an analysis weighing evidence and exercising judgment in the process of reaching a conclusion reported to the agency. This case is more like *Carter v. U.S. Dept. of Commerce,* 307 F.3d 1084, 1090-92 (9th Cir. 2002), holding that statistical adjustments to the census to correct for overcounting and undercounting were not exempt since the statistical model and inputs were already known, and the results did not reveal anything of significance about the decisional process.[9]

More important, the status of the IPM modeling runs has already been effectively determined by the D.C. Circuit in *Appalachian Power Co. v. E.P.A.*, 249 F.3d at 1052-54, 1059. The Court there held that if EPA chooses to employ the IPM in its rulemakings, it must fully

---

[9]The Court distinguished *Quarles* as involving subjective opinion and judgment on the part of the author. *Id.* at 1091 n.6.

explain not only the model but also the facts and assumptions used in modeling runs; and it must

consider all the relevant data (including other modeling runs that might detract from its decision.

And of course the Clean Air Act itself requires that all relevant data, including the modeling runs,

be placed in the rulemaking record.  CAA § 307(d).

In sum, in light of the clear and strong evidence regarding EPA's longstanding practice of

making the IPM modeling data, assumptions and results public, in light of express Executive

Branch policy requiring such information to be made public in connection with significant

regulatory actions, and in light of the decision of the D.C. Circuit in the *Appalachian Power* case,

EPA has failed to carry its burden of justifying its claim of exemption with respect to the IPM

modeling runs.  EPA's explanation for claiming the exemption with respect to many of the

remaining documents (all except 114) is not sufficiently precise to allow a judgment as to whether

the exemption is claimed simply because the documents contain information about the

suppressed IPM runs, or because they contain genuinely deliberative material.[10]  Because the

modeling runs are not exempt, EPA should be ordered to clarify the basis for its claim with

respect to each document.  Alternatively, the Court should order EPA to produce those

documents for *in camera* review.  *Ethyl Corp. v. U.S. EPA*, 25 F.3d at 1248-50.

---

[10]For example, if one analogizes the IPM to a scientific or engineering test, then the
protocols followed in performing the test, including the selection of data sources and
assumptions, would presumably not be exempt as deliberative, since that sort of information is
generally discoverable to prevent unfairness. *See Pearl Brewing Co. v. Joseph Schlitz Brewing
Co.*, 415 F. Supp. 1122 (S.D. Tex. 1976) (allowing discovery of full documentation of program
used to estimate impact of antitrust violations in market).  Of course in the context of a
rulemaking, the agency's obligation to consider and include relevant data in the record extends
well beyond the obligation of a civil litigant.  *See Appalachian Power Co. v. EPA*, 249 F.3d at
1052-54, 1059.

Attorney General Reilly does not contest EPA's claim of exemption with respect to document 114 (staff notes of meetings), nor its claim of attorney-client privilege with respect to portions of documents 1, 21, 24, 56, 95, 102, 104, and 105-08, and these portions may be redacted from those documents.

## II.   THE COURT SHOULD FIND THAT EPA'S RESPONSE TO ATTORNEY GENERAL REILLY'S FOIA REQUEST WAS ARBITRARY AND CAPRICIOUS.

FOIA provides that if the Court finds that "the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding," the Agency's procedures and handling of the request shall be investigated by the Merit Systems Protection Board's Special Counsel.  5 U.S.C. § 552(a)(4)(F). Attorney General Reilly urges the Court to make that finding here.

EPA's continued insistence that the suppressed IPM runs are exempt has not and cannot be justified by the nature of the runs, and conflicts with EPA's own past treatment of IPM runs as well as the fact that EPA made other IPM runs analyzing the MACT alternative public in connection with the NPRM, long before its final decision.  Moreover, EPA's persistence even after the investigations and reports of the agency's own Inspector General as well as the GAO, without any response to the conclusions reached in those reports very strongly suggests that the true reasons for the agency's stand are not cognizable under FOIA, and thus that EPA has indeed acted arbitrarily and capriciously in its handling of the request.  This is a matter of concern, since EPA is charged with the responsibility to protect public health and the environment based on scientific understanding.  Any suggestion that the agency would prefer to bury relevant facts

rather than deal with them forthrightly undercuts its credibility, and so should be thoroughly investigated.

### Conclusion

The Court should deny EPA's motion for summary judgment; should order EPA to produce documents 115 and 116; should order EPA to reconsider and clarify its claim of exemption with respect to documents 1 through 113 and 117 through 120 in light of its ruling with respect to documents 115 and 116, or, alternatively to submit those documents to the Court for *in camera* inspection; and should make a finding that EPA acted arbitrarily and capriciously in its handling of this FOIA request,[11] pursuant to 5 U.S.C. § 552(a)(4)(F).

Respectfully submitted,

/S/
William L. Pardee, BBO #389070
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place -- Rm. 1813
Boston, MA 02108
(617) 727-2200, ext. 2419

DATED: September 15, 2005

---

[11]The complaint also requests the Court to award attorneys fees pursuant to § 552(a)(4)(E).  Attorney General Reilly will file a motion for fees at the appropriate time.