# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108-1598

THOMAS F. REILLY
ATTORNEY GENERAL

(617) 727-2200
www.ago.state.ma.us

October 31, 2005

Noreen Russo, Clerk
U.S. Courthouse--7th floor, Ctrm 23
1 Courthouse Way
Boston, Ma 02210

Re:     Reilly v. U.S. EPA, Civil Action No. 05-10450 RBC

Dear Ms. Russo:

I am writing in connection with the pending cross-motions for summary judgment, to draw the Court's attention to additional evidence bearing on a central issue before the Court. The issue is whether particular computer modeling (IPM) runs performed in connection with EPA's mercury rulemaking are exempt from production under FOIA because EPA does not rely on them to support its rule (presumably because they do not support its rule). The Plaintiff's contention is that the modeling runs are public records because they constitute empirical data concerning the subject of the rulemaking rather than policy discussions, and do not themselves expose the policy making process. In support of that contention, we have pointed to several rulemakings (including the mercury rulemaking itself) as well as other materials published on EPA's website to show that EPA in fact uses IPM modeling runs to supply the factual basis for its actions.

Last Thursday, EPA published a new study on its Clean Air Markets website – (http://www.epa.gov/airmarkets/mp/) – entitled "Multipollutant Analysis: Comparison Briefing." A copy of the study is enclosed. In an accompanying news release, EPA's Administrator describes the analysis as an "apples to apples" comparison of various legislative programs and the existing regulatory programs with each other, purportedly showing that the Administration's proposed Clear Skies legislation "is the clear choice for cleaner air and healthier lives." A copy of the news release is also enclosed.

1

Noreen Russo, Clerk
October 31, 2005
Page 2

The study consists of a series of charts and tables providing the results of analyses using a range of modeling and other techniques, including the IPM. The assumptions and IPM modeling runs (26 of them) supporting these charts and tables are all also published on the website. (A copy of the first webpage, listing these documents, is attached).

Leaving aside the question of what the study really proves (in fact it shows that Clear Skies is markedly less effective in terms of health benefits, and less cost-effective [measuring those benefits against the cost to industry] than both alternatives included in the study), the important point is that EPA cites the study and the underlying IPM runs as empirical data. EPA's use of the IPM here is entirely consistent with how EPA used the model in connection with the various rulemakings cited in our brief, including the mercury rulemaking. The fact that EPA has used the IPM uniformly to supply data in its rulemakings further supports our contention that the IPM runs that EPA suppressed in the mercury rulemaking cannot be kept secret on the pretense that they actually constitute policy discussion or analysis.

Although we expect to address these issues fully at oral argument, if the Court has additional questions about this submission, please do not hesitate to call. For the Court's convenience, I am sending a hard copy of this letter and attachments by first class mail.

Yours truly,

William L. Pardee
Assistant Attorney General
617-727-2200 x 2419
bill.pardee@ago.state.ma.us

cc:    Mark Quinlivan (by email)



# *Multi-Pollutant Analysis: Comparison Briefing*

**U.S. Environmental Protection Agency**

**Office of Air and Radiation**

October 2005



# Introduction

This technical support package is part of a comprehensive U.S. Environmental Protection Agency (EPA) analysis of various multi-pollutant proposals.  The analysis is based on air quality, health benefits, and power sector modeling and provides projections for each proposal for the years 2010, 2015, and 2020.

EPA has modeled the following multi-pollutant approaches:

1. Clean Air Planning Act (Carper, S.843 in 108th)
2. Clean Power Act (Jeffords, S.150 in 109th)
3. Clear Skies Act of 2005 (Inhofe, S.131 in 109th)
4. Clear Skies Act of 2003 (Inhofe/Voinovich at the Administration's request, S.485 in 108th)
5. Clear Skies Manager's Mark (of S.131 in 109th)
6. Clean Air Interstate Rule, Clean Air Mercury Rule, and the Clean Air Visibility Rule

# Key Elements of Analysis

**Baseline**

- EPA analyzed all proposals relative to a common baseline, to allow for comparison of the incremental impacts of each proposal over time.

  - For the economic modeling of the utility industry, the baseline includes Title IV, the $NO_x$ SIP Call, New Source Review settlements, State-specific rules, and/or agreements that were finalized by mid-2004.

  - For air quality modeling, the baseline also includes the Tier II, Heavy Duty Diesel, and Non-Road Diesel Rules.

**Short-Term Feasibility Constraint**

**Sensitivity Analyses**

- Natural gas prices

- Electric demand

- Feasibility constraints

- Incremental cost impacts of specific provisions in the different proposals

**Provisions with Offline Analyses**

- EPA conducted a number of offline analyses to evaluate the effects of certain provisions that could not be more comprehensively evaluated in the time available.
  - Opt-ins
  - Early Reduction Credits
  - Allowance Allocations
  - Other changes to existing Clean Air Act provisions

# Modeling Tools

---

**Integrated Planning Model (IPM)**

**Retail Electricity Pricing Model**

**Air Quality Modeling***

**Benefits Modeling (BENMap)**

**Greenhouse Gas Offset Models for the Clean Air Planning Act (S.843)****

**Interpolation Methods*****

*Same PM and ozone modeling platform as EPA used for CAIR.

**$CO_2$ Mitigation from SGM, EPPA, MERGE, IGEM; Agriculture and Forestry from FASOM, GTM; Non-$CO_2$ from various EPA Non-$CO_2$ Models used in EMF-21.

***Air quality and benefits for Clear Skies 2003 (S.485), Clear Skies (Manager's Mark), and the Clean Power Act (S.150) were calculated by interpolation using projected $SO_2$ and $NO_x$ emissions coupled with the modeling results from Clear Skies (S.131) and the Clean Air Planning Act (S.843). EPA believes that the interpolation technique provides a reasonable assessment of the projected air quality and benefits for the scenarios that were not modeled with air quality and benefits models. Our confidence in this technique is based on an analysis in which we applied the interpolation technique for two scenarios which we also modeled. The results indicate that the interpolation for these scenarios were within 5% of the corresponding modeled values.

# Uncertainty in Projections of Costs and Technological Feasibility

There are a number of factors that can lead to uncertainty in cost estimates including:

- Differences in assumptions about key variables such as natural gas prices or electricity demand – EPA has addressed this uncertainty by performing sensitivity analyses on both natural gas prices and electric demand.

- Uncertainty about availability, cost, and performance of control technologies.
    - If technology is not available to meet emission constraints (such as the first phase unit-specific mercury constraints under the Clean Air Planning Act (Carper, S.843), or the first phase $CO_2$ caps or mercury requirements under the Clean Power Act (Jeffords, S.150)), costs could be significantly higher for those bills.
    - If there are technical innovations (including new technologies or improvements in existing technologies), this could lead to lower costs.  This is particularly true in the longer term.

- Unquantified costs of regulation vs. legislation.
    - State-by-State plan development process under CAIR, CAMR, and CAVR and source-specific determinations under CAVR results in additional unquantified costs. These costs are borne by both State regulators and interested parties, such as the power sector and environmental groups, that participate in this process.
    - Uncertainty of litigation under regulation can delay pollution control decision-making, increasing costs in later "rush to compliance".

# Uncertainty in Projections of Benefits

There are a number of factors that can lead to uncertainty in the benefits estimated including*:

- Gaps in scientific knowledge that prevent us from quantifying certain types of benefits.

- Variability in estimated pollution concentrations and response relationships, introduced through differences in study design and statistical modeling.

- Errors in measurement and projection for important variables in analysis such as population growth rates, changes in emissions and pollutant concentrations derived from air quality modeling.

In addition, if projected emission reductions occur more slowly than projected, benefits would be less.

- If litigation results in delaying CAIR, CAMR, or CAVR, benefits would be less. Litigation could result in other changes to timing or control levels that would impact benefits.

- If emission controls cannot be installed quickly enough, or if allowance costs exceed projected prices so that safety valves are triggered, benefits could be less.

*For a more complete discussion of uncertainties related to benefits estimates for fine particles ($PM_{2.5}$) and Ozone, see
"Regulatory Impact Analysis for the Final Clean Air Interstate Rule",  EPA-452/R-/05-002, March 2005, U.S. EPA

# Comparison of Provisions

| | Clean Air Planning Act (Carper, S.843 in 108th) | Clean Power Act (Jeffords, S.150 in 109th) | Clear Skies Act of 2005 (Inhofe, S.131 in 109th) | Clear Skies Act of 2003 (Inhofe/ Voinovich, S.485 in 108th) | Clear Skies Act of 2005 (Managers' Mark of S.131) | CAIR/CAMR/CAVR |
|---|---|---|---|---|---|---|
| **Affected Units** | Existing and new electricity generating facilities with a nameplate capacity > 25 MW | Existing and new electricity generating facilities with a nameplate capacity >/= 15 MW | Electricity generating facilities with a nameplate capacity > 25 MW. Exempts most co-gens from mandatory inclusion but allows them to opt-in.<br><br>For $NO_x$, new units are included regardless of size, except new gas-fired units serving a generator with capacity </= 25 MW.<br><br>For Hg, units emitting 50 lbs or less are exempted on an annual basis. | Electricity generating facilities with a nameplate capacity > 25 MW; cogen units selling more than 1/3 of potential output capacity and more than 25 MW to the grid.<br><br>New units are included regardless of size, except new gas-fired units serving a generator with capacity </= 25 MW exempted for $SO_2$. | Electricity generating facilities with a nameplate capacity > 25 MW. Exempts most co-gens from mandatory inclusion but allows them to opt-in.<br><br>New units are included regardless of size, except new gas-fired units serving a generator with capacity </= 25 MW exempted for $SO_2$ and $NO_x$.<br><br>For Hg, units emitting 30 lbs or less are exempted on an annual basis | Existing and new electricity generating facilities with a nameplate capacity > 25 MW; cogen units selling more than 1/3 of potential output capacity and more than 25 MW to the grid.<br><br>(CAIR: 28 States+DC<br>CAMR: 50 States +DC<br>CAVR: Non-CAIR States) |
| **Emissions Caps** | $SO_2$<br>2009: 4.5 million tons<br>2013: 3.5 million tons<br>2016: 2.25 million tons<br><br>$NO_x$<br>2009: 1.87 million tons<br>2013: 1.7 million tons<br><br>$CO_2$<br>2009: 2006 emissions* (2.655 billion tons, 656.9 MMTCE)<br>2013: 2001 emissions* (2.454 billion tons, 607.2 MMTCE)<br>*May be achieved using emissions offsets.<br><br>Hg<br>2009: 24 tons<br>2013: 10 tons<br>Includes Hg unit-specific limit.<br><br>Birthday provision:<br>Starting in 2020, affected units on which construction commenced before August 17, 1971 must meet performance standards for $SO_2$ and $NO_x$. | $SO_2$: 2.25 million tons (split into West and Non-West: West: 275,000 tons, Non-west: 1.975 million tons)<br><br>$NO_x$<br>2010: 1.51 million tons<br><br>$CO_2$: 2.050 billion tons (507.2 MMTCE)<br><br>Hg<br>2010: 5 tons<br>No Hg trading. Hg unit-specific emissions limitation of no greater than 2.48 grams per 1,000 MWh in 2009.<br><br>Birthday provision:<br>Facilities subject to BACT limits after January 1, 2014 or 40 years after commencement of generation, whichever comes later. | $SO_2$<br>2010: 4.5 million tons<br>2018: 3.0 million tons<br><br>$NO_x$<br>2008: 2.2 million tons<br>2018: 1.8 million tons<br><br>$CO_2$<br>Not covered<br><br>Hg<br>2010: 34 tons<br>2018: 15 tons | $SO_2$<br>2010: 4.5 million tons<br>2018: 3.0 million tons<br><br>$NO_x$<br>2008: 2.1 million tons<br>2018: 1.7 million tons<br><br>$CO_2$<br>Not covered<br><br>Hg<br>2010: 26 tons<br>2018: 15 tons | $SO_2$<br>2010: 4.5 million tons<br>2016: 3.0 million tons<br><br>$NO_x$<br>2008: 2.2 million tons<br>2016: 1.8 million tons<br><br>$CO_2$<br>Not covered<br><br>Hg<br>2010: 34 tons<br>2016: 15 tons | $SO_2$ (CAIR)<br>2010: 3.6 million tons<br>2015: 2.5 million tons<br><br>$NO_x$ - Annual (CAIR)<br>2009: 1.5 million tons<br>2015: 1.3 million tons<br><br>$NO_x$ - Ozone Season (CAIR)<br>2009: 0.6 million tons<br>2015: 0.5 million tons<br><br>$CO_2$<br>Not covered<br><br>Hg (CAMR)<br>2010: 38 tons<br>2018: 15 tons<br><br>CAVR: BART for individual units |

# Projected Emissions from Electric Generating Units









# Projected Annual Costs



**Note:** Allowance transfer costs are not included in these estimates.

# Air Quality Impacts: Areas Projected to Exceed NAAQS Absent Additional Local Controls

| Nonattainment Areas for PM$_{2.5}$* | | | | |
|---|---|---|---|---|
| | Designated Nonattainment Areas (Based on 2001- 2003 Ambient Data) | 2010 | 2015 | 2020 |
| Clean Air Planning Act (S.843) | 39 | 11 | 12** | 14** |
| Clean Power Act (S.150) | 39 | 9 | 10** | 11** |
| Clear Skies (S.131) | 39 | 20 | 18 | 18 |
| Clear Skies 2003 (S.485) | 39 | 20 | 17 | 17 |
| Clear Skies (Manager's Mark) | 39 | 20 | 17 | 16 |
| CAIR/CAMR/CAVR | 39 | 21 | 17 | 16 |

| Nonattainment Areas for 8-Hour Ozone* | | | | |
|---|---|---|---|---|
| | Designated Nonattainment Areas (Based on 2001- 2003 Ambient Data) | 2010 | 2015 | 2020 |
| Clean Air Planning Act (S.843) | 126 | 20 | 11 | 10 |
| Clean Power Act (S.150) | 126 | 16 | 11 | 10 |
| Clear Skies (S.131) | 126 | 22 | 11 | 10 |
| Clear Skies 2003 (S.485) | 126 | 22 | 11 | 10 |
| Clear Skies (Manager's Mark) | 126 | 22 | 11 | 10 |
| CAIR/CAMR/CAVR | 126 | 22 | 11 | 10 |

*Does not account for disbenefits associated with initial increase in emissions prior to 2010 under the Clean Power Act (S.150) and benefits associated with early reductions under Clear Skies (S.131) and Clear Skies (Managers' Mark). Ozone in the West was not modeled as part of this analysis. Future year ozone nonattainment in the West is based on modeling that was performed for the Nonroad Engine Rule. Results for the Clean Power Act (S.150), Clear Skies 2003 (S.485), and Clear Skies (Managers' Mark) were calculated based on interpolation using results from other scenarios modeled with air quality models.

**The increase in PM$_{2.5}$ nonattainment areas from 2010 to 2015 and 2020 is primarily due to growth in emissions of SO$_2$ and directly emitted PM$_{2.5}$ from industrial and unaffected smaller Electric Generating Unit (EGU) sources. There are no increases in other emissions from these sources.

# Annual Monetary Health Benefits of Reducing Fine Particles and Ozone

| Projected Quantified Annual Health Benefits (Billion $ 1999)* | | | |
|---|---|---|---|
| | **2010** | **2015** | **2020** |
| **Clean Air Planning Act (S.843)** | **$109 - 128** | **$117 – 137** | **$137 – 161** |
| **Clean Power Act (S.150)** | **$139 - 162** | **$156 – 183** | **$180 – 211** |
| **Clear Skies (S.131)** | **$66 – 78** | **$84 – 99** | **$114 – 134** |
| **Clear Skies 2003 (S.485)** | **$68 – 80** | **$88 – 102** | **$118 – 138** |
| **Clear Skies (Managers' Mark)** | **$68 – 79** | **$89 – 104** | **$122 – 143** |
| **CAIR/CAMR/CAVR** | **$62 – 73** | **$91 – 106** | **$120 - 140** |

- The monetized benefits estimated for CAIR/CAMR/CAVR are from reductions in ozone and fine particle concentrations resulting from lower $SO_2$ and $NO_x$ emissions.  EPA is not estimating the benefits from the Hg and $CO_2$ reductions that also occur.

- Fine particle concentration reductions provide the vast majority of the monetized benefits.  From past analysis that has been done of $SO_2$ and $NO_x$ reductions, it is clear that each ton of $SO_2$ reduction that occurs to lower fine particle emissions provides more benefits than the $NO_x$ reductions that occur to lower fine particles in the same area.  Therefore, we believe that the total monetized benefits of a ton of $SO_2$ reduction are significantly higher than a ton of $NO_x$ reduction.

There are unquantified benefits that are relatively greater for proposals with larger emissions reductions, including improvements in visibility in parks and recreational areas and in residential areas, decreases in ozone-related damage to agriculture, decreases in sulfur and nitrogen (reduced acidification of surface waters, damage to forest ecosystems and soils, and coastal eutrophication), decreases in mercury deposition, and reduction in risks associated with climate change.

*Does not account for disbenefits associated with initial increase in emissions prior to 2010 under the Clean Power Act (S.150) and benefits associated with early reductions under Clear Skies (S.131) and Clear Skies (Managers' Mark). Results for the Clean Power Act (S.150), Clear Skies 2003 (S.485), and Clear Skies (Managers' Mark) were calculated based on interpolation using results from other scenarios modeled with air quality models.

# Projected Allowance Prices









*The Clean Power Act (S.150) does not permit allowance trading for mercury. $CO_2$ and mercury control costs under the Clean Power Act collapse $SO_2$ and $NO_x$ trading markets and govern all three pollutants.

# Electricity and Natural Gas Prices





# Coal Production

- With the exception of the Clean Power Act (S.150), total coal production is projected to increase under all bills relative to 2003 levels.

- Under Clear Skies 2003 (S.485), Clear Skies (S.131), Clear Skies (Managers' Mark), and CAIR/CAMR/CAVR, coal production is projected to increase over all three regions relative to 2003.

- Under the Clean Air Planning Act (S.843), both Appalachian and Western coal production are projected to decline very slightly from 2003 levels in 2010, but rise relative to 2003 levels by 2020.

- Under the Clean Power Act (S.150), Interior coal production is projected to be at 2003 levels in 2010, increasing in 2020. Both Western and Appalachian coal production are projected to decline relative to 2003 levels.



# Generating Capacity

- Coal capacity drops to less than 2/3 of current levels under the Clean Power Act (S.150); in all other bills coal capacity increases slightly by 2020.

- Under the Clean Power Act (S.150), combined cycle and renewable generation become more economical, and increase significantly relative to 2003 levels.

- By 2020, combined cycle capacity increases under the remaining bills by about 70 MW, and renewable generation increases only slightly.

**Note:** EPA did not model the birthday provisions of the Clean Power Act (S.150) or the Clean Air Planning Act (S.843) for units <100MW.







# Technical Feasibility of Installing Controls by 2010

- EPA modeling places limits the combined amount of selective catalytic reduction (SCR) and flue gas desulfurization (scrubbers) that can be installed by 2010. This constraint is binding in all bills, such that the cost of each bill is higher in 2010 than it would be if such a constraint were not in place.

- Certain other responses to the emissions constraints in the bill, such as installation of mercury controls and the building of new natural gas capacity, would also likely be limited to some degree in practice due to resource constraints.

- EPA modeling does not place limits on these responses, and EPA believes that projected activated carbon injection (ACI) installations and additional natural gas capacity for the Clean Air Planning Act (S.843) and the Clean Power Act (S.150) exceed what is feasible by 2010.



- While activated carbon controls do not require a significant amount of boilermakers, engineering and project management resources may present bottlenecks in 2010.
- Installation of significant combined cycle capacity in 2010 would present boilermaker, project management and engineering challenges.

# Unique Provisions, Off-line Analyses, and Allocations

- EPA conducted off-line analyses of unique provisions in the bills that could not be analyzed within IPM.

| Proposal | Unique Provisions Analyzed by EPA | Summary of Allocation Provisions |
|---|---|---|
| Clean Air Planning Act (S.843) | Carbon offsets – number of offsets required, total costs<br><br>Allocations – distribution, total value | Relies on Title IV allocations for $SO_2$; uses updating, output-based allocations for $NO_x$, Hg, and $CO_2$. |
| Clean Power Act (S.150) | Allocations – distribution; cost of allowance purchases to power sector | Primarily "auction-like" provision with allowances distributed to households, impacted sectors, and set-aside for renewable energy and efficiency projects. |
| Clear Skies (S.131) | Early reduction credits – estimated early reductions and additional allowances awarded<br><br>Allocations – distribution, total value<br><br>Opt-ins – number of sources potentially eligible to opt-in and their emissions<br><br>Transitional areas – number of eligible non-attainment areas | Relies on Title IV allocations for $SO_2$; uses historic heat input for $NO_x$ and Hg, with fuel adjustment factors for $NO_x$ and coal adjustment factors for Hg. |
| Clear Skies 2003 (S.485) | Allocations – distribution; cost of allowance purchases to power sector | Increasing percentage of allowances auctioned each year. For $SO_2$, allocations tied to Title IV; for $NO_x$ and Hg, allocations based on historic heat input, adjusting for coal type for Hg. |
| Clear Skies (Managers' Mark) | Early reduction credits – estimated early reductions and additional allowances awarded<br><br>Allocations – distribution, total value<br><br>Opt-ins – number of sources potentially eligible to opt-in and their emissions<br><br>Transitional areas – number of eligible non-attainment areas | Relies on Title IV allocations for $SO_2$; uses historic heat input for $NO_x$ and Hg, with fuel adjustment factors for $NO_x$ and coal adjustment factors for Hg. |

# To Learn More…

**Additional materials can be found on EPA's website:**

***http://www.epa.gov/airmarkets/mp***

- More detailed briefings of each multi-pollutant approach

- Technical support documents

- Air quality, benefits, and power sector modeling files



## U.S. Environmental Protection Agency

# EPA Newsroom

Recent Additions | Contact Us | Print Version     Search:     GO

EPA Home > EPA Newsroom > Clear Skies and Legislative and Regulatory Analyse...



**EPA Newsroom Home**

**News Releases**

**Comunicados En Español**

**Get News by E-mail**

**RSS** XML

**Media Contacts**

**Visiting Offices & Labs**

**Regional Newsrooms**

**Events Calendar**

**U.S. Government Newsrooms**

**Broadcast Services**

**Public Service Announcements**

**Image Gallery**

**Media Kits**

**Speeches**

**Testimony**

**EPA History**

**FOIA**

**Glossary**

**Acronyms**

# Clear Skies and Legislative and Regulatory Analyses Released

Contact: Eryn Witcher, 202-564-4355 / witcher.eryn@epa.gov

(Washington, D.C.-October 27, 2005) Administrator Stephen L. Johnson today announced the results of the most detailed, comprehensive analysis of air ever conducted by the U.S. Environmental Protection Agency. The legislative and regulatory analyses compared several cap-and-trade approaches aimed at reducing sulfur dioxide, nitrogen oxides, and mercury emissions from coal-fired power plants.

"This additional information answers any remaining questions," said Johnson. "This is an apples-to-apples comparison that shows Clear Skies legislation is the clear choice for cleaner air and healthier lives."

Clear Skies will significantly expand the Clean Air Act's most innovative and successful program to cut power plant pollution of sulfur dioxide, nitrogen oxides and, for the first time, mercury by an unprecedented 70 percent in two phases. These cuts in pollution will provide substantial health benefits by imposing a mandatory multi-pollutant cap on emissions from more than 1300 power plants nationwide, reducing pollution by as much as 9 million tons annually at full implementation. The country will achieve this by spending more than $47 billion in large part to install, operate and maintain pollution abatement technology on both old and new power plants.

Clear Skies cap and trade approach will give states the most powerful, efficient and proven tool available for meeting new, tough, health-based air quality standards for fine particles and ozone. Most counties will be able to meet the new standards without having to take any new local measures beyond the Clear Skies power plant reductions. The market-based trading approach will substantially cut the overall cost of compliance that is passed on to consumers and shareholders.

Earlier today, Johnson briefed congressional members on EPA's analysis. The study incorporated the latest computer models and assumptions to create a side-by-side comparison of President Bush's Clear Skies legislation to several alternatives introduced on Capitol Hill.

The legislative and regulatory analyses project potential costs and benefits for

public health, air quality, and the power sector for the years 2010, 2015, and 2020. The legislative and regulatory proposals analyzed:

1. Clean Air Planning Act (Carper, S.843 in 108th)
2. Clean Power Act (Jeffords, S.150 in 109th)
3. Clear Skies Act of 2005 (Inhofe, S.131 in 109th)
4. Clear Skies Act of 2003 (Bush Administration proposed bill, S.485 in 108th)
5. Clear Skies Manager's Mark (of S.131)
6. Clean Air Interstate Rule (CAIR), Clean Air Mercury Rule (CAMR), Clean Air Visibility Rule (CAVR)

The analyses and supporting documentation may be found online at:
http://www.epa.gov/airmarkets/mp

Release date:10/27/2005

## Receive our News Releases Automatically by Email

EPA Home | Privacy and Security Notice | Contact Us

Last updated on 10/27/2005 06:30:07 PM
URL:
http://yosemite.epa.gov/opa/admpress.nsf/DisplayView/NT000062BA?OpenDocument



## U.S. Environmental Protection Agency

# Clean Air Markets

Recent Additions | Contact Us | Print Version    Search:

EPA Home > Clean Air Markets > Recent Additions

**Doing Business With Us**

**Programs and Regulations**

**Progress and Results**

**Allowance Trading**

**Reports and Articles**

**Data and Maps**

**Acid Deposition Monitoring**

**Environmental Issues**

# Multi-Pollutant Analyses and Technical Support Documents

Over the past several years, various multi-pollutant proposals, designed to reduce emissions from the power sector, have been introduced in the Senate. EPA agreed to perform detailed analyses for five of these legislative proposals in response to Senate requests. That information, along with analysis of EPA's regulatory approach to reducing emissions from the power sector, is provided on this web site. These analyses are based on air quality, health benefits, and power sector modeling projections and estimates for the years 2010, 2015, and 2020.

The following legislative proposals were modeled:

1. Clean Air Planning Act (Carper, S.843 in 108th Congress)
2. Clean Power Act (Jeffords, S.150 in 109th Congress)
3. Clear Skies Act of 2005 (Inhofe, S.131 in 109th Congress)
4. Clear Skies Act of 2003 (Inhofe/Voinovich at the Administration's request, S.485 in 108th Congress)
5. Clear Skies Manager's Mark (of S.131 above)

In addition, EPA modeled three recently finalized federal regulations as a sixth analysis:

6. The Clean Air Interstate Rule (CAIR), which covers SO2 and NOx emissions in the Eastern U.S.; the Clean Air Mercury Rule (CAMR), which covers mercury emissions nationwide; and the Clean Air Visibility Rule (CAVR), which requires certain units - depending on their visibility impacts - to install pollution controls in certain areas of

the country.

[News release about EPA Administrator Steve Johnson's release of the analyses](#)

[About PDF](#) | [Free Excel Viewer](#)    EXIT disclaimer ▶

## Summaries of the Analyses:

[Multi-Pollutant Analysis: Comparison Briefing Table Summarizing Key Provisions of all Six Scenarios](#)

The six analyses and additional supporting materials are presented here:

# October 2005 EPA Multi-Pollutant Analyses

1. [Multi-Pollutant Legislative Analysis: The Clean Power Act (Jeffords, S.150 in 109th)](#)
2. [Multi-Pollutant Legislative Analysis: The Clean Air Planning Act (Carper, S.843 in 108th)](#)
3. [Multi-Pollutant Legislative Analysis: The Clear Skies Act of 2005 (Inhofe, S.131 in 109th)](#)
4. [Multi-Pollutant Legislative Analysis: The Clear Skies Act of 2003 (Inhofe, S.485 in 108th)](#)
5. [Multi-Pollutant Legislative Analysis: The Clear Skies Act of 2005 (Manager's Mark of S.131 in 109th)](#)
6. [Multi-Pollutant Regulatory Analysis: The Clean Air Interstate Rule, The Clear Air Mercury Rule, and The Clean Air Visibility Rule (EPA promulgated rules, 2005)](#)

# Power Sector Modeling Supporting Materials[1]

1. [Technical Support Document - Assumptions for Short-Term Feasibility Constraint](#)
2. [Technical Support Document - Assumptions for Modeling](#)

Demand Response

3.  Technical Support Document - Description of Allocations Analysis

4.  Technical Support Document - Analysis of Carbon Dioxide Offsets Provisions of the Clean Air Planning Act of 2003 (S. 843)

5.  State by State Projections of Emissions and Electricity Prices

6.  IPM Run - Base Case

7.  IPM Run - CSA 2005: Inhofe

8.  IPM Run - CSA 2005: MM

9.  IPM Run - CSA 2003

10. IPM Run - Jeffords

11. IPM Run - Carper

12. IPM Run - CAIR/CAMR/CAVR

13. IPM Run - Base Case - EIA Gas and Growth

14. IPM Run - CSA 2005: Inhofe - EIA Gas and Growth

15. IPM Run - CSA 2005: MM - EIA Gas and Growth

16. IPM Run - CSA 2003 - EIA Gas and Growth

17. IPM Run - Jeffords - EIA Gas and Growth

18. IPM Run - Carper - EIA Gas and Growth

19. IPM Run - CAIR/CAMR/CAVR - EIA Gas and Growth

20. IPM Run - CSA 2005: Inhofe - Demand Response

21. IPM Run - CSA 2005: MM - Demand Response

22. IPM Run - CSA 2003 - Demand Response

23. IPM Run - Jeffords - Demand Response

24. IPM Run - Carper - Demand Response

25. IPM Run - CAIR/CAMR/CAVR - Demand Response

26. IPM Run - CSA 2005: Inhofe - Unconstrained

27. IPM Run - CSA 2005: MM - Unconstrained

28. IPM Run - CSA 2003 - Unconstrained

29. IPM Run - Jeffords - Unconstrained

30. IPM Run - Carper - Unconstrained

31. IPM Run - Carper - Hard CO2 Cap

32. IPM Parsed Files for the years 2010, 2015 and 2020

33. IPM Documentation

## Air Quality Modeling Supporting Materials

34. [Technical Support Document - Air Quality Modeling Technique used for Multi-Pollutant Analysis]

35. [Air Quality Modeling Results Excel File] (w/ the following information):
    - Projected PM2.5 concentration in each nonattainment area
    - Projected Ozone concentration in each nonattainment area
    - Projected PM2.5 concentration in each county with a monitoring site
    - Projected Ozone concentration in each county in the East with a monitoring site
    - Impact on PM2.5 concentrations, by county
    - Impact on Ozone concentrations, by county

## Benefits Modeling Supporting Materials

36. [Technical Support Document - Health Benefits Extrapolation Method for EPA's Multi-Pollutant Analyses of 2005]

37. [Benefits Modeling Results]

[1] For simplification: The Clean Power Act (Jeffords, S.150 in 109th) = "Jeffords", The Clean Air Planning Act (Carper, S.843 in 108th) = "Carper", The Clear Skies Act of 2005 (Inhofe, S.131 in 109th) = "CSA 2005: Inhofe", The Clear Skies Act of 2003 (Inhofe, S.485 in 108th) = "CSA 2003", The Clear Skies Act of 2005 (Manager's Mark of S.131 in 109th) = "CSA 2005: MM", The Clean Air Interstate Rule, The Clear Air Mercury Rule, and The Clean Air Visibility Rule (2005) = "CAIR/CAMR/CAVR."

[Top of Page]



CAM Update | Forms | Workshops | Glossary
Site Map | About Us | Questions and Answers | Other Resources

EPA Home | Privacy and Security Notice | Contact Us