# United States District Court
# District of Massachusetts

THOMAS F. REILLY,
      Attorney General
      of the Commonwealth of Massachusetts,
         Plaintiff,

           v.                              Civil No. 05-10450-RBC[1]

UNITED STATES ENVIRONMENTAL
      PROTECTION AGENCY,
         Defendant.

# <u>OPINION</u>

COLLINGS, U.S.M.J.

## I.  INTRODUCTION

On March 10, 2005, plaintiff Thomas F. Reilly, Attorney General of the

Commonwealth of Massachusetts (hereinafter "AG Reilly" or "plaintiff"), filed

a complaint pursuant to the Freedom of Information Act (hereinafter "FOIA"),

Title 5 U.S.C. § 552, seeking an order requiring the defendant, the United States

---

[1]
      With the parties' consent this case has been referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to Title 28 U.S.C. §636(c).

Environmental Protection Agency (hereinafter "EPA" or "defendant"), to produce certain documents relating to the regulation of mercury emissions from power plants. In response to pre-litigation requests the defendant had withheld certain documents from disclosure pursuant to Title 5 U.S.C. §552(b)(5) (hereinafter "Exemption 5" or the "deliberative process privilege"), and under the attorney-client privilege. The EPA filed its answer (#4) to the complaint on April 11, 2005.

A little more than three months later on July 29, 2005, the defendant filed a motion for summary judgment, a declaration and a "Vaughn index" (#10) together with a memorandum of law in support thereof (#11). In turn, on September 15, 2005, the plaintiff submitted a cross-motion for summary judgment and a statement of material facts with exhibits (#12) as well as a memorandum in support of the cross-motion and in opposition to the defendant's dispositive motion (#13). Following an extension of time, on October 20, 2005, the EPA filed its memorandum in opposition to the plaintiff's cross-motion for summary judgment (#17). Eleven days later AG Reilly filed a letter and supplementary exhibit (#18) thereby completing the written summary judgment record.

Following oral argument on March 7, 2006, it was determined that in

light of the complexity of the subject matter involved, an evidentiary hearing needed to be held to develop more fully the facts recited in the defendant's expert's declaration. The evidentiary hearing was set for and held on March 22, 2006. Although the record was developed in the context of the parties' cross-motions for summary judgment, since the Court heard evidence on the matter, the decision on the merits of the claims shall be made on the basis of the summary judgment record supplemented by the testimony adduced at the evidentiary hearing rather than on the basis of summary judgment practice.

## II. THE FACTS

This case arises out of a dispute between AG Reilly and the EPA over the disclosure of documents relating to the promulgation of the Clean Air Mercury Rule (hereinafter "CAMR"), 70 Fed. Reg. 28,606 (May 18, 2005), which became effective on July 18, 2005. (#10, Declaration of Samuel Napolitano[2] ¶5; #11, p. 2)    According to the EPA, "[t]he CAMR permanently caps and reduces mercury emissions from coal-fired power plants through the establishment of a cap-and-trade system under §111 of the Clean Air Act, 42 U.S.C. §7411. (#10, Napolitano Dec. ¶5; #11, p. 2)

---

[2]

Mr. Napolitano is the Director of the Clean Air Markets Division ("CAMD") of the EPA which was involved in the development of the CAMR. (#10, Napolitano Dec. ¶¶1, 5)

A.  The Mercury Rulemaking and IPM

On December 15, 2003, the EPA announced its proposals for new regulations to control mercury emissions from power plants nationwide. (#1 ¶6; #4 ¶6)  On January 30, 2004, those proposed regulations were published in a Notice of Proposed Rulemaking (hereinafter "NPRM"), to wit, "Proposed National Emission Standards for Hazardous Air Pollutants; and, in the Alternative, Proposed Standards of Performance for New and Existing Stationary Sources: Electric Utility Steam Generating Units", 69 Fed. Reg. 4652 (January 30, 2004). (#1 ¶6; #4 ¶6)  The NPRM described two major

> alternative regulatory approaches to controlling mercury emissions: establishment of an emissions standard or standards based on maximum achievable control technology (MACT), in accordance with CAA §112, 42 U.S.C. §7412, or, alternatively, new source performance standards coupled with a "cap and trade" system under CAA §111, 42 U.S.C. §7411.

Complaint #1 ¶7.

The cap-and-trade alternative was stated in the NPRM to be preferred because, *inter alia*, the EPA had concluded that "this approach would yield comparable or better reductions in total mercury emissions within the same time frame in

a more cost-effective manner than establishment of MACT standards". (#1 ¶7[3])

The EPA used a proprietary computerized model, i.e., the Integrated Planning Model (hereinafter "IPM"), to prepare forecasts utilized in evaluating the relative costs and benefits of alternative proposed regulatory approaches to pollution control. (#1 ¶¶ 10, 11;  #10, Napolitano Dec. ¶5)  According to the EPA, "IPM is a multi-regional, dynamic, deterministic linear programming model of the U.S. electric power sector." (#13, p.3 n.1; #10, Napolitano Dec. ¶6)  Its fundamental purpose is to find "the least-cost solution for the power sector for meeting projected electricity demand in regions across the country by taking into account environmental constraints and other economic or infrastructure constraints inherent to the power sector." (#10, Napolitano Dec. ¶6)  In addition to the CAMR,

> EPA has used IPM to develop rules, such as the Nox SIP Call, a revised national air quality standard for ozone, and utility cooling water standards; to evaluate the effects of the 1990 Clean Air Act Amendments on the utility industry; to analyze the environmental impacts of utility industry restructuring; to investigate CO2

---

[3]      The defendant views the allegations in paragraph 7 of the complaint as the plaintiff's characterization of the NPRM and contends that, in fact, the NPRM speaks for itself. (#4 ¶7)  Indeed, the EPA takes the position that AG Reilly is characterizing things that speak for themselves in many of the allegations in the complaint.  *See*, e.g., #4 ¶¶1, 6, 7, 8, 9, 10, 11, 13, 14, 15, 19, 20.

reduction strategies; and to evaluate multi-pollutant controls.

Complaint #1 ¶11; #10, Napolitano Dec. ¶¶6, 7.

The EPA uses IPM modeling to examine impacts of proposed pollution control policies on the electric power sector, and thus to provide the factual/analytical support for regulatory and legislative proposals. (#12, Statement of Material Facts ¶4.2[4]) From time to time, the EPA updates the data and assumptions employed in the IPM modeling, and in doing so consults with stakeholders and others about the accuracy of the data and reasonableness of the assumptions. (#12, Statement of Material Facts ¶4.3) The EPA maintains a website on which it reports updates to the IPM modeling data and assumptions, and publishes modeling runs conducted in connection with rulemakings. (#12, Statement of Material Facts ¶4.4[5]) The modeling runs are also placed in the docket for the appropriate rulemaking. (#12, Statement of

---

[4]

The defendant has submitted no statement controverting the plaintiff's statement of material facts and so, to the extent that they are facts and not conclusions of law, they are deemed to be admitted. *See* Local Rule 56.1. The plaintiff's material facts shall be essentially quoted herein verbatim, albeit without quotation marks or reference to the supporting documentation.

[5]

Numerous IPM run output files are available for public viewing at: http://epa.gov/airmarkets/epa-ipm/utilityhgredux.html. This link provides access to 23 IPM runs conducted by the EPA in conjunction with the CAMR rulemaking. The web pages containing these links were submitted by the plaintiff as Exhibit A to its Motion for Summary Judgment (#12). The Court may take judicial notice of these materials. *See Nebraska v. EPA*, 331 F.3d 995, 999 n.3 (D.C. Cir., 2003).

Material Facts ¶4.3)

Numerous IPM runs were made to evaluate both the MACT and cap-and-trade options vis-a-vis mercury emissions, and those IPM runs relied upon in developing the CAMR were disclosed in Docket No. OAR-220-0056, available for review by the public on the EPA's website. (#10, Napolitano Dec. ¶8) In the mercury rulemaking, until it abruptly abandoned the original regulatory approach in favor of a cap-and-trade approach under a different provision of the Clean Air Act, the EPA consulted extensively with a stakeholder group regarding the data and assumptions employed in the IPM modeling runs, and reported the results of its modeling runs to the workgroup. (#12, Statement of Material Facts ¶4.5) The EPA published its initial IPM runs analyzing this alternative with the Notice of Proposed Rulemaking, long before it reached a final decision with regard to the mercury rule. (#12, Statement of Material Facts ¶4.5[6])

In reviews of the process followed by the EPA in developing the Notice of Proposed Rulemaking regarding mercury emissions by power plants, the EPA's

---

[6]

In his supplemental filing (#18), AG Reilly submitted a recent study that the EPA published "consist[ing] of a series of charts and tables providing the results of analyses using a range of modeling and other techniques, including IPM. The assumptions and IPM modeling runs (26 of them) supporting these charts and tables were all also published on the [EPA] website." (#18, pp. 1-2) In the plaintiff's view, the point to be made is that the "EPA cites the study and the underlying IPM runs as empirical data" as it has in other cases, rather than as "policy discussion or analysis" as is claimed in this case.

Inspector General found that the policy biases of upper level EPA officials distorted the rulemaking process and led to the suppression of evidence that would tend to undercut the EPA's preferred approach, including several IPM runs relating to the technology based (MACT) regulatory approach under §112 of the Clean Air Act. (#12, Statement of Material Facts ¶4.6)  The Government Accountability Office (GAO) also found that the EPA violated guidelines for performing cost-benefit analyses of significant rules by failing adequately to analyze alternative regulatory approaches and failing to make its analyses public, thereby undercutting the credibility of the approach upon which the EPA settled. (#12, Statement of Material Facts ¶4.6)

## B. The Plaintiff's FOIA Request and Lawsuit

The plaintiff duly filed, on or about March 19, 2004, a request pursuant to FOIA with the EPA, requesting "All records relating to the use of the Integrated Planning Model (IPM) in connection with the impact on the electricity generating and fossil fuel industries of proposed EPA standards for the emission of mercury from power plants." (#12, Statement of Material Facts ¶1)  In a June 10, 2004 letter, Samuel Napolitano of the EPA released some documents to AG Reilly, but also denied the request in part. (#10, Napolitano

Dec. ¶11)  The partial denial of the FOIA request was appealed, and on or about December 9, 2004, the EPA issued its final determination with respect to the plaintiff's request in which the EPA asserted that numerous documents, including staff notes, analytical documents, and email, were exempt from production under Exemption 5 in that they were covered by the deliberative process privilege. (#10, Napolitano Dec. ¶11; #12, Statement of Material Facts ¶2)

Among the documents withheld are Documents ##115 and 116, consisting of the results of computer modeling of several regulatory alternatives using IPM. (#12, Statement of Material Facts ¶3)  Documents ##115 and 116 consist of IPM runs.      (#12, Statement of Material Facts ¶4.1)  Specifically, "115 consists of IPM Run Outputs for two alternative MACT options and 116 consists of IPM Run Outputs for the Hg [i.e., mercury] Trading option." (#12, Statement of Material Facts ¶4.1)

9

On March 10, 2005, the plaintiff filed the instant lawsuit seeking, *inter alia*, an order compelling the defendant to produce "improperly withheld agency records." (#1 ¶1)  In its answer filed on April 18, 2005, the defendant, reaffirming its position taken on December 9, 2005, denied that it had withheld documents improperly. (#4)  A little more than two months later on June 28, 2005, the defendant released additional documents responsive to the plaintiff's FOIA request, and then the next month filed its motion for summary judgment. (#10; #10, Napolitano Dec. ¶14)  At this point in time the EPA identifies 120 documents responsive to the  plaintiff's FOIA demand which it claims are privileged under Exemption 5 of FOIA. (#10, Napolitano Dec. ¶15)

Accompanying its motion, the defendant has filed the Napolitano Declaration and an attached "Vaughn index" which describes each withheld document and the purported justification for its exemption from FOIA disclosure. *See generally Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir., 1973). Specifically, the Vaughn index consists of the following fields for each withheld document: (1) an identifying number assigned to each document, (2) number of pages, (3) subject, (4) date, (5) author, (6) recipients, (7) description, (8) exemption claimed, and (9) release/withheld status.  Mr. Napolitano's general

description of the withheld documents is as follows:

> The responsive records that were withheld and constitute the subject of this litigation consist of handwritten EPA staff notes, computer files containing IPM runs for two MACT options, computer files and spreadsheets containing IPM runs for two cap-and-trade options, economic and emissions analyses of the cap-and-trade proposal in the form of documents and presentation materials, and EPA internal correspondence in the form of staff emails.

Defendant's Motion For Summary Judgment #10, Napolitano Dec. ¶12.

With respect to the withheld IPM runs (Documents ##115 and 116), the Vaughn index provides no dates, or page lengths, or author.

## III.  DISCUSSION

It is perhaps best to begin with a general survey of the legal landscape in order to establish the context for the primary issue in this case.

### A.  Freedom Of Information Act

The Freedom of Information Act, 5 U.S.C. §552, is a revision of §3 of the Administrative Procedure Act, 5 U.S.C. §1002 (1964 ed.), which "was generally recognized as falling far short of its disclosure goals[.]"  *Environmental Protection Agency v. Mink*, 410 U.S. 73, 79 (1973).  In *Mink*, the Supreme Court recited the legislative intent of FOIA as declared by Congress: "It is the purpose

of the present bill...to establish a general philosophy of full agency disclosure

unless information is exempted under clearly delineated statutory language."

*Mink*, 410 U.S. at 80, n.6, quoting S.Rep.No.813, 89th Cong., 1st Sess., 5, p.3

(1965). The Court elaborated on the purpose of FOIA, stating:

> Without question, [FOIA] is broadly conceived. It
> seeks to permit access to official information long
> shielded unnecessarily from public view and attempts
> to create a judicially enforceable public right to secure
> such information from possibly unwilling official
> hands.

*Mink,* 410 U.S. at 80.

Despite this strong emphasis on extensive disclosure, the Court in *Mink*

also acknowledged the difficulty of balancing the competing interests involved:

> At the same time that a broad philosophy of 'freedom
> of information' is enacted into law, it is necessary to
> protect certain equally important rights of privacy with
> respect to certain information in Government files,
> such as medical and personnel files. It is also necessary
> for the very operation of our Government to allow it to
> keep confidential certain material, such as the
> investigatory files of the Federal Bureau of
> Investigation.

*Mink,* 410 U.S. at 80, n. 6, quoting S.Rep.No.813, 89th Cong., 1st Sess., 5, p. 3
(1965).

While claims of exemption from disclosure must be consistent with

"clearly delineated statutory language", *Mink,* 410 U.S. at 80, n. 6, quoting S.Rep.No.813, 89th Cong., 1st Sess., 5, p. 3 (1965), the Court also looks to "the reasons for exemption from the disclosure requirements in determining whether the Government has properly invoked a particular exemption" and "examine[s] the effect that disclosure would have on the interest the exemption seeks to protect." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 157 (1989). Furthermore, while recognizing that "[these] statutory exemptions are intended to have meaningful reach and application", the Court was careful to observe that "'these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of [FOIA]'" and that "[a]ccordingly, these exemptions must be narrowly construed[.]" *John Doe Agency*, 493 U.S. at 152 (quoting *Dept. of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).

Finally, "[t]he government bears the burden of demonstrating the applicability of a claimed exemption" and "the district court must determine *de novo* whether the queried agency has met this burden." *Church of Scientology International v. U.S. Dept. of Justice*, 30 F.3d 224, 228 (1 Cir., 1994) (internal citations omitted); Title 5 U.S.C. §552(a)(3)(b).

B.  <u>Exemption 5 - "Deliberative Process Privilege"</u>

13

Exemption 5 of FOIA provides that "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" are exempt from public disclosure. Title 5 U.S.C. §552(b)(5). Thus, "[a]gency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (*e.g.*, attorney-client, work-product, executive privilege) are protected from disclosure under Exemption 5." *Providence Journal Company v. U.S. Dept. of the Army*, 981 F.2d 552, 557 (1 Cir., 1992), citing *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799 (1984); *Mink*, 410 U.S. at 86.

Exemption 5 has also been said to incorporate a "deliberative process" privilege, which "covers 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Dept. of the Interior and Bureau of Indian Affairs v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001), quoting *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). The Court in *Klamath* explained the underlying reason for this privilege, stating:

> [t]he deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to

14

> enhance the quality of agency decisions...by protecting
> open and frank discussion among those who make them
> within the Government.

*Klamath*, 532 U.S. at 8-9 (internal citations and quotation marks omitted).

In *Providence Journal*, the First Circuit employed a two-part test for determining whether a document qualifies for exemption from disclosure under the deliberative process privilege. *Providence Journal*, 981 F.2d at 557.  First, the document must qualify as "predecisional" since:

> [t]he quality of a particular agency decision will clearly
> be affected by the communications received by the
> decisionmaker on the subject of the decision prior to the
> time the decision is made...However, it is difficult to see
> how the quality of a decision will be affected by
> communications with respect to the decision occurring
> after the decision is finally reached.

*Sears*, 421 U.S. at 151.

Thus, according to the First Circuit test,

> [a] document will be considered  "predecisional" if the
> agency can (i) pinpoint the specific agency decision to
> which the document correlates, (ii) establish that its
> author prepared the document for the purpose of
> assisting the agency official charged with making the
> agency decision, and (iii) verify that the document
> precedes, in temporal sequence, the decision to which
> it relates.

*Providence Journal,* 981 F.2d at 557 (internal citations and quotations omitted).

The "established view" is that "an agency may meet its burden of proof...by demonstrating that the preparer was not the final decisionmaker and that the contents confirm that the document was originated to facilitate an identifiable agency decision." *Providence Journal,* 981 F.2d at 559.

Second, a "predecisional" document must also be part of the "deliberative process" to be privileged under Exemption 5. *Providence Journal,* 981 F.2d at 559. The First Circuit's formulation is as follows:

> A predecisional document will qualify as "deliberative" provided it (i) formed an essential link in a specified consultative process, (ii) 'reflect[s] the personal opinions of the writer rather than the policy of the agency,' and (iii) if released, would 'inaccurately reflect or prematurely disclose the views of the agency.'

*Providence Journal,* 981 F.2d at 559 quoting *National Wildlife Federation v. Forest Serv.,* 861 F.2d 1114, 1118-9 (9 Cir., 1988).

However, the test as formulated is not so easy to apply, as a review of certain key cases discussing the deliberative aspect of Exemption 5 will demonstrate.

Starting with the discussion of Exemption 5 in *Mink,* the Supreme Court recognized that "[d]rawing ... a line between what may be withheld and what must be disclosed is not without difficulties." *Mink,* 410 U.S. at 86. Attempting to make distinctions, the Court concluded that solely factual matters severable

from deliberative portions of documents should be disclosed. *Mink*, 410 U.S. at 89 (footnote omitted)("Virtually all of the courts that have thus far applied Exemption 5 have recognized that it requires different treatment for materials reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other.")

The Court in *Montrose Chemical Corp. of California v. Train*, 491 F.2d 63, 66-67 (D.C. Cir., 1974) noted that the *Mink* dichotomy of purely factual versus deliberative materials had been presaged in some of its prior decisions,[7] but that the contours of the distinction had not been fully limned. Faced with the question of whether two documents compiled by EPA attorneys to summarize more than 9200 pages of record evidence taken in connection with EPA hearings on DDT must be disclosed, the Court found that application of the simple factual/deliberative distinction alone would not suffice to resolve the quandary. Although the documents at issue were essentially summaries of facts available in the public realm and so presumably discoverable under the purely

---

[7]

By way of example the Court quoted the case of *Bristol Myers Co. v. FTC,* 424 F.2d 935, 939 (D.C. Cir.), *cert. denied*, 400 U.S. 824 (1970) to the effect that "[p]urely factual reports and scientific studies cannot be cloaked in secrecy by an exemption designed to protect only 'those internal working papers in which opinions are expressed and policies formulated and recommended.'" *Montrose Chemical*, 491 F.2d at 67 (footnote and further citation omitted).

factual/deliberative dichotomy, the EPA argued that the compilation itself revealed the agency's internal deliberative process. Recognizing the merit of this position, the Court elaborated on the purely factual/deliberative distinction:

> Our solution rests on the interpretation of the purpose of exemption 5. If the exemption is intended to protect only deliberative materials, then a factual summary of evidence on the record would not be exempt from disclosure. But if the exemption is to be interpreted to protect the agency's deliberative process, then a factual summary prepared to aid an administrator in resolution of a difficult, complex question would be within the scope of the exemption.

*Montrose Chemical*, 491 F.2d at 68.

Thus, not only were the deliberative materials found to fall within the protection of Exemption 5, so, too, was the deliberative process.[8]

Five years after *Montrose Chemical*, the Second Circuit dealt with a FOIA case involving an "occupational safety and health standard for exposure to lead" promulgated by the Secretary of Labor.    *Lead Industries Ass'n, Inc. v.*

---

[8]

The following year the Supreme Court adopted similar reasoning, writing that:

> Exemption 5, properly construed, calls for "disclosure of all 'opinions and interpretations' which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be."

*N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975)(citations omitted).

*Occupational Safety and Health Admin.*, 610 F.2d 70, 73 (2 Cir., 1979). The case presented in a posture fairly comparable to the one at bar: While review of the new standard was being sought in the Court of Appeals for the District of Columbia, the plaintiff, Lead Industries Association, Inc. ("LIA"), filed a FOIA action against the Occupational Safety and Health Administration ("OSHA") in the United States District Court for the Southern District of New York seeking documents relating to the development of the new standard.[9]  The primary documents in dispute were two draft reports authored by outside consultants.

The Second Circuit framed the issue as being "the problem presented when a party to agency rule-making seeks disclosure of documents submitted to the

---

[9]

The Second Circuit was plainly displeased with the simultaneous litigation, pointedly writing:

> Convenience would clearly have been served by LIA's bringing this proceeding in the District Court for the District of Columbia. While that court initially would have known no more about the case than the District Court for the Southern District of New York, there would have been opportunities for discussion and coordination with the Court of Appeals, e. g., on scheduling, that were foreclosed by bringing the action in the Southern District of New York. Even more important any appeal in the FOIA action could have been heard by the same panel reviewing the lead standard, with great savings in judicial time and resources, as well as savings to the parties. We cannot fathom why the defendants did not move for transfer under 28 U.S.C. s1404(a), as was ordered in *Ferri v. United States Department of Justice*, 441 F. Supp. 404 (M.D. Pa. 1977), on facts less compelling than here. If there should again be a case in this circuit where disclosure under FOIA is avowedly sought in aid of a review proceeding in another circuit, the district court should seriously consider a stay pending a FOIA application to the reviewing court or a transfer of its own motion to a district court in that circuit if this would be permissible.

*Lead Industries Ass'n, Inc.*, 610 F.2d at 79 (footnotes omitted).

agency by its staff or outside consultants to assist it in rendering an informed decision" based upon the record developed in the course of the rule making. *Lead Industries Ass'n, Inc.*, 610 F.2d at 83. The concern was that "disclosure of factual portions of the report may reveal the deliberative process of selection." *Lead Industries Ass'n, Inc.*, 610 F.2d at 83 (citation omitted). Thus, "[w]hether a particular document is exempt under (b)(5) depends not only on the intrinsic character of the document itself, but also on the role it played in the administrative process." *Lead Industries Ass'n, Inc.*, 610 F.2d at 80 *citing Montrose Chemcial,* 491 F.2d at 68 (other citation omitted).

The Court articulated its view of Exemption 5 as it had evolved in case law to date:

> We believe the proper rule, consistent with *Mink* and the other Supreme Court cases and most of the lower court decisions, notably *Montrose Chemical Corp. v. Train*, *supra*, and *Mead Data Central, Inc. v. United States Department of Air Force*, 184 U.S.App.D.C. 350, 368-69, 566 F.2d 242, 260-61 (D.C.Cir.1977), is this: If the factual materials are "inextricably intertwined" with policy making recommendations so that their disclosure would "compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5," *Mink*, *supra*, 410 U.S. at 92, 93 S.Ct. at 838, the factual materials themselves fall within the exemption. *See also* Attorney General's Memorandum on the 1974 Amendments to the Freedom of

Information Act 14 n. 8 (1975).

*Lead Industries Ass'n, Inc.*, 610 F.2d at 85.

The District Court was found to have been correct in refusing to order disclosure of the bulk of the reports.  With respect to those portions that the lower court ordered divulged, however, the Court of Appeals found that "instead of merely combing the documents for 'purely factual' tidbits, the court should have considered the segments in the context of the whole document and that document's relation to the administrative process which generated it." *Lead Industries Ass'n*, 610 F.2d at 86.  To the extent that disclosure of parts of the reports exposed the deliberative process by virtue of the summaries revealing which facts were deemed important in the rule-making record, the Second Circuit concluded that such disclosure should not have been ordered. *Lead Industries Ass'n, Inc.* 610 F.2d at 85-86.

In 1987 the D.C. Circuit summarized the legal development of Exemption 5 under FOIA from the time when courts only distinguished between so-called "factual" and "deliberative" materials to the refinement of recognizing that it was the deliberative process which Congress intended to protect.  "[T]he key question in Exemption 5 cases became whether the disclosure of materials would

expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Dudman Communications Corp. v. Department of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir., 1987).

This latter approach was followed in affirming the lower court's decision to withhold as exempt "a preliminary draft of a historical work prepared and published by the Department of the Air Force." *Dudman Communications Corp.*, 815 F.2d at 1566, 1569.  The Appeals Court determined that the release of the preliminary draft would, when compared with the final version, reveal the editorial judgments of the Air Force and so "stifle the creative thinking and candid exchange of ideas necessary to produce good historical work." *Dudman Communications Corp.*, 815 F.2d at 1569.

In *Wolfe v. Department of Health and Human Services*, 839 F.2d 768, 769 (D.C. Cir., 1988), members of a Public Citizen Health Research Group made FOIA requests for "records which indicate what actions have been completed by the Food and Drug Administration ("FDA") but which await final decision or approval by the Secretary of Health and Human Services ("HHS") or the Office of Management and Budget ("OMB")."  Prefacing its ultimate decision, the D.C.

Circuit wrote an exegesis on the deliberative process aspect of Exemption 5

which shall be quoted at length:

> This case turns, therefore, on whether or not the information requested is deliberative--that is "whether it reflects the give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866; *see also Sears*, 421 U.S. at 150, 95 S.Ct. at 1516 (privilege focuses on documents which reflect process by which governmental decisions and policies are formulated).
>
> It is not possible to resolve whether the information is deliberative by characterizing it, as plaintiffs do, as merely involving a factual request for dates and titles. Exemption 5 disputes can often be resolved by the simple test that factual material must be disclosed but advice and recommendations may be withheld. *Mead Data Cent.*, 566 F.2d at 256. Indeed the fact/opinion distinction "offers a quick, clear, and predictable rule of decision," for most cases. But "courts must be careful not to become victims of their own semantics." *Id.* In some circumstances, even material that could be characterized as "factual" would so expose the deliberative process that it must be covered by the privilege. *Id.* We know of no case in which a court has used the fact/opinion distinction to support disclosure of facts about the inner workings of the deliberative process itself.
>
> The Supreme Court recognized this when it approved the fact/opinion distinction. In *EPA v. Mink* the Court required disclosure of "purely factual material contained in deliberative memoranda" which was "severable from its context" *Mink*, 410 U.S. at 88, 93 S.Ct. at 836; *Dudman Communications v. Department of*

> *Air Force*, 815 F.2d 1565, 1568 (D.C. Cir.1987); *see also Ryan v. Dep't of Justice*, 617 F.2d 781, 791 (D.C. Cir.1980) (requiring disclosure of facts only if they "do not reveal the deliberative process and are not intertwined with the policy-making process"); *accord Montrose Chem. Corp. v. Train*, 491 F.2d 63, 68 (D.C. Cir.1974) (disclosure of factual summaries made in preparing final agency opinion "would be the same as probing the decision-making process itself."). These cases illustrate that this court cannot mechanically apply the fact/opinion test. Instead, we must examine the information requested in light of the policies and goals that underlie the deliberative process privilege.
>
> Moreover, in *Grumman*, the Supreme Court specifically noted that the context in which the documents were used itself "serve[d] to define the document." *Grumman*, 421 U.S. at 170, 95 S.Ct. at 1493. Thus the first step in determining whether disclosure would harm the deliberative process is to examine the context in which the materials are used.

*Wolfe*, 839 F.2d at 774.

The Court found that when the requested documents were considered within the framework of the FDA approval process, it would be possible to glean not only what proposals had been suggested, but whether those proposals had been approved or disapproved at a number of levels of review within the relevant agencies. *Wolfe*, 839 F.2d at 774. Put another way, within the FDA approval process, the very act of forwarding a proposal on to the next level was

*de facto* an acceptance whereas the failure to forward constituted a rejection of the proposal. As a consequence, "the information sought will generally disclose the recommended outcome of the consultative process at each stage of that process, as well as the source of any decision not to regulate." *Wolfe*, 839 F.2d at 775 (footnote omitted). The Circuit Court held that Exemption 5 was enacted to protect agencies from "just such a fishbowl." *Wolfe*, 839 F.2d at 776.

In one of the primary cases upon which the EPA relies, the Ninth Circuit affirmed the District Court's decision denying the National Wildlife Federation's ("National Wildlife") FOIA requests to the United States Forest Service ("Forest Service"). *National Wildlife Federation v. United States Forest Serv.*, 861 F.2d 1114 (9 Cir., 1988). The documents sought included working drafts of plans for a national forest, working drafts of an environmental impact statement relating to the national forest plan, and "'previews' of the drafts, which are comments, criticisms, and recommendations made by the Land Management Planning Office." *National Wildlife Federation*, 861 F.2d at 1115. The Court adopted a process-oriented "approach to analyzing claims of exemption under exemption 5, which looks to the underlying purpose of the deliberative process privilege, [which] is consistent with the 'flexible, common-sense approach' to exemption

5 that has been approved by the Supreme Court." *National Wildlife Federation*, 861 F.2d at 1119 (citation omitted).

The subject documents in *National Wildlife Federation* included "tentative opinions and recommendations of Forest Service employees ... [which] are themselves the *essence* of the deliberative process." *National Wildlife Federation*, 861 F.2d at 1121 (emphasis in original). In addition,

> Projected levels of various activities expected from implementation of the Forest Plans, the estimated costs and benefits associated with each activity, and estimates as to the Forest's maximum capacity for sustaining each activity are similarly opinions that figure heavily in the formulation of Forest Service policies. While these opinions might be characterized as opinions on facts or the consequences of facts, such a distinction, as we discussed previously, is not the touchstone for determination of the applicability of exemption 5. As long as these opinions reveal the issues that the Forest Service considers important and provide telling clues as to the Forest Service's proposed course of action in addressing the conflicting demands on the Forest's resources, they are as much a part of the deliberative process as opinions on pure matters of law or policy.

*National Wildlife Federation*, 861 F.2d at 1121.

In sum, the Court concluded that the withheld materials "constitute[d] the 'give-and-take' of the Forest Service and represent the mental processes of the agency in considering alternative courses of action prior to settling on a final

plan." *National Wildlife Federation*, 861 F.2d at 1122.  As such, the documents

fell within the coverage of Exemption 5.

In the final case upon which the EPA places great emphasis, a newspaper

reporter filed a FOIA request seeking "certain cost estimates prepared by Navy

officials in the course of the Navy's selecting homeports for ships in a new

battleship group." *Quarles v. Department of the Navy*, 893 F.2d 390, 391 (D.C.

Cir., 1990).  It had been originally planned that one new battleship group would

be deployed from a single designated U.S. harbor on the Gulf of Mexico. *Quarles*,

893 F.2d at 391.  The Navy

> convened a special study team, composed of
> representatives of various command and technical units,
> to evaluate seven finalist sites on operational, logistic,
> environmental and other criteria. The team's final
> report, "Gulf Coast Battleship Surface Action Group:
> Preferred Alternative Home Port Evaluation," also
> included the material disputed here-- cost estimates for
> each site, including the costs of land, ship berthing,
> dredging, buildings and facilities, and utilities.

*Quarles*, 893 F.2d at 391.

Following the submission of the final report, the Navy made the determination

to disperse the vessels as part of a larger overall plan among nine different ports

rather than to a single Gulf Coast homeport. *Quarles*, 893 F.2d at 391.

In discussing the contours of Exemption 5, the Court wrote as follows:

> Even when requested material is found to be factual, the courts have held it exempt where they were convinced that disclosure "would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Dudman*, 815 F.2d at 1568. With this second step, courts have sometimes allowed the withholding of factual summaries prepared by decisionmakers, *see Lead Industries Ass'n v. OSHA*, 610 F.2d 70, 85 (2d Cir.1979); *Washington Research Project v. HEW*, 504 F.2d 238, 250-51 (D.C.Cir.1974); *Montrose Chemical Corp. v. Train*, 491 F.2d 63 (D.C.Cir.1974), as of other factual materials. *See Wolfe*, 839 F.2d at 774 (protecting log showing routing path and dates of FDA recommendations, i.e., facts *about* the inner workings of the deliberative process itself); *Dudman* (protecting factual material in early drafts of an official history on grounds that disclosure would unduly reveal editorial judgments). But this additional inquiry has been used only to *expand* Exemption 5's protections. Otherwise, "the fact/opinion distinction 'offers a quick, clear, and predictable rule of decision,' for most cases." *Wolfe*, 839 F.2d at 774 (quoting *Mead Data I*, 566 F.2d at 256).

*Quarles*, 893 F.2d at 392 (emphasis in original).

The Court found that the cost estimates requested were shielded from disclosure because "[t]hey derive from a complex set of judgments--projecting needs, studying prior endeavors and assessing possible suppliers. They partake of just that elasticity that has persuaded courts to provide shelter for opinions

generally." *Quarles*, 893 F.2d at 392-393.  Moreover, credit was given to the Navy's attestation that to reveal the "analyses and estimates" included in the final study report would adversely impact researchers expressing their "candid opinions" in the future. *Quarles*, 893 F.2d at 393.

## C. <u>The Instant Case</u>

Having surveyed the cases so as to examine the law, the types of materials exempted as well as the contexts in which they were found to be protected by Exemption 5, it is time to apply that law to the facts at hand.

It became clear at the March 7th hearing that the pivotal question to be decided in this case is whether Documents ##115 and 116 must be produced to the plaintiff by the EPA.[10]  Document #115 consists of "IPM Run Outputs for two alternative MACT options" and is described as "5 computer output files, about 2 MB in total zipped size.  IPM run used to evaluate the MACT approach.  These runs were not relied upon by EPA in promulgating the CAMR."  (#10, Exh. A, Vaughn Index p. 68)  Document #116 consists of "IPM Run Outputs for Hg Trading Option" (mercury cap-and-trade), with 5 computer output files of approximately 2 MB each, and 2 spreadsheet files of approximately 6 MB each.

---

[10] The defendant indicated at the hearing that if it is ordered to release the subject IPM runs, its position with respect to other withheld documents listed in the *Vaughn* index may well change.

(#10, Exh. A, Vaughn Index p. 68)

There is no dispute that these IPM runs are predecisional. The issue is whether Documents ##115 and 116 are deliberative, or part of the deliberative process. The EPA takes the position that they are deliberative while AG Reilly disagrees. Because the initial materials submitted by the EPA, in particular the Napolitano Declaration, did not provide a sufficient, understandable factual basis upon which the Court could decide the issue,[11] an evidentiary hearing was scheduled in order to elucidate the facts more fully in layman's terms.

First, the facts as they have been developed are as follows:

In his declaration, Mr. Napolitano stated the following:

> 6.     IPM is a dynamic, linear-programming model that is used by EPA to examine the impacts of air pollution control policies in the power sector for sulfur dioxide..., nitrogen oxides... and mercury..., throughout the contiguous United States. Essentially, IPM finds the least-cost solution for the power sector for meeting projected electricity demand in regions across the country by taking into account environmental

---

[11]

On appeal,

> In reviewing a district court's judgment under the FOIA, we "must determine whether the district judge had an adequate factual basis for his or her decision" and, if so, we "must determine whether the decision below was clearly erroneous." *Church of Scientology v. United States Department of the Army*, 611 F.2d 738, 742 (9th Cir.1979) (*Scientology* ).

*National Wildlife Federation*, 861 F.2d at 1116; *Lame v. U.S. Dept. of Justice*, 767 F.2d 66, 70(3 Cir., 1985).

constraints and other economic or infrastructure constraints inherent to the power sector. In doing so, IPM provides projections for electricity generation characteristics, emissions, emissions control installations, fuel use, and other power sector impacts.

7.      IPM has been used for evaluating the economic and emission impacts of environmental policies for over a decade. In addition to using IPM to develop environmental policies, EPA also uses IPM to provide analytical support for proposed rulemaking. Use of IPM in the context of policy development or proposed rulemaking typically involves examining a number of IPM runs that vary, for example, in control levels, timing of control levels, or assumptions about the effectiveness or availability of control technology. Information from these runs is used to inform policy or rule development.

8.      EPA conducted a number of IPM runs to evaluate the MACT and cap-and-trade approaches. All runs upon which EPA relied in developing CAMR were disclosed in Docket No. OAR-2002-0056 for the proposed mercury rulemaking.

*****

17.     Documents 115 and 116 both consist of IPM runs. 115 consists of IPM Run Outputs for two alternative MACT options and 116 consists of IPM Run Outputs for the Hg Trading option. These runs were not relied upon by EPA in promulgating the CAMR. As noted above at paragraphs 6 and 7, IPM is a cost-benefit analysis used by the Agency to evaluate cost impacts of proposed rulemaking. These documents are pre-decisional because development of the CAMR, including IPM analysis, was on-going at the time of these runs;

31

the runs were created before the publication of the rule in May 2005 and EPA's underlying decision-making process is ongoing. Each run of the IPM, in its choice of specific variables and use of certain projections, reveals issues that CAMD considered important in the rulemaking process. Release of runs not relied on by the Agency would provide clues to the Agency's deliberations prior to rulemaking. Release of this information could compromise future Agency deliberations and cause public confusion about the reasons behind EPA's decision-making process. There is no segregable factual information that could be released without revealing protected pre-decisional and deliberative information at the expense of EPA's decision-making process.

Defendant's Motion For Summary Judgment #10, Napolitano Dec. ¶¶6, 7, 8, 17.

Mr. Napolitano's statements were amplified by the testimony of Kevin Culligan, a supervisor in the program development branch of CAMD, during the evidentiary hearing held on March 22, 2006. Mr. Culligan is a fourteen-year, career employee of the EPA who has held positions of increasing responsibility during his tenure. At present Mr. Culligan supervises a group of thirteen people who analyze power sector and market-based rules; the group also runs IPM for the agency.

Mr. Culligan started working with IPM in 1999. As he described it, IPM is a computer model that models how the power sector will react to various environmental regulations or legislation. It is used by the industry to check all

32

kinds of things that will affect the power sector. The EPA does its runs through a contractor, ICF, which has versions of IPM that it uses for both sets of clients, the government and private industry. There is an EPA version of IPM based on information that the agency has developed, and other IPM versions based on assumptions inputted by industry. The EPA has granted requests by others to use its version of IPM; the EPA version is something that anyone can use, it just costs them money to do so. In short, the model itself is in the public domain.

According to Mr. Culligan, what the EPA does is to plug in (or input) constraints into the model which are, in essence, projections of what the future will look like, how much electricity will be needed, what are fuel prices going to be, etc. In the process of doing the "runs" with these constraints plugged in, the model will output how it thinks the power sector will meet all those constraints, i.e., will it build new plants, will it use existing plants more, will it convert from coal to gas or from gas to coal, and so on. Many of the constraints used by the EPA in running IPM relate to costs.

Mr. Culligan testified that the whole point in using the model is to vary the inputs to see what impact varying those inputs has. Typically a "base case" will be run and then constraints are inputted to determine how that base case is affected, i.e., how much is pollution reduced, how much does it cost to reduce

the pollution, what is different about the power sector, etc. IPM can also be run to make comparisons in regulatory cases, for example, telling the model to control mercury to a certain amount and then look at what happens if gas costs more than was considered in the standard case, what if there is more electric demand than in the standard case, what if technology works better in the standard case than originally thought, etc.

There is no typical number of IPM runs that are done in a rule-making. EPA will make a proposal and then do IPM runs to support that proposal. After receiving comments on the proposal, EPA will often use IPM to respond to comments before finalizing the rule. Mr. Culligan could not think of any power sector rulemaking since the mid-1990s that had not used IPM. Typically at every point in the rulemaking from proposal to final, EPA will look at the runs that were done and determine which ones directly support or justify the conclusions being reached. Those runs are put in the docket for the rulemaking and made publicly available; other IPM runs would likely not be made available.

Before using IPM, Mr. Culligan's staff undertakes extensive research into the pertinent literature and peer reviews, as well as information from the Department of Energy, to determine the general assumptions to be input into the model. When doing the actual rulemaking itself, the questions asked of IPM

depend on the kind of regulation the EPA is trying to do. For example, if the EPA is looking at capping mercury emissions in the power sector, some analysis would be done to determine what a reasonable cap may be, and then that cap would be run for IPM to test it. That IPM run may in turn give cause to test other variables. The runs themselves do not determine what the rule will be, they provide data that the EPA then confers upon and makes judgments about in order to come up with a proposed rule.

In Mr. Culligan's opinion, if the EPA released every IPM run from a rulemaking he would be less likely to do runs and would think more carefully if every run he did had to be supported and explained. From his perspective such disclosure would take away a powerful analytic tool because IPM would not be used in such an exploratory fashion. Initially Mr. Culligan directly related these concerns with the need for putting IPM runs on the docket, not to producing them in response to a FOIA request. He thereafter did testify, however, that regardless of the reason why he had to release them, he would still think twice before he would do the runs. Mr. Culligan testified that it would be his preference to make all IPM runs available to the public if he knew that they would have to be produced in response to a FOIA request.

The mercury rulemaking was finalized while Mr. Culligan was serving as

35

the acting branch chief, so he was familiar with it. The EPA had appointed a working group to help in the development of the rule. One of its functions was to assist the EPA in determining inputs to be put into the IPM. The EPA conducted IPM runs on both the MACT and cap-and-trade options in the mercury rulemaking[12] and made a run on each option available to the public during the proposal and supplemental proposal stages. When the cap-and-trade rule was finalized, they released additional cap-and-trade runs.

The harm resulting from releasing the IPM runs in #115 and #116 in Mr. Culligan's view is that if he or others doing the IPM runs knew that they would later have to release them, they would think twice before doing them. It would result in less robust rulemaking plus it would mean extra work to back up and justify everything that they did to investigate.

With the facts with respect to the IPM established, perhaps it is best to return briefly to the case law and compare the types of information which have been held to within the "deliberate process privilege" and therefore withheld to the computer runs at issue in the instant case.    The following types of documents have been found to be protected:

---

[12]

The individual who actually did the IPM runs for the mercury rulemaking no longer works for the EPA.

(1)     A "factual summary prepared to aid an administrator in resolution of a difficult, complex question" because the preparers of the summary "...were exercising their judgment as to what record evidence would be important to the Administrator in making his decision." *Montrose Chemical,* 491 F.2d at 68.

(2)     "[F]actual materials [which] are 'inextricably intertwined' with policy making recommendations so that their disclosure would 'compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5,' *Mink, supra,* 410 U.S. at 92, 93 S.Ct. at 838." *Lead Industries Ass'n, Inc.,* 610 F.2d at 85. Parts of reports which exposed the deliberative process by virtue of the summaries revealing which facts were deemed important in the rule-making record. *Lead Industries Ass'n, Inc.,* 610 F.2d at 85-86.

(3)     A preliminary draft, which, when compared with the final version, would reveal the editorial judgments of the agency and so "stifle the creative thinking and candid exchange of ideas necessary to produce good historical work." *Dudman Communications Corp.,* 815 F.2d at 1569.

(4)     "[R]ecords which indicate what actions have been completed by [an agency, i.e., the FDA] but which await final decision or approval by [a cabinet-level Secretary, i.e., the Secretary of Health and Human Services] because "the information sought will generally disclose the recommended outcome of the consultative process at each stage of that process, as well as the source of any decision not to regulate." *Wolfe,* 839 F.2d at 769, 775.

(5)     Working drafts of plans for a national forest, working drafts of an environmental impact statement relating to the national forest plan, and "'previews' of the drafts, which are comments, criticisms, and recommendations made by" another agency because "[t]hey constitute the 'give-and-take' of the [agency] and represent the mental processes of the agency in considering alternative courses of action prior to settling on a final plan" or are "...opinions,

recommendations, and queries aimed at improving the draft[s]." *National Wildlife Federation*, 861 F.2d at 1115, 1122, 1123.

(6)    "[C]ost estimates prepared by Navy officials in the course of the Navy's selecting homeports for ships in a new battleship group" because cost estimates "derive from a complex set of judgments - projecting needs, studying prior endeavors, and assessing possible supplier" and "partake of just that elasticity that has persuaded courts to provide shelter for opinions generally. *Quarles*, 893 F.2d at 391, 392, 393.

Based on the facts of this case and the case law, the issue at hand is not easily decided. Strong argument can be made on both sides. At bottom, the decision is based on where one draws the line between protected and non-protected material. However, having considered this matter at length, the Court concludes that Documents ##115 and 116 are not covered by Exemption 5 because they are not deliberative materials nor are they part of the deliberative process to the extent that they are subject to the exemption as it has been construed. Rather, IPM runs are investigative tools that generate raw data or empirical evidence used by the EPA in its rulemaking.

Put another way, viewed on the deliberative/fact continuum, the Court finds that the requested IPM runs fall "closer to fact and would not reveal the agency's protectable thought processes." *Assembly of the State of California v. United States Department of Commerce*, 968 F.2d 916, 922 (9 Cir., 1992); *see also*

38

*Carter v. United States Department of Commerce*, 307 F.3d 1084, 1090-1091 (9 Cir., 2002). There are several reasons why the Court reaches this conclusion.

First, it is acknowledged that the information which is inputted into an IPM run results from research and discussion within the EPA.[13] Release of the requested IPM runs would, *a fortiori*, reveal the inputs and, consequently, to some extent the agency's thought process. But this is true of any investigation by which an agency seeks facts - knowing what questions are asked or which witnesses are interviewed reveals aspects of what the investigator deemed important or worthy of consideration. In a larger sense everything could be considered deliberative. But lines must be drawn or the narrow exemption overwhelms the statutory intent. *See, e.g., Petroleum Information Corp. v. United States Department of the Interior*, 976 F.2d 1429, 1436 (D.C. Cir., 1992)("Our inquiry whether the agency has plausibly demonstrated the involvement of a policy judgment in the decisional process relevant to the requested documents serves a further, complementary purpose; it enables us
to contain Exemption 5 within its proper scope.") It is well to recall again that

---

[13]

As noted at the evidentiary hearing, the Court sees a distinction between e-mails and memoranda generated by, between or among agency employees discussing the inputs prior to an IPM run and the results of the run itself.

the deliberate process exemption, like all exemptions to FOIA, must be "narrowly construed[.]" *John Doe Agency,* 493 U.S. at 152.

Looking at IPM in the context of the rulemaking as a whole, in the Court's view it is used essentially as an investigative technique utilized to generate raw data. It is those facts which then serve as the grist for the agency's decisionmaking, that data which is debated and discussed in formulating the rule. Releasing the results of IPM runs simply would not "'expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.'" *Quarles,* 893 F.2d at 392 quoting *Dudman Communications Corp.,* 815 F.2d at 1568. IPM results "reveal nothing about the process informing" the ultimate mercury rulemaking judgment of the EPA. *Assembly,* 968 F.2d at 922.

Indeed, in his testimony, Mr. Culligan expressed no concern that the release of the IPM runs would impact either the give-and-take or other candid discussion within his agency; his concerns involved justifying the agency's action in deciding to do the runs, as explained, *infra.* On the basis of evidence adduced on the record of this case, the Court finds that release would have *de minimus,* if any, effect in "stifl[ing] the creative thinking and candid exchange of ideas

necessary..." to an agency's functioning.   *Dudman Communications Corp.*, 815 F.2d at 1569.

Second, as noted, *supra,* the EPA version of IPM with its intrinsic assumptions and information is available for use by the public; the internal workings of IPM are not in any way deliberative.  Further, in this case, the initial modeling runs were reported to the stakeholder group and published.  The IPM runs that directly supported the rulemaking were also made available to the public because they were put on the docket.   The EPA has made no attempt to explain why Documents ##115 and 116 should be considered deliberative, while the IPM runs it chose to publish are not.[14]  Although it is asserted that the IPM runs in Documents ##115 and 116 were not relied upon by the agency in promulgating the rule, from all that appears, neither were the initial modeling runs.  That the EPA would prefer to make public only those IPM runs it chooses to publish on the docket simply is not a reason to withhold the materials when faced with a FOIA request.  *Compare Carter*, 307 F.3d at 1092.

In his testimony, Mr. Culligan did not appear readily to distinguish

---

[14]

As in the Ninth Circuit cases, this decision is not being based on any notion of waiver. *See Assembly*, 968 F.2d at 922-923 and footnote 5; *Carter*, 307 F.3d at 1091.  Rather, consideration is given to the disclosure of other IPM runs "only to determine whether the disclosure of these [IPM runs] would expose the decision-making process any more than it had already been disclosed." *See Assembly*, 968 F.2d at 922-923 and footnote 5; *Carter*, 307 F.3d at 1091.

between publishing IPM runs on a rulemaking docket and producing them in response to a FOIA request. His primary focus was on the burden of having to explain and justify why certain runs were undertaken if they were made public. While the concern of having to do additional work to back up and justify everything that the EPA did to investigate may be relevant when putting materials on a rulemaking docket, it simply does not appertain when producing materials under FOIA. Moreover, it is not a concern germane to the inquiry of whether Documents ##115 and 116 "bear on the formulation or exercise of agency policy-oriented *judgment.*" *Petroleum Information Corp.*, 976 F.2d at 1435 (emphasis in original; citations omitted).

Having carefully weighed all of the pertinent considerations, the Court finds that Documents ##115 and 116 are not exempt from production under Exemption 5 of FOIA.[15]

---

[15] It is clear from the foregoing discussion to the case law has taken Exemption 5 well beyond the plain words of the statute. It is to be recalled that the statutory language creating Exemption 5 of FOIA provides that "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" are exempt from public disclosure. Title 5 U.S.C. §552(b)(5). Applying the words of the statute to the instant case, the Court is of the view that in civil litigation in which the rulemaking was an issue, the validity of the conclusions reached by the EPA would have to be presented by expert testimony and the EPA would have to serve an expert report pursuant to Rule 26(a)(2), Fed. R. Civ. P. The two runs at issue would have to be disclosed in the report if the expert was made aware of them because, in that circumstance the runs would have been "considered" by the expert in reaching his conclusions even if the expert ultimately did not rely on them. The Advisory Notes to the 1993 amendments to Rule 26 make this point quite clearly. They provide:

> The report is to disclose the data and other information considered by the
> expert and any exhibits or charts that summarize or support the expert's

### IV. Conclusion

For the reasons stated, the final judgment is this case shall provide that Documents ##115 and 116 be produced pursuant to the plaintiff's FOIA request. Further action on the plaintiff's FOIA request shall be, and hereby is, PRETERMITTED pending further consideration by the defendant of its position with respect to the remaining requested documents. Counsel are directed to confer and to file a joint status report *on or before the close of business on Monday, May 1, 2006* indicating what issues, if any, remain for decision by the Court.

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

April 13, 2006.

---

opinions. Given this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions - whether or not ultimately relied upon by the expert - are privileged or otherwise protected from disclosure when such persons are testifying or being deposed.

*See also Suskind v. Home Depot Corp.,* 2001 WL 92183 * 1-2 (D. Mass., 2001).

43